UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Chapter 11
                                .
OWENS CORNING, *et al.*,        .    Case No. 00-03837(JKF)
                                .    Jointly Administered
         Debtors.               .
                                .    June 19, 2006 (10:06 a.m.)
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1        THE COURT: Good morning.

2        MR. PERNICK: Good morning, Your Honor.

3        THE COURT: I apologize for being late.  I was

4   talking with one of my colleagues and not paying attention to

5   the time, so, I was on another floor.  This is the matter of

6   Owens Corning, Bankruptcy No. 00-3837.  The participants I

7   have listed by phone: Kate Stickles, Gary Pachulski, Sara

8   Gooch, Andy Chang, James McClammy, Denise Wildes, Gordon

9   Harriss, David Parsons, Christine Daley, Stuart Kovensky,

10  Judy Liu, Bruce White, Christine Jagde, James Gadsden,

11  Christena Lambrianakos, Dallas Albaugh, John Shaffer, Sara

12  Lorber, Tracy Essig, John Christy, and James Gibb.  I'll take

13  entries in court, please.

14       MR. PERNICK: Good morning, Your Honor.  Norman

15  Pernick on behalf of the debtors.

16       MR. RAICHT: Good morning, Your Honor.  Geoff

17  Raicht, Sidley, Austin on behalf of the debtors.

18       MR. STEEN: Good morning, Your Honor.  Jeffrey

19  Steen, S-t-e-e-n, Sidley, Austin on behalf of the debtors.

20       THE COURT: One second, wait one second.  Okay.  I

21  think I saved it.  These computers like to do automatic

22  updates, and there's nothing you can do to stop it, and then

23  it gets - you get this blue screens of death, and I thought

24  that's what was happening.  Mr. Steen, I'm sorry.

25       MR. STEEN: Thank you, Your Honor.

```
 1              THE COURT: Go ahead.

 2              MR. EISENBERG: Good morning, Your Honor.  Adam

 3    Eisenberg, Saul Ewing, on behalf of the debtors.

 4              MR. LOCKWOOD: Peter Lockwood, Caplin & Drysdale, on

 5    behalf of the Asbestos Claimants Committee, Your Honor.

 6              MR. RESSLER: Howard Ressler, Anderson, Kill &

 7    Olick, on behalf of the Official Representatives of the

 8    Bondholders and the Trade Creditors.

 9              MR. KRESS: Good morning, Your Honor.  Andrew Kress,

10    Kaye Scholer, on behalf of the Futures Representative.

11              MR. KRUGER: Good morning, Your Honor.  Lewis Kruger

12    and Ken Pasquale on behalf of various clients.

13              MR. GRAY: Your Honor, good morning.  Tony Gray,

14    Brown, Rudnick Berlack, Israels, for the Ad Hoc Committee of

15    Preferred and Equity Security Holders.

16              MR. KLAUDER: Good morning, Your Honor.  Dave

17    Klauder for the United States Trustee.

18              MR. SUDELL: Good morning, Your Honor.  William

19    Sudell of Morris, Nichols, Arsht & Tunnell for the Official

20    Committee of Unsecured Creditors.

21              MS. ESKIN: Good morning.  Marla Eskin, Campbell &

22    Levine, for the Asbestos Claimants Committee.

23              MS. ZIEG: Good morning, Your Honor.  Sharon Zieg of

24    Young, Conaway, Stargatt & Taylor, on behalf of the Futures

25    Representative.
```

1          MR. COBB: Good morning, Your Honor.  Richard Cobb,

2    Landis, Rath & Cobb, on behalf of Credit Suisse First Boston,

3    Caymans Branch, as agent for the Bank Group.  Your Honor on

4    the phone is Judy Liu of Weil Gotshal and Manges, my co-

5    counsel.

6          MR. CASARINO: Good morning, Your Honor.  Marc

7    Casarino of White & Williams, LLP, on behalf of Century

8    Indemnity Company.

9          MR. GIBBONS: And, Your Honor, Joseph Gibbons of

10   White & Williams on behalf of Century Company.

11         MR. MONACO: Good morning, Your Honor.  Frank

12   Monaco, local counsel for the designated members.

13         MS. CURRIER: Good morning, Your Honor.  Teresa

14   Currier from Klett Rooney here on behalf of J.P. Morgan, and

15   I'm also here with Mark Thompson and Alice Eaten from Simpson

16   Thatcher, also representing J.P. Morgan.

17         THE COURT: All right, thank you.  Mr. Pernick.

18         MR. PERNICK: Yes, Your Honor.  Your Honor, you were

19   kind enough to enter a number of orders, which I'll just put

20   on the record and to make sure that they comport with your

21   records.  You entered an order in item number 1, dealing with

22   that omnibus objection (in part), that's the thirty-ninth

23   omnibus objection; number 2 (same, in part), that's the

24   fortieth; 3 (in part), that's also an omnibus objection;

25   number 4 (in part) is an omnibus objection; and number 5 (in

1   part) is an omnibus objection; number 6, which was the St.

2   Joseph's asbestos property damage claims objection; number 7,

3   which was the Praxair settlement, another property damage

4   claim settlement; number 8, OCI, was another property damage

5   settlement; number 9 dealt with miscellaneous property damage

6   claims; 10, which was the Shintech settlement; 11, which was

7   the Tobacco settlement; 12, which was E&Y supplemental

8   retention; and 15 dealt with the syndication agreement under

9   seal.  We also have continued, item number 16, which is the

10  equity commitment agreement motion.  That's for Friday.  I

11  believe it starts at 9:30 and it's in Pittsburgh.

12              THE COURT: All right.

13              MR. PERNICK: And then continued as to certain

14  claims that's going to the July 24th hearing, number 1, 2, 3,

15  4, and 5.  So that leaves us with three items going forward:

16  number 13, which is the revised voting procedures; number 14,

17  which deals with the plan support agreement motion; and

18  number 17, which is a status conference on the Committee's

19  professionals, and what I'd suggest is on number 13, the

20  voting procedures, we just have a redlined and a clean form

21  of order to hand up that I believe has been agreed to by

22  everybody and is consensual.

23              THE COURT: On which item?

24              MR. PERNICK: On number 13, the revised voting

25  procedures.

1          THE COURT: Thirteen, okay, thank you.

2          MR. PERNICK: And then we'll take number 17 to the

3     extent the Court would like it, which is the status

4     conference, and then number 14, the plan support agreement

5     motion.  That's the one that's actually going probably have

6     the most discussion.

7          THE COURT: All right.

8          MR. PERNICK: Mr. Eisenberg is going to handle

9     number 13, Your Honor.

10          THE COURT: Thank you.

11          MR. EISENBERG: Good morning, Your Honor, Adam

12    Eisenberg, Saul Ewing, on behalf of the debtors.  Your Honor,

13    I have a fair amount of paper here.  If it's helpful to the

14    Court, I could hand up a clean and a blackline copy.

15          THE COURT: Sure.  Thank you.

16          MR. EISENBERG: Your Honor, I think I can be pretty

17    brief because I think we've resolved all our issues at this

18    point.  Briefly, we were in front of the Court back in April

19    on this matter.  Your Honor had made a couple of comments.

20    We have made those changes as directed by the Court.  We have

21    also made a series of changes as required by the new plan

22    that was filed, for example, now we have Class A-12, which is

23    equity voting, et cetera.  So what we've done is on May 22nd,

24    Judge, we filed a clean and a blackline version of these

25    documents.  We only received two responses, one informal and

1    one formal.  The one objection to the voting procedures that

2    was actually filed, was by the Bank of New York, which is

3    indenture trustee with respect to the NIPS.  We also received

4    some comments from Tony Gray, who is here on behalf of the Ad

5    Hoc Equity Committee.  Your Honor, we worked out those

6    issues.  Those changes which had been agreed to by the

7    relevant parties are in the blackline.  Judge, the blackline,

8    just so it's clear, reflects the changes for the May 22nd

9    document to the one, the clean that I just handed up this

10   morning.

11            THE COURT: Okay.

12            MR. EISENBERG: Unless Your Honor has any questions,

13   I would just leave it at that, and ask that the Judge issue

14   this order.

15       THE COURT: What's the resolution with respect to the

16   issues that were raised by Mr. Gray with respect to the NIPS

17   issue?

18       MR. EISENBERG: Your Honor, what we did is the NIPS are a

19   little bit of a hybrid, Your Honor, and what we did is those

20   NIPS vote in terms of units or shares.  So, if I have five

21   NIPS, I vote five.  So the documents have been changed to

22   reflect that, but we also need a conversion factor, Judge, to

23   convert those units of NIPS into dollars for purposes of

24   tabulation under the plan.  So what we've done is the NIPS

25   convert at $50 per NIPS with all rights reserved if at some

1  future date that turns out to be disputed.  We do not think

2  it's very likely that that will occur.

3          THE COURT: So the $50 is agreed upon?

4          MR. EISENBERG: It's agreed upon, but we reserved

5  the rights of the parties to argue differently later, and I

6  could get into the reason for that if you'd like.  It's

7  actually very simple, but it's a little - Well, it's not so

8  simple, but it gets into the issue of the number of NIPS

9  versus the total debt being voted.  The actual offering

10  memorandum talks about a liquidation preference vis-a-vis the

11  NIPS at $50 per NIP, and that's what we put in the documents,

12  with the reservation of rights for parties to object later.

13  We think it is very unlikely that those issues are going to

14  come up.

15          THE COURT: All right.  Has everyone seen the

16  modified version of this order?

17          MR. EISENBERG: Your Honor, the Ad Hoc Committee has

18  seen it, the Bank of New York has seen it.  I've left some

19  copies on counsel table this morning, but the only parties

20  who had real interest in these issues have seen these new

21  drafts and, I think I can represent, are okay with it.

22          THE COURT: All right, Mr. Gray, any responses?

23          MR. GRAY: Your Honor, thank you.  I have no further

24  response, Your Honor.  Our comments, we believe, are

25  reflected in the revisions before you.  One other point is

1    that with respect to Class A-12, there's now a clarification

2    that the holders, only the holders of the existing Owens

3    Corning common stock will be voting in Class A-12.  That's

4    just a clarification to make sure that that's reflected in

5    both the order and in the ballots.

6              THE COURT: All right.

7              MR. GRAY: Your Honor, we are still in the process

8    of working with the debtors with respect to the plan and the

9    disclosure statement to make sure that those items comport

10   with the settlement term sheet that the parties entered into

11   last month, and so, the Ad Hoc Committee does reserve it's

12   rights as to those items, but with respect to what's before

13   you, we have no objection to the Court entering the proposed

14   plan solicitation and voting order.  Unless Your Honor has

15   any other questions.

16             THE COURT: Okay, I'm not sure who's -

17             MR. GRAY: Thank you.

18             THE COURT:  - representing the agent.  Mr. Cobb,

19   was it?  I'm not sure who has concerns about the NIPS issue.

20             MR. GADSON (TELEPHONIC):  Your Honor, it's James

21   Gadson, Carter, Ledyard & Millburn LLP in New York -

22             THE COURT: Yes.

23             MR. GADSON (TELEPHONIC):  - representing the Bank

24   of New York, successor trustee.

25             THE COURT: Thank you.

1      MR. GADSON (TELEPHONIC): I can confirm Mr.

2   Eisenberg's statements that the objections raised by the Bank

3   of New York to the voting procedures have been resolved, and

4   I formally withdraw the objection.  Like the Ad Hoc

5   Committee, the bank reserves any disclosure statement and

6   plan issue.

7      THE COURT: All right, thank you.

8      MR. GOLDBERGER: Your Honor, that's all I had.  If

9   you have specific questions about some of the change, I'm

10  happy to try to address them.

11     THE COURT: Well, I don't because I haven't read

12  them.  So, I think what I will do is take this back with me

13  after court and take a look.  Well, let me look at the

14  blackline now and see if there are not significant changes,

15  maybe I can just do it now.  Okay, the changes really do seem

16  to be just as the three of you have reported them to be on

17  the record, so I'll sign this order.

18     MR. EISENBERG: Thank you, Your Honor.

19     THE COURT: Okay.

20     MR. PERNICK: Your Honor, item number 17 is the

21  status conference, the monthly status conference regarding

22  the Committee's professionals and I know that the Agent Bank

23  and the Official Representatives both filed reports.  I'm not

24  sure if the Court has any other questions or wants to hear

25  from them, but that's the next item on the agenda.

1          THE COURT: I guess at this point I'm not clear what

2    is still be litigated if everyone but perhaps some of the

3    insurers are onboard with the consensual plan, so, why do I

4    need two entities now?

5          MR. PERNICK: Well, I'll let each of them speak and

6    then the debtor - I mean we may have some comments based on

7    what they say.

8          THE COURT: Good morning.

9          MR. RESSLER: Good morning, Your Honor.  Howard

10   Ressler, Anderson, Kill & Olick, the Official Representatives

11   of the Bondholders and Trade Creditors.  Your Honor, you will

12   recall that there are basically two pending adversary

13   proceedings relevant to our involvement.  One is the bank

14   adversary action pending before Judge Fullam, the other is an

15   action, an equitable subordination action, pending before

16   Your Honor.  Under the settlement term sheet, those actions

17   would be tolled and stayed.  I believe the Court actually

18   directed the parties to make joint motions to toll and stay

19   the respective actions.  Those actions have been prepared and

20   we're in the process of getting signatures from the various

21   parties to those proceedings.  There are about eight or nine

22   banks which are not represented by Weil Gotshal, in some

23   cases by in-house counsel or otherwise, and that slowed this

24   process down slightly, but my guess is by the end of this

25   week or next week, those additional signatures will be

1   obtained, those motions will be filed, but I guess the answer

2   to your question is, our role obviously is diminished at this

3   point.  I think what we're doing, essentially, is just

4   monitoring the proceedings to make sure that the rights which

5   we believe that we've obtained on behalf of our

6   constituencies are upheld through the disclosure statement

7   hearing and through confirmation, but obviously, our

8   involvement is, well, you know, diminished from what it was

9   when the litigations were active.  I believe from reading the

10  bank's report, they've taken sort of a similar position to

11  the core which is also that they're really basically

12  monitoring the proceedings at this point, but I'm sure they

13  want to be heard as well.  Thank you.

14          THE COURT: All right, who wants to speak for the

15  banks, please.

16          MS. LIU (TELEPHONIC): Yes, good morning, Your

17  Honor.  This is Judy Liu on behalf of the banks, and I guess

18  I would echo the comments just made.  We are basically in a

19  monitoring role right now, just to insure that whatever the

20  banks were supposed to get under the fifth plan is carried

21  through in the sixth plan, and with the actions otherwise

22  stayed, it's more or less a monitoring role.

23          THE COURT: Okay, thank you.  Mr. Pernick?

24          MR. PERNICK: Your Honor, that's what I was hoping

25  we were gong to hear, and the debtor's fine with that

1   monitoring role.  We think the amount of fees that will be

2   spent are appropriate under those circumstances for those

3   parties just to make sure that the agreements that they

4   reached are actually implemented, and as long as it stays in

5   monitoring or if for some reason the parties need to do more

6   than that, they let the Court know, that's fine with us.

7           THE COURT: Okay, I'll just ask, I guess, that I

8   continue to get a status report simply so that I can find out

9   that in fact everything is stayed pending confirmation and

10  find out whether there are any other surprises out there.

11  Okay, Mr. Pernick, thank you.

12          MR. PERNICK: And that leaves us, Your Honor, with

13  item number 14, which is the plan support agreement motion,

14  and Geoffrey Raicht firm, the Sidley firm is going to handle

15  that.

16          MR. RAICHT: Good morning, Your Honor.

17          THE COURT: Good morning.

18          MR. RAICHT: Geoffrey Raicht, Sidley Austin, on

19  behalf of the debtors.  Your Honor, how I would like to

20  proceed is to give the Court an overview and a background as

21  to how we got here and then dive into the substance of both

22  the motion and address the objections and then certainly

23  allow any party who wishes to be heard in favor of the motion

24  or opposition to it to be heard, if that's okay with Your

25  Honor.

1          THE COURT: That's fine.

2          MR. RAICHT: You know, this motion is really

3   predicated, Your Honor, on an event at the end of last year,

4   which was the filing of the fifth amended plan on December

5   31st.  That plan was filed after five years of litigation,

6   after the Third Circuit reversed the Sub-Con ruling and

7   directed the debtors to file a plan by December 31st, which we

8   did.  That plan, Your Honor, we believe was confirmable on

9   its face.  It provided a radicle distribution to all

10  creditors below the banks consistent with the Third Circuit's

11  Sub-Con ruling.  However, Your Honor, at that time or around

12  the time we filed the plan, certain representatives of the

13  bondholders announced that they had a blocking position and

14  would not support that fifth amended plan.  So, what turned

15  out to be a plan that we perhaps would go forward on turned

16  out to be a springboard for discussions and negotiations

17  among the various parties, because the debtors, well, if we

18  had to, we would go forward with that plan, it has always

19  been our hope that we would have a consensual plan among all

20  the credit constituencies.  So that negotiation occurred, and

21  as a result, on May 10, the debtors were happy to report that

22  a settlement in principal had been reached among all the

23  representatives of the major constituencies.  And also on

24  that day, Your Honor, the debtors announced that a settlement

25  term sheet had been agreed to, and that term sheet was

1   negotiated primarily among the representatives of the

2   creditor constituencies with the debtors' assistance, which

3   outlined the terms of a consensual plan to be embodied in a

4   sixth amended plan.  The parties to that agreement

5   represented - that agreement represented a significant

6   milestone in these cases, and literally permitted the debtors

7   to turn the corner and to get to a largely consensual plan,

8   which would be the first such plan in these cases, but more

9   importantly - Well, I shouldn't say more importantly, but

10  certainly an important aspect of that settlement was

11  resolution of various litigations to which Your Honor just

12  heard.  That is the Cybergenics litigation, the estimation

13  litigation, and the equitable subordination litigation.  So,

14  we have a term sheet that had been filed with the Court on

15  May 10th, on public notice, and on May 23rd, the debtors filed

16  the plan support motion, and they filed that under § 363 and

17  under 9019.  The parties to the agreement, Your Honor, are

18  the debtors, asbestos, the futures representative, and

19  registered holders holding the majority of the aggregate

20  principal amount of pre-petition bonds issued by Owens

21  Corning.  I think it's important to understand, Your Honor,

22  that when this plan support agreement and term sheet were

23  entered into, those members of the bondholders had executed

24  confidentiality agreements, which had given them in their

25  negotiations a level playing field with asbestos and the

1    futures representative on information to make a reasoned

2    determination about whether or not it was appropriate to

3    enter into this plan support agreement.  Let me pause for a

4    minute, and let's describe what the plan support agreement

5    does and what it doesn't do.  I think it's important.  The

6    plan support agreement seeks authorization to implement and

7    execute the plan support agreement, which is literally, it

8    takes the term sheet, which is a three-page document annexed

9    to Exhibit A and gives it legs.  It allows it to implement

10   and execute.  However, if certain conditions are not met, and

11   each of the holders agrees to support - let me rephrase it

12   right.  If certain conditions are met, each of the holders

13   agrees to support the plan, but there are preconditions and

14   they are numerated in the document.  I think it's important

15   just to run through them briefly.  First, is that each of the

16   plan, the disclosure statement, and all the rights offering

17   documents are reasonably and satisfactory to the holders.

18   The second, is that the material terms of those plan

19   documents are substantially identical to the terms set forth

20   in the plan support agreement.  Third, the disclosure

21   statement aptly describes the terms of the settlement term

22   sheet that's going to be embodied in the plan and is approved

23   by this Court, and finally, there are no material

24   modifications of the plan documents, and there's no material

25   breach of the plan support agreement.  That's what it does,

1    Your Honor.  What it doesn't do: The plan support agreement
2    does not solicit any party's vote.  It does not seek approval
3    of the substantive provisions of the sixth amended plan.  All
4    of the treatment and distribution mechanisms under the plan
5    are all subject to confirmation and 1129 standards.  So, Your
6    Honor, as we said, we have a term sheet, we filed a plan
7    support agreement, and then, Your Honor, on June 5th as the
8    Court knows, the debtor filed it's sixth amended plan which
9    is probably the single most important development in the
10   debtors' cases, and as Your Honor knows, a hearing to approve
11   the disclosure statement has been set up for July 10th, and
12   the debtors are not and they will not solicit votes until a
13   disclosure statement is approved with respect to that plan.
14   As Your Honor just observed with Mr. Eisenberger's
15   presentation, that the voting procedures, an order has now
16   been signed by this Court.  That's where we are at the
17   moment.  We now have had two objections filed.  One is by
18   Century Indemnity Company and the other is by the U.S.
19   Trustee.  I'll take Century first, briefly, and I'll
20   certainly allow at the end of my presentation if they wish to
21   be heard or clarify my statements, that's certainly
22   appropriate.  I believe their objection, Your Honor, to the
23   extent the plan support agreement and the settlement term
24   sheet limits what the debtors can put into the plan, it may
25   violate their rights as an insurer.  I believe, Your Honor,

1    that Century's objection is more of a disclosure statement or

2    confirmation objection.  They're not a party to the plan

3    support agreement and nothing prejudices their rights to make

4    those objections at the appropriate time.  That's the

5    debtors' view.  They certainly can be heard on that

6    subsequently.  But the more immediate objection, Your Honor,

7    if I can is the U.S. Trustee's objection, and their objection

8    is that the plan support agreement is an improper

9    solicitation under 1125, which is obviously, Your Honor, a

10   very serious charge from the debtors' perspective.  It's the

11   debtors' view, Your Honor, that the plan support agreement is

12   a classic embodiment of a highly negotiated instrument that

13   lays the groundwork and lays the way for a consensual plan,

14   which is the hallmark of Chapter 11.  As Your Honor knows,

15   consensus between a debtors and its creditors that leads to a

16   successful reorganization is exactly what Congress intended

17   under the Bankruptcy Code.  And a settlement of this

18   complexity and involving a creditor constituency with this

19   level of sophistication has to be reduced to writing if it's

20   going to have - if it's going to be anything.  And as Your

21   Honor is aware, the parties to this document are

22   sophisticated.  They're represented by lawyers and other

23   professionals.  And it's also important to note, I believe,

24   Your Honor, that these parties to the document largely

25   purchased their obligations or their debt post-bankruptcy

1 during the course. They got into this process with their

2 eyes wide open. That's kind of where we are as a policy

3 matter, but as a legal matter, Your Honor, I think that the

4 plan support agreement fully complies with the controlling

5 law of this circuit, <u>Century Glove</u>. <u>Century Glove</u>, which as

6 Your Honor knows, defines what a solicitation is. It states

7 very clearly and holds very clearly that the word

8 "solicitation" must be read narrowly, and to define it

9 broadly, would inhibit prior negotiations. And the purpose

10 of negotiations is to reach compromise over terms of a

11 tentative plan, but compromises among creditors, Your Honor,

12 we don't believe are solicitations. And particularly, Your

13 Honor, this plan support agreement is not a solicitation

14 under 1125. And to be quite frank, Your Honor, it was

15 carefully crafted by the parties not to be interpreted as

16 one. The debtors have not solicited votes to any party, and

17 the plan support agreement does not make a specific request

18 for an official vote.

19         THE COURT: Well, why is it needed?

20         MR. RAICHT: Well, Your Honor, I think it is needed

21 very simply. One is that we have, again, a large complex of

22 issues that need to be resolved and reduced to writing that

23 enables the parties to move forward so we all know what the

24 terms are going forward.

25         THE COURT: But isn't that what the plan does?

1          MR. RAICHT: That is what the plan is going to - We

2     anticipate the plan is going to do, Your Honor, but there is

3     obviously time between now and the plan to get there, and one

4     of the key provisions, Your Honor, of the plan support

5     agreement which the U.S. Trustee observed is a provision

6     about claims trading, and if you have a deal or an

7     arrangement or an agreement with certain creditors, if you

8     don't - I guess, if you don't then have them agree to it, and

9     they agree not to trade their claims, you will in essence,

10    Your Honor, be having to re-cut deals again and again, and

11    this gives certainty to the process, Your Honor.

12          THE COURT: Well, you can do that by setting a

13    voting deadline date, you know, holders of record on such and

14    such a date are the ones who can vote, so, send out a notice

15    that says, Tomorrow is it, folks.  If you hold the claim

16    tomorrow, you vote, and if you don't, you don't.  Won't that

17    lock everybody in?

18          MR. RAICHT: I don't - Respectfully, I don't think

19    so, Your Honor.  I think that what happens is that, you know,

20    first the voting deadline, perhaps, is some point out at a

21    later date.  What we're talking about is between now and

22    voting after the disclosure statement goes out, you would

23    like to have the certainty that these parties are obligated

24    under a document.

25          THE COURT: Excuse me, a minute.  Somebody is trying

1   to use this computer as a fax.  Okay, I apologize, I think

2   I'm back to being able to take notes again.  The debtor wants

3   to be sure that everyone's going to hold to the deal, that's

4   where I started getting fax.

5       MR. RAICHT: And I think that's right, Your Honor.

6   And as Mr. Pernick and I were just discussing, you know, the

7   other piece of this, Your Honor, is that on Friday in

8   Pittsburgh there's going to be a hearing on an equity

9   commitment agreement, which has significant financial

10  obligations to it.  Again, all the parties need to know what

11  the road map's going to be, and if there is questions, if

12  there's insecurity about that, Your Honor, I think it's

13  detrimental.

14      THE COURT: But if the debtors filed the sixth

15  amended plan and the sixth amended plan encompasses the items

16  that are covered in the plan support agreement, and the

17  parties have already told the debtor that provided the plan

18  says X that they're going to vote for the plan, I'm not sure

19  what the plan agreement does.  I don't necessarily see it as

20  a solicitation document.  I'm just not sure why it's

21  necessary.  It's almost as though you're trying to get pre-

22  approval for the plan without getting the plan pre-approved.

23      MR. RAICHT: Understood, Your Honor, and I think,

24  again, let me try and go back to the initial point, which is

25  - and your question's a good one.  If we have a document - If

1   we have technically an agreement today that says if the plan

2   provides X and the plan delivers X, you know, you will

3   support the plan.  The problem is, Your Honor, that you have

4   these particular individuals today.  There are 16 signatories

5   to it on behalf of the bondholders.  If they trade their

6   claim tomorrow, then - without the plan support agreement in

7   place, then that particular party is not in any way needs to

8   be part of that obligation.

9          THE COURT: That's why you set a bar date or voting

10  deadline date, I'm calling it a bar date.  You know, you say,

11  Holders of claims and bonds as of a certain date vote and the

12  rest don't.

13         MR. RAICHT: Well, Your Honor, again, I think that

14  from our perspective I think that, you know, there are -

15  there's a time delay to get there, number one, that would

16  certainly - as we stand here today, Your Honor, we are trying

17  to have it approved so that we all go forward during the

18  voting process during the plan solicitation process, and if

19  we wait that long, I think, again, we run the risk that we

20  will lose parties, and we will lose a consensual plan or a

21  largely consensual plan.

22         THE COURT: Pardon me.  Is there something that I

23  can do that stops this fax from -

24             UNIDENTIFIED SPEAKER: Automation is . . .

25  (microphone not recording).

1          THE COURT: I'm sorry, but I can't take notes

2    because it won't let me do that, so, and I would prefer to

3    make sure I have notes on this.  I'm just going to have to

4    ask you stop until someone gets here and gets this resolved.

5          Now, it's not doing it.  Can you call them please

6    and ask them if they could come up.  Counsel, it stopped

7    doing that temporarily, so let's see how far we can go, and

8    if it starts giving me fax information, I'll just have to ask

9    you to stop.  I guess the other thing is that I'm not also

10   sure why you can't lock in the vote with respect to a

11   particular bondholder, and if the claim trades, it trades

12   with that vote locked in.

13         MR. RAICHT: Let me try and address that with two

14   points, Your Honor.  First, in terms of a voting deadline,

15   we're talking about sometime in the future, 60 to 90 days.

16   This debt, these bonds, Your Honor, I think it's fair to say,

17   trade hourly, and if you're talking about between now and

18   that 60 to 90 days, that the parties who stand here today may

19   not be the parties that are here tomorrow.  That puts this

20   agreement, that puts this framework for a consensual sixth

21   amended plan at great jeopardy, and again, Your Honor, people

22   need certainty because there's money if Your Honor approves

23   an equity commitment agreement on Friday which provide, I

24   think - is it June 30th?  That June 30th there's a $100 million

25   fee that gets paid out which is irrevocable, and I think that

1    the parties need to know that as we go down that road, that

2    we have a structure that's solid and a structure that can be

3    relied upon, and we don't want to have, you know, we don't

4    want to rely upon at some point down the road other parties

5    who we have to re-cut a new deal with.  And that's a major

6    risk, which is why we entered into this agreement - Oh, oh,

7    are we getting a fax again?

8              THE COURT: Okay, go ahead.

9              MR. RAICHT: I'm not sure if Your Honor is getting

10   exasperated with me or the fax machine.

11             THE COURT: No, it's the fax machine.

12             MR. RAICHT: That's my point, Your Honor.  Those are

13   the two major points which is, with all due respect, Your

14   Honor, I think that voting in this context on this fast

15   track, Your Honor, and again the volume of the debt that

16   could trade quite regularly, it puts the deal potentially at

17   risk, and that's why we wanted to have this agreement in

18   place and also again, as we've discussed, because there is a

19   potential equity commitment or a payment under the equity

20   commitment agreement paid June 30th, I think I need to know

21   that we're all holding hands.

22             THE COURT: All right.  Pardon me.  We're going to

23   take a recess so this can be checked.

24             MR. RAICHT: Sure.

25             (Whereupon at 10:39 a.m. a recess was taken in the

1    hearing in this matter.)

2             (Whereupon at 10:44 a.m. the hearing in this matter

3    reconvened and the following proceedings were had:)

4             THE COURT: Okay, counsel, sorry, we'll try it

5    again.

6             MR. RAICHT: That's quite all right, Your Honor.  I

7    want to try to make it understood one or two more

8    observations about this point, Your Honor, and then I'll try

9    to move on unless Your Honor has more questions, and they

10   are, I think, three short ones.  First, Your Honor, I think

11   that the notion of a record date is problematic because the

12   whole purpose of this document is to say that if you buy the

13   debt, if you buy the claim, the obligation goes with it, and

14   I'm not sure a record date by itself gets us there, that's

15   number one.  Number two is that if we do have this

16   uncertainty and our timetable gets thrown off or for whatever

17   reason there is a significant economic impact to the debtors'

18   estate, I believe if we have to push back our timetable,

19   there is a $30 million fee that has to be paid to extend it,

20   which is obviously not money that the debtor wants to be

21   spending at that time.  We're all working hard towards that

22   deadline, and we want to try and meet it without further

23   expenditure.  And lastly, Your Honor, on this point, you know

24   this motion was made under both 363 and 9019, and 363 is a

25   business judgment rule, and I think it is in the debtors'

1   business judgment that this is a transaction that is in the

2   best interest, but also observe, Your Honor, more than

3   anything I'm going to ask in a few moments of Mr. Lockwood or

4   Mr. Kress to take the podium that - and if anyone else wants

5   to be heard on it, they support this.  This is not something

6   - the only party that has objected to this and the mechanism

7   is the U.S. Trustee, but the parties who are signatories to

8   it have agreed to these terms.

9           THE COURT: Well, I would hope they would.

10          MR. RAICHT: That's right, that's right.  And we

11  haven't found any objection from them.  I'd be here standing

12  on a different reason if that were the case, and I do, Your

13  Honor, I've heard your points.  I want to quickly go through

14  on a couple and I'll give up the podium to Mr. Lockwood and

15  Mr. Kress, which is, this motion, we've obviously done this

16  in a public forum.  Not only did we file the term sheet, we

17  have filed a motion for a specific approval.  We have not

18  done what has been done in other cases in this jurisdiction,

19  which are merely filing it, annexing it to a document, and

20  putting it on notice to people in that format.  We've

21  actually put it on specific notice pursuant to a motion.

22  We've done everything in the light of day.  I think, Your

23  Honor, I've gone into with you why I think it would be no

24  harm to debtors' estates if the PSA is approved.  Actually, I

25  do think that there would be significant damage to the estate

1    if it were not approved, and in addition to the economic

2    issues and the voting issues, there is a risk, Your Honor,

3    that the settlements that we talked about before, the

4    Cybergenics and the equitable subordination and the

5    estimation, that's all encompassed as part of this process,

6    as part of this settlement, and if we unwind this document,

7    you know, question mark as to how those are going to be

8    treated going forward.  That's the points I wanted to make,

9    you know, on direct presentation, Your Honor.  I do think it

10   might be helpful to hear from Mr. Lockwood and Mr. Kress on

11   some of the points that you've raised.

12        THE COURT: Well, I have one - I'm not finished.

13        MR. RAICHT: I'm sorry, Your Honor.

14        THE COURT: Century's objection also indicates that

15   part of this document is - that the parties to the appeals, I

16   guess, other than Century will be withdrawing their appeals.

17   All right, so, what happens - I mean if Century is party to

18   the appeals and Century isn't a party to this document and

19   isn't withdrawing the appeals, then I'm not sure what's been

20   gained.

21        MR. RAICHT: Well, I think it is part - I think,

22   Your Honor, that the - there are specific appeals, if I'm not

23   mistaken, that are addressed by this, and it is those appeals

24   that are identified by the parties to the agreement, and

25   Century not being a party to the agreement, I think it's

1    outside that scope, but I think that in terms of the core

2    parties that need to be under an agreement are the ones who

3    have signed this.

4            THE COURT: But, I don't quite follow that, because

5    estimation's one of them, and so if Century is successful in

6    showing, for example, that the estimation isn't 7 billion,

7    it's 2 billion, then the whole plan doesn't work on the basis

8    that it's structured anyway.  So, as long as that appeal's

9    still going, I don't see what you've gained.

10           MR. RAICHT: Mr. Lockwood who represents asbestos

11   would like to be heard on that point.

12           MR. LOCKWOOD: Your Honor, you're going to hear me

13   mention insurance neutrality, our favorite topic.  We have in

14   addition to making the arrangements that are set forth in the

15   term sheet, which is attached to this document, put in

16   provisions in the plan, in the new sixth amended plan, which

17   basically say that the estimation - we've modified the old

18   provision which said that Century was bound by the

19   estimation.  We've now said Century isn't bound by the

20   estimation, and that indeed the estimation shall have no

21   effect on Century.  If Century perseveres in its appeal, we

22   will be arguing to the Third Circuit that that appeal should

23   be dismissed on the ground that Century no longer has any

24   interest in the amount of the estimation because it's not a

25   creditor.  It's distributable share isn't affected by it, and

1    it's not bound by it under the plan, and we also have

2    combustion engineering kind of nothing in the plan shall bind

3    Century that we're also putting in, so, while I think that

4    there is a theoretical possibility, I suppose, that Century

5    could come up with a different number, it's pretty unlikely,

6    and after all, nothing in this world is sure, safe death and

7    taxes, and there's, furthermore, an argument that if the plan

8    is voted on and it's a consensual plan, the creditors can

9    make any - they can use a plug number whether it originated

10   with Judge Fullam or they pulled it out of their ear.  I mean

11   this is pot plan, and if we want to put in $7 billion and

12   everybody agrees to it and everybody votes for it, then even

13   if the Third Circuit said, Judge Fullam got it wrong, that's

14   not going to overturn a creditor vote after a disclosure

15   statement and no impaired class.  So, at the end of the day,

16   I don't believe that Century has any possibility whatsoever

17   of overturning a plan with that number in it if it's voted on

18   by the creditors anymore than if somehow or another some of

19   the other actions got reinstated for some reason or another

20   and produced some result that was different from what the

21   voted confirmed plan provided for.  With respect to the

22   issues addressed by Mr. Raicht, I think it's important to

23   note that we're not only just the signator of the Asbestos

24   Claims Committee's document, we were, at least, I think, as

25   interested in making it happen as the debtor was.  Your

1  Honor's listened over the five years that this case has been
2  going on and a number of other cases that you and I have had
3  during the same period to a whole lot of discussions about
4  what happens when Congress does things with the Fair Act and
5  how that changes the calculus of people's motivations about
6  what they do or don't want to do in one of these asbestos
7  plans.  In addition to that, Owens Corning has stock that's
8  actively trading in the market.  The bonds are actively
9  trading in the market.  What happened here was through a
10 confluence of events, the asbestos constituencies on the one
11 hand and the dissenting creditor bondholders and bank debt
12 holders on the other who had blocking positions, I mean, they
13 came right out and said it in open court.  We looked up the
14 votes.  They were right.  We couldn't get a plan confirmed on
15 a consensual basis, so we had to sit down and negotiate,
16 which as Mr. Raicht said, it's exactly what you're supposed
17 to be doing in a plan, but given the volatility if you will
18 of the pieces of this from the asbestos constituencies' point
19 of view, if you look at the term sheet, the various things
20 that are going on here is effectively a constructive sale of
21 the stock that would otherwise be going to asbestos interests
22 through the trust to the very bondholders that are the
23 parties to this plan's supporting agreement and also parties
24 to the equity commitment agreement, and for this plan to
25 work, that structure has to get locked into place.  If this

1    plan support agreement isn't approved, then effectively the

2    bondholders have the ability to sort of give us a handshake

3    deal, but if the market goes in the tank or Congress re-ups

4    the Fair Act next month, and it really looks like it's going

5    to pass or something like that, it would be a tremendous

6    economic incentive for them to say sayonara to the whole

7    deal, and it has nothing to do with bad faith or anything

8    else.  I mean, if you're not contractually bound to do

9    something, then not doing it is not a breach of anybody's

10   obligation to anybody else.  And frankly, that's the purpose

11   for this agreement, and while the U.S. Trustee has raised

12   some technical arguments about, you know, voting and that

13   sort of thing, the fact is, if you accept the argument they

14   way they're posturing it, it's virtually impossible to

15   contemplate any sort of complex bankruptcy of the sort that

16   we're looking at here ever being worked out pre-confirmation

17   in some sort of a consensual deal where the parties to the

18   deal are making economic commitments to each other that are

19   implemented through the plan.  So, we would respectfully urge

20   Your Honor to uphold the plan support agreement here as being

21   in the best interest of all the creditors of this debtor as

22   well as the debtor itself.  Thank you.

23         MR. PERNICK: Your Honor, two quick points: One, Mr.

24   Lockwood said if the market tanks.  I'm not sure if that's

25   correct.  I think that's probably already happening, but, on

1    the estimation point, just - and my colleagues will correct

2    me if I get this wrong, the procedural status is there were

3    actually two appeals, one by the banks and one by Century.

4    In the term sheet, everybody except for Century agreed to

5    stay those appeals pending dismissal if the sixth amended

6    plan was confirmed.  Century refused to do so, although we

7    requested that they do so as a group, and we filed a motion

8    with the Third Circuit.  Now, the Third Circuit entered a

9    stay of Century's appeal pending plan confirmation.  So, the

10   confirmation objection that Century has theoretically is, the

11   plan proposes that that litigation be dismissed.  They can

12   object to that at confirmation.  Your Honor can rule on it.

13   So that's the technical answer to that question, and right

14   now it's stayed, and it's pending a potential, I guess,

15   confirmation fight if Century wishes to raise that objection,

16   and we'll deal with it at that time.

17           MR. KRESS: Good morning, Your Honor.  Andrew Kress

18   on behalf of the Futures Representative.  I'm not going to

19   repeat everything that my colleague, Mr. Lockwood, said, but

20   I do want to emphasize the importance of keeping the deal

21   together.  We unfortunately went down that path in Armstrong

22   where we thought we had reached an economic agreement with

23   the commercial creditors only to find two weeks before the

24   voting deadline, because of activity in Congress with respect

25   to the Fair Act, that what was a consensual plan turned into

1   a contested plan, and we are a case where we thought, Your

2   Honor, would be the first of the five major Chapter 11

3   asbestos cases to come out of Chapter 11, and unfortunately

4   not only are we still in Chapter 11 in connection with

5   Armstrong, but it doesn't look like that that company will be

6   emerging anytime soon because of challenges to confirmation,

7   and that is precisely what was tried to be avoided here, Your

8   Honor.  Not to go down the path of what we - what all the

9   constituencies thought was the economic deal that had been

10  reached, and that only to find at the last minute because of

11  some external event that that deal craters.

12              THE COURT: Mr. Klauder?

13              MR. KLAUDER: Good morning, Your Honor.  David

14  Klauder for the United States Trustee.  On the threshold

15  issue that Your Honor had, which I still think is important

16  and wanted to just quickly reiterate that again is, what is

17  the Court being asked to approve here?   That's the question.

18  The motion is couched in terms of a settlement, but it

19  appears what's happening here, it's a settlement of the

20  claims and the treatment of various creditors and such, which

21  seems to me is what a plan is for.  So you have to go the

22  route of confirmation of plan.  We don't want to cut that

23  off, and I think that threshold issue is very important.

24  We've heard implement and execute the agreement.  That's what

25  the debtors are attempting or want authority to do, but of

1    course, they don't need Court approval to file a plan,

2    according to these terms, so I think it's very important that

3    Your Honor addresses that threshold issue, and we get past

4    that, that we're not circumventing the plan process here by

5    this agreement and really what is the purpose of the

6    agreement, and that goes into the meat of the objection,

7    which is the lockup portion of the agreement.  Your Honor,

8    what counsel has indicated today what they believe to be

9    technical terms or technical arguments made by the United

10   States Trustee, I would characterize those as statutory

11   arguments.  1125(b) is pretty clear.  It states that you

12   cannot solicit an acceptance or rejection of a plan until a

13   written disclosure statement is approved by the Court.  The

14   plan proponents did in fact enter into the plan support

15   agreement post-petition and prior to a disclosure statement

16   being approved.  The agreement binds the signatory creditors

17   to vote in favor of the plan provided it is consistent with

18   the settlement term sheet.

19          THE COURT: Well, actually, I do have a disclosure

20   statement that's been approved in this case.  It's just not

21   in accord with the sixth amended plan, but I did

22   conditionally approve a disclosure statement.  It was,

23   however, based on the fact that substantive consolidation

24   would be approved by the Third Circuit, and it wasn't, but

25   there is a disclosure statement that has essential economic

1    information of the debtor that's been approved by the Court.

2         MR. KLAUDER: But it doesn't deal with - I mean it's

3    completely different from what is happening here.  It's a

4    totally different deal, the treatment of the creditors, and

5    what they're agreeing to vote in favor of is totally

6    different than that disclosure statement that was approved

7    sometime ago.

8         THE COURT: The deal is different, but the economic

9    situation that the debtor finds itself in but for the

10   vagaries of the market, because obviously stocks and bonds

11   trade at different values, and that would have to be updated

12   on pretty much an hour-by-hour basis till you get to the plan

13   confirmation.  But, the structure of the debtor that's laid

14   out in the disclosure statement has really not changed.  The

15   issue of course is the plan treatment because of the

16   substantive consolidation that's no longer going to happen.

17   But I guess the issue is, do I have to approve the disclosure

18   statement or do I have to approve a disclosure statement

19   before the debtor can continue to negotiate?  You know,

20   somewhat of Hobson's choice, Mr. Klauder, and I'm sympathetic

21   to the U.S. Trustee's position in this case, but it is

22   somewhat of a Hobson's choice for the debtor and the creditor

23   constituents.  They have to be able to bargain to come to a

24   consensual plan, but then when it comes to trying to insure

25   that the parties will stick to the bargain that they've made,

1    I guess the question is, How do you do it?  Well, in most

2    cases you do it by soliciting the votes, but in this case, I

3    thought this was going to be the first case out of

4    bankruptcy.  I saw no basis for this case to be here for six

5    years or five years.  It's been here this long.  If it takes

6    making sure that the bonds that should continue to trade

7    actively, because that's in the best interest of everybody to

8    have the bonds trading, trade knowing that they're going to

9    be in a locked position with respect to a particular plan if

10   that plan is filed by the debtor with those terms in it, and

11   it's post-petition.  It is not a pre-petition, non-disclosed

12   document.  Im not why that's so wrong.

13        MR. KLAUDER: Your Honor, it's - I think 1125(b) is

14   pretty clear.  It's in violation of that and the Third

15   Circuit interpretation of 1125(b) in <u>Century Glove</u>.

16        THE COURT: Well, what that says is that you can't

17   accept or reject the plan before commencement of the case

18   under certain circumstances in 1120 - I'm sorry, that's I'm

19   looking at 1126.

20        MR. KLAUDER: Right, okay.

21        THE COURT: That an acceptance or rejection of the

22   plan can't be solicited after commencement unless at all

23   times before that solicitation there's transmitted to the

24   holder the plan or a summary of the plan and a written

25   disclosure statement approved after notice and a hearing by

1   the Court as containing adequate information.  Well, all of

2   these entities have received that disclosure statement that I

3   think still does contain adequate information with respect to

4   the debtors - what led the debtor into bankruptcy and what

5   the debtor has done post-petition.  What's changed, of

6   course, is the itemization as to what's going to happen to

7   the creditor constituencies because that can't work.

8         MR. KLAUDER: And we would argue that that's

9   important and that, I mean, I can't say that I've researched

10  that issue, whether it's a disclosure statement or the

11  disclosure statement.  I will say that it said the plan in

12  1125, and what we're talking about here is the sixth amended

13  plan.  So there has not been a disclosure statement approved

14  for the sixth amended plan.

15        THE COURT: That's true.

16        MR. KLAUDER: So we would argue that that's the

17  issue, not some disclosure statement prior to it, and yes,

18  the debtors' position or the debtors' financial situation may

19  not have changed, but the treatment for creditors and the

20  treatment under - that's going on here has changed

21  substantially, and that would be an important part of the

22  disclosure statement, I would think, so -

23        THE COURT: Well, here's - The section itself in

24  1125(a) defines what adequate information is, and it says,

25  and I'm going to read it in the version that exists -

1          MR. KLAUDER: Can I get my Code, so -

2          THE COURT: Uh-huh.

3          MR. KLAUDER:  I'll just step away.

4          THE COURT: I'm reading it in the version, the old

5    version, before the amendments which apply to this case.  In

6    this section adequate information means information of a kind

7    and in sufficient detail as far as is reasonably practicable

8    in light of the nature and history of the debtor and the

9    condition of the debtor's books and records that would enable

10   a hypothetical investor of the relevant class to make an

11   informed judgment about the plan but adequate information

12   need not include such information about any other possible or

13   proposed plan.  So, if in fact the disclosure statement

14   contained adequate information but the plan has been

15   modified, I'm not sure that I don't have an approved

16   disclosure statement.

17         MR. KLAUDER: But how can a hypothetical or a

18   claimant make an informed judgment about the plan if they

19   don't know about the - if the treatment of the plan - They

20   need to know about that to make a judgment about whether to

21   vote in favor or against the plan.

22         THE COURT: But I think that's what this is saying.

23   The disclosure statement went out in connection with whatever

24   number, fourth - I'm not sure.  Whatever the plan was that

25   the disclosure statement was approved with respect to, and

1   then I think the issue is do you always have to re-approve

2   disclosure statements.  I think this section is saying, no,

3   sometimes the same disclosure statement can be used even if

4   there is a different plan that is proposed.

5           MR. KLAUDER: But they're not doing that here.

6   They're going down that road again with another disclosure

7   statement.

8           THE COURT: They are because of the treatment of the

9   classes and frankly because I'm conservative enough about

10  that that they know I'd order it anyway, probably, even if

11  they didn't want it.  Well, and in fact, I said that I'd

12  order it at the time that I approved that disclosure

13  statement to the extent that substantive consolidation would

14  change the treatment of the classes.  So I think they do need

15  to amend the disclosure statement, but with respect to the

16  adequacy of information, I'm not sure that that test under

17  the circumstances of this case isn't met.  I'm not sure I'd

18  want to be making that statement in all cases, but I don't

19  think that the historical facts or the problems that the

20  debtor has been facing post-petition have changed, really.

21  The issues are the same.  What's the estimation?  Is

22  substantive consolidation going to be approved, and to the

23  extent that the Cybergenics issue has any bearing going

24  forward, who's going to take over the avoidance actions?

25  Those have been the issues since the beginning of the case.

1          MR. KLAUDER: Your Honor, I haven't researched the

2    issue.  I mean, there's not too much on 1125(b).

3          THE COURT: No.

4          MR. KLAUDER: so, I'm not sure that there would be

5    much on this particular issue, so I don't feel comfortable

6    certainly arguing what's out there with cases.  I just would

7    respectfully disagree with the interpretation.  I think the

8    treatment of the creditors that is substantially changed, is

9    extremely important and is part of adequate information and

10   is part of what a claimant would need to make an informed

11   judgment whether to vote in favor or against the plan.

12          THE COURT: Okay.

13          MR. KLAUDER: Your Honor, then going to what we

14   argued in the objection, we cited an important provision of

15   the agreement, which was the specific performance provision

16   of the agreement which is at paragraph, I believe - just so

17   we're clear, paragraph (19) of the agreement.  I'm not going

18   to read that verbatim, but what that in essence creates is a

19   remedy of injunctive relief, meaning if there's a breach of

20   the agreement, if one of the signatory creditors does not

21   vote in favor of the plan, then they can be forced to vote in

22   favor of that plan.  You ask what happens if a creditor votes

23   - a signatory creditor votes rejection to the plan?  The

24   debtors or the plan proponents can come in and say, Yes, we

25   have this ballot that says, Rejection to the plan, after we

1  went through the whole solicitation process, after the

2  disclosure statement was approved, we have this ballot that

3  says, Rejection, but you know what, we have this plan support

4  agreement that they signed.  So, rip up that ballot, that

5  doesn't count.  Look at the plan support agreement.  Their

6  vote should be changed and should be an acceptance of the

7  plan.

8          THE COURT: Well, is that any different than asking

9  the Court to designate a vote because of, you know, some, I

10  guess, bad faith because they agreed to a lockup and then

11  they voted a different way?

12          MR. KLAUDER: No, I guess not.  I mean - In the

13  cases that we cited, the two cases by Judge Walrath in this

14  district kind of went down that path where the agreement did

15  not come in front of the Court prior to the disclosure

16  statement and all that.  It came at the back-end where it was

17  at confirmation, and we moved to designate those votes, and

18  Judge Walrath found in both cases and agreed with our

19  position and stated that post-petition lockup agreements are

20  invalid under 1125(b).  And, Your Honor, we would submit that

21  those rulings, while certainly not binding on you are

22  persuasive when the Chief Judge of this district with very

23  similar agreements, if not identical agreements, finds that

24  post-petition lockup agreements are invalid under 1125(b).

25          THE COURT: But they weren't - I think the

1    difference is to the extent that you have a lockup agreement

2    that actually solicits a vote by a class and haven't sent it

3    out to anyone on any kind of notice, it almost looks like a

4    secret agreement that is somehow or other wrong.  I don't

5    know what other sin to put on it, but wrong.  But when the

6    parties themselves have reached an agreement and the purpose

7    is to make sure that the time delay, which is necessitated by

8    virtue of the Bankruptcy Code because you have to go through

9    the disclosure statement approval in a solicitation process,

10   and by virtue of whatever events may happen in that time

11   frame and the trading, which is very active, are the problems

12   that could lead to the change in the votes, is that not a

13   slightly different circumstance from what Judge Walrath faced

14   in those two cases?

15        MR. KLAUDER: Well, Your Honor, there was no

16   indication of bad faith or trying to sweep something under

17   the rug in those cases.  1125(b) doesn't have any of those

18   sort of exceptions when you come out and you do this in front

19   and where everybody knows what's going on, then it's okay.

20   Judge Walrath looked at it strictly under 1125(b) and Century

21   Glove so I don't think those issues came into play, and I

22   don't think they should.  1125(b) is pretty clear, and Judge

23   Walrath found that to be the case, and let me just cite to

24   you Century Glove, the Third Circuit relevant authority,

25   where they held that a party does not solicit acceptances

1   when it presents a draft plan for the consideration of

2   another creditor but does not request that creditor's vote.

3   We would argue that that is exactly what's happening here.

4   They have requested that creditor's vote, and it was done

5   prior to the disclosure statement being approved on this

6   plan, and as such, it's in violation of 1125(b).

7          THE COURT: All right.  Well, what would your

8   position be if the debtor's out of this mix altogether, but

9   the creditors agree that so as to be able to confirm a

10  consensual plan, they enter into an agreement that they then

11  present to the debtor and if the debtor chooses to put it in

12  the plan, the debtors does, and if the debtor doesn't then it

13  won't be a consensual plan?

14         MR. KLAUDER: They enter into agreement to vote in

15  favor of the plan?

16         THE COURT: They enter into a contract that says

17  that to the extent that the bonds are traded, the voting

18  rights that are agreed upon as of a certain date will be

19  traded with the bonds, and that provided that a plan is

20  proposed that says X, that they'll vote in favor of that

21  plan.

22         MR. KLAUDER: But who did they enter the contract

23  with?  I mean, I think that -

24         THE COURT: With their creditor constituents.

25         MR. KLAUDER: Well, I think that's a different

1   scenario, and I don't know that we would have an issue with

2   that.  I mean the issue is the plan proponent soliciting the

3   acceptance and rejection, the votes on the plan.  That would

4   be the issue, so, I don't think that would be an issue for us

5   or an issue under 1125(b).  I think that's a different

6   scenario.

7           THE COURT: Okay.

8           MR. KLAUDER: Your Honor, if you have any other

9   questions, I'd be happy to answer those, but those are the

10  arguments I wanted to make.  Thank you.

11          THE COURT: All right, thank you.

12          MR. CASARINO: Good morning, Your Honor.

13          THE COURT: Good morning.

14          MR. CASARINO: Marc Casarino from White & Williams

15  on behalf of Century Indemnity.  I have with me my colleague

16  Joe Gibbons, also from White & Williams.  He's been admitted

17  *pro hac vice*, and he'll this argument if I may cede the

18  podium to him.

19          THE COURT: Fine, thank you.

20          MR. CASARINO: Thank you, Your Honor.

21          THE COURT: Good morning, Mr. Gibbons.

22          MR. GIBBONS: Good morning, Your Honor.  Century's

23  position is pretty simple.  The question is if this agreement

24  is approved by the Court, what is the effect of the Court's

25  approval?  Number one, who's bound by the agreement and to

1   what extent is the debtor in this case seeking prior approval

2   of terms that are going to be incorporated in the sixth

3   amended plan?  Century is a party to the appeal before the

4   Third Circuit.  We're not a party to the plan support

5   agreement.  We filed objections to the fifth amended - the

6   disclosure statement for the fifth amended plan.  We have

7   issues with the sixth amended plan because we believe they

8   violate our rights, and to the extent that the plan support

9   agreement locks the debtor in to certain provisions in the

10  sixth amendment plan, then we're concerned that the approval

11  of that plan, unless our rights are reserved, the approval of

12  the plan support agreement will prejudice our rights and

13  limit our rights to oppose the sixth amended plan.

14          THE COURT: Well, I think the point that you and Mr.

15  Klauder both made with respect to the fact that this is not a

16  pre-approval of the plan is a good one.  It's not a pre-

17  approval of the plan.  There isn't a plan on the table

18  subject to approval today, so I'm not going there, but to the

19  extent that the parties are asking that some document among

20  themselves be approved that will be incorporated into a plan,

21  I think if there is a preservation of all parties, non-

22  parties to the agreement's rights to object to any disclosure

23  statement and the plan, I think that takes care of one of

24  your issues, and I think this agreement or order that

25  approves it, if one is entered, does have to do that.

1          MR. GIBBONS: Your Honor, that would be our wish.

2          THE COURT: Okay.

3          MR. GIBBONS: Just to clear up a couple of things

4    that were said on the record earlier, number one, Century is

5    a creditor, and there's a whole standing issue before this

6    Court about a year and a half ago as to whether or not

7    Century could participate in the estimation.  We got Court

8    approval to participate in the estimation proceeding.  We are

9    like the lone surviving appellant before the Third Circuit,

10   and one of the interesting things about the fifth amendment

11   plan and the sixth amendment plan is that by virtue of the

12   class of creditor that Century is in, the plan provides that

13   all creditors in that class waive their right to appeal the

14   estimation order.  So, if this plan support agreement is

15   binding on anybody, including Century, we are prejudiced in a

16   big way.  The Third Circuit agreed with the debtor to adjourn

17   the arguments on appeal to see what happens with respect to

18   the plan, but it is adjourned.  Our appeal is still active,

19   and -

20         THE COURT: But you're going to be in that class

21   whether the plan support agreement is confirmed or not under

22   this plan, and if your rights to object to the plan are

23   preserved, why does this agreement itself cause some

24   prejudice?

25         MR. GIBBONS: The agreement requires, is my

1    understanding, the agreement provides that the parties agree

2    that the sixth amended plan is going to have certain

3    provisions.

4              THE COURT: Right.

5              MR. GIBBONS: And otherwise the sixth amended plan

6    is going to be substantially similar to the fifth amended

7    plan.

8              THE COURT: Which already has you in a class -

9              MR. GIBBONS: Which already has me in a -

10             THE COURT:  - waiving the appeal rights.

11             MR. GIBBONS: Right.

12             THE COURT: Right.

13             MR. GIBBONS: So, as long as all of our rights are

14   preserved to object to the plan and assert our rights going

15   forward, our issue with the approval of the plan support

16   agreement is resolved.

17             THE COURT: Okay, well, I am happy to -

18             MR. LOCKWOOD: We're prepared to agree with Century

19   that the order approving the plan support agreement have a

20   specific provision in it saying that Century is not bound

21   with respect to any disclosure statement or confirmation

22   objections it might have by the Court's approval of the plan

23   support agreement.  The debtor, I believe, is willing to

24   agree to that too.

25             MR. GIBBONS: That's fine, Your Honor -

1    MR. LOCKWOOD: That should satisfy Mr. Gibbons' last

2    position.

3    THE COURT: All right, so it's not - essentially

4    it's not waiving any right to bring forth an objection to the

5    disclosure statement or plan.

6    MR. LOCKWOOD: Exactly, Your Honor . . . (microphone

7    not recording).

8    THE COURT: Okay, that's fine, and I think an order

9    to that extent can be incorporated, but I'm still not to

10   approval of the agreement yet.

11   MR. GIBBONS: Well, that resolved our issue, Your

12   Honor.

13   THE COURT: Okay, thank you.

14   MR. GIBBONS: Thank you.

15   MR. RAICHT: Good morning, again, Your Honor.

16   Geoffrey Raicht from Sidley.  I think everyone who wanted to

17   be heard has been, unless I'm mistaken.  But just a couple of

18   points just to get back and say this is it.  Your Honor's

19   absolutely right that, you know, the plan support agreement

20   does not seek to approve the terms of the sixth amended plan.

21   It's all going to come before Your Honor at confirmation.

22   That is exactly what is not before you today.  I think, Your

23   Honor, you pose a hypothetical to the U.S. Trustee about a

24   contract that was largely negotiated between creditors and

25   then brought to a debtor, and I think that the circumstances

1    described in your hypothetical, Your Honor, are very similar

2    to what happened in this instance.  So, I think that we're

3    pretty much close to your hypothetical, Your Honor.  I wanted

4    to -

5            THE COURT: Well, no, you're not because the

6    debtor's a party to it.

7            MR. RAICHT: The debtor is a party to it, Your

8    Honor, and I think in your hypothetical, if I understood you

9    correctly, is that the creditors negotiated the document and

10   then brought it to the debtor.

11           THE COURT: For a plan.  To put it into a plan, not

12   to sign off on the agreement.  To say, Here, this is what

13   we've agreed to.  We're willing to vote for a consensual plan

14   provided that the debtor agrees -

15           MR. RAICHT: Uh-huh.

16           THE COURT:  - representing whatever other

17   constituencies are out there, that this is a good idea and

18   proposes this plan.

19           MR. RAICHT: Again, I think that, you know, in this

20   case, the creditors have, again, what the creditors have

21   among themselves said, if the plan provides X, Y, and Z, we

22   will support a plan, and they presented it to the debtor and

23   the debtor in an abundance of caution and to be fully - with

24   full disclosure to everybody, have brought it before this

25   Court, again, not to approve the terms of the plan, but to

1  permit the debtor to execute and implement the roll forward,
2  if you will, so we can get there.
3          THE COURT: But, you don't need my permission to do
4  that.  The one thing the debtor doesn't need while it's in an
5  exclusive period is permission from the Court to file a plan.
6          MR. RAICHT: Correct.
7          THE COURT: So, the debtor does not need -
8          MR. RAICHT: That's correct, but, again, I don't
9  want to sit down with this, I want to go back and beat an
10 argument done before, but, again, the real meat of the plan
11 support agreement is that the parties who are part to it are
12 obligated under it for claim straightening purposes,
13 whatever.  I know we covered that ground, Your Honor.
14         THE COURT: But why is the debtor obligated in a
15 claim straightening issue?
16         MR. RAICHT: The debtor's trying to put - It is the
17 debtor's exclusive period, and the debtor's putting forth a
18 plan to which its creditor constituencies, both asbestos, who
19 represents approximately $7 billion of debt, and the
20 bondholders, who have another, I think, a billion-something
21 of debt.  They have agreed the debtor's putting forth a plan.
22 We're all coming together in a consensual manner, and I think
23 the debtor's view is appropriate that we are a party to that.
24         THE COURT: Well, I think there is where your
25 problem is.  You folks want to take a few minutes and see

1  whether or not the debtor has to be a party to this

2  agreement?

3          MR. RAICHT: Sure, Your Honor, thank you.

4          THE COURT: I'll take just a brief five-minute

5  recess so you folks can talk.

6          (Whereupon at 11:22 a.m. a recess was taken in the

7  hearing in this matter.)

8          (Whereupon at 11:33 a.m. the hearing in this matter

9  reconvened and the following proceedings were had:)

10          THE COURT: Please be seated.

11          MR. RAICHT: I'm sorry for the delay, Your Honor.

12          THE COURT: All right.

13          MR. RAICHT: Geoffrey Raicht for Sidley Austin.

14  Your Honor, we have caucused - I'm sorry, two minutes, Your

15  Honor?

16          THE COURT: All right.

17          MR. LOCKWOOD: Sorry, Your Honor.

18          THE COURT: Okay.

19          MR. RAICHT: Apologies, again, Your Honor.

20          THE COURT: Okay.

21          MR. RAICHT: As I was saying, Your Honor, I believe

22  we have discussed with the relevant parties.  Your Honor, I

23  believe if will resolve your concerns with respect to this

24  motion, I believe that the parties will endeavor over the

25  next two/three days to amend the agreement to remove the

1    debtor as a party and come back to Your Honor on Friday in

2    Pittsburgh with what we hope to be an amended plan support

3    agreement.  Would that resolve Your Honor's concern?

4              THE COURT: Mr. Klauder?

5              MR. KLAUDER: Your Honor, that proposal, so to

6    speak, was floated to me and off the top of my head I said,

7    no, because there would still be the issue of the plan

8    proponents, the ACC and the FCR being part of the agreement

9    and having the ability to use the lockup portion.  Now, if

10   the proposal is to continue this until Friday and give a

11   couple days to kind of think about that issue and maybe some

12   other issues, I have no problem with that and discussing it

13   with them, but off the top of my head on that specific

14   proposal, I don't think it's going to be sufficient to

15   satisfy our concerns.

16             THE COURT: Okay, well, Mr. Lockwood?

17             MR. LOCKWOOD: Your Honor, just to be brutally frank

18   about all of this, we - I believe that we could probably get

19   to the point where we could amend the agreement pursuant to

20   its provisions - it's a written document and we can't do it

21   in open court - if it will solve the problem.  However, I

22   want to make it clear from the ACC and the - Well, I'm let

23   Mr. Kress speak for himself.  For the ACC's perspective, the

24   lockup provisions here are critical.  I mean, we've been

25   burned in the Armstrong cases.  Mr. Kress described it by

1   making a deal with a creditor constituency and then having

2   them sell their positions out and legislative developments,

3   and they voted against the plan, and two years later we're in

4   litigation with them over it.  So, if the U.S. Trustee's

5   position is that a lockup agreement with entities other than

6   the debtor but who are co-plan proponents with the debtor

7   violates 1125(b), which we would disagree with, and if

8   they're prepared to press that and I don't know, take an

9   appeal or whatever, then we prefer rather than running around

10  like a bunch of chickens trying to get the agreement amended

11  to achieve something that won't satisfy the U.S. Trustee, we

12  prefer to have Your Honor go ahead and decide it now and, you

13  know, basically let us know whether we can do this deal or

14  not.

15       THE COURT: Okay, well, I think that's fair.  I

16  think the issue is whether or not the creditors as creditors

17  can form a contract without taking a look at the plan

18  solicitation issue, and if the creditors among themselves can

19  come to some agreement that says if the debtor and/or others

20  propose this plan, we'll vote for it, then I think they're

21  free to contract as they choose.  But the issue, I think,

22  becomes more complex from the U.S. Trustee's point of view

23  when the plan proponents are parties to the agreement.  I

24  only asked about the debtor because frankly I thought that

25  the creditor constituents as parties to the agreement are

1    creditors no matter how you look at it or representatives of

2    the creditors, and they could bind the people that they

3    represent in that capacity.  But if it doesn't solve the

4    problem, then I agree.  There's no point in having an amended

5    document floated that removes the debtor if the issue is

6    still there.  So, I don't know, Mr. Klauder, is there any

7    benefit to my deferring some ruling to let you discuss this

8    with the other plan proponents or is the U.S. Trustee's

9    position going to be fixed in that respect?

10       MR. KLAUDER: I think it's going to be fixed, Your

11   Honor.

12       THE COURT: Okay.  I am going to, I think, defer

13   ruling on this until Friday so that I can take a look again

14   at the cases and at 1125.  I really am not aware of many

15   cases, in fact maybe none, under 1125(b) that hit this

16   specific issue that I raised earlier about a disclosure

17   statement as opposed to the disclosure statement to accompany

18   a plan.  I'm going to see if I can find anything along that

19   line.  I tend to think that will be a useless exercise, but

20   nonetheless, I want to see if I can.

21       MR. LOCKWOOD: Your Honor, when you're doing that, I

22   would ask you to read very carefully Section 4 of the plan

23   support agreement which contains the lockup provisions that

24   the U.S. Trustee is objecting about and keep in mind that the

25   term sheet and the plan support agreement predate the filing

1    of the sixth amended plan so that in fact there was no sixth

2    amended plan in existence at the time that this commitment

3    was given.  This is a conditional commitment on the part of

4    the bondholders and explicitly within the language of Section

5    4 itself, it contains various requirements that the plan when

6    it is drafted and filed will have to comport with.  So that

7    to the extent that 1125(b) talks about getting an acceptance

8    of a plan there was no acceptance of a plan that occurred as

9    a result of this.  What there was, was an agreement that

10   there would be a plan and if it met certain parameters then

11   the parties to this agreement, the bondholder parties to this

12   agreement would vote for it.

13           THE COURT: Okay.  Mr. Klauder?

14           MR. KLAUDER: Your Honor, I was just going to point

15   out on that issue that the disclosure statement or a

16   disclosure statement that we're kind of up in the air as to

17   what other law is out there.  I would like to research the

18   issue too if - I don't know if you're open to have anymore

19   argument on Friday on that particular issue if I find

20   something I can address with you.  I'd be happy to do that.

21           THE COURT: Sure, if you find a case, frankly, if

22   you send me - or file something that's just a letter brief

23   that says, Look at this case.  I'll be happy to read the case

24   even without any argument, so if you find something and I

25   don't, I don't want to miss it -

1          MR. KLAUDER: Okay.

2          THE COURT:  - so I'd be happy to notify the other

3   parties.  That way if somebody else has some challenge, they

4   can do it too.  All right.  I will take this matter under

5   advisement, but I will make a ruling on Friday and announce a

6   ruling on Friday.

7          MR. RAICHT: I'm sorry, Your Honor.  Geoffrey Raicht

8   again.  With respect to the case as a letter briefing, the

9   debtors would also like the opportunity to submit something.

10          THE COURT: Sure.

11          MR. RAICHT: Would there be a deadline that Your

12   Honor would establish to submit those?

13          THE COURT: Well, Thursday would be good if I'm

14   going to make a ruling on Friday.

15          MR. RAICHT: I appreciate it, Your Honor.

16          THE COURT: How about Thursday at noon.

17          MR. RAICHT: Perfect, Your Honor, thank you.

18          THE COURT: Anybody who finds something that you

19   think is relevant for me to look at, I'll accept a - just a -

20   I'm not sure what.  I guess a letter that you can send on e-

21   mail file.  Is there some miscellaneous pleading or call it a

22   letter memo and file it as a brief attached to this.

23          MR. LOCKWOOD: You could call it a list of

24   supplemental authorities, which is something that is

25   recognized by the rules.

1       THE COURT: Well, I was trying to get something that

2    CMECF would accept.  I don't really care what name you put on

3    it as long as you link it to this.  Call it a list of

4    supplemental authorities, that's fine.  Link it to this

5    document number and file it by Thursday at noon.

6       MR. PERNICK: Your Honor, if you want, when

7    everybody serves us with a copy we'd be happy to put an e-

8    mail together and send it to the Court with everybody's

9    submissions.

10       THE COURT: That would actually be easier because

11    then I'd get it at one time, if anybody finds anything.

12    Look, you folks do this all the time too.  Are any of you

13    aware of any cases on this subject?  No, nobody is, because

14    I'm not either.  So I have a feeling it's going to be a

15    pretty short list, but, okay.

16       MR. PERNICK: so everybody will still file

17    electronically, but then we'll amass whatever gets filed and

18    we'll put it in one package for the Court.

19       THE COURT: All right, thank you.  All right, with

20    respect to Century's issues though, would you folks please

21    work out some language that satisfies Century that it's

22    rights to object to the disclosure statement and plan will be

23    preserved because if I do find a way to approve this

24    agreement, I'd at least would like to have that issue

25    resolved before Friday.  Okay.  And so, Mr. Pernick, will you

1    bring to court a revised order on Friday?

2            MR. PERNICK: Yes.

3            THE COURT: Okay.  All right, thank you.

4            MR. PERNICK: Thank you very much, Your Honor.

5            THE COURT: We're adjourned.

6            (Whereupon at 11:45 a.m. the hearing in this matter

7    was concluded for this date.)

8

9

10

11

12

13

14

15

16

17

18

19            I, Elaine M. Ryan, approved transcriber for the

20    United States Courts, certify that the foregoing is a correct

21    transcript from the electronic sound recording of the

22    proceedings in the above-entitled matter.

23

24    /s/ Elaine M. Ryan                        June 23, 2006
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221