```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

IN RE:                         . Case No.  00-3837
                               .
 OWENS CORNING, et al.,        . 5414 USX Tower
                               . 600 Grant Street
                    Debtors.   . Pittsburgh, PA  15219
                               .
                               . June 23, 2006
. . . . . . . . . . . . . . . . 9:32 a.m.

                      TRANSCRIPT OF HEARING
             BEFORE HONORABLE JUDITH K. FITZGERALD
              UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Sidley Austin LLP
                          By:  GEOFFREY RAICHT, ESQ.
                               DENNIS TWANEY, ESQ.
                               GUY NEAL, ESQ.
                          Washington, DC

                          Sidley Austin LLP
                          By:  JEFFREY STEEN, ESQ.
                          Chicago, IL

                          Saul Ewing LLP
                          By:  NORMAN PERNICK, ESQ.
                          222 Delaware Avenue, Suite 1200
                          Wilmington, DE  19801

                          Owens Corning
                          By:  STEPHEN KROLL, ESQ.


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For Certain Bondholders: | Stroock & Stroock & Lavan LLP<br>By: LEWIS KRUGER, ESQ.<br>BRETT LAWRENCE, ESQ.<br>KEN PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY 10038-4982 |
| For the Futures Rep.: | Kaye Scholer LLP<br>By: ANDREW KRESS, ESQ.<br>425 Park Avenue<br>New York, NY 10022-3598 |
| For the U.S. Trustee: | Office of the U.S. Trustee<br>By: DAVID KLAUDER, ESQ.<br>844 King Street, Suite 2313<br>Lockbox 35<br>Wilmington, DE 19801 |
| For JP Morgan<br>Securities, Inc.: | Simpson Thacher & Bartlett LLP<br>By: MARK THOMPSON, ESQ.<br>ALICE BELISLE EATON, ESQ.<br>425 Lexington Avenue<br>New York, NY 10017-3954 |
| For Murray Capital<br>Management, Inc.: | Murray Capital Management, Inc.<br>By: MARTI MURRAY<br>(Telephonic appearance) |
| For Bond Holders<br>and Trade Creditors: | Anderson Kill & Olick, P.C.<br>By: HOWARD D. RESSLER, ESQ.<br>1251 Avenue of the Americas<br>New York, NY 10020-1182<br>(Telephonic appearance) |
| For the Official<br>Committee of Unsecured<br>Creditors: | Morris Nichols Arsht & Tunnell, LLP<br>By: WILLIAM SUDELL, ESQ.<br>1201 North Market Street<br>Wilmington, DE 19899-1347<br>(Telephonic appearance) |
| For Linden Advisors, LP: | Linden Advisors, LP<br>By: ANDY CHANG<br>(Telephonic appearance) |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

```
For DK Acquisition          Willkie Farr & Gallagher LLP
Partners:                   By:  STEPHEN B. VOGEL, ESQ.
                            The Equitable Center
                            787 Seventh Avenue
                            New York, NY  10049-6099
                            (Telephonic appearance)

For Blue Ridge              Mayer Brown Rowe & Maw, LLP
Investments & Bank of       By:  CHRISTINE JAGDE, ESQ.
America:                    71 S. Wacker
                            Chicago, IL  60606-4637
                            (Telephonic appearance)

For Official Committee      Monzack & Monaco, P.A.
Bondholders:                By:  FRANCIS MONACO, ESQ.
                            1201 North Orange Street
                            Suite 400
                            Wilmington, DE  19899
                            (Telephonic appearance)

For Ad Hoc Committee:       Brown, Rudnick, Berlack & Israels
                            By:  JOHN ELSTAD, ESQ.
                            One Financial Center
                            Boston, MA  02111
                            (Telephonic appearance)

For Lehman Brothers:        Lehman Brothers
                            By:  CHRISTINE DALEY
                            (Telephonic appearance)

For HSBC Bank:              Kelley Drye & Warren, LLP
                            By:  EDWARD LEEN, ESQ.
                            101 Park Avenue
                            New York, NY  10178
                            (Telephonic appearance)

For JP Morgan:              Klett, Rooney, Leiber & Schorling, LLP
                            By:  TERESA CURRIER, ESQ.
                            The Brandywine Building
                            1000 West Street
                            Suite 1410
                            Wilmington, DE  19801
                            (Telephonic appearance)
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Ad Hoc Bondholders:  Stroock & Stroock & Lavan, LLP
By:  ERIC KAY, ESQ.
     DENISE WILDES, ESQ.
180 Maiden Lane
New York, NY  10038
(Telephonic appearance)

For Owens Corning:  Owens Corning
By:  JOHN W. CHRISTY, ESQ.
     JAMES A. GIBB, ESQ.
Toledo, OH
(Telephonic appearance)

For Owens Corning:  Saul Ewing LLP
By:  J. KATE STICKLES, ESQ.
222 Delaware Avenue, Suite 1200
Wilmington, DE  19801
(Telephonic appearance)

For Wilmington Trust Company:  Pryor Cashman Sherman & Flynn
By:  DALLAS ALBAUGH, ESQ.
(Telephonic appearance)

For James J. McMonagle:  Young, Conaway, Stargatt & Taylor, LLP
By:  SHARON ZIEG, ESQ.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
(Telephonic appearance)

For Credit Suisse First Boston:  Weil, Gotshal & Manges, LLP
By:  JUDY G. LIU, ESQ.
New York, NY
(Telephonic appearance)

For Credit Suisse:  Landis, Rath & Cobb, LLP
By:  REBECCA BUTCHER, ESQ.
919 Market Street, Suite 600
Wilmington, DE  19801
(Telephonic appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee of Asbestos Claimants: | Campbell & Levine<br>By:  MARK HURFORD, ESQ.<br>800 N. King Street, Suite 300<br>Wilmington, DE  19801<br>(Telephonic appearance) |
| For Official Committee of Asbestos Claimants: | Caplin & Drysdale, Chartered<br>By:  PETER VAN LOCKWOOD, ESQ.<br>One Thomas Circle, N.W.<br>Washington, DC  20005<br>(Telephonic appearance) |
| For Bank of America: | The Bayard Firm<br>By:  ERIC SUTTY, ESQ.<br>222 Delaware Avenue<br>Wilmington, DE  19899<br>(Telephonic appearance) |
| For Bear, Stearns & Company: | Bear, Stearns & Company Inc.<br>By:  MITCHELL SUSSMAN<br>(Telephonic appearance) |
| For Owens Corning: | Sidley Austin<br>By: HADLEY VAN VACTOR, ESQ.<br>(Telephonic appearance) |
| For JP Morgan Chase Bank: | Simpson Thacher & Bartlett LLP<br>By:  NATHAN CHANEY, ESQ.<br>(Telephonic appearance) |
| For JP Morgan Chase Bank: | JP Morgan Chase Bank<br>By:  OLIVER BUTT<br>(Telephonic appearance) |
| For JP Morgan Securities, Inc.: | JP Morgan Securities, Inc.<br>By:  JAY LIFTON<br>(Telephonic appearance) |
| For Foster & Sear, LLP: | Greenberg Traurig<br>By:  BRUCE WHITE, ESQ.<br>600 Three Galleria Tower<br>13155 Noel Road<br>Dallas, TX  75240<br>(Telephonic appearance) |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

For ACE American Ins.:      White & Williams LLP
                           By:  MARC CASARINO, ESQ.
                                JOSEPH GIBBONS, ESQ.
                           824 North Market Street
                           Suite 902
                           Wilmington, DE  19801
                           (Telephonic appearance)

For Official Committee     Davis Polk & Wardwell
of Unsecured Creditors:    By:  LOWELL GORDON HARRISS, ESQ.
                                JAMES McCLAMMY, ESQ.
                           450 Lexington Avenue
                           New York, NY  10017
                           (Telephonic appearance)

For Kensington Int'l:      Stutman Treister & Glatt, P.C.
                           By:  K. JOHN SHAFFER, ESQ.
                           1901 Avenue of the Stars
                           Los Angeles, CA  90067
                           (Telephonic appearance)

1    THE COURT: You're all here for Owens, right?

2                    (Pause)

3    THE COURT: Good morning. Please be seated. This is

4 the matter of Owens Corning, Bankruptcy Number 00-3837, pending

5 in the District of Delaware. The participants I have listed by

6 phone, Marti Murray, Howard Ressler, William Sudell, Andy

7 Chang, Stephen Vogel, Christine Jagde, Francis Monaco, John

8 Elstad, Christine Daley, Edward Leen, Teresa Currier, Eric Kay,

9 Denise Wildes, John Christy, James Gibb, Kate Stickles, Dallas

10 Albaugh, Sharon Zieg, Judy Liu, Rebecca Butcher, Mark Hurford,

11 Peter Lockwood, Eric Sutty, Mitchell Sussman, Hadley Van

12 Vactor, Nathan Chaney, Oliver Butt, Jay Lifton, Bruce White,

13 Marc Casarino, Joseph Gibbons, Gordon Harris, James McClammy,

14 and John Shaffer. I'll take entries in Court, please.

15    MR. PERNICK: Good morning, Your Honor. Norman

16 Pernick from Saul Ewing, for the debtors.

17    MR. NEAL: Good morning, Your Honor. Guy Neal,

18 Sidley Austin, for the debtors.

19    MR. STEEN: Good morning, Your Honor. Jeffrey Steen,

20 S-t-e-e-n, also of Sidley Austin, on behalf of the debtors.

21    MR. RAICHT: Good morning, Your Honor. Geoffrey

22 Raicht, Sidley Austin.

23    MR. KRESS: Good morning, Your Honor. Andrew Kress,

24 Kaye Scholer, on behalf of the futures rep.

25    MR. KRUGER: R. Lewis Kruger, Stroock & Stroock &

**J&J COURT TRANSCRIBERS, INC.**

1  Lavan, on behalf of various bond holders.

2          MR. LAWRENCE:  Good morning, Your Honor.  Brett

3  Lawrence, Stroock & Stroock & Lavan, on behalf of various bond

4  holders.

5          MR. PASQUALE:  Ken Pasquale from Stroock & Stroock &

6  Lavan for certain bond holders.

7          MR. KLAUDER:  Good morning, Your Honor.  David

8  Klauder for the United States Trustee.

9          MR. THOMPSON:  Good morning, Your Honor.  Mark

10  Thompson, Simpson Thacher, for JP Morgan Securities.  With me

11  is Alice Eaton, also of Simpson Thacher.

12          THE COURT:  Mr. Pernick?

13          MR. PERNICK:  Your Honor, we actually have two items.

14  We didn't officially put the first one on the agenda because we

15  didn't think the Court was asking for further argument.

16          THE COURT:  No.

17          MR. PERNICK:  I think you saw all the submissions.

18          THE COURT:  I did.

19          MR. PERNICK:  But I would suggest -- I don't know how

20  the Court wants to handle that one.

21          THE COURT:  I'm ready to give you a ruling on --

22          MR. PERNICK:  Okay.

23          THE COURT:  -- on the Plan Support Agreement.  All

24  right.  The Plan Support Agreement I have concluded, after very

25  careful review and discussion with my law clerk, both as to the

**J&J COURT TRANSCRIBERS, INC.**

terms of the agreement and the cases that we were able to find and look at from the submissions of the parties, I have determined that the Plan Support Agreement is not a solicitation, and therefore the issues that I was concerned with with respect to a disclosure statement and its review are not applicable at all, but let me go through the rationale that I have arrived -- that let me to this conclusion.

First of all, cases define the act of solicitation very narrowly. One case goes so far as to say that the solicitation has to be in the context of a specific request for an official vote. That's the Zentex GBV Fund case at 19 Fed. App. 238 at 247-48. It's a 6th Circuit 2001 case. Of course, in this instance this Plan Support Agreement is clearly to a request for an official vote. There is no ballot, no plan.

Cases also point out the difference between the solicitation and negotiation processes, and recognize that communication between creditors and between the debtors and creditors is crucial to effectuate the goal of the Bankruptcy Code, and that goal, in this instance, the one I'm speaking about, is to achieve consensual resolution of disputes. The Dow Corning case, the Gulph Woods case, and others identify that process and make that distinction.

Here, the Plan Support Agreement is an effort to settle what I think can fairly be called extraordinarily complex litigation, the equitable subordination actions, the

estimation of asbestos personal injury claims, and the

fraudulent transfer adversary that's pending in the District

Court.  Debtors have now been in bankruptcy for over six years,

and in that time there has been shifting sands in terms of who

holds the blocking position for plan treatment in several

classes.  The parties have engaged in years of discovery, weeks

of trial, and months of appeals, and all the while trying to

preserve -- the debtors have been trying to preserve their core

businesses and resolve the legacy liability to the satisfaction

of the asbestos personal injury claimants.

I think the plan proponents are in a very difficult

situation here.  They want to propose a plan that meets the

consent of all constituents, but determining who the

constituents are is a daily changing task.  In addition, unless

the various litigation is settled, the appeals could stymie

confirmation for more years to come.  With the automatic stay

in place, in that entire time no resolution will occur of the

merits of any pre-petition claim, especially those of the

asbestos PI claimants who cannot pursue the debtors' assets,

but also those of the holders of the bank and bond debt.

Meanwhile, interest continues to accrue on the secured portion

of the debt, all of which means that there will be less

available to the unsecured creditors and tort claimants

ultimately.  It's time for these debtors to leave bankruptcy

behind them, emerge from Chapter 11, and go on with the

successful business lines that they have achieved for decades,

so the question is how can the debtors accomplish the goal of

emerging without first ascertaining the positions of the

creditor constituents regarding the plan?  Because successful

as the debtors' businesses are, they do not generate sufficient

cash -- or, pardon me, let me restate that.  They do not have

sufficient cash on hand today to be able to pay the $7 billion

in tort claims, the $1.8 billion in bond debt, and I have

forgotten the exact number of the bank debt.  I think it's

upwards of $2 billion at this point.  Is that correct, Mr.

Pernick?

MR. PERNICK:  With interest and fees it's a little

above 2.3.

THE COURT:  All right.  $2.3 billion of bank debt.

To successfully do that the debtors need the inflow of cash,

and that is what the debtors hope to attain through the equity

commitment motion that's also set for hearing today.  With an

enterprise value of $5.858 billion, the debtors obviously need

additional capital to pay the claims more than those claims

would achieve in a Chapter 7 liquidation.  And, of course, JP

Morgan has a substantial interest in making sure that when it

commits its $2.187 billion for the purpose of providing that

equity backstop, that the creditors are actually going to

support the debtors' efforts to reorganize in this fashion.

To achieve the consensual resolution of all of these

**J&J COURT TRANSCRIBERS, INC.**

1  complex issues, find the funding for a plan, and emerge from

2  Chapter 11 with a confirmed plan, the parties have crafted a

3  settlement agreement in the form of the Plan Support Agreement

4  and presented to the debtors their view of what a plan must

5  contain in order to gather their support.  The debtors have

6  3expressed the intent since the beginning of this case to

7  achieve a consensual plan.  Now the debtors have that

8  opportunity.  That is the essence of negotiation, not of

9  solicitation.

10       The agreement is contingent on the debtors filing a

11  disclosure statement and plan that meets with the consent of

12  the participants to the Plan Support Agreement.  If those

13  documents do not meet with the constituents' satisfaction, they

14  are not committed to vote for the plan.  Credit Suisse, as

15  agent for the banks, is not a party to the plan support

16  agreement, but has nonetheless also submitted a response

17  supporting it.

18       This, in the Court's view, is a major accomplishment

19  toward confirmation because one of the stumbling blocks

20  throughout this case has been the absence of agreement between

21  the banks and the bonds as to their respective treatments under

22  the plan.  The parties have attempted to resolve those

23  differences in a variety of ways, through mediation, through

24  settlement discussions with the Court, through litigation and

25  appeals.  Now an agreement has the chance of coming to light

and of remaining in place due to the trading conditions that
the parties agreed to if the Plan Support Agreement is
approved.  The participants to the Plan Support Agreement and
Credit Suisse are highly sophisticated, well represented
parties in interest.  They all have counsel, financial
advisors, investment advisors, and those with financial trading
arms actively participate in the market for Owens bond and bank
debt.  After six years of bankruptcy with years of discovery on
virtually every aspect of the debtors' businesses, these
parties probably don't even need a disclosure statement to
inform their ability to vote.  But, of course, the negotiations
have taken place in light of the fact that the Court did
approve a disclosure statement two years ago, and although plan
classifications and treatment of some creditor groups has
changed due to the reversal of the substantive consolidation
ruling, the parties, through their counsel, know all there is
to know about the debtors and how the debtors' operations have
changed in the two years since the disclosure statement was
approved.  This is a publicly traded company.  There are
publicly filed documents.  Bargaining after approval of a
disclosure statement is clearly appropriate.

There is, of course, need to approve a disclosure
statement that comports with the plan that the debtors will
advocate for confirmation, and other parties who are not
parties to the Plan Support Agreement will need that

information.  Further, no vote will be permitted until a
disclosure statement that comports with the plan offered for
confirmation has been approved.  If the disclosure statement
and plan proffered for confirmation contain materially
different treatment for the classes, then the Plan Support
Agreement sets out the parties are not bound to vote for the
plan.  There is nothing in the Plan Support Agreement that
demands or solicits a vote unless the plan proposed meets with
the satisfaction of the Plan Support Agreement parties.  And
those parties have put together in the Plan Support Agreement
the information that tells the plan proponents what the
parameters of the plan must be to achieve the favorable vote of
the creditors who are parties.

The Plan Support Agreement is the written
memorialization of the negotiations towards settlement of the
legal disputes that have prevented confirmation to date, and of
the negotiations toward confirmation of a plan, and that is not
the solicitation of a vote.  There are no cases that the Court
or any party has found that address whether the disclosure
statement that the Court approves before solicitation has to be
that accompanying the plan that is out for vote; however, I do
not need to decide that question today.  Here there was no
solicitation of any plan.  I do note, however, that the sixth
amended plan, which is coming up for disclosure statement and
confirmation -- let me state that again.  I note that the sixth

amended plan and the disclosure statement accompanying that

plan had not been filed when the Plan Support Agreement was

negotiated.  The parties were, in fact, negotiating to arrive

at the consensual terms of that plan.  The cases approve of

negotiation and they are clear that negotiation and settlement

do not constitute solicitation in violation of the Bankruptcy

Code.

To the extent that there is a fine line between

negotiation and solicitation, that line is not crossed here.

An order will be entered approving the debtors' request to

enter into the Plan Support Agreement.

MR. PERNICK:  And, Your Honor, we'll submit a form of

order.  We still have to finish working out Century's language

just for the reservation of rights, which we got, but

unfortunately a lot of us were traveling here yesterday, so

we'll do that after the hearing.

THE COURT:  All right.  I'll take it when I get it on

a C.O.C.  Thank you.

MR. PERNICK:  Thank you.  Your Honor, the next item

is actually Item Number 1 on the agenda that went to the Court,

which is the motion to enter into the Equity Commitment

Agreement and Guy Neal from Sidley is going to present that.

MR. NEAL:  Good morning, Your Honor.  Guy Neal,

Sidley Austin, co-counsel for the debtors.  Your Honor, we're

here today on the debtors' motion for an order pursuant to

Section 105(a), 363(b), and 1125(e), for authority to enter into the Equity Commitment Agreement dated May 10th, 2006 between Owens Corning and JP Morgan Securities, Inc. in the form attached to the motion as Exhibit A, pay the related fees and expenses, and furnish certain related -- and what we submit are standard indemnities.

Also seeking approval as part of this order, Your Honor, is approval of the syndication agreement dated May 10th, 2006, in the form attached as Exhibit B to the motion that was executed by and between the investor, D.E. Shaw Laminar Portfolios, Plainfield Special Situations Master Fund Limited, and certain other investor parties. They are referred to as ultimate purchasers and we seek the Court's approval of that agreement as well as a related document to the Equity Commitment Agreement.

Your Honor, only one objection has been filed and we take that objection very seriously, by the Office of the United States Trustee, and with the additional time associated with the movement of this hearing from January 13th to today -- excuse me -- from June 19th to today, we have met with Mr. Klauder of the U.S. Trustee's Office. We have tried to address, in our best efforts, all of his concerns, and Mr. Klauder will speak today, of course, as to his objection.

Yesterday, Your Honor, as you know, we filed a motion for leave to file a reply brief, which I believe Your Honor

kindly granted, and we limited our reply as rules require, to

five pages, which was a feat in and of itself, Your Honor.

THE COURT: But said everything it needed to say.

(Laughter)

MR. NEAL: Very good. We appreciate that. This was

not to be an evidentiary hearing back on the 19th, but in any

event we submitted the declaration -- two declarations, in

fact, and JP Morgan submitted one declaration, to pinpoint,

target, and address the very specific concerns raised by Mr.

Klauder in his objection. So, what we have is, we have the

declaration of Mr. Stephen K. Kroll, Senior Vice President,

General Counsel, and Secretary of Owens Corning. We also have

a declaration, a little bit longer than Mr. Kroll's

declaration, but important nonetheless, of Robert Kost of

Lazard, the debtors' financial advisors, both of which address

the negotiations, often contested, often heated, and certainly

burning midnight oil associated with the negotiation of the

Equity Commitment Agreement, as well as the debtors' business

judgment that this is the best deal the debtors were able to

negotiate under the very specific facts and circumstances of

this case.

Now, Your Honor, I believe we have the agreement of

the U.S Trustee on this point, and we'd like to proceed as

follows, if it makes sense to Your Honor. We would like to

have those declarations submitted as the proffer of the direct

**J&J COURT TRANSCRIBERS, INC.**

1 testimony of these two witnesses.  And I believe Mr. Klauder

2 has no objection to that.  And Mr. Klauder certainly has the

3 right to cross examine should he feel that that is necessary.

4         THE COURT:  Mr. Klauder, is there any objection to my

5 accepting the declarations as the direct case of the --

6         MR. KLAUDER:  No, there is not.

7         THE COURT:  All right.  I will accept the

8 declarations of Mr. Kost from Lazard and Mr. Kroll from Owens

9 Corning as proffered.  And do you want to finish your

10 recitation first before I see if there's --

11        MR. NEAL:  Sure, Your Honor -- I'm sorry.  I cut you

12 off.  Before?

13        THE COURT:  There is cross examination?

14        MR. NEAL:  Yes, Your Honor.  If you would?

15        THE COURT:  All right.

16        MR. NEAL:  I appreciate that.  And let me stress --

17 of course, Your Honor, that we have both Mr. Kroll and Mr. Kost

18 in the courtroom today to effectuate the cross examination.

19 They're not by phone.  They're here in person, and are willing

20 to address any questions Mr. Klauder or the Court may have.

21 Let me briefly, Your Honor, turn to the evidence that's set

22 forth in these declarations, and then address the United States

23 Trustee's concerns.  First, as set forth in fair detail in the

24 declaration of Stephen Kroll, it's the debtors' business

25 judgment reached after consultation with Lazard, their

financial and restructuring advisor, as well as, and this is
important, Your Honor, as well as the debtors' co-plan
proponents and every other key creditor constituency in these
cases that the Equity Commitment Agreement is a critical and
integral component of the debtors' Chapter 11 cases, which has
been documented in the settlement term sheet and which is
reflective in some part in the Plan Support Agreement that Your
Honor is now very familiar with, and as well as the sixth
amended plan that was on file earlier this month. As set forth
in Mr. Kroll's declaration, the Equity Commitment Agreement
largely removes the potential risks and uncertainties of the
capital markets, mitigates against the financial impact of the
cyclicality of these businesses, and provides the claimants
that have reached the settlement as set forth in the Plan
Support Agreement and the plan. It provides them adequate
assurance that the sixth amended plan is or will be feasible.
For this reason, Your Honor, the motion has the support of the
$7 billion in asbestos claimants subject to a response that was
filed by Mr. Kress, as well as approximately 1.5 million of the
bond holder claims, and every other major stakeholder in these
Chapter 11 cases. Indeed, no claim holder or equity holder,
Your Honor, has objected to the merits of the relief that the
debtors seek today.

Second, Your Honor, as set forth at fair length in
the declaration of Mr. Kost of Lazard, that this Equity

Commitment Agreement and the terms and conditions of it fall well within the four corners of backstop commitments that this Court has approved and that other Courts have approved. And real brief, Your Honor, I won't read, you know, verbatim, and take the Court's time, but real brief, in the declaration of Mr. Kost, it sets forth, specifically in Paragraphs 11, 12, and 13, that the terms and the condition of the Equity Commitment Agreement were heavily negotiated at arm's length between the debtors and the investor and the key variables that Lazard and the debtors and the other parties negotiated with the investor were the period of the time commitment, the conditionality of the time commitment, including what else would apply to it, strike price for the rights offering, and the amount and the nature of the commitment fee and the related fees and expenses.

In paragraph 14 of Mr. Kost's declaration it is Lazard's opinion, certainly shared by the debtors, that the combination of a lengthy commitment period, a firm backstop price, and a firm underwritten backstop commitment makes the terms of the Equity Commitment Agreement no less favorable than the backstop commitment provided in the USG Corporation Chapter 11 case, and largely unprecedented and underwritten rights offering of the size and the complexity of the one contemplated here. The Equity Commitment Agreement as negotiated provides the debtors with extraordinarily high level of assurance that they will ultimately raise and receive the equity capital

1 necessary to make the payments under the sixth amended plan.

2 And lastly, Your Honor, in terms of what the

3 declarations say and what I'm trying to underscore, Your Honor,

4 in part, is that in Lazard's opinion the amount and the nature

5 of the backstop and related fees and expense reimbursement

6 undertakings and the other terms are fair and reasonable given

7 the significant benefits to the debtors, the strength and time

8 period of the commitment by an entity such as JP Morgan, and a

9 comparison to other underwritten rights offerings, including

10 USG, as well as the volatility, risks and uncertainty

11 associated with the capital markets, as well as the cyclicality

12 of the debtors' business.

13 I will now turn my presentation and try to be brief

14 with respect to responding to the anticipated objection or some

15 points raised by the Office of the U.S. Trustee. Now, we've

16 had the opportunity, given an extra few days to put this

17 hearing together, to have a conference call, about an hour,

18 with the Office of the U.S. Trustee to walk the Trustee through

19 some of these economic points and why this deal, we would

20 submit, although USG does not have to be the template that this

21 deal, in many respects, is superior to USG in terms of what we

22 were able to negotiate with JP Morgan in this environment.

23 Now, even if you accept that USG is an apples to

24 apples comparison --

25 THE COURT: Well --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. NEAL:  Yes.

2          THE COURT:  -- let me start this.  I am very familiar

3 with the USG equity commitment backstop offering, since it took

4 place in my Court.  I do not see that the two cases are in a

5 parity for a number of reasons.  First of all, USG was

6 advocating 100 percent plan for all creditor constituents

7 except the asbestos PI creditors with interest, and that plan

8 was already on the table and set for confirmation in a very

9 short period of time at the time that the backstop offering was

10 going forward by the parties.  I don't think the plan itself

11 had been set for confirmation.  I think the timing -- that what

12 I'm trying to get to is that the short timing involved in that

13 equity rights commitment letter led to an immediate

14 confirmation hearing, and in fact, the case is already

15 confirmed.  So, I think the timing issues were significantly

16 different.  In addition, Berkshire Hathaway was a major

17 shareholder of the debtor and had some additional incentives,

18 perhaps, to come up with the agreement in the fashion that it

19 did.  I am also aware, from that case, as well as the

20 declarations submitted in this one, that there is a significant

21 difference between the regulatory forces facing Berkshire

22 Hathaway and JP Morgan as the offeror of this particular

23 agreement.  So, I don't think that they are on a parity for

24 those reasons.  There are some issues, however, that I think

25 should be addressed, and I'm not totally comfortable that they

are addressed, as well, in Owens.  In that case, not having the
fees and expenses reviewed by the Court seemed somewhat less of
a concern to me because of the fact that everybody was being
paid 100 percent on the dollar with interest and the effective
date of the plan was expected to be in a very short time
thereafter.  I don't know yet because this plan hasn't come up
in that kind of a context, whether Owens is in the same
position.  And I don't know how I'm going to get to
confirmation without getting some assurance in this case that
the fees and expenses are reasonable, and I don't know how I'm
going to get that assurance unless I see them.  So, I am a
little bit concerned about the fees and expenses in this
context.  I don't even know what they are.  I don't know how
I'm going to judge that they're reasonable.

MR. NEAL:  Very good, Your Honor.  Let me address
that specific point.  I mean, it certainly is a requirement
here under the ECA that the fees and expenses both be non-
refundable and the professional fees, which is what Your
Honor's point is that they be -- they be paid as part of the
deal.  Your Honor, this is all a matter of negotiation, and on
the one hand you could say --

THE COURT:  Regardless, there is a confirmation issue
that says I need to make a finding and I don't know how you're
going to have me make that finding without telling me what they
hare and submitting those fees and expenses to the Court under

1   the conditions of this case.

2         MR. THOMPSON:  May I speak?

3         MR. NEAL:  Certainly.

4         MR. THOMPSON:  For the record, it's Mark Thompson of

5   Simpson and Thacher.  I suspect it's mostly my fees that we're

6   talking about, so I thought I should step up, Your Honor.  Your

7   Honor, I've already spoken to the U.S. Trustee just before Your

8   Honor took the bench, and we have no objection in submitting

9   our invoices and the backup detail to whatever protocol there

10  is in this case for paying fees, you know, just like a DIP

11  lender would do in any other case, you know, with -- this is

12  just an equity version of a, you know, exit financing.  We're

13  happy to do something like that.  I note -- and I think the

14  U.S. Trustee has no objection, I haven't, in anticipation of

15  that, prepared our time records and, you know, fee application

16  guideline conformance, but I am happy to provide whatever

17  detail we would ever provide to a client, you know, to Your

18  Honor or to whatever system Your Honor wants to set up.

19        THE COURT:  All right.  Thank you.  That will help.

20        MR. NEAL:  And perhaps Mr. Pernick can address -- we

21  already have a mechanism in place that Mr. Pernick is very well

22  familiar with respect to the banks' fees, and that process --

23        MR. PERNICK:  Your Honor, and we just had this

24  thought while we were talking before the hearing.  You may

25  recall that under the bank standstill agreement the banks

1 actually submit their attorneys and financial advisor fees to

2 the debtors and they are reviewed.  I can't recall whether

3 anybody else gets a copy, but I don't think that would be an

4 issue.

5          THE COURT:  No, but before we get to confirmation

6 somebody is going to have to tell me what those fees are --

7          MR. PERNICK:  Right.

8          THE COURT:  -- because I'm going to have to determine

9 that they are reasonable, too, so --

10          MR. PERNICK:  Absolutely.  Well, there will be --

11          THE COURT:  -- it's the same issue.

12          MR. PERNICK:  That issue has already been anticipated

13 in that there has to be agreement on what the final number for

14 the banks is.  Of course, the Court has to approve that, so --

15 but we would be happy to do the same mechanism, and I think the

16 Court may recall that Owens Corning's legal department actually

17 has a review process that meaningfully goes through these

18 bills, questions its every advisor, every lawyer, every

19 financial advisor, so there is a process that's already in

20 place, and if I recall correctly, I think that's what got Your

21 Honor comfortable with the bank standstill procedure.

22          THE COURT:  That was it.  But for confirmation

23 purposes we still need to go the next step.

24          MR. PERNICK:  Not a problem.

25          THE COURT:  All right.  Well, it appears -- I'll hear

**J&J COURT TRANSCRIBERS, INC.**

1 from Mr. Klauder if there is a concern about that process when

2 he speaks later, but at least from -- for my concern right now

3 I think at least this is a workable issue.

4          MR. NEAL: Okay. Very good, Your Honor. Unless Your

5 Honor has any other specific concerns that you'd like me to

6 address first, let me just go through some of the issues raised

7 by the U.S. Trustee in our response, and which we tried to put

8 forth in our five-page reply. Next we just talked about the

9 magnitude of the $100 million backstop fee. As set forth in

10 the declaration of Mr. Kost, you know, that amount of fee, that

11 fee, 100 million backstop fee, is not unreasonable under the

12 circumstances of this case. Again, Your Honor has pointed out

13 the differences between this case and USG, and that the USG

14 percentage shouldn't be necessarily used as the ceiling for

15 this deal. Indeed, there are other backstop commitments that

16 have been approved by other Courts in which the fee was higher

17 than the fee being sought here. And again, with USG, just

18 sticking with that for now, we don't have a Warren Buffett

19 willing to backstop 2.187 billion in this instance. You know,

20 no other single investor or group of investors has come forward

21 willing to provide an alternative or superior backstop

22 arrangement. This has been out. My math I don't have in front

23 of me, but this motion has been on file since May 10th, and we

24 have over a 40 day period in which this has been out in the

25 marketplace and public. We have in the declarations of Mr.

Kost as well as Mr. Kroll, you know, a detailed explanation of how the debtors and Lazard have made themselves available to any parties wishing to discuss this arrangement, wishing to submit a competing proposal. No party has put forward a formal expression of interest, and certainly no party has come forward through today, as of now in this hearing, willing to do it under any different terms for any less amount of money. So, in this regard, you know, based on information provided to Owens Corning by Lazard, the fees contemplated are well within the range of similar fees and are certainly market, Your Honor, which is an important consideration.

The Trustee makes an issue concerning the escrow, and really what arguably could be semantical in many respects of what is an escrow? Does this escrow that we propose that exists on an economic and regulatory basis, whether that compares or is equal or is on par with the USG escrow arrangement. Your Honor, we submitted, unfortunately after the 12 noon deadline yesterday, but nonetheless, Your Honor, we did our best efforts to submit a declaration or have JP Morgan, I should say more accurately, submit a declaration on point with the escrow consideration. And as, Your Honor, as we set forth in our papers, there is tantamount under the rules and regulations of the SEC and the Federal Reserve, a requirement that JP Morgan, once this order is approved, allocate 100 percent of that money towards this deal such that they have

opportunity cost concerns of having this money tied up that was
the same concerns that this Court really focused on in the
hearing in February in USG and for that reason, we submit, what
flows from that is the irrevocable nature of the fee.  They are
agreeing, JP Morgan, the investor, to tie up a significant
amount of money on a regulatory basis on their books and
records for a comparatively longer period of time, and not only
with the risks associated with this deal which we address, and
I can touch upon briefly, but the length of that time, we
submit, that the irrevocable nature of that fee is also
reasonable in this context.

Turning to the release and exculpation provisions,
I'll be brief on this, Your Honor, I believe we have been
successful in addressing the U.S. Trustee's concerns with
respect to the release and exculpation provisions in this
order.  As Your Honor is well aware, given several of the
voting procedure motions that have been on file, and
statements, and representations made in the plan and disclosure
statement, we're proposing a rights offering effective pre-
confirmation, Your Honor.  And whereas if you, again, use USG
as a comparison, those release and exculpation provisions came
in the confirmation order with the rights offering to follow.
Here we're proposing similar release and exculpation
provisions, again with the rights offering to follow.  We
submit that that's standard in the other backstop agreements

that we have reviewed, either <u>JL French</u>, <u>Intermet</u>, or certainly

in <u>USG</u>.  And I believe, again, we have addressed the U.S.

Trustee's concerns in that issue.

A couple more points, Your Honor, and then I'll sit

down and turn this over to Mr. Klauder or the other plan

proponents who might want to say something in support.  There

is the issue of the syndicate structure.  Again, I believe

we've addressed the U.S. Trustee's concerns in that regard.  We

have carefully walked the U.S. Trustee's Office through the

nature of the agreement and underscored how this is an

agreement -- and we do this in the reply as well, as Your Honor

is familiar, between the debtor and JP Morgan only.  JP Morgan

takes the entire risk in the first instance and is liable to

the company for the full backstop amount, and we believe and we

have confidence, and this is set forward in Mr. Kost's

declaration, that, you know, relying on the good faith and

creditworthiness of JP Morgan is certainly a very reasonable

thing for the debtors to do in this instance.

This morning, Your Honor, unless Mr. Klauder says

otherwise, we might have been able to, you know, convince Mr.

Klauder with respect to the commitment, the outs, or in some

nomenclature they're called, you know, hell or high water

commitments associated with this deal.  Your Honor, this is a

very similar deal to <u>USG</u>, even accepting that as an apples to

apples comparison, but it's very similar in terms of the

**J&J COURT TRANSCRIBERS, INC.**

1  limited ability of the investor in this instance to back out of
2  this deal.  Importantly, there is no material adverse change
3  clause either from a business or operational perspective of
4  Owens Corning should, God forbid, something happen in the near
5  term, or in terms of the market generally.  That is, there are
6  no triggers that would allow, or floor that would allow JP
7  Morgan to back out should the market continue what we have
8  submitted in certain -- in our declaration and exhibits,
9  continue a downward trend in the building product sector.  So,
10  we have -- I would not go so far as to use the nomenclature
11  hell or high water, because that's been defined differently in
12  different contexts, but we have a similar arrangement, a very
13  firm backstop commitment of JP Morgan that we believe is
14  reasonable in this marketplace.
15          Lastly, Your Honor, and we put this at the end of Mr.
16  Kost's declaration.  We addressed this in our reply.  The
17  parties and the other -- the parties in this case, the debtors
18  and the other key constituents can't ignore the fundamental
19  economics of the marketplace these days.  We have submitted a
20  series of exhibits attached to the back of Mr. Kost's
21  declaration which show the performance of the stock prices in
22  the housing sector companies and the declines, fairly steep
23  declines, Your Honor, I mean, to the extent you were a patient
24  in a hospital you would not want this to be your chart hanging
25  on your door reflecting the percentage decline in building

sector companies comparable to Owens Corning. And, Your Honor,

you can slice this many different ways. I mean, you can look

at it in a six month window. You can look at it in a three

month window. But really all you need to do is look at it

since May 10th, and the declines associated from May 10th to

today in the market with these building sector stocks, the

percentage decline is about 20 percent, Your Honor. For that

reason, Your Honor, the deal we struck, we submit, has been

affirmed, not only from a business judgment standard, but by

any standard a being a great deal, and a timely deal for these

cases such that, Your Honor, the market has changed

dramatically. We do not want to be in a position, Your Honor,

to have to renegotiate that deal, which is set to expire unless

an order is entered on June 30. So, the market has spoken,

Your Honor, to sum up, that this is a reasonable deal. This is

a good deal for the estates, and it will put us on a path, on

the expedited time track consistent with the sixth amended plan

to emerge from bankruptcy, hopefully in the third quarter of

this year.

        THE COURT: Any of the other plan proponents wish to

address this?

        MR. KRESS: I do, Your Honor.

        THE COURT: Mr. Kress?

        MR. KRESS: Perhaps I think I'd like to wait until

the U.S. Trustee speaks.

1          THE COURT:  All right.  Mr. Klauder?

2          MR. KLAUDER:  Thank you, Your Honor.  David Klauder

3  for the United States Trustee.  It's nice to make my first trip

4  to Pittsburgh and to this courtroom, no matter how long it took

5  me to get here last night.  Your Honor, I want to make a few --

6          THE COURT:  People had trouble getting home, too, Mr.

7  Klauder, if that's any consolation.

8          MR. KLAUDER:  I guess I'd better cancel my dinner

9  plans.  I wanted to make a few comments about our objection and

10  then the presentation and the evidence put forth by the debtors

11  to sort of put some context around the pleading that we filed.

12  I want to make it abundantly clear that the U.S. Trustee was

13  not looking to, quote, unquote, blow up this deal.  We

14  understand the impact of the deal and the importance of forging

15  the consensus to get to confirmation.

16          We felt we would not be complying with our statutory

17  duty if we did not closely review the transaction, especially

18  when you're dealing with the payment of $100 million commitment

19  fee on an unconditional non-refundable basis.  The payment of

20  such a large amount has to be scrutinized not only by the

21  economic parties which it appears it has, but also by our

22  office, and of course the Court.  We felt that the recent

23  transaction in the USG case provided guidance to the Court, and

24  we can look toward those terms and the Court's decision not

25  necessarily as a barometer, but as guidance.  Contrary to what

1  the debtor stated in their reply, we are not looking at the USG

2  deal as a one-size-fits-all transaction, but as we so often do

3  as lawyers, we look towards other cases to see if similar

4  transactions occurred and compare those to the particular

5  transaction that is happening in the case.  We also feel it's

6  important to look at different cases and similar transactions

7  because the debtor does have a burden to meet here, and to do

8  so would help in determining whether the debtor has met its

9  burden.

10        We felt USG especially instructive because it was a

11  very recent case in front of Your Honor here in the District of

12  Delaware, not necessarily here, but in the District of

13  Delaware, and a similar type of bankruptcy case in the sense of

14  a mass tort asbestos bankruptcy case.  In our objection we

15  highlighted three major differences with the USG deal that we

16  felt were particularly important in that case and to the

17  Court's decision to approve the USG deal.  In the time frame

18  from which the equity commitment motion and agreement was filed

19  and from when our objection was filed we were able to discuss

20  these issues with the debtors in a meaningful way, both in a

21  lengthy conference call and in other phone calls and in a

22  meeting prior to Court today that certainly provides comfort to

23  our office as to the deal that is going forward.

24        Those particular provisions or those particular

25  differences were as follows.  Number one, the no escrowing of

1  the backstop money.  Of course, the Court found that as a major

2  factor in approving the <u>USG</u> deal and the commitment fee.  We

3  now understand the differences between the deal, between JP

4  Morgan and Berkshire Hathaway and certainly the arrangement

5  that -- or the -- how they put forth how JP Morgan is subject

6  to regulatory -- subject to regulations, provides us some

7  comfort on that issue.  Secondly, here we are dealing with a

8  group of investors instead of the one investor in <u>USG</u>.  I think

9  that issue is tempered by the fact that the debtors have put

10 forth today that JP Morgan is solely liable and that debtors

11 can look solely to JP Morgan if something happens with this

12 deal.  Finally, we indicated the no hell of high water

13 provisions.  We were concerned with the investor, JP Morgan,

14 possibly getting out of this deal.  The debtors have assured us

15 from a market type perspective that they have negotiated as

16 many outs as possible out of this deal, and that JP Morgan is

17 assuming a huge risk again provides us comfort on this issue.

18         Your Honor, we did have to distinct other objections.

19 We've already addressed the first one, and that being the fees

20 and expenses of the attorneys.  We certainly were going to

21 request that Your Honor set up some type of process for Court

22 approval of those fees and expenses, and it appears we have

23 done so.  It may need some tinkering, I think, with the order,

24 because we're -- it's different -- a different type of process

25 than what is set out in the initial agreement, but as the Court

1  has proposed and as the parties it appears have agreed, I think

2  we can agree with that process.

3        Finally, we indicated the release and exculpation

4  provisions.  Your Honor, we were concerned that there wouldn't

5  be -- we were concerned with far-reaching on those particular

6  provisions.  We don't want to see, quote, unquote, confirmation

7  type releases happening here.  It's my understanding that the

8  releases are solely related to this particular transaction,

9  that being the rights offering and the Equity Commitment

10  Agreement, and provided that that is the case, we have no

11  objection to the release provisions -- to release provisions

12  like that.  Therefore, Your Honor, that's the end of my

13  presentation.  While I'm not withdrawing the objection, per se,

14  I think these comments can be instructive and help the Court in

15  making its decision.

16        THE COURT:  All right.  Thank you.

17        MR. KLAUDER:  Thank you.

18        MR. NEAL:  Your Honor, Guy Neal for the debtors.

19  Just to quickly confirm the final two points raised by Mr.

20  Klauder, that we, I think, are in full agreement on.  First,

21  the fees and expenses mechanism, as described by Mr. Thompson

22  as well, we're prepared to work out an arrangement in the

23  proposed form of order that will reflect an arrangement that's

24  been consistent, perhaps, relating to the banks but also this

25  Court's review of the reasonableness of those fees.  Second,

the release and exculpation provisions I just want to point

out, we believe, and the debtors maintain that the existing

form of the order is clear that the release and exculpation is

related solely to such parties' participation and the

transactions contemplated by the Equity Commitment Agreement

and the syndication agreement, and any activities arising

therefrom. So, they are limited in the respect that Mr.

Klauder states. We just wanted to confirm that.

THE COURT: Okay. I think that can be clarified in

an order too, so that the U.S. Trustee's Office is comfortable

that the order does, in fact, say that they are limited to the

specifics of this transaction. I think the agreement --

MR. NEAL: Very well. We'll run the order back by

Mr. Klauder again --

THE COURT: Okay.

MR. NEAL: -- before it's submitted.

THE COURT: I think you need to do that with respect

to the fees and expense issue anyway.

MR. NEAL: Very good.

THE COURT: All right. Mr. Kress?

MR. KRESS: We agree, Your Honor, that obviously the

Equity Commitment Agreement is a key part of the negotiated

settlement, but that has been reached. But likewise, Your

Honor, there are other key aspects of that settlement agreement

which have to be approved by the investor, JP Morgan, the

futures representative, the ACC, as well as the backstop
providers, and those include what is called the collar
agreements and the registration rights agreement.
Unfortunately, Your Honor, during the six-and-a-half week
period we had from the time the settlement agreement was
reached, until just last week we have not seen any of those
documents and we got them for the first time last week.  Within
72 hours the futures representative and the ACC submitted a
detailed comment.  We had our first negotiating session
Tuesday, which I would say is productive, Your Honor.  Progress
was made.  However, we're not there yet.  We do not have final
agreements on the collars.  We do not have final agreement on
the registration rights agreement.  We did get revised
documents last night, obviously not -- did not have an
opportunity to see if they have raised new issues.  And the
concern we have, Your Honor, is very simple, that unless those
agreements are negotiated satisfactory to the parties, which
would be the investor, the future rep, the company, the ACC, as
well as the backstop providers, there really isn't a deal.  And
to allow the company to pay $100 million non-refundable
deposit, unless the parties can actually say to this Court,
yes, the deal is done, we're ready to go, it seems is not in
the best interest of all creditors and the estate, and
therefore while this is not -- should not be deemed an
objection, per se, to the terms of the equity commitment

agreement because obviously it is a key part of the deal, we do

believe, Your Honor, that any payment of the $100 million fees,

and preferably the entry of the order should be conditioned

upon there being final agreement reached on the two key sets of

documents that have to be agreed to for there to be a deal in

this case.

THE COURT:  All right.  Mr. Neal?

MR. NEAL:  If you can give me just 20 seconds, Your

Honor?

(Pause)

MR. NEAL:  Your Honor, for the record, Guy Neal

again.  Your Honor, we have tried to resolve, right outside the

courtroom immediately before Your Honor took the bench, Mr.

Kress's concerns and it relates to the interplay of a couple

things, Your Honor.  First and foremost certainly is the

terminable event of this equity commitment agreement if an

order is not entered by June 30th.  We've already moved this

hearing from the 19th to today to allow for more time, and we

were hopeful, we thought we would get there.

THE COURT:  Well, you've got a week.

MR. NEAL:  We've got a week, Your Honor.  It might

make sense for two things, Your Honor.  First, if we could

explore your potential availability perhaps by phone next week,

number one, and then take a brief adjournment and try to see

how we could work out Mr. Kress's concerns.  One avenue to

1  proceed, and I'm not sure we're all in agreement on it just

2  yet, Your Honor, is perhaps to have a hearing date, a

3  telephonic hearing date slotted for Friday, which I believe is

4  the 30th --

5          THE COURT:  I can't do it Friday.  I'm going to be

6  traveling to Denver.  I can do it Thursday at some point, but

7  I'm going to be on a plane, and, you know, given the weather,

8  I'm not sure when and how --

9          MR. NEAL:  Well, Your Honor, before we commit to

10 that, we could have -- Thursday is a realistic possibility is

11 what Your Honor is saying?

12         THE COURT:  Thursday is realistic, but I need to tell

13 you when, so just a second.

14         MR. NEAL:  Okay.  Very good.

15         THE COURT:  It might be midnight, but -- we'll see

16 here.

17         MR. PERNICK:  Be careful what you promise, Your

18 Honor.

19         THE COURT:  Midnight on Wednesday, Mr. Pernick.

20         MR. PERNICK:  Much better.

21         MR. NEAL:  To the extent it matters, Your Honor, we

22 believe that the conference would be very brief.

23         THE COURT:  Well, it looks as though my first motion

24 on motions day doesn't start until 9:15, so maybe we could

25 start at 9:00 Thursday morning.  I have a really, as you may

1  imagine, jammed schedule that day since I'm going to be out of

2  town the following day, and the afternoon is tied up with

3  Pittsburgh Corning and NARCO and GIT.

4          MR. NEAL:  And before we adjourn, that would be

5  telephonic, right, Your Honor?

6          THE COURT:  Telephonic is fine.

7          MR. NEAL:  All right.  Very good.  Your Honor, if we

8  could just have maybe 15 minutes, with the Court's indulgence?

9          THE COURT:  All right.

10          MR. NEAL:  Thank you so much.

11          THE COURT:  We're in recess.

12                          (Recess)

13          THE CLERK:  All rise.

14          THE COURT:  Please be seated.  Mr. Neal?

15          MR. NEAL:  Yes, Your Honor.  I believe when you left

16  the bench, Your Honor -- Guy Neal for the record.  When you

17  left the bench, I think Mr. Lockwood had a comment to make

18  regarding scheduling of next Thursday.

19          THE COURT:  Okay.

20          MR. NEAL:  He's here by phone.

21          THE COURT:  Mr. Lockwood?

22          MR. LOCKWOOD:  Your Honor, it had to do with your

23  statement that Thursday afternoon matters were Pittsburgh

24  Corning and NARCO/GIT?

25          THE COURT:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1    MR. LOCKWOOD:  As you know, I'm involved with both of

2  those.  I have the agendas for those two hearings, the second

3  one being the amended agenda for the GIT hearing, which is the

4  later of the two beginning at two.  The Pittsburgh Corning

5  hearing, you know, as Your Honor knows, is basically nothing

6  but status conferences on some motions, and that's scheduled

7  for an hour, and based on past experience and the matters on

8  the agenda, it doesn't sound like that's going to take up a

9  heck of a lot more time than an hour, if that.  The GIT/NARCO

10 is likewise status conferences, and albeit one of them has to

11 do with the adjourned confirmation hearing, based on my own

12 personal knowledge there's not going to be an extended

13 discussion of where that's going for the moment.  And so, I

14 just wanted to observe, it seemed to me it would be pretty

15 likely that Your Honor would be likely, depending on how early

16 Your Honor has to leave the bench that day, and assuming that

17 there's nothing else on that Your Honor might be able -- would

18 highly likely have some time, you know, 4:30, five o'clock, or

19 something like that, for a short call, if that's all this is

20 going to take.

21    THE COURT:  I have an appointment that's in another

22 -- one of the suburbs in the city at six o'clock, Mr. Lockwood,

23 so I'm going to have to leave probably by five at the very

24 latest, and maybe a few minutes earlier depending on what the

25 weather is like and how traffic is going to be that day, so,

**J&J COURT TRANSCRIBERS, INC.**

1  you know, if you're telling me that we can be done by -- done

2  with PCC, NARCO and GIT by three, we could do this at three.

3  Otherwise I think we're probably safer at nine.

4        MR. LOCKWOOD:  Three I think is -- I couldn't make

5  that sort of a representation, particularly not without counsel

6  for those debtors around, but my impression from hearing the

7  parties talk is that they're not looking for, you know, a two

8  hour hearing Thursday.  They're looking more for a much shorter

9  period of time, but I'll let Mr. Neal and his compatriots

10  address that.

11       THE COURT:  Mr. Lockwood, I'm going to ask my clerk.

12  Maybe she can go give Mr. Ziegler a call while we're on the

13  phone, because he's usually pretty good at estimating the time

14  frames, too, so she'll go make a phone call and come back and

15  see whether he confirms your understanding, and maybe we can --

16       MR. LOCKWOOD:  Yes.  Well, my understanding, as I

17  say, it would be likely to be over by four, or something like

18  that.  If you really think we're going to need -- if the

19  parties think we're going to need a two hour hearing, then I

20  think we've got a lot bigger problems than that, since you were

21  talking about only giving us from nine until 9:30.

22       THE COURT:  Nine to 9:15.

23       MR. LOCKWOOD:  Even worse.

24       MR. NEAL:  Your Honor, if I may speak to that

25  briefly, Your Honor?  We would think that four o'clock, for

**J&J COURT TRANSCRIBERS, INC.**

1 | instance, would be appropriate, subject to confirming with
2 | other debtors' counsel. But, Your Honor, as a point of
3 | clarification, Your Honor, subject to the resolution of Mr.
4 | Kress's concerns and the two points with respect to the order,
5 | with respect to the U.S. Trustee, that being the fees and
6 | expenses of the professionals and perhaps a clarification on
7 | the release and exculpation provisions, it's our understanding,
8 | Your Honor, maybe I should ask in a more affirmative way, is
9 | that the Court's proposal to enter the order, Your Honor, such
10 | that the hearing on Thursday can simply be whether or not we
11 | have resolved the U.S. Trustee's points on the order and Mr.
12 | Kress's concerns.

13 | THE COURT: Yes. I think from Mr. Klauder's
14 | recitation that concerning the exculpation and release
15 | provisions, if he's satisfied with what the agreement says
16 | without clarification in the order, then I don't know that it
17 | has to go into the order. If you'd prefer that the order
18 | simply clarify that those provisions relate only to the terms
19 | of this transaction and nothing further, that's an easy half of
20 | a sentence to put into the order. And with respect to the fees
21 | and expenses I think you'll be able to work out a process. I
22 | don't think that's going to cause a problem. Mr. Klauder?

23 | MR. KLAUDER: Your Honor, David Klauder for the
24 | United States Trustee. Let me put the one issue to bed. I've
25 | looked at the order with the release language, and it's fine.

It's appropriate.

THE COURT: All right.

MR. KLAUDER: We have no issues with it.

THE COURT: Okay. That's fine. So then, you're down to the fees and expense issue, and I can't imagine, based on JP Morgan's agreement to have that submitted, that that's going to tie up this process. So, I think you're down to Mr. Kress's issue, and as soon as you folks tell me that they are resolved and show me what the final documents are, then I think I'm prepared to enter an order. If you can't resolve it and I have to have a hearing, then that -- you know, that's going to be a different issue. But I am sympathetic to Mr. Kress's concern that $100 million is a lot of money in absolute dollar terms, and until all of the documents are in place I'm not going to be entering an order that approves this transaction, so get it done.

MR. NEAL: Very well, Your Honor. We appreciate that -- event, and we think four o'clock would be, to the extent it works for Your Honor, an appropriate time.

THE COURT: Well, at four you get, you know, until let's say 4:50. Is that going to be enough, because -- if you've got it resolved you'll submit it on a --

UNIDENTIFIED ATTORNEY: We're either going to tell you, Your Honor, that we've reached agreement on the documents and we're ready to go, or we're going to tell you we're not

1  there.

2      THE COURT:  Okay.

3      UNIDENTIFIED ATTORNEY:  And presumably if we're not

4  there we're going to have to talk among ourselves to decide how

5  we're going to get there.  Because obviously everyone is moving

6  to try to get this done as quickly as we can, believe me, Your

7  Honor.  Unfortunately we've got these type of complicated,

8  complex corporate transactions and documentation.  It takes

9  time, issues can come up.

10     THE COURT:  Okay.

11     MR. NEAL:  In the interim, Your Honor, it might make

12 sense to turn to other housekeeping matters that Mr. Pernick

13 has on the scheduling issues.

14     THE COURT:  All right.

15     MR. PERNICK:  Your Honor, I just have one

16 housekeeping matter.  In the spirit of sort of continuing what

17 I think we all believe, at least on the debtors' side is an

18 exciting march towards confirmation, we are planning on filing

19 a motion to approve for exit financing purposes a commitment

20 letter.  It's in the final stages -- that deal is in the final

21 stages of being negotiated, and we'd like to offer the Court

22 two possible ways of doing this.  One is if we could put it on

23 for the July 24th hearing, and that would mean that the Court

24 is shortening time somewhat to hear it.  The other one is if

25 the Court is uncomfortable with that, that we have some kind of

**J&J COURT TRANSCRIBERS, INC.**

hearing date between the July and August hearing dates.  And

the reason for that is we don't believe the lenders will be

able to start the syndication process until the commitment --

until the debtor is authorized to enter into it.  And waiting

until the end of August really makes it very tight and very

difficult.

THE COURT:  When are you going to file the documents?

Shortened time means shortened by how much time?

MR. PERNICK:  I think we could probably file them no

later than Wednesday, which is the 28th, and I believe the July

hearing is July 24th.

THE COURT:  That's fine.

MR. PERNICK:  Okay.

THE COURT:  Okay.  Mr. Ziegler apparently thinks that

those three cases should be finished by three o'clock or

shortly thereafter, Mr. Lockwood.

MR. LOCKWOOD:  That certainly doesn't -- I would have

no reason to disagree with that.  I was convinced they would be

done before four, so if he thinks it's even earlier than that,

he's likely to have a little better information than I would.

THE COURT:  So, I could schedule this -- if it's

going to be by phone, I would suggest 3:30, maybe, because it

probably won't -- well, I don't know -- I don't know whether

I'll be finished exactly at three, so perhaps 3:30 would give

you an hour and a half, roughly.  That should surely be enough

1 time.

2          MR. NEAL:  Very well, Your Honor.  Thank you so much.

3          THE COURT:  All right.  So, Item 1 is continued to

4 June the 29th at 3:30 by phone.  I've forgotten, are you using

5 Court Call?

6          MR. PERNICK:  Yes.

7          THE COURT:  Okay.  So, we'll have the dial in number

8 for that process.  Are you -- if this is finished before then

9 are you going to submit a final document on a C.O.C.?

10          MR. PERNICK:  I think we would do that.

11          THE COURT:  But are these portions going to be under

12 seal?  The --

13          UNIDENTIFIED ATTORNEY:  The documents I was referring

14 to?

15          THE COURT:  Yes, sir.

16          UNIDENTIFIED ATTORNEY:  Oh.  They have to -- they

17 will be attached to the plan, obviously have to be fully set

18 forth in the disclosure statement.

19          THE COURT:  Okay.  So, they won't be under seal even

20 for purposes of this motion?

21          UNIDENTIFIED ATTORNEY:  No, no.  There has to be full

22 disclosure.  These are key documents in terms of the

23 registration of rights, for example, between the parties, and

24 the collars, which have -- yes, all that is going to have to be

25 disclosed.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  Okay.  Well, if you get them done before
2   June 29th, so that you don't need this call, then I guess you
3   could submit them on a certification and attach the new
4   documents to them.

5        UNIDENTIFIED ATTORNEY:  I think the only thing we
6   would be submitting is the order approving the equity
7   commitment agreement because those documents form part of the
8   plan which would ultimately get approved as part of the
9   confirmation order, Your Honor.

10       THE COURT:  Okay.  I still want to see them.

11       UNIDENTIFIED ATTORNEY:  I understand.  I'm just
12  saying, Your Honor.

13       THE COURT:  Okay.

14       MR. NEAL:  I'm sorry, Your Honor.  Guy Neal again.
15  For clarification, I mean, to the extent we make Mr. Kress
16  happy on these issues, are you expecting those documents to be
17  attached in advance of the 3:30 hearing on Thursday?

18       THE COURT:  Yes.  If you can -- if you get them
19  finished and can file them on a certification of counsel with
20  an order that approves the agreement with these portions
21  attached and that meets Mr. Klauder's concern with respect to
22  the fees and expenses, I would expect just to approve that
23  order at that time, because then there won't be any objections
24  to the entry of the order and you won't need a hearing.  If you
25  --

1          MR. NEAL:  Very good.  To the extent, Your Honor, we

2     have agreement in principle reached at 3:29 on Thursday on the

3     documents but not the documents, we'll still go forward.

4          THE COURT:  If the documents are not filed on a

5     C.O.C., we're having a hearing.

6          MR. NEAL:  Very good.

7          THE COURT:  Okay.  Because I'm going to want to know

8     what the outcome is, so there will be a hearing unless, you

9     know, by like, say, noon, because if you don't file them by

10    noon, I won't know about them anyway.  So, if you get them

11    filed by noon, then I guess, Mr. Pernick, have someone call my

12    chambers and let me know that they are there, because they

13    obviously won't come across my desk that fast.

14         UNIDENTIFIED ATTORNEY:  That's fine, Your Honor.

15         THE COURT:  And we'll cancel the hearing.  If they're

16    not filed, then -- even if you've got an agreement in principle

17    you can tell me that, because even if you have an agreement in

18    principle, if you don't get an order entered the next day, and

19    frankly that's not going to happen.  So, it's either the 29th

20    or it's not going to be until the following week some time.

21         MR. PERNICK:  Okay.  Your Honor, from the debtors'

22    perspective we have nothing further.  Again, we appreciate the

23    Court continuing to help us move this towards confirmation.

24         THE COURT:  Okay.  Anyone else have any issues?

25    Okay.  This item is adjourned, then, until June 29th at 3:30 by

1 phone, and I will accept the order on the carryover matter from

2 the hearing earlier this week on the Plan Support Agreement

3 when I get it from you, Mr. Pernick, on a certification of

4 counsel.

5         MR. PERNICK:  Okay, Your Honor.

6         THE COURT:  Okay.  Thanks.  We're adjourned.

7         MR. NEAL:  Thank you.

8         MR. LOCKWOOD:  Thank you, Your Honor.

9                 * * * * *

## C E R T I F I C A T I O N

        I, TAMMY DeRISI, court approved transcriber, certify
that the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter and to the best of my ability.


<u>/s/ Tammy DeRisi</u>           Date:  June 27, 2006

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**