UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 00-03837(JKF)
                                .
                                . (Jointly Administered)
                                .
OWENS CORNING, et al.,          .
                                . USX Tower - 54th Floor
                                . 600 Grant Street
                                . Pittsburgh, PA 15219
                Debtors.        .
                                . July 10, 2006
. . . . . . . . . . . . . . . . 9:15 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:              Saul Ewing LLP
                              By:  NORMAN L. PERNICK, ESQ.
                                   JAY SHULMAN, ESQ.
                              222 Delaware Avenue
                              Suite 1200
                              Wilmington, DE  19801

                              Sidley Austin Brown & Wood, LLP
                              By:  GEOFFREY RAICHT, ESQ.
                                   JAMES F. CONLAN, ESQ.
                                   JEFFREY C. STEEN, ESQ.
                                   DENNIS TWOMLEY, ESQ.
                                   ANDREW O'NEILL, ESQ.
                              Bank One Plaza
                              10 South Dearborn Street
                              Chicago, IL 60607

Audio Operator:               Janet Heller

Proceedings recorded by electronic sound recording, transcript
          produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No.   (609) 587-3599**

APPEARANCES (Cont'd.):

```
For Bondholders, trade          Anderson Kill & Olick, P.C.
creditors & plaintiffs:         By:  ANDREW RAHL, ESQ.
                                1251 Avenue of the Americas
                                New York, NY  10020


For Ad Hoc Equity &             Brown Rudnick Berlack Israels LLP
Preferred Securities            By:  ANTHONY L. GRAY, ESQ.
Holders:                        One Financial Center
                                745 Atlantic Avenue
                                Boston, MA  02111


For the Futures Rep:            Kaye Scholer LLP
                                By:  ANDREW KRESS, ESQ.
                                425 Park Avenue
                                New York, NY  10022


For Ad Hoc Committee            Otterbourg, Steindler, Houston
of Trade Claim Holders:          & Rosen, P.C.
                                By:  GLENN RICE, ESQ.
                                     MELISSA A. HAGER, ESQ.
                                230 Park Avenue
                                29th Floor
                                New York, NY  10169


For WCI Communities, Inc.:      Carlton Fields, P.A.
                                By:  ROBERT N. GILBERT, ESQ.
                                     JOSEPH IANNO, JR., ESQ.
                                Esperanté, 222 Lakeview Avenue
                                Suite 1400
                                West Palm Beach, FL  33401-6149


                                Pachulski, Stang, Ziehl, Young,
                                 Jones & Weintraub, P.C.
                                By:  LAURA DAVIS JONES, ESQ.
                                     (telephonically)
                                919 North Market Street
                                17th Floor
                                P.O. Box 8705
                                Wilmington, DE  19899


For CSFB as Agent:              Weil, Gotshal & Manges LLP
                                By:  CHRISTOPHER J. MARCUS, ESQ.
                                767 Fifth Avenue
                                New York, NY  10153
```

APPEARANCES (Cont'd.):

For Various Clients:              Stroock & Stroock & Lavan, LLP
                                  By:  LEWIS KRUGER, ESQ.
                                  180 Maiden Lane
                                  New York, NY  10038

For the Bank of New York as       Carter Ledyard & Milburn LLP
Indentured Trustee:               By:  JAMES GADSDEN, ESQ.
                                  2 Wall Street
                                  New York, NY  10005

For the Futures Rep:              Young Conaway Stargatt & Taylor,
                                    LLP
                                  By:  SHARON M. ZIEG, ESQ.
                                  The Brandywine Building
                                  1000 West Street
                                  17th Floor
                                  P.O. Box 391
                                  Wilmington, DE  19899

For Goldman Sachs & Co.:          Milbank, Tweed, Hadley &
                                    McCloy LLP
                                  By:  JEFFREY MILTON, ESQ.
                                  1 Chase Manhattan Plaza
                                  New York, NY  10005

For ACC:                          Campbell & Levine, LLC
                                  By:  MARK T. HURFORD, ESQ.
                                  800 N. King Street
                                  Suite 300
                                  Wilmington, DE  19801

For Baron & Budd, et al:          Stutzman, Bromberg, Esserman,
                                    & Plifka, PC
                                  By:  SANDER L. ESSERMAN, ESQ.
                                  2323 Bryan Street
                                  Suite 2200
                                  Dallas, TX  75201

4

APPEARANCES (Cont'd.):

For the Asbestos Committee:    Caplin & Drysdale, Chartered
                               By:  RONALD E. REINSEL, ESQ.
                               One Thomas Circle, N.W.
                               Washington, DC  20005

For Wilmington Trust:          Pryor Cashman Sherman & Flynn LLP
                               By:  RICHARD LEVY, JR., ESQ.
                                    TINA N. MOSS, ESQ.
                               410 Park Avenue
                               New York, NY  10022

For Schultze Asset Mgt.:       Reed Smith, LLP
                               By:  DAVID ZIEGLER, ESQ.
                               435 Sixth Avenue
                               Pittsburgh, PA  15219

For JP Morgan Securities,      Simpson, Thacher & Bartlett, LLP
Inc.:                          By:  ALIU EATON, ESQ.
                               425 Lexington Avenue
                               New York, NY  10017

For Two Creditors:             Foley & Mansfield, P.L.L.P.
                               By:  JAMES J. LOTZ, ESQ.
                               1200 Marquette Plaza
                               250 Marquette Avenue
                               Minneapolis, MN  55401

1          THE COURT:  Please be seated.  This is the matter of

2    Owens Corning, bankruptcy number 00-3837.  The participants

3    that I have listed appearing by phone, Christine Jagde, Denise

4    Wildes, David Klauder, Gordon Harriss, Kara Zaleskas, Alex

5    Jachmich, James McCarroll, Laura Davis Jones, Sara Gooch, Bruce

6    White, Marc Casarino, Joseph Gibbons, Pavel Smyshlyaer, Lake

7    Huynh, Eric Sutty, James McClammy, Stephen Vogel, John Shaffer,

8    Marti Murray, Donald Workman, Rebecca Butcher, Katharine Mayer,

9    William Taylor, Jr., Gabriel MacConaill, David Baldwin, Dallas

10   Albaugh, Mike Joyce, David Parsons, Christine Daley, John

11   Christy, James Gibb, Kate Stickles, Joshua Brau, Lisa Epps,

12   Andy Chang, Stuart Kovensky, William Sudell, Francis Monaco,

13   Daniel Chandra, and Christena Lambrianakos.  Excuse me one

14   minute, please.

15                          (Pause)

16          THE COURT:  Good morning, Mr. Pernick.  I'll get

17   entries of appearances in court, please.

18          MR. PERNICK:  Good morning, Your Honor.  Norman

19   Pernick on behalf of the debtors.

20          MR. KRUGER:  Lewis Kruger, Your Honor, Stroock and

21   Stroock and Lavan on behalf of various clients.

22          MR. RAICHT:  Good morning, Your Honor.  Geoffrey

23   Raicht on behalf of the debtors.

24          MR. SHULMAN:  Your Honor, Jay --

25          THE COURT:  Excuse me.  One second.  I'm sorry.

1  Okay.

2          MR. SHULMAN:  Jay Shulman, Saul Ewing, on behalf of

3  the debtors.

4          MR. STEEN:  Good morning, Your Honor.  Jeffrey Steen,

5  Sidley Austin, on behalf of the debtors.

6          MR. CONLAN:  Your Honor, Jim Conlan from Sidley on

7  behalf of the debtors.

8          MR. RAHL:  Andrew Rahl, Anderson, Kill, and Olick,

9  bonds and trade.

10          MR. REINSEL:  Good morning, Your Honor.  Ron Reinsel,

11  Caplin and Drysdale, on behalf of the Asbestos Committee.  Also

12  with us is Mark Hurford, Campbell and Levine.

13          THE COURT:  Excuse me one second.  I haven't been

14  typing for a week, and it's like my fingers aren't working

15  here.

16          MR. KRESS:  Good morning, Your Honor.  Andrew Kress,

17  Kaye Scholer, on behalf of the Futures Rep, and with me is

18  Sharon Zieg from Young Conaway.

19          MR. GRAY:  Your Honor, good morning.  Tony Gray,

20  Brown, Rudnick, Berlack, Israels, for an Ad Hoc Committee

21  consisting of security holders of preferred and equity

22  securities.

23          THE COURT:  Good morning.

24          MR. ZIEGLER:  Good morning, Your Honor.  David

25  Ziegler, Reed Smith, for Schultze Asset Management.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MARCUS:  Good morning, Your Honor.  Christopher

2     Marcus, Weil, Gotshal, and Manges, for Credit Suisse as the

3     agent.

4          MR. ESSERMAN:  Good morning, Your Honor.  Sander L.

5     Esserman on behalf of the Baron and Budd firm, Weitz Luxemburg

6     (phonetic), Foster Sear (phonetic), Waters and Krause, and

7     finally Reaud Morgan firm.

8          MR. GADSDEN:  Good morning, Your Honor.  James

9     Gadsden, Carter, Ledyard, and Millburn, LLP, for the Bank of

10    New York as Indentured Trustee.

11         MS. EATON:  Good morning, Your Honor.  Alice Eaton

12    with Simpson, Thacher, and Bartlett on behalf of J.P. Morgan

13    Securities, Inc.

14         MR. GILBERT:  Good morning, Judge.  Bob Gilbert along

15    with Laura Davis Jones on behalf of WCI Communities, Inc.

16         THE COURT:  Good morning, Your Honor.

17         MR. RICE:  Good morning, Your Honor.  Glenn Rice,

18    Otterbourg, Steindler, Houston, and Rosen on behalf of the two

19    Ad Hoc Committees of Trade Claim Holders.

20         THE COURT:  Mr. Pernick.

21         MR. PERNICK:  Good morning, Your Honor.  Your Honor,

22    we're going to go in order of the agenda letter, unless the

23    Court would like to do so otherwise, and the reason is (a) that

24    was the order things were filed as required, but also the one

25    objection of Schultze Asset Management, I think if we deal with

1  that in the context of the disclosure statement, then it'll

2  make it easier to consider the rights offering motion.

3           THE COURT:  All right.

4           MR. PERNICK:  I am pleased to report that we've

5  resolved the vast majority of the disclosure statement

6  objections.  I believe that Schultze is the only remaining

7  objector that's not resolved, although I understand that there

8  may be a couple of clarifying comments on the record, so I

9  think we're resolved, but we'll have -- everybody's in court,

10  and we'll be able to determine that.

11          And I'm also pleased to report that we have in many

12  instances gone further than just resolve disclosure statement

13  objections, and to the extent confirmation objections were

14  raised by many of the objectors, we have resolved a good number

15  of those, also.  That certainly doesn't waive their right to

16  raise other confirmation objections, but I simply wanted to

17  make the point that to the extent they were raised, we tried to

18  and in large part were successful to resolve those objections.

19          Just for the ease of the Court let me just make sure

20  that everybody in the courtroom and the Court is looking at the

21  same set of documents.  What I delivered to chambers and what I

22  put in the back of the courtroom today is a completely red line

23  draft of the plan and disclosure statement from June 5th, and

24  that's the document that I'll be referring to as I go through

25  the objections and provide page numbers.  We also had in the

**J&J COURT TRANSCRIBERS, INC.**

1  back of the courtroom -- and the Court has a complete set, but

2  we had in the back of the courtroom a set of only the changed

3  exhibits and schedules and appendices.  There is one set of the

4  complete set of exhibits, schedules, and appendices in the

5  back.  So to the extent that anyone in the courtroom wishes to

6  refer to one of those, one of my colleagues can help show where

7  they are, and there are reference copies there.

8           THE COURT:  All right.

9           MR. PERNICK:  We also filed an amended chart and

10  response of objections and how they've been dealt with, and

11  again there were extra copies in the courtroom, and I believe

12  everybody's got a copy of those, and that's what I'll be

13  referring to today as I proceed through the objections.

14           THE COURT:  Where is that exhibit, Mr. Pernick?

15           MR. PERNICK:  That was actually a separate document

16  that was delivered to chambers, also.  I have an extra copy

17  right here if the Court would like it.

18           THE COURT:  That's Federal Mobile.  That's -- I

19  thought that was it, too, but it's not.  Was something

20  delivered --

21           THE CLERK:  It was, and I made as many copies.

22           THE COURT:  Okay.  Thank you.

23           MR. PERNICK:  It would be debtors' amended response

24  to objections.

25           THE COURT:  Ms. Baker just gave me a copy of it, so

**J&J COURT TRANSCRIBERS, INC.**

1  thank you.

2          MR. PERNICK:  Starting with item A, that's the

3  Secretary of the United States Department of Labor.  It was

4  their objection, DI number 18144, and we have basically

5  resolved that objection with respect to the disclosure

6  statement hearing.  As I understand it, the Department of Labor

7  is resolving -- is reserving on the issue of the release

8  question for ERISA fiduciaries until the confirmation hearing,

9  and we will certainly see what we can do between now and then

10  to resolve that objection.  But for purposes of the disclosure

11  statement hearing today, I understand that that objection is

12  either resolved or withdrawn.

13          THE COURT:  All right, so language was added to the

14  disclosure statement?

15          MR. PERNICK:  I don't think we added any language to

16  the disclosure statement on this one, Your Honor.  They had a

17  clarification that they wanted put in to deal with the

18  indemnification to exempt --

19          THE COURT:  Right.

20          MR. PERNICK:  -- plan fiduciaries.  We did not add

21  that in yet.  That's -- we considered that to be a confirmation

22  objection.

23          THE COURT:  Well, I think the problem is if you're

24  going to change the release and exculpation provisions, if

25  they're stated in the disclosure statement and then the plans

**J&J COURT TRANSCRIBERS, INC.**

1  changed, they probably ought to be changed in the disclosure

2  statement.  But I don't -- I'm not quite sure, since I -- it

3  doesn't look like there was a change from this exhibit to the

4  prior one with respect to this objection.  Was there?

5           MR. PERNICK:  There was not.

6           THE COURT:  So I'm concerned that if the release and

7  exculpation language does change, I guess it won't change

8  anybody's plan treatment, but will it affect whether they're

9  going to vote?  The ERISA fiduciaries are not creditors.

10 Right?

11          MR. PERNICK:  They are not creditors.

12          THE COURT:  So they're not going to be voting.

13          MR. PERNICK:  No.  And the plan provides that the

14 pension plans are going to be, for all intents and purposes,

15 assumed --

16          THE COURT:  Assumed.

17          MR. PERNICK:  -- and they are in full compliance as

18 we stand here today.

19          THE COURT:  Okay.  I'm going to group B, C, and D

20 together.  That's the objections of Baron and Budd, Weitz and

21 Luxemburg, and Waters and Krause.  They have been resolved.

22 Also, Mr. Esserman I believe is here to confirm that.  And just

23 for the purposes of the record -- and there are several

24 references, but the key reference is on page 78 of the

25 disclosure statement and page 21 of the disclosure statement.

1  This deals with the question of the administrative deposits.

2  There were four escrows pre-petition that were with four law

3  firms, and the plan has been changed, and the disclosure

4  statement has been changed in the two places that I noted to

5  note that those law firms are now going to administer those

6  escrows for the benefit of their clients.  There are certainly

7  procedures that have to be adhered to, but the law firms are

8  going to do that.

9          There's one exception, Waters and Krause.  There was

10 a claim that was approximately $11 million improperly

11 distributed pre-petition, and as I understand it, how we are

12 right today, that claim is still going to be preserved and is

13 not resolved yet.  But for disclosure statement purposes today,

14 I believe the objections are resolved.

15          THE COURT:  All right.  Anyone -- Mr. Esserman or

16 anybody want to address that?

17          MR. KRESS:  Your Honor, that is -- what Mr. Pernick

18 said is 99 percent correct.  With respect to Waters and Krause,

19 they will be able to retain their escrows, but they will be

20 making a payment, not from the escrows, a settlement payment to

21 the trust in the amount of a million five in full settlement

22 and satisfaction of the causes of action, Your Honor.

23          MR. PERNICK:  I apologize.  I was not aware of the

24 amount, Your Honor.

25          THE COURT:  Mr. Esserman.

1        MR. ESSERMAN:  Your Honor, Sandy Esserman on behalf

2   of the Waters and Krause firm.  What was stated on the record

3   is correct by Mr. Kress.  There has been a resolution of the

4   Waters and Krause issues as well as all the other escrow firms.

5        THE COURT:  Okay.

6        MR. PERNICK:  That takes us to item E on page two,

7   Pacific Employers Insurance Company and other members of the

8   Ace group of companies.  Those objections have been resolved by

9   the insertion of language at page 228 and 229 of the disclosure

10  statement, which is basically a reservation of rights with

11  respect to confirmation issues.  I will tell the Court though

12  that the even better news on that one is we have actually

13  reached an overall settlement with Century, and we're going to

14  be filing a 9019 motion with respect to that settlement, and we

15  hope to do that for the August 21 hearing.

16       THE COURT:  All right.

17       MR. PERNICK:  The next is number F.  It's the Bank of

18  New York as the Successor Indentured Trustee.  As I understand

19  it, I believe that -- and Mr. -- I know Mr. Gadsden is here.  I

20  believe that we're resolved for disclosure statement purposes,

21  and they're reserving their confirmation issues, but I'm going

22  to let Mr. Gadsden either confirm or correct me.

23       THE COURT:  All right.

24       MR. GADSDEN:  Your Honor, at least two issues.  The

25  first is the treatment of the Indentured Trustee.  That has

**J&J COURT TRANSCRIBERS, INC.**

1  been resolved by a change to the plan.  The second is the

2  treatment that will flow to the holders of the monthly income

3  preferred shares, and that is that they will receive 5.5

4  percent -- warrant that convert to 5.5 percent of the common

5  equity on the terms that have been described in the plan.  And

6  I have -- I'm going to continue to work with the debtors

7  representatives to make sure that that's -- that the

8  distribution aspects are accurately reflected in the plan that

9  I think the disclosure statement can go.

10          THE COURT:  All right.

11          MR. PERNICK:  That takes us to item number G, which

12  is the objection of the Ad Hoc Committee of Trade Claim Holders

13  at both the parent and subsidiary levels, and I believe -- and

14  Mr. Rice is here, and he can comment on it.  I believe that we

15  are resolved also on all of those objections for -- both for

16  purposes of confirmation, and we did actually resolve some of

17  their objections that would respect -- I'm sorry.  It's

18  resolved with effect to disclosure.  We also resolved some of

19  their objections and made changes with respect to confirmation

20  by paying interest at the federal judgment rate to the

21  subsidiary trade creditors in all the different classes in the

22  subsidiaries.  The treatment is described on pages 176 to 177,

23  182 to 183, 185, 187 to 188, 189 to 190, 192, 194 to 195, 196

24  to 197, 199, 201, and 203.  And the reason for that is we

25  describe the treatment with respect to each debtor for that

1  class of unsecured creditors.  So it's basically the same

2  change, but it was made a number of times, so that it was clear

3  that each subsidiary's trade creditors got that treatment.

4          THE COURT:  Mr. Rice.

5          MR. RICE:  Your Honor, that is correct.  We represent

6  two separate ad hoc committees of trade claim holders.  One in

7  the class six level.  That's the subsidiaries.  And the other,

8  the holders of claims in Class A-6(b) which at the parent.  The

9  issues with respect to class six, the subsidiaries, they have

10  been resolved, Your Honor, and the issues with respect to Class

11  A-6(b), which are primarily discrimination issues regarding the

12  type of currency that's being distributed, we have agreed to

13  withdraw that portion of our objection that deals with

14  discrimination to the disclosure statement and have it deemed

15  to be a confirmation objection.

16          THE COURT:  All right.

17          MR. PERNICK:  That takes us to --

18          THE COURT:  Wait.  Wait a second, please.

19          MR. PERNICK:  Sorry, Your Honor.

20                    (Pause)

21          THE COURT:  Okay, Mr. Pernick.  Thank you.

22          MR. PERNICK:  You're welcome.  That takes us to

23  number H, which is on page seven, and that's the objection of

24  the Ad Hoc of Preferred and Equity Security Holders, and we've

25  made both language changes in the disclosure statement, but

**J&J COURT TRANSCRIBERS, INC.**

1 also some of those language changes reflect substantive changes

2 to deal with anticipated and express confirmation issues.

3 Those changes, as noted on the chart, were made in a number of

4 areas, but particularly on page 88, and that deals with their

5 first objection as well as page 174 to 175.  With respect to

6 their third objection reflecting an increase of the 5.5 percent

7 percentage amount sufficient to assure that the holders of the

8 mixed claims get that amount of 5.5 percent, we made changes

9 again on page 87 and on page 173, and I think those are the

10 changes.  The rest of them are agreed to be confirmation

11 issues, and I understand Mr. Gray's here, and that the

12 disclosure statement issues are resolved.  And to the extent

13 there are still confirmation issues, those are reserved.

14          THE COURT:  Mr. Gray.

15          MR. GRAY:  Your Honor, good morning.  Tony Gray for

16 the Ad Hoc Preferred and Equity Security Holders Committee.

17 Your Honor, I do confirm for the record Mr. Pernick's statement

18 with regards to the disclosure statement objections and a

19 reservation of rights with regards to confirmation objections.

20 Thank you.

21          THE COURT:  All right.

22          MR. PERNICK:  That takes me to page nine, item I,

23 which is Schultze Asset Management's objection.  I'd like to

24 defer that to the end and just finish going through what I

25 think are resolved objections or objections that can be quickly

1  overruled.

2         That takes us to amended appendix B, which starts

3  with item A, the objection of Roderick Harden, and what we did,

4  Your Honor, was there were a number of letters that came in.

5  There were actually a few disclosure statement notices which

6  came back with handwriting on them.  And so what we did is just

7  to be sure that the Court knew that we dealt with all of those

8  and that this was on the record, we actually listed those as

9  undocketed, informal objections.  Mr. Harden's was just a

10 general case inquiry.  We didn't think that needed a formal

11 response to the disclosure statement, but we did write to him

12 with respect to the general case status.

13        Item B was Curtis Spillman.  He's an asbestos

14 personal injury claim inquiry, and again schedule B-2 provides

15 the Court with a copy of the correspondence that we did to Mr.

16 Spillman.  And I apologize.  Up on A, schedule B-1 is the

17 letter that we wrote to him.

18        Item C, Winifred Bosch (phonetic), was a general case

19 inquiry.  Again we don't think it's a disclosure statement

20 objection, but we did respond with a letter, the form of which

21 is in schedule B-1.

22        D is Glenn Healey (phonetic), another asbestos

23 personal injury claim inquiry, and again we responded with a

24 letter in the form of B-2 regarding the treatment of claims.

25        E was Janice -- James Fleming.  It was a general case

1 inquiry.  We responded in the form of schedule B-1.  I'm going

2 to skip the SEC for a moment, and I'll come back to it.

3        Item G is Tecla Howden (phonetic).  It was a general

4 case inquiry.  We responded in the form of the letter in

5 schedule B-1.

6        H was Burl Mathis (phonetic).  I responded on June

7 26th.  It's docket entry number 18176.  We don't believe it was

8 a disclosure statement objection.  It was -- Mr. Mathis, the

9 Court may recall, has written a number of letters to the Court

10 and to counsel about payment of his claim, but we didn't read

11 it as a disclosure objection.

12        I is Margaret -- it looks like Margaret Stitts

13 (phonetic).  This is a confirmation issue as to the personal

14 injury claim inquiry.  We referred and wrote the letter in the

15 form of Schedule B-2.  And the objection to the disclosure

16 statement was on the basis that interest should be provided on

17 claims and discussion of alleged asbestos personal injury claim

18 -- a specific one should be made.  We don't believe -- we

19 believe that those are confirmation issues, and we didn't think

20 any further disclosure was necessary.

21        Item J was Antonia R.A. Barnes.  This was an asbestos

22 personal claim inquiry, and we responded in the form of

23 schedule B-2.

24        And item K was Carol Ann Johnston.  This was a

25 response to the notice of the disclosure statement, and

1  actually this was a good one.  It said no objection whatsoever,

2  and we didn't respond to that one, because we liked it.

3         That takes us through all of A through K on amended

4  appendix B, and what I'd ask the Court to do is consider to the

5  extent that those were disclosure statement objections, most of

6  which we think were not, but just so the record's clear, to the

7  extent they were, we would request that they be overruled.

8         THE COURT:  Are any of the parties in the objections

9  A through K on the phone?  I don't think I -- wrong list.

10                    (Pause)

11        THE COURT:  I'm not seeing any names.  Is anyone on

12  the phone representing any of the individuals whose names Mr.

13  Pernick just read into the record on appendix B, items A

14  through J except for F?

15                 (No verbal response)

16        THE COURT:  All right.  It does appear at this point

17  that the letters were appropriate responses to the disclosure

18  statement objections to the extent that they were disclosure

19  statement objections.  And to the extent they're plan

20  objections, that's reserved.  So I will overrule those

21  objections as to the disclosure statement only.

22        MR. PERNICK:  Thank you, Your Honor.  I'd like to go

23  back to the first page of amended appendix B to the United

24  States SEC.  Those objections are resolved.  I'm not sure if

25  Ms. Weiss is on the phone.  I don't believe she's in court.  I

1  think she authorized Mr. Shulman and my office to state that

2  the objections are resolved, but let me just go through those

3  resolutions quickly.

4         The first was a challenge by the SEC to the

5  applicability of Section 1145 to the rights offering, and that

6  was resolved by agreed upon language.  It's in section 11A of

7  the disclosure statement at page 297, and it's also in section

8  5.7 of the plan, page 134.  And just for the record, it's

9  actually also in the language of the rights offering order that

10 the Court is being asked to consider.  It's the same language

11 about the exemptions that apply.  That deals with number one

12 and number two of their objections.

13        Number three dealt with discriminatory -- allegedly

14 discriminatory distributions, and the SEC asked us to disclose

15 the authority upon which we relied.  We made agreed changes to

16 sections 7(b)(3)(e) three little Is of the disclosure

17 statement, and that's at page 165 to 169.

18        THE COURT:  To say what?

19        MR. PERNICK:  Let me pull that out.

20                    (Pause)

21        MR. PERNICK:  Actually, I think the -- let me -- I

22 want to just check with my colleagues, but I believe the SEC

23 actually was satisfied with most of the language that we

24 already had in the disclosure statement.  This was their

25 concern that there was an inappropriate death trap, and when we

1  went -- we actually met with Ms. Weiss, and when we went

2  through the treatment, she was actually okay with it.  I don't

3  believe we made any changes.  Give me one second.

4                    (Pause)

5            MR. PERNICK:  I apologize, Your Honor.  On page 169

6  we put in the following language, "Classes A-5, A-6(a), and A-

7  6(b), each could receive smaller distributions and/or

8  distributions in different forms, paren, different proportions

9  of cash versus new OCD common stock, end of paren, if their

10 classes reject the plan.  Or in the class of case -- in the

11 case of Class A-6(a) and Class A-6(b), if Class A-5 rejects the

12 plan.  Differences in treatment primarily result from the

13 conditioning of certain waiver of various rights otherwise

14 available to class A-7 on the acceptance of the plan by A-5, A-

15 6(a), and A-6(b).

16           THE COURT:  Does that tell anybody anything?  I'm

17 sorry.  I mean it's just -- if that was supposed to clarify

18 anything, I --

19           MR. PERNICK:  She was okay with it, but obviously --

20           THE COURT:  It doesn't do it for me.

21           MR. PERNICK:  We can write and propose to the Court

22 some alternative language that explains that if the Court would

23 like that.

24           THE COURT:  Well, I mean I understand what it's

25 doing, but I -- you have to be very careful in reading this

**J&J COURT TRANSCRIBERS, INC.**

1  plan to have a clue that you might get a different treatment if

2  somebody rejects the plan.  So --

3        MR. PERNICK:  Right.  I mean basically the plan --

4  and it is -- a number of other places has what you might call a

5  waterfall death trap provision, which is that the classes all

6  ahead have to accept for the classes below to receive the

7  recovery and the treatment, or that treatment changes.

8        THE COURT:  Then maybe it would be helpful somewhere

9  just to say that.

10        MR. PERNICK:  Okay.  We can do that.

11        THE COURT:  You know, if you put that in as an

12  introductory paragraph to this allegedly clarifying language,

13  maybe it will clarify.

14        MR. PERNICK:  No problem.

15                        (Pause)

16        MR. PERNICK:  Item number four, they allege that the

17  disclosure statement should indicate whether the plan in effect

18  provides administrative claim treatment for pre-petition

19  indemnification claims, and if so, the legal and factual basis

20  for the treatment when other general unsecured claims are

21  reported less favorable, and we put language in at pages 226

22  and 227 which was acceptable to the SEC on that item.

23        THE COURT:  That says what?

24                        (Pause)

25        THE COURT:  So you're planning to give administrative

1  expense treatment to pre-petition, general unsecured claims.

2  That's what this paragraph says.

3          MR. PERNICK:  Correct.

4          THE COURT:  Okay.

5          MR. PERNICK:  Indemnification claims, but yes.

6          THE COURT:  How are you going to do that?  If they

7  exceed the insurance that's available, how is the debtor going

8  to do that and not violate the Third Circuit's pretty clear

9  opinion on the absolute priority rule at this point?  I suppose

10  if no one objects, it's not going to be an issue, but what if

11  someone does?

12          MR. PERNICK:  If someone does, we'll have to deal

13  with that objection, but so far all of the parties that

14  negotiated -- and we believe that the classes will accept and

15  agree to that treatment.

16          THE COURT:  I don't know.  I think I'm going to want

17  a brief on whether you can do it even if no one objects.  You

18  might be able to the way the language of the Code is

19  structured, but it seems to me if you've got a pre-petition

20  unsecured claim, it's a pre-petition unsecured claim, and

21  that's how it ought to be paid, like the rest of them.  I'm not

22  sure why this class is singled out for special treatment.

23  There is after all quite a bit of insurance that should cover

24  it, and if it exceeds the insurance coverages that are

25  available, then I'm really not sure why it's getting some

1 administrative expense priority.

2        MR. PERNICK:  Okay, Your Honor.  I think what we

3 propose to do is we'll provide a brief obviously in advance of

4 confirmation, and we're comfortable that the laws support that,

5 but we'll provide that to Your Honor.

6        THE COURT:  Well, it may if there is no objection,

7 but the problem is, as I said, what if there is.  I mean they

8 didn't expect that there was going to be an objection in

9 Armstrong either.

10        MR. PERNICK:  Right.

11        THE COURT:  So at this point in time I'm not at all

12 comfortable that the deals that are struck are actually going

13 to be the deals when confirmation comes, and I'm -- and I'm not

14 sure why this type of provision should favor that class anyway.

15        MR. PERNICK:  Okay, Your Honor.  Item number five was

16 really kind of a small one.  The SEC was concerned about

17 unclaimed distributions, and what we did was we changed both

18 the treatment and the language, pages 231 and 232.  And with

19 agreement of them, and, of course, subject to the Court's

20 approval, we're going to post within 90 days the list of

21 unclaimed distributions on the OC website, which is a website

22 that many, many creditors and parties in interest have used to

23 look at documents.  We've been doing this since the beginning

24 of the case.  I think it's a pretty -- I think a lot of people

25 know about it, and it's a pretty good place, and that was

**J&J COURT TRANSCRIBERS, INC.**

1  satisfactory to the SEC.

2          THE COURT:  Okay, and then what happens if no one

3  claims them thereafter?

4          MR. PERNICK:  I think the plan provides a provision

5  that says that it -- I believe it goes into the court, but I'll

6  -- let me just check that.

7                          (Pause)

8          THE COURT:  It says they're going to be returned to

9  the disbursing agent and then to the reorganized debtors until

10  they're claimed.

11          MR. PERNICK:  Your Honor, I think that's correct.

12  We're double checking that.

13          THE COURT:  And then -- and after the first

14  anniversary, they're going to revert to the reorganized debtor

15  without any further restriction.

16          MR. PERNICK:  I mean I know it's a confirmation

17  issue, but does the Court wish different treatment on that?

18          THE COURT:  I think the -- I don't see any reason

19  why.  I think the notice should be posted to give people an

20  opportunity to know that their distributions have been

21  unclaimed.  I guess the question is how long are you going to

22  leave the notice up, the whole time until the year anniversary

23  is over, you know, so that -- or take it off as people claim

24  their funds?

25          MR. PERNICK:  I think we can do that.

1          THE COURT:  Maybe put a notice on that says if you

2     don't claim your funds by, you know, a certain date, they're

3     going to revert to the debtor, and you're going to lose your

4     opportunity to claim them.  I don't know what the notice -- I

5     think putting the notice on is a good idea.  I just think the

6     language of the notice may be something you folks need to talk

7     about to be sure that it is effective notice to make sure that

8     people, in fact, can get their distributions if they find out

9     about them.

10          MR. PERNICK:  We'll do language along the lines of

11     what the Court suggests, and we'll keep it updated with respect

12     to people who have made their claims, so that the list gets

13     shorter and is easier to look at.

14          THE COURT:  Okay.

15          MR. PERNICK:  Hopefully, there are not that many, but

16     in the even they are, that's certainly fine.

17          THE COURT:  All right.

18          MR. PERNICK:  And then the last was the SEC was

19     concerned about the notice to equity security holders, and

20     actually when we went through the notice that we had given both

21     of the May 10th hearing and of this hearing, the SEC was

22     satisfied, and there weren't any changes that were required.

23          THE COURT:  Okay.

24          MR. PERNICK:  I think that deals with everybody

25     except for Schultze.  And, Your Honor, just a couple of

1  comments on their objection.  First, it is a very late

2  objection.  As the Court is aware, the objections were due on

3  June 26th.  This objection was not filed until June 29th, and

4  you can see on page nine in footnote one we've gone through

5  whatever history we could ascertain from the record which is

6  that a notice of appearance wasn't filed until July 5th, and

7  there are -- not that they were required to, but there were no

8  2019s filed either that contained Schultze, so we had no notice

9  that they were even a holder in this case.

10      I don't believe that they got direct notice except

11  for publication notice, but I do -- my guess is that they are a

12  late purchaser of some bond claims, and I think when they

13  purchased that late, they purchased with all of the rights and

14  all the obligations of those bond claims, and certainly, the

15  underlying claims holders had notice of this hearing, and there

16  was publication notice anyway.  So I don't think we've heard a

17  very good excuse why this objection should even be considered

18  and why it was late.  Notwithstanding that, we've obviously

19  dealt with the objection and responded to it.

20      I will say two other things.  First, the disclosure

21  statement notice required that if you were going to object,

22  that you provide the Court and counsel with proposed language

23  with your objection.  We didn't receive any proposed language

24  to resolve the objections.  And second, when we spoke to them,

25  we asked for suggested language to evaluate, and they declined

**J&J COURT TRANSCRIBERS, INC.**

1  to do that.  I think that says a lot about what their true

2  motivation is here, although some of it is still beyond me.

3  I'm not quite sure what their overall objectives are.

4         The issues that they raise we really don't consider

5  to be terribly significant, and I'll just go through them one

6  by one.  Number one, the plan is patently unconfirmable, and,

7  therefore, the Court should not approve the disclosure

8  statement.  We believe that's a confirmation issue and not a

9  disclosure statement issue.

10         THE COURT:  Well, I think there's language that

11  indicates -- case law that indicates that if it is patently

12  unconfirmable, that can be considered to be a disclosure

13  statement, but I'm not sure this plan is patently

14  unconfirmable.

15         MR. PERNICK:  Correct.

16         THE COURT:  It may be voted down, but I don't think

17  as a general proposition that it is unconfirmable per se.

18         MR. PERNICK:  We agree, Your Honor.  We don't think

19  they've laid out any technical objections that would tell the

20  Court or counsel that it is patently unconfirmable.  The second

21  one is that the plan is based on an allegedly improper

22  settlement of the bank order claims and the causes of action

23  against the bank orders.  Again this is a confirmation issue,

24  but the real answer to this question is that these parties

25  should've objected when the unimpairment motion was filed and

**J&J COURT TRANSCRIBERS, INC.**

1  ruled on by the Court, and they were nowhere to be seen then,

2  and I think the date for that objection is over.  The merits of

3  the bank treatment have already been dealt with by the Court

4  and by counsel, and, yes, I guess you could technically raise a

5  question in the plan, but really if the banks receive that

6  treatment, they're deemed unimpaired, and that was done on due

7  notice to everybody in the world.

8           THE COURT:  Well, to the extent that it is anything,

9  it's the confirmation objection.  I think we'll wait and see

10 how the votes come before I take that.  It's clearly not a

11 disclosure statement issue, because the disclosure statement

12 lays out I think that treatment, and the plan is based on the

13 settlement.  The debtors did file the motion early on to make

14 sure that everyone had notice of it.  I don't know what more

15 you could've done to provide that notice.  So I'm not at this

16 point prepared to say that an objection to the plan may be

17 waived by not filing an objection to the motion, but I think it

18 is a plan issue not a disclosure statement issue.

19          MR. PERNICK:  Right, and I should -- that goes

20 without saying, and I should've said it up front anyway.  But

21 obviously to the extent any party has confirmation objections,

22 they are preserved, and Schultze is in that category, so we

23 really are trying to deal just with disclosure statement

24 objections here.  We don't think, as the Court noted, that any

25 of those objections even seriously raise a question of the

1  confirmability of the plan, and, therefore, we don't think

2  they're disclosure statement objections, but I'll just deal

3  with the remainder of them very quickly.

4        The third one is that the plan violates the absolute

5  priority rule.  Again we think it's a confirmation objection at

6  best.

7        THE COURT:  Well, it is a confirmation objection, but

8  it may violate the absolute priority rule.

9        MR. PERNICK:  Well, the answer --

10       THE COURT:  So --

11       MR. PERNICK:  -- to the question, just to give the

12  Court a little bit of advance read on this, is that if all the

13  classes accept that it doesn't violate the rule, and if all of

14  those classes ahead reject, then the plan is express in too

15  many places to mention that the treatment reverts to the fifth

16  amended plan treatment, and, therefore, that resolves any

17  absolute priority question in our view.

18       THE COURT:  Well, that may.  I mean that may, in

19  fact, resolve it, but then we're into a different set of

20  objections to the fifth amended --

21       MR. PERNICK:  Right.

22       THE COURT:  -- and I'm not sure how we're going to

23  handle that.  I think this is an administrative nightmare, and

24  I'm not sure why --

25       MR. PERNICK:  Right.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  -- it's being done this way.

2           MR. PERNICK:  Four is broken down into a number of

3  sub-parts.  Four (a), there's an alleged conflict of interest

4  among the members of the Ad Hoc Equity Committee, the Ad Hoc

5  Committee of Bondholders, the Official Committee of Unsecured

6  Creditors, and everybody who signed the plan support agreement

7  and Class A-5 creditors who are purely bondholders, the alleged

8  conflict I guess is that some of those parties allegedly own

9  debt at different levels.  We certainly know that that's been

10 true for a long time.  I've made that comment a number of times

11 in arguing and responding to different motions, but with

12 respect to any alleged conflict of interest, it's -- first of

13 all, it's the first time raised.  We don't believe that there's

14 a conflict of interest there, but again I guess if it's

15 anything, it's a confirmation objection.  And those issues have

16 been public for a long time.  For them to be raised at this

17 point in time I think from a disclosure standpoint is a little

18 bit late.

19          THE COURT:  Well, I don't understand this one.  I

20 need to hear from counsel.  I really do not know what this

21 objection means.  Good morning, Mr. Ziegler.

22          MR. ZIEGLER:  Good morning, Your Honor.  I'd be happy

23 to address that, because really I think if you -- when

24 everything else is stripped down, that is our principal

25 objection as a disclosure statement issue at this point in

1   time.  We do have -- and we reserve all of our issues with

2   regard to confirmation.  But the conflict of interest we

3   believe -- we believe that some of this -- the plan supporters

4   -- or the supporting holders I think is a defined term that's

5   used in the disclosure statement, although I don't see it

6   defined in the plan, but that those parties are defined or

7   described in certain places as being certain bondholders.

8        We believe that in addition to being bondholders at

9   least some of them also hold significant positions in either

10  the bank debt or the equity tiers of interest in this case.

11  And we believe that that's a relevant factor into their

12  decision to support this plan, a plan that provides good

13  treatment for the banks, better than expected treatment for

14  equity, and we think less than should be for the bondholders.

15  So we -- I think that to -- the disclosure statement right now

16  is sort of -- implies that it has the broad backing of

17  virtually all constituencies.  We think that it would be

18  relevant for individual bondholders -- bondholders like my

19  client, who hold only positions as bondholders, to know that

20  some of these people who are supporting the plan are

21  benefitting by the different treatments that are provided.

22        THE COURT:  You mean the bondholders who are almost

23  all institutional investors and the bank debt who are all

24  institutional investors don't know that the other people and

25  enterprises that have classifications in different classes in

**J&J COURT TRANSCRIBERS, INC.**

1 the plan hold claims in those classes?

2          MR. ZIEGLER:  We don't --

3          THE COURT:  I find that very difficult to believe.

4          MR. ZIEGLER:  We don't know that everyone does, Your

5 Honor.  I don't think --

6          THE COURT:  Well, who does?

7          MR. ZIEGLER:  -- that there's any harm done in

8 putting an additional sentence in the plan -- in the disclosure

9 statement to disclose that fact.

10          THE COURT:  Well, but the problem is, Mr. Ziegler,

11 this debt trades so actively that by the time we get to the

12 voting it may not be the case anymore.  I mean your client may

13 not even be a holder by then.

14          MR. ZIEGLER:  That's a --

15          THE COURT:  So how -- do you --

16          MR. ZIEGLER:  Well, the people that are voting

17 though, Your Honor, are relying on the disclosure statement,

18 and all we're suggesting is that we put a sentence in the

19 disclosure statement that indicates that some of these parties

20 have conflicting positions.

21          THE COURT:  I'm not sure they're conflicting.  They

22 may hold class -- they may hold a position in different classes

23 in the plan.  That doesn't mean they have a conflict of

24 interest just because they're a bondholder and also a bank debt

25 holder or a trade debt holder.

34

1          MR. ZIEGLER:  It would mean that they are more --

2  they would be more willing to have some of the value go to

3  equity if they have an equity position.  They'd be more willing

4  to have better treatment for the banks at the expense of the

5  bondholders if they owe -- have bank debt.

6          THE COURT:  Well, I think the problem with the banks

7  is the Third Circuit's opinion on substantive consolidation.

8  That's the -- I don't know how the debtor's going to deal with

9  that issue in a plan to say that the banks are getting better

10 treatment.  They're getting better treatment because of the

11 status of their claims.

12         MR. ZIEGLER:  We don't know, Your Honor, the details

13 behind the settlement, which is one of our -- has been one of

14 our objections.  We don't know that the banks didn't use their

15 position to leverage better treatment for the equity to get the

16 plan through as well.

17         THE COURT:  Well, they may have.  I don't know

18 either, but what difference does it make?

19         MR. ZIEGLER:  Yes, but --

20         THE COURT:  I mean that's what the negotiation

21 process is all about.

22         MR. ZIEGLER:  I understand that, but we believe --

23 again simply that there are conflicting positions here, and

24 that that should be disclosed, and it's a -- I don't think it's

25 a major issue if they have the broad support for the plan that

**J&J COURT TRANSCRIBERS, INC.**

1  they think they have --

2          THE COURT:  Well --

3          MR. ZIEGLER:  -- this wouldn't have much of an impact

4  anyway.

5          THE COURT:  I disagree with the fact that it's a

6  conflict.  Conflict of interest to me means that you, for

7  example, as counsel have clients in different classes.  Now

8  that may be a problem, but the fact that you have a position as

9  a bond and you have a position as a bank, you're still

10 creditors in the case.

11         MR. ZIEGLER:  Well, Your Honor, you just described

12 it.  Counsel for one of these people with claims in both

13 classes, they're the ones who negotiated this deal, and they

14 have a conflict, because they're negotiating four different

15 levels of debt in the same plan.

16         THE COURT:  Well, you know, more power to them if

17 they got a settlement representing people in different classes.

18 How did they do that?

19         MR. ZIEGLER:  We just think that it should be

20 disclosed, Your Honor.

21         THE COURT:  Mr. Pernick, what about a sentence added

22 to the disclosure statement that says, you know, some or all

23 classes -- some or all creditors in specific classes may hold

24 claims in other classes or -- I don't think you can describe

25 the specific entities because of the fact that --

**J&J COURT TRANSCRIBERS, INC.**

1       MR. ZIEGLER:  Your Honor, I think my suggestion would

2  be a sentence in the section that describes the settlement

3  agreement and the plan support agreement that says that some of

4  the parties to the settlement agreement and the plan support

5  agreement may hold positions in more than one class of debt,

6  and that may influence their decision to support the plan.

7       THE COURT:  Well, I don't know that that's a fact.

8       MR. ZIEGLER:  I said it may have.

9       THE COURT:  You can -- your client can send out a

10 letter if it thinks that it has -- that the fact that they hold

11 positions in different classes has influenced their vote on the

12 plan.  If you want to do that, you may do it, but I'm not going

13 to require the debtor, unless the debtor knows for a fact that

14 that's the case, to put that type of information in a

15 disclosure statement.  But I will ask the debtor to add a

16 sentence that says that creditors may hold claims in different

17 classes.

18      MR. PERNICK:  Your Honor, that's fine.  I have two

19 problems with that.  One, under the 2019 order we're the only

20 party that -- assuming those 2019s were up to date, which, of

21 course, each day I assume it changes, so they're by their

22 nature not in real time.  I don't know if I can make that

23 statement or not, and I don't know whether the other parties

24 can tell me whether that's true or not.  I guess if we say may

25 hold, you know, that's okay, but I really don't know.

1          THE COURT:  Well --

2          MR. PERNICK:  I have a view, but I don't know it as a

3 fact.

4          THE COURT:  I think to the extent that it's a may,

5 that's not a problem --

6          MR. PERNICK:  Okay.

7          THE COURT:  -- because it's, you know -- it may -- it

8 probably is the case that some of these creditors hold claims

9 in different classes.  So if you say may, I think that covers

10 all the bases, but I'm not ruling to go so far as unless you've

11 got factual knowledge that, in fact, that's influencing the

12 vote to say that, because I don't think that's a fair

13 representation.

14          MR. PERNICK:  We don't have factual knowledge of that

15 at this point, Your Honor.  We would intend to conduct some

16 discovery to further that, because we have had informal

17 information on that point.

18          THE COURT:  Well, I mean if you want to do the

19 discovery on that score, fine, but what's going to happen is if

20 your client wants to pursue the issue, it's up to your client

21 to get the information out there.  I'm not going to require the

22 debtor to do it except for this sentence that indicates that,

23 you know, some entities may hold claims in different classes.

24          MR. ZIEGLER:  Understood, Your Honor.

25          MR. PERNICK:  Can I just clarify that last comment of

1  the Court?  Is the Court authorizing Schultze to send a letter?

2  You're not requiring the debtor to put that with the package,

3  first of all.

4          THE COURT:  No, I'm not requiring the debtor to put

5  anything with the package, but if Schultze wants to send a

6  letter, I don't think I get to say yes or no.  Do I?  I mean if

7  they want to solicit votes against the plan, they can solicit

8  votes against the plan.

9          MR. PERNICK:  Does it have to be approved by the

10  Court?  I mean it's within our exclusivity period.

11          THE COURT:  I -- oh, well --

12          MR. PERNICK:  I think maybe the Court has to see it.

13          THE COURT:  Okay, so if you want to send a letter

14  out, it's -- I'm not getting that far, Mr. Pernick.  All I'm

15  saying is right now the debtor -- I'm not requiring the debtor

16  to do it.  If Schultze wants something more, it has to initiate

17  the activity that's going to generate the letter not the

18  debtor.

19          MR. PERNICK:  I just didn't want the Court's comments

20  on the record to be interpreted by Schultze as authority to

21  send a letter out without review.

22          THE COURT:  I'm not granting anybody authority to do

23  anything.  What I'm saying is what is not going to happen.

24          MR. PERNICK:  Thank you, Judge.

25          THE COURT:  Okay.  What's not going to happen is the

1  debtor is not going to put that information in the disclosure

2  statement.

3          MR. ZIEGLER:  Your Honor, we understand.  We will --

4  I have to consult with my client.  We hadn't discussed whether

5  we'd be interested in sending a letter out.  If we do decide to

6  do that, we will look into and make a determination as to

7  whether we need approval.

8          THE COURT:  Okay.

9          MR. ZIEGLER:  If we do, we'll seek it.

10         THE COURT:  That's fine.

11         MR. KRUGER:  So, Your Honor, if I may, I assume that

12  there's no determination yet, and discovery is appropriate

13  until they have actually asked for discovery?

14         THE COURT:  Oh, no.  But if somebody wants -- if a

15  creditor wants discovery with respect to the plan, they're

16  probably going to get it.  So I haven't decided what type of

17  discovery, but I'm not foreclosing discovery.  That's --

18         MR. KRUGER:  I'm not sure what conflict of interest

19  arises if there's no fiduciary obligation, and that's

20  discussion for a later date.

21         THE COURT:  Well, I'm not either.  But nonetheless,

22  to the extent that the issue right now is disclosing that some

23  creditors may have claims in different classes, I don't see

24  what the problem is with adding that sentence.

25         MR. KRUGER:  Agreed, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. PERNICK:  Your Honor, I thought I heard Mr.

2   Ziegler say that that was their basic objection, but I want to

3   make sure that there aren't any other ones that need to be

4   discussed.

5           MR. ZIEGLER:  Yes, Your Honor, I think that's true.

6   We have general problems with some of the same comments that

7   the Court made earlier on.  We don't really feel that the

8   disclosure statement adequately describes the reasons for the

9   settlement and the treatment of the creditors, but we think we

10  understand at this point in time, and I don't know whether

11  we're going to get anywhere by sitting here and fighting over a

12  major rewrite of the disclosure statement.

13          THE COURT:  Why didn't your client object at the time

14  that the motion went out to the world?

15          MR. ZIEGLER:  I don't know, Your Honor.  I don't

16  think we were engaged by this client at that point in time.

17          THE COURT:  Well, your client may want to have an

18  explanation for that if it's going to pursue that objection for

19  plan confirmation.

20          MR. ZIEGLER:  Yes, Your Honor.

21          MR. PERNICK:  Your Honor, I think I'd like to pause

22  at this point.  From the debtor's perspective I think that

23  we've dealt with all of the objections that were raised, and I

24  just want to make sure that everybody in the courtroom agrees

25  with that.

1          THE COURT:  Okay.  First of all, those on the phone,

2 are there any objections that the debtor has not addressed?

3                    (No verbal response)

4          THE COURT:  Okay.  Everyone's listen only?

5                         (Pause)

6          THE COURT:  Operator, can -- is the operator there,

7 please?

8          OPERATOR:  Yes, I'm here.

9          THE COURT:  Can you un-mute the participants just for

10 a minute?  I want to make sure that no one has additional

11 comments that the Court needs to address.

12          OPERATOR:  Absolutely, Your Honor.  Just one moment.

13 It'll take just a second for the time delay.

14          THE COURT:  All right.  Thank you.

15                         (Pause)

16          OPERATOR:  And all parties telephonically should be

17 live at this time.

18          THE COURT:  Thank you.  Does anyone on the phone have

19 any additional objections that the debtor needs to address or

20 comments with respect to what has happened so far?

21          MS. JONES:  Your Honor, this is Laura Davis Jones.  I

22 believe Mr. Gilbert is in the courtroom, and he will have a

23 comment, and I just wanted to point out that I did file a

24 motion for his admission pro hac vice and would ask the Court

25 to consider him today.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  Thank you.  I will do that.  Okay.

2    Anyone in court have additional objections that need to be

3    addressed or comments to be made?  Mr. Gilbert.

4          MR. GILBERT:  Thank you, Judge.  I guess this is as

5    good a time as any.  Ms. Jones and myself represent WCI

6    Communities, Inc., and we just wanted to advise the Court and

7    the other constituents present today that we had filed on

8    Friday a motion for allowance of an administrative expense

9    claim with respect to one of the subsidiary debtors, Exterior

10   Systems, Inc.  The claim really deals with alleged construction

11   defects with respect to a project that the debtor was a

12   subcontractor on in Palm Beach County, Florida.  We are

13   involved in a dialogue with counsel for the debtor right now.

14   We're trying to resolve the issue, and we continue to work --

15   it's our intention to continue to work in good faith to get to

16   that point.  But we wanted the Court and the rest of the

17   creditors and parties in interest to know that this had

18   actually been filed.

19         THE COURT:  Okay.  That -- I don't think that affects

20   the disclosure statement or plan.

21         MR. GILBERT:  It is absolutely not a disclosure

22   objection.

23         THE COURT:  All right.  Thank you.

24         MR. GILBERT:  Thank you.

25         THE COURT:  Mr. Kress.

                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. KRESS:  Good morning, Your Honor.  Obviously, the

2  Futures Representative fully supports the disclosure statement

3  and encourages the Court to approve it.  Just one comment

4  though.  While the disclosure statement and plan doesn't

5  reflect what I'm about to say, that is something that will come

6  in through probably the plan supplement, and that is with

7  respect to corporate governance issues.  And, in particular,

8  under a plan the Futures Representative and the ACC each of a

9  right to designate a member of the effective date -- post-

10 effective date Board of Directors, however, for the Futures

11 Representative and the ACC's designee, those individuals will

12 not actually take their seats on the Board until after the

13 stock is issued under the plan, which is --

14          THE COURT:  Until what?

15          MR. KRESS:  The stock is issued under the plan to the

16 trust, because the stock being issued is all dependent upon

17 whether or not there's a fair act by the end of this

18 congressional term.  So I just wanted to clarify that, Your

19 Honor, that they will not be sitting on the Board.  Although

20 they will have been designated, they will not be sitting on the

21 Board as of the effective date.

22          THE COURT:  Okay.  I think the -- I thought somewhere

23 that I gathered that.  I'm not sure where now.  If it's not

24 stated in the disclosure statement, maybe I just surmised that

25 that was the case, Mr. Kress.  Do you want that explicit?

44

1          MR. KRESS:  It would be helpful, Your Honor, but I'm

2    not going to ask the debtors to at the last minute redo the

3    disclosure statement to deal with that, because I --

4          THE COURT:  Well, I don't think they need to redo it.

5    They have to add one sentence anyway, and the black line

6    version I think at this point is still a work in progress.  Is

7    it or --

8          MR. PERNICK:  That was actually one of my last

9    comments that I was going to make.  Except for the two

10   sentences that you'd like us to add, and then we can add

11   something here if you'd like, the only -- there will be a

12   couple of non-substantive changes to Appendix I, which we'll

13   obviously submit to the Court and file.  But besides that, I

14   think we're ready to finalize the document.

15         THE COURT:  Okay.  I think then they can add a

16   sentence to that effect and make it clear.

17         MR. KRESS:  That will be fine, Your Honor.

18         THE COURT:  All right.

19         MR. KRESS:  Thank you.

20         OPERATOR:  Your Honor, would you like me to go ahead

21   and silence the lines at this time?

22         THE COURT:  Oh, yes.  Thank you.

23         OPERATOR:  Thank you.

24         MR. PERNICK:  Your Honor, just so the record is clear

25   then, I think we dealt with all the objections, and they've

**J&J COURT TRANSCRIBERS, INC.**

1 either been resolved or, to the extent they're not, I think

2 we'd -- I'd ask the Court to consider overruling them just for

3 the record, so that we know that we're past the disclosure

4 statement approval stage.

5          THE COURT:  Let me hear from counsel first.

6          MR. PERNICK:  I know what he's -- it's -- actually,

7 I'll add that one thing.  The -- this is a good thing.  The

8 Asbestos Claimants Committee and the Futures Rep would like to

9 send out a support letter with the disclosure statement.  And

10 we brought a copy of that to the Court for the Court to

11 consider, and we'd like the Court to approve that as part of

12 the disclosure statement's solicitation materials.

13          THE COURT:  All right.  Let me see them.  Thank you.

14          MR. PERNICK:  We have a couple of extra copies in

15 court if any of the parties would like to see that.

16                              (Pause)

17          THE COURT:  Oh, it's one joint letter.  Is that

18 correct?

19          MR. PERNICK:  Correct.

20          THE COURT:  I have two copies here.  All right.  I'll

21 read it --

22          MR. PERNICK:  Yes, I gave the Court two copies.

23          THE COURT:  I will read it aloud, so that those on

24 the phone can hear it.  It's from the Official Committee of

25 Asbestos Claimants in care of Caplin and Drysdale, and the

1  Legal Representative for Future Claimants in care of Kaye

2  Scholer to all Asbestos Personal Injury Claimants of Owens

3  Corning and/or Fiberboard Corporation.

4        "Dear Asbestos Personal Injury Claimant, The Official

5  Committee of Asbestos Claimants, which consists of asbestos

6  personal injury claimants called the Asbestos Claimants

7  Committee, and the Legal Representative for Future Claimants

8  who represents the interests of individuals who in the future

9  will be asbestos personal injury claimants wholeheartedly

10  support the sixth amended Chapter 11 plan of reorganization,

11  called the plan, of Owens Corning and certain of its

12  affiliates, called the debtors, and urge all asbestos personal

13  injury claimants to accept the plan.

14        To accept the plan you may either submit a ballot

15  accepting the plan directly to the voting agent, who is

16  identified in the enclosed ballot materials, or, alternatively,

17  you may authorize your attorney to vote to accept the plan on

18  your behalf.  If you have previously authorized your attorney

19  to vote for you, this prior authorization will be sufficient.

20        The plan is the product of extensive efforts by the

21  debtors, the Asbestos Claimants Committee, the Legal

22  Representative for Future Claimants, and representatives of the

23  major creditor and equity constituencies to negotiate a plan of

24  reorganization for the debtors that is fair and equitable to

25  all parties in interest.  Indeed the Asbestos Claimants

**J&J COURT TRANSCRIBERS, INC.**

1  Committee, the Legal Representative for Future Claimants, and

2  the debtors are co-proponents of the plan and all conclude that

3  the plan provides for the maximum recoveries to and the

4  expeditious and equitable treatment of present and future

5  asbestos personal injury claimants.

6        The Asbestos Claimants Committee and the Legal

7  Representative for Future Claimants and their counsel have been

8  integrally involved in the negotiation and drafting of the plan

9  and have concluded that the treatment of asbestos personal

10  injury claimants contained in the plan is in the best interests

11  of such claimants.  Furthermore, the Asbestos Claimants

12  Committee and the Legal Representative for Future Claimants and

13  their counsel have been instrumental in the development of the

14  trust distribution procedures that will govern the allowance

15  and payment of asbestos personal injury claims.

16        The Asbestos Claimants Committee and the Legal

17  Representative for Future Claimants does encourage you to

18  review the enclosed plan documents, especially the disclosure

19  statement for the plan and believe that you will reach the same

20  conclusion about the benefits afforded asbestos personal injury

21  claimants under the plan.  For these and other reasons, the

22  Asbestos Claimants Committee and the Legal Representative for

23  Future Claimants urge all asbestos personal injury claimants

24  designated as Classes A-7, Owens Corning asbestos personal

25  injury claimants, and B-8, Fiberboard asbestos personal injury

1  claimants, under the plan to accept the plan.  Sincerely yours,

2  The Official Committee of Asbestos Claimants and the Legal

3  Representative for Future Claimants."

4          Anyone have an objection to that letter?

5                  (No verbal response)

6          THE COURT:  All right.  I don't see any problem with

7  the letter.  It may be included with the package.

8          MR. PERNICK:  Thank you, Your Honor.

9          THE COURT:  Any other comments with respect to the

10 disclosure statement?

11                 (No verbal response)

12         THE COURT:  Okay.  It appears that the objections

13 have been largely resolved.  Those that are not resolved are

14 overruled for the reasons that I've previously articulated on

15 the record, however, all objections to the plan are still

16 preserved.  I am not addressing any objections to plan

17 confirmation at this time with the exception of the few changes

18 that I've instructed the debtor to make with respect to the

19 disclosure statement which will be incorporated in the next

20 round before the disclosure statement is published to the

21 general populous.  Do you have all the dates that you need for

22 the confirmation hearing?

23         MR. PERNICK:  As usual, you've anticipated my next

24 item, also.  We've sent in a proposed form of order filed on

25 the 8th, docket number 18321.

1          THE COURT:  Do you have a copy?  I haven't seen it?

2  I'm sorry.

3          MR. PERNICK:  And there are actually three dates that

4  we need to insert in that order starting on page four.  But if

5  I can suggest, because I think it might be helpful to the Court

6  and to the parties in court, maybe I'll just go through the

7  time line between now and confirmation, and that will include

8  the three dates that we need.  We were hoping for disclosure

9  statement approval today, July 10th.  The mailing and the

10  solicitation packages under the voting procedures takes place

11  17 days after the entry of the disclosure statement order.  We

12  would obviously have to file the final version of the plan and

13  disclosure.  In a best case scenario, Your Honor, we would do

14  that tonight.  I think in a worst case scenario, that will be

15  done tomorrow.

16          THE COURT:  That's fine.

17          MR. PERNICK:  And so just for being cautious

18  purposes, let's say that the 17 days runs from tomorrow, then

19  that's when the order gets entered.  We would propose a voting

20  deadline of September 1.  That's actually the Friday before

21  Labor Day, and we would also propose that as the objection

22  deadline.  And as crazy as that sounds, that actually gives the

23  tabulation agents and the debtors that holiday weekend to work

24  on counting the ballots and to start formulating responses.  So

25  we think that actually would be a helpful date to the process.

1          The debtors then we would propose would have or any

2    parties a response and a brief deadline of either September

3    11th or September 12th, whatever the Court desires, and we

4    would propose that the tabulation report be due on September

5    15th, and then the confirmation hearing, of course, is

6    September 18th.

7          So just for purposes -- now I'll circle back to the

8    order on page five.  What we would propose to the Court is in

9    the first paragraph that the objection deadline would be

10   September 1, in the second paragraph that the ballot deadline

11   would be September 1 -- let me see if I'm -- I apologize.  I

12   may have missed a blank.  I'm sorry.  On page four the

13   objection deadline would also be September 1 on page four.

14   It's in the fourth line.

15          THE COURT:  Yes, I see.  Those are all fine.  I don't

16   think you have the response dates or the ballot tabulation

17   dates in here.  Do you?

18          MR. PERNICK:  We do not have that in the form of

19   order, Your Honor.  I can certainly add those in.

20          THE COURT:  I think that would be helpful.  That way

21   everybody will have the same knowledge of what those dates are.

22   Objections to that proposed time schedule?

23                        (Pause)

24          MR. RICE:  Your Honor, just for clarification

25   purposes, the disclosure statement objections that are deemed

1  to be confirmation objections need to be re-filed --

2          THE COURT:  Yes.

3          MR. RICE:  -- as confirmation objections?

4          THE COURT:  Yes, they will.

5          MR. RICE:  All right.  Thank you.

6          THE COURT:  Between now and then the debtor I'm sure

7  will be working to try to resolve them, so I want to use that,

8  so I know what it is that I have to address.

9          MR. ZIEGLER:  Your Honor, I just wanted to point out

10 that the voting tabulation report won't be filed until

11 September 14th.  Objections will be due September 1st.  As has

12 been discussed here a couple times already, the absolute

13 priority issue is going to depend in large part on the vote, so

14 it will be difficult.  I guess we can raise the objections in

15 the abstract, but we won't be able -- we won't really know the

16 effect of the --

17         THE COURT:  What the class --

18         MR. ZIEGLER:  -- the vote on the absolute priority

19 rule until after the objections are due under this time.

20         MR. PERNICK:  Your Honor, we obviously understand

21 that problem and apologize.  I don't know that there's much we

22 can do.  The problem is if the voting -- I think we could

23 probably -- Mr. Berger will probably kill me, but I think we

24 can have an earlier report on all of the classes except for the

25 asbestos personal injury claimants.  That one, because we have

1  to match them up with the databases and with the 2019s, that

2  takes a lot of time, and even September 15th -- Mr. Ziegler

3  misspoke -- is going to be difficult --

4           THE COURT:  That's not --

5           MR. PERNICK:  -- for that to get done.

6           THE COURT:  That class though isn't like to be the

7  class that's going to have an absolute priority problem --

8           MR. PERNICK:  Right.

9           THE COURT:  -- problem.  So I think maybe if we can

10 do that a report on the other classes, that will affect that

11 issue earlier and let that last class go until later.  That may

12 make some sense.  Would anybody have a problem with bifurcating

13 the ballot agent's report like that?

14           MR. PERNICK:  May I have one moment?

15                         (Pause)

16           MR. PERNICK:  Your Honor, if we can, we're actually

17 going to step out - Mr. Shulman's going to step out and call

18 Mr. Berger and see what the earliest date is that he could do

19 that first ballot report with all the classes except asbestos

20 personal injury.

21           THE COURT:  Okay.  We'll take a recess and then get

22 -- and then address that issue in a minute.  But are you saying

23 that the disclosure statement and ballots and so forth are not

24 going to be mailed out for was it 17 days after --

25           MR. PERNICK:  It's 17 days to print them.  Yes.  And

**J&J COURT TRANSCRIBERS, INC.**

1  as I understand from talking to Mr. Berger, that is extremely

2  tight.  There's actually I think five or six subcontractors

3  that he's using to print the volume of paper that needs to go

4  out.

5       THE COURT:  Well, that's still -- assuming it gets

6  mailed out on the 28th, which is the absolute last day that it

7  could go out of July, that's the last Friday in July, that

8  would still give people five full weeks to get ballots and

9  objections in if they're due September 1.

10      MR. PERNICK:  Well, we had calculated that if -- let

11 me just check my dates here.  If the disclosure statement is

12 approved today, the packages would be mailed on July 27th.

13      THE COURT:  Well, I can't approve it today.  It's not

14 even filed yet.

15      MR. PERNICK:  Right.  I'm just -- this is what -- so

16 if it's tomorrow, it will be July 28th, and that actually

17 getting to September 1 would give you a 34-day voting period.

18      THE COURT:  Right.  It's a five-week period.

19      MR. PERNICK:  Right.

20      THE COURT:  Five calendar-week period.  So I think

21 that's okay.

22      MR. PERNICK:  I'm not sure I see a scenario where the

23 tabulation -- where the objection deadline can really be much

24 after the voting deadline, because Mr. Berger -- I assume he's

25 going to need a week at least, if not more, to tabulate the

1  votes in the other classes.

2       THE COURT:  Well, I think the objection deadline and

3  the voting deadline are both okay on September 1.  I think the

4  issue is the briefs.  Trying to get how he's going to get the

5  ballots in before briefs are due --

6       MR. PERNICK:  Right.

7       THE COURT:  -- I think is the question on -- so --

8       MR. PERNICK:  I think if there's an absolute priority

9  objection, it's just going to have to be raised, if I can

10  suggest, in those papers.  Hopefully, it won't be something

11  that we have to deal with, because we'll get the votes.  But if

12  we do, then it'll be in there.  I'm not sure I personally see

13  another way to do that.

14       THE COURT:  How many creditors do you expect are

15  going to be voting other than asbestos-related claims?  I mean

16  how big a project is this to get --

17       MR. PERNICK:  Can I have one moment?

18                    (Pause)

19       MR. PERNICK:  These are real rough estimates.  And

20  just so the Court knows and for the record I have with Dennis

21  Coleman from Owens Corning who's been in-house sort of handling

22  this part of it.  We estimate that we're going to mail about

23  250,000 packages.  Now that includes asbestos, so a rough

24  estimate today -- and I apologize we don't have those exact

25  numbers with us -- would be non-asbestos packages, probably ten

1  to twenty thousand.

2          THE COURT:  Okay.

3          MR. PERNICK:  So it's not -- you know, it's not a

4  couple hundred.

5          THE COURT:  Anybody here involved in W.R. Grace with

6  the dust sampling issue?  The reason I'm asking is we were

7  supposed to have a trial on dust sampling in September, which I

8  think has been postponed because of the postponements.  Does

9  anybody know?

10         MR. HURFORD:  Your Honor, Mark Hurford.  I'm fairly

11 certain those dates were moved.  I know that there was

12 discussion of a revised CMO for the PD issues.

13         THE COURT:  Yes.

14         MR. HURFORD:  They were going to presented to you

15 later this month at the omnibus hearing.

16         THE COURT:  Okay.  Well, they're showing up color-

17 coded here on my calendar as though they were canceled.  I just

18 want to verify -- I think we went through this issue --

19         MR. HURFORD:  Yes.

20         THE COURT:  -- in setting this hearing before and

21 somebody called.

22         MR. KRESS:  Your Honor, that's correct.

23         THE COURT:  Okay.

24         MR. KRESS:  We went through that.

25                         (Pause)

1            THE COURT:  I'm trying to see whether or not if we

2    start this -- if I can start it a day or so later that would

3    assist in any way, but I'm not -- I appreciate your deadlines,

4    and I don't think I'm going to be able to do that.  I have

5    nothing scheduled right now on the 19th because of the

6    cancellation of Grace, but I thought if we needed a second day,

7    this could carry over, so I'm not sure that one day is going to

8    make any difference.

9            MR. PERNICK:  I don't think it is, Your Honor.  I

10   mean given the -- you know, the progress that we've made with

11   all the parties with confirmation objections, absent just

12   unanticipated objections coming out of the woodwork in a large

13   volume I don't think we'll need the whole day, although I

14   obviously want to reserve it.  But we're hopeful that

15   confirmation hearing, you know, to the extent we have other

16   objections, we can resolve them or narrow them down.

17           THE COURT:  Okay.

18           MR. PERNICK:  And I'm not sure that a day or two

19   really does help us anyway.  I think -- I understand the

20   inefficiency of having any party that wants to raise that

21   objection write it, but given our tight time frame on the back

22   end to get the rights offering done to get everything done to

23   meet the October 30 deadline of the parties to the agreement

24   and the fact that there's a $30 million fee for us to extend

25   beyond that, I'm very hesitant to do anything but suggest to

1  the Court that the time line that we have right now is about

2  the minimum that we need.

3          THE COURT:  Okay.  Well, the other thing at the

4  moment, I still do not have any motions scheduled on my normal

5  motions day, which is September 29.  And I also have only one

6  thing that I could get moved on the 28th.  So that would be the

7  other option, to move it to the 28th and 29th of September.

8          MR. PERNICK:  I think that would be extremely

9  difficult for the debtor if we lost those ten days.

10          THE COURT:  Okay.  Then I guess, Mr. Ziegler, at

11  least file the objection if you have it, but the briefs -- I'll

12  make the briefs due later than the objection date, so that --

13  and I'll let -- we'll take a recess, so we can call the ballot

14  agent and see when these dates can come in.

15          MR. ZIEGLER:  That's fine, Your Honor.  I was going

16  to suggest that we have the right to at least supplement after

17  the voting deadline, but if you make the briefs due after that,

18  I guess we can just state the objection in their terms on the

19  first and supplement with a brief.

20          THE COURT:  Yes, I think that's probably -- it

21  probably makes more sense, because if the votes come in to

22  accept the class, then where are you going to go with the

23  objection?

24          MR. ZIEGLER:  They may change their position.

25          THE COURT:  Right.  So okay.  We'll take a ten-minute

1 recess, so you can call and see what you can do with respect to

2 dates.

3          MR. PERNICK:  Thank you, Your Honor.

4                         (Recess)

5          THE CLERK:  The Court come to order.

6          THE COURT:  Please be seated.  Mr. Pernick.

7          MR. PERNICK:  I'm sorry about that.  Thank you for

8 your patience.  Here's what we've worked out with Mr. Ziegler.

9 We're going to keep the objection and briefs with objection

10 deadline September 1, because there really -- we walked through

11 a number of scenarios.  It's just very difficult to save him

12 having to write that part of the brief if he wants to write it.

13 So the easiest thing is September 1.  If he needs an

14 opportunity to supplement, we'll discuss that, be happy to talk

15 about that with him.  I can't imagine this, but if we can't

16 work it out, we'll get the Court on the phone and get a

17 supplement date.

18          We will -- I am advised that the key vote here is

19 going to be in Class A-5, the bondholder vote, and we've

20 consulted with Jane Sullivan of Financial Balloting Group, and

21 she can have that report by September 8th.  I think we can give

22 a preliminary report to Mr. Ziegler before that, and I will

23 make the representation to the Court that as soon as we can

24 give a preliminary indication on where A-5 is, we'll do that.

25 I don't know that -- I would assume we can't do that before

**J&J COURT TRANSCRIBERS, INC.**

1 September 1, but if the bondholders vote early and it looks

2 good, and it's before September 1, then we'll give it to him

3 then.  Okay?

4          So just to recap, first of all, one thing that I was

5 incorrect about that I'd like to just let the Court know, the

6 number of mailings that are going to go out to non-asbestos is

7 actually about 50,000, because I had forgot about the equity

8 portion.  So we're mailing to equity holders, to bondholders,

9 and the equity portion is about 35,000.  The bondholders is

10 about 35 hundred, and the general unsecured is about 10,000.

11 Just so the Court could get some perspective as to what's going

12 -- what mailings are going out and what number of ballots might

13 come in.  So --

14          THE COURT:  Okay.

15          MR. PERNICK:  -- the dates that I think we have then

16 is we have September 1 for a voting and objection deadline.

17 And the objections -- obviously, if there are briefs by the

18 objectors, they would have to come in with the objection.  The

19 debtors' response deadline and brief deadline we would propose

20 to the Court actually September 11th, which is Monday.  We will

21 -- if the Court would like it, we can file two tabulation

22 reports if the Court would like that.  We can do one by

23 September 11th for everybody but asbestos, and then we could do

24 September 15th for the asbestos personal injury claimants.

25          THE COURT:  Well, if I have that supplemental report

**J&J COURT TRANSCRIBERS, INC.**

1  filed by September 11, Mr. Ziegler, and then give you I guess

2  until the 15th, which is the Friday before the hearing starts

3  on Monday to file a supplemental brief, if you need it, is that

4  -- does that work?

5          MR. ZIEGLER:  We'll do that, Your Honor.

6          THE COURT:  Okay, so all right.  Let's do a ballot

7  report for all classes, except the asbestos claims, by

8  September 11 and then a supplemental just for them on the 15th.

9          MR. PERNICK:  And if the debtor wants to respond to

10 that supplement, Your Honor, I guess we can just respond in

11 court.

12         THE COURT:  Yes, I think that's --

13         MR. PERNICK:  That would probably be the easiest

14 thing.

15         THE COURT:  -- what will have to happen.  I can't

16 imagine what the supplement's going to say if he's writing the

17 brief early, except that, you know, if the class is voted to

18 accept and he didn't know that, he could change the position a

19 little.

20         MR. PERNICK:  And just so we're clear, I think the

21 original September 1 brief would have to include all the

22 arguments including any absolute priority argument, if there is

23 one, and then the supplement is to deal with any issues --

24 further issues that were raised or needed to be clarified by

25 the tabulation reports.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Right.  That's right.  I think it's going

2    to have to work that way under this schedule, but you've said

3    that the report with respect to the bondholder group will be

4    done by September 8th, and I think that would still be -- I

5    don't know that it needs to --

6          MR. PERNICK:  September 11th.  Sorry.

7          THE COURT:  No, you told me you would --

8          MR. PERNICK:  Oh, I'm sorry.  I did say September

9    8th.  Right.

10         THE COURT:  But frankly, if you're all right with

11   this, Mr. Ziegler, the difference between Friday the 8th and

12   September 11th for my purposes is irrelevant.  So if Mr.

13   Pernick can simply tell you what that class is by September 8th

14   and file it September 11, that's all right with me.

15         MR. ZIEGLER:  Yes, that's fine, Your Honor.

16         MR. PERNICK:  And if we can tell earlier, we will.

17         THE COURT:  Okay, so I'm just going to expect a

18   report to be filed by September 11th, but as soon as you know

19   the results of that class, you'll tell Mr. Ziegler what that

20   is.

21         MR. PERNICK:  Okay, and I think that's all of the

22   dates, and we'll obviously submit to the Court a revised form

23   of order with the final version of the plan and the final

24   version of the disclosure statement, and we're actually going

25   to -- and Mr. Hurford's been kind enough to offer us his

**J&J COURT TRANSCRIBERS, INC.**

1  office, so we're actually going to leave court and go over

2  there and try to do that this afternoon.

3        THE COURT:  Okay.  I was taking a look at the ballots

4  again and the information that's going out with the ballots,

5  because I've lost track of how they ended up being approved

6  based on the settlement agreement, and they do indicate that

7  the fifth amended had some changes necessitated by the

8  settlement, and, therefore, the sixth amended was filed.  I'm

9  not clear though.  How are -- I haven't looked at what you sent

10  in today, Mr. Pernick, totally yet, so I'm not -- through the

11  plan -- to the plan.  How will people know what their treatment

12  is going to be under the fifth amended in the event that the

13  sixth amended isn't approved?

14        MR. PERNICK:  We actually -- and this is my fault for

15  misspeaking a little bit earlier.  We revert to the treatment

16  in the fifth amended plan if the vote is no in the classes, but

17  we don't revert to the actual fifth amended plan.  And the

18  treatment is described in the disclosure statement --

19        THE COURT:  Okay.

20        MR. PERNICK:  -- and in the plan.

21        THE COURT:  All right.  I was concerned that somehow

22  what is stated in the sixth amended, even with the alternative

23  treatment, may not be what's in the fifth amendment.  I just

24  didn't compare the two.

25        MR. PERNICK:  No.  Nobody will have to read the fifth

**J&J COURT TRANSCRIBERS, INC.**

1  amended plan to understand.  They can look at the document

2  that's going out.  Well, I won't say nobody, but our intent is

3  that everything is in the sixth amended plan, and it's just the

4  treatment from the fifth, which has been incorporated to the

5  extent that there is a no vote --

6          THE COURT:  Okay.

7          MR. PERNICK:  -- and there has to be a cram down in

8  that class.

9          THE COURT:  All right.  When you have actually filed

10  the final documents, whether it's today or tomorrow, have

11  somebody call my staff, so I'm alerted to the fact that they're

12  there, and e-mail them to that e-mail box that you normally use

13  addressed -- the PAWB box, so that -- JKF box, so that I can

14  print them and take a look at them right away.  If you get them

15  filed today, I'll try to get through them and get an order

16  entered, but I think in all probability, based on the fact that

17  you're going to need to make changes and get them filed, it'll

18  probably be tomorrow.

19          MR. PERNICK:  Okay.

20          THE COURT:  But I'll do my best, depending on what

21  time you get them to me today.

22          MR. PERNICK:  Thank you very much, Your Honor.

23          THE COURT:  Any thing else?  Oh, yes, we have a

24  second motion.

25          MR. PERNICK:  Just one other --

**J&J COURT TRANSCRIBERS, INC.**

1         MR. PERNICK:  Anything else on the disclosure

2 statement first?  Mr. Ziegler.

3         MR. ZIEGLER:  This is really on the confirmation,

4 Your Honor.  As we mentioned earlier, my client wants to take

5 some discovery on confirmation issues.  There's no discovery

6 deadline in the order that was just worked out.  I don't know

7 if that's acceptable.  I don't really care, but as long as it's

8 understood that discovery is open, and we can commence doing

9 discovery.

10        THE COURT:  Well, I think discovery's going to have

11 to end by the ballot date, so whether -- yes, I think it's

12 open, but doesn't it have to kind of end, so that people will

13 know what their ballots are going to be and their objections

14 will be by September 1?

15        MR. ZIEGLER:  If that's the deadline, then we'll --

16 discovery's open now, and we'll close September 1.

17        THE COURT:  Okay.  I mean there are two weeks after

18 that, so if somebody needs additional time I'd certainly, you

19 know, be willing to consider it.  But I think a good ending

20 deadline would be the date that the ballots are due, and that's

21 Friday, September 1.  So let's say discovery closes August 31.

22        MR. ZIEGLER:  Okay, Your Honor.  Thank you.

23        THE COURT:  Anyone else on disclosure statement or

24 plan issue?

25                  (No verbal response)

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Okay.  Mr. Pernick.

2              MR. PERNICK:  Your Honor, thank you.  That's it for

3  the disclosure statement, and I believe Mr. Raicht has

4  something very quick on the rights offering order.

5              UNIDENTIFIED ATTORNEY:  Your Honor, may I be excused?

6              THE COURT:  Yes, sir.  Anybody who's no longer

7  interested in the proceedings may leave.  Thank you.

8              MR. RAICHT:  Good morning, Your Honor.

9              THE COURT:  Good morning.

10             MR. RAICHT:  Geoffrey Raicht, Sidley Austin, on

11 behalf of Owens Corning.  Your Honor, this is the debtors'

12 motion on -- for an order approving the procedures and forms in

13 connection with the rights offering, which is taken in

14 connection with the plan support agreement, the equity

15 commitment agreement, and the term sheet, etcetera.  We had

16 filed this motion in June, Your Honor -- June 18th I believe.

17 We filed a supplement a couple of weeks ago.

18             We have received four objections, three of which are

19 from the parties of Longacre, Amrock (phonetic), and Contrary

20 (phonetic) represented by the Otterbourg firm.  The fourth was

21 by the Schultze Group.  We did receive some other inquiries

22 from individuals which were resolved, and we also received an

23 inquiry from the SEC, which Mr. Pernick referenced in his

24 presentation on the disclosure statement.  We spoke with the

25 SEC.  We reached agreement with them, and I'm authorized to

**J&J COURT TRANSCRIBERS, INC.**

1 report that they consent to the form of the order with the

2 language that's included.  We have resolved all of the

3 objections for the Otterbourg parties as reflected in the COC

4 that was submitted on Friday.

5          THE COURT:  I haven't seen that.

6          MR. RAICHT:  You have not seen that.  There was a COC

7 filed, Your Honor.  The Amrock, Contrary, and Longacre claims

8 have all been resolved.  It was merely matters of either

9 adjustments to the amount that they could participate in the

10 rights offering or claim transferee information.

11          On the Schultze objection, Your Honor, it's our view

12 that was really not an objection to this rights offering.

13 There was nothing in it that related to this.  It was all

14 disclosure statement related.  We would ask Your Honor to

15 overrule that objection.

16          On Friday we did circulate a revised copy of the

17 order and the materials to the parties who had submitted

18 objections, including the SEC, the U.S. Trustee, J.P. Morgan,

19 that group.  We haven't received any comment back from anybody.

20 We think it -- we believe it's all consensual.  The one piece

21 of information that the debtors really added to what we filed

22 back in June, Your Honor, is the last exhibit, which is exhibit

23 7.  What that really is is what I -- we call the math.  It is

24 working with our financial advisor from Lazard.  We have shown

25 each class -- Classes A-5, A-6, and A-6(b) -- what is the final

**J&J COURT TRANSCRIBERS, INC.**

1  amount of their claims.  They're going to participate for

2  rights offering purposes and what is going to be the rights per

3  $1,000 claim that are being offered.  Actually, it turns out

4  with the math that there are going to be 43 rights offered for

5  every $1,000 worth of claims.  We did circulate in a form of

6  exhibit, and we put the math in late last night, and we've

7  included that as an exhibit.

8         Unless Your Honor has any questions or wants me to

9  walk through the changes to the order from the as-filed

10 version, I'm happy to do that.

11        THE COURT:  I haven't seen it, so somebody's going to

12 have to give me a copy, so I can see it and walk me through it.

13        MR. RAICHT:  Okay.

14                    (Pause)

15        MR. RAICHT:  Your Honor, I believe you've been handed

16 up a clean copy of order as well as a black line of the -- I'm

17 sorry.  You have a clean copy of the order and all the

18 exhibits, and I believe you were handed a black line of order

19 against the version that was filed on June 18th.  If Your Honor

20 would like me to walk you through it, I'm happy to do that, if

21 you want to take a minute to read it

22        THE COURT:  Yes, just give me a minute to --

23        MR. RAICHT:  Sure.

24        THE COURT:  -- let me read it.  Thank you.

25                    (Pause)

**J&J COURT TRANSCRIBERS, INC.**

1         THE COURT:  Well, I think exhibit 7 helps to clarify

2   what's happening with respect to the rights offering.  Unless

3   somebody has an objection to the inclusion of exhibit 7, I

4   think it is a helpful document to add.  Any objections to

5   exhibit 7?

6                    (No verbal response)

7         THE COURT:  Okay.  I have no problem with exhibit 7.

8   Mr. Ziegler, I'm not sure whether I've addressed -- before I

9   can get to the issue that the debtor was asking, I think need

10  to address any objections your client may have.

11        MR. ZIEGLER:  That's fine.  Schultze does not have

12  any further objections to the rights offering motion.  We've

13  just included it with our disclosure statement objections, and

14  what we've already done with regard to that is sufficient --

15        THE COURT:  All right.  Thank you.

16        MR. ZIEGLER:  -- for our objection.

17        THE COURT:  Anyone have any further objections to the

18  rights offering?

19                    (No verbal response)

20        THE COURT:  Okay, then I -- is this one that you've

21  handed me, which is a complete -- is it a complete copy?

22        MR. RAICHT:  It is a --

23        THE COURT:  I haven't looked at every page, but

24  obviously --

25        MR. RAICHT:  It is a complete copy of the order and

**J&J COURT TRANSCRIBERS, INC.**

1  all seven exhibits, Your Honor, in clean form.

2         THE COURT:  And the only changes have been those in

3  the black line version that you also handed up and the addition

4  of exhibit 7?

5         MR. RAICHT:  Exhibit 7 in the order.  There were

6  changes, Your Honor, black lines, to the instructions, which

7  were clarifications.  Those again were circulated to all the

8  parties last week.

9         THE COURT:  Okay.  I've signed that order.

10        MR. RAICHT:  Thank you, Your Honor.

11        THE COURT:  Okay.

12        MR. PERNICK:  Your Honor, as always, thank you for

13  your patience, and we appreciate your help in getting this

14  approved today.

15        THE COURT:  Okay.  Anyone have any housekeeping

16  matters?

17                    (No verbal response)

18        THE COURT:  We're adjourned.  Thank you.

19                      * * * * *

20

21

22

23

24

25

## CERTIFICATION

I, PATRICIA C. REPKO, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of my ability.


/s/ Patricia C. Repko          Date:  July 17, 2006
PATRICIA C. REPKO
J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**