```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

IN RE:                        . Case No. 00-3837 (JKF)
                              .
   OWENS CORNING, et al.,     . USX Tower - 54th Floor
                              . 600 Grant Street
                              . Pittsburgh, PA 15219
                 Debtors,     .
                              . September 18, 2006
. . . . . . . . . . . . . . . . 8:44 a.m.
```

                        TRANSCRIPT OF HEARING
              BEFORE HONORABLE JUDITH K. FITZGERALD
               UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Saul Ewing<br>By:  NORMAN L. PERNICK, ESQ.<br>     J. KATE STICKLES, ESQ.<br>222 Delaware Ave., Ste. 1200<br>P. O. Box 1266<br>Wilmington, DE 19899 |
| For the Debtors: | Saul Ewing LLP<br>By: CHARLES O. MONK, II, ESQ.<br>100 South Charles Street,<br>Baltimore, MD 21201-2773 |
| For the Debtors: | Debevoise & Plimpton<br>By:  MARY BETH HOGAN, ESQ.<br>919 Third Avenue<br>New York, NY 10022 |
| For the Debtors: | Sidley Austin LLP<br>By:  JEFFREY C. STEEN, ESQ.<br>     JAMES CONLAN, ESQ.<br>Bank One Plaza<br>10 South Dearborn Street<br>Chicago, IL 60607 |
| Audio Operator: | Janet Heller |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

**APPEARANCES CONTINUED**:

For the Debtors:                    STEVEN KROLL, ESQ.


For the Asbestos Creditors
Committee:                          Caplin & Drysdale
                                    By:  PETER LOCKWOOD, ESQ.
                                         ELIHU INSELBUCH, ESQ.
                                    One Thomas Circle, N.W.
                                    Washington, D.C.  20005

For Bondholders & Trade
Creditors:                          Anderson, Kill & Olink
                                    By:  ANDREW RAHL, ESQ.
                                    1215 Avenue of the Americas
                                    New York, NY  10020


For Futures Rep.                    Young Conaway Stargatt &
                                    Taylor, LLP
                                    By: JAMES L. PATTON, JR., ESQ.
                                    The Brandywine Building
                                    1000 West Street
                                    17th Floor
                                    P.O. Box 391
                                    Wilmington, DE  19899

                                    Kaye Scholer
                                    By:  ANDREW KRESS, ESQ.
                                    425 Park Avenue
                                    New York, NY  10022-3598

For Official Committee of
Unsecured Creditors:                Davis Polk & Wardwell
                                    By:  JAMES McCLAMMY, ESQ.
                                         GORDON HARRISS, ESQ.
                                    450 Lexington Avenue
                                    New York, NY  10017


For Bank of New York as
 Indentured Trustee:                Carter, Ledyard & Milburn, LLP
                                    By:  JAMES GADSDEN, ESQ.
                                    2 Wall Street
                                    New York, NY  10005


For Goldman & Sachs:                Milbank, Tweed, Hadley &
                                    McCloy LLP
                                    By:  JEFFREY MILTON, ESQ.
                                    1 Chase Manhattan Plaza
                                    New York, NY  10005

**APPEARANCES CONTINUED:**


For Kensington & Springfield: Stutman, Treister & Glatt
By:  K. JOHN SHAFFER, ESQ.
1901 Avenue of the Stars
12th Floor
Los Angeles, CA  90067

For J.P. Morgan Securities &
J.P. Morgan Chase Bank: Simpson, Thacher & Bartlett, LLP
By:  MARK THOMPSON, ESQ.
425 Lexington Avenue
New York, NY  10017

For Travelers: Simpson, Thacher & Bartlett, LLP
By:  WILLIAM REGAN, ESQ.
425 Lexington Avenue
New York, NY  10017

For the Internal Revenue Svc.: U.S. Department of Justice
By:  DAVID KATINSKY, ESQ.

For Ad Hoc Bondholder
Committee: Stroock & Stroock & Lavan, LLP
By:  KENNETH PASQUALE, ESQ.
180 Maiden Lane
New York, NY  10038

For Ad Hoc Committee of
Preferred & Equity Security
Holders: Brown Rudnick Berlack Israels LLP
By:  ANTHONY L. GRAY, ESQ.
One Financial Center
745 Atlantic Avenue
Boston, MA  02111

For Credit Suisse: Weil, Gotshal & Manges LLP
By: CHRISTOPHER MARCUS, ESQ.
    MARTIN BIENENSTOCK, ESQ.
767 Fifth Avenue
New York, NY  10153

For Continental Casualty Co.: Seyfarth Shaw LLP
By:  DAVID CHRISTIAN, ESQ.
55 E. Monroe Street, St. 4200
Chicago, IL  60603

**APPEARANCES CONTINUED:**

For Zurich International
 Bermuda:                        Marks, O'Neill, O'Brien &
                                Courtney, PC
                                By:  ANNE MYERS, ESQ.
                                    DAVID HELWIG, ESQ.
                                1880 J.F. Kennedy Blvd.
                                Philadelphia, PA  19103

For U.S. Trustee:             Office of the U.S. Trustee
                                By:  DAVID KLAUDER, ESQ.
                                601 Walnut Street
                                Room 950W
                                Philadelphia, PA  19106

For Pacific Employers
Insurance Company:           Bazelon, Less & Feldman
                                By:  JENNIFER HOAGLAND, ESQ.
                                1515 Market Street, Suite 700
                                Philadelphia, PA  19102

For WCI Communities, Inc.:   Carlton Fields, PA
                                By:  ROBERT N. GILBERT, ESQ.
                                P.O. Box 150
                                West Palm Beach, FL  33402

For Mainstay Funding:        Baker & Hostetler, LLP
                                By:  DONALD WORKMAN, ESQ.
                                1050 Connecticut Avenue, NW
                                Washington, DC  20036

For Blue Ridge Investments:  Mayer, Brown, Rowe & Maw LLP
                                By:  CHRISTINE JAGDE, ESQ.
                                190 South La Salle Street
                                Chicago, IL  60603

For HSBC Bank:                Kelley, Drye & Warren, LLP
                                By: C. LAMBRIANSKOS, ESQ.
                                101 Park Avenue
                                New York, NY  10178

For Barron & Budd, Foster &
Spear, Waters & Krause and
Weiss and Lutzenberg:        STEVEN FELSENTHAL, ESQ.

**APPEARANCES CONTINUED:**

```
For ACE American Insurance:      White & Williams, LLP
                                 By:  JOSEPH GIBBONS, ESQ.
                                 1800 One Liberty Place
                                 Philadelphia, PA  19103
```

**TELEPHONE APPEARNCES:**

```
For GK Capital:                  STUART KOVENSKY, ESQ.

For Ochziff Capital Mangement:   JOSEPH KRIGSFELD, ESQ.

For Lehman Brothers:             CHRISTINE DALEY, ESQ.

For James McMonagle:             Young, Conaway, Stargatt &
                                 Taylor LLP
                                 By:  SHARON ZIEG, ESQ.
                                 The Brandywine Building
                                 1000 West Street
                                 17th Floor
                                 P.O. Box 391
                                 Wilmington, DE  19899

For Dow Jones News:              PEG BRICKLEY, ESQ.

For Linden Advisors, LP:         ANDY CHANG, ESQ.

For Pinal County:                Steve Brown & Associates
                                 By:  TRACY ESSIG, ESQ.
                                 1414 East Indian School Road
                                 Phoenix, AZ  85014

For Brunswick Group:             NAOMI DECTER, ESQ.
                                 LYDIA CHAN, ESQ.
                                 JENNIFER LOWNEY, ESQ.

For the Debtors:                 JOHN W. CHRISTY, ESQ.
                                 JAMES GIBBS, ESQ.

For ACC:                         Montgomery, McCracken, Walker
                                 & Rhoads, LLP
                                 By:  NOEL C. BURNHAM, ESQ.
                                 300 Delaware Avenue
                                 Suite 750
                                 Wilmington, DE  19801

For Aurelius Capital Managment:  WEI WANG, ESQ.
```

**TELEPHONE APPEARANCES (Cont'd):**

For DK Acquisition Partners:    Willkie Farr & Gallagher LLP
By:  STEPHEN B. VOGEL, ESQ.
The Equitable Center
787 Seventh Avenue
New York, NY  10019

For Halcyon Asset Management:    JOHN GREENE, ESQ.

For Credit Suisse First Boston:    Landis Rath & Cobb, LLP
By: REBECCA BUTCHER, ESQ.
919 Market Street
Wilmington, DE  19801

For Kensington & Springfield:    Potter, Anderson & Corroon, LLP
By: DAVID J. BALDWIN, ESQ.
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801

Stutman, Treister & Glatt
By:  ISAAC PACHULSKI, ESQ.
1901 Avenue of the Stars
12th Floor
Los Angeles, CA  90067For

For Official Committee of
Unsecured Creditors:    Morris, Nichols, Arsht & Tunnell
By:  WILLIAM H. SUDELL, ESQ.
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899

For Octavian Advisors:    MYRON MANTERMACH, ESQ.

For ACE American Insurance:    White and Williams LLP
By:  MARC S. CASARINO, ESQ.
824 North Market Street
Suite 902
Wilmington, DE  19801

For Murray Capital Management:    MARTI MURRAY, ESQ.

For Bear Stearns & Company:    BLAKE HUYNH, ESQ.

**TELEPHONE APPEARANCES (Cont'd):**

| | |
|---|---|
| For Official Committee of Bondholders: | Monzack and Monaco, P.A.<br>By:  FRANCIS MONACO, JR., ESQ.<br>400 Commerce Center<br>Twelfth & Orange Streets<br>Wilmington, DE  19899 |
| For Goldman Sachs & Company: | Goldman Sachs & Company<br>By:  EITAN MELAMED, ESQ.<br>New York, NY |
| For Owens Corning: | Covington & Burling, LLP<br>By;  ANNA ENGH, ESQ.<br>1201 Pennsylvania Avenue<br>Washington, DC  20004 |
| For Owens Illinois: | McCarter & English<br>By:  KATHARINE MAYER, ESQ.<br>919 Market Street<br>Suite 1800<br>Wilmington, DE 19899 |
| For WCI Communities, Inc.: | Carlton Fields, PA<br>By:  ROBERT GILBERT, ESQ. |
| For Citizens Bank: | Choate, Hall & Stewart LLP<br>By:  DOUGLAS GOODING, ESQ.<br>53 State Street<br>Boston, MA 02109 |
| For JP Morgan: | Simpson, Thacher & Bartlett, LLP<br>By:  ALICE B. EATON, ESQ.<br>425 Lexington Avenue<br>New York, NY  10017 |
| For JP Morgan: | Klett Rooney Lieber & Schorling<br>By:  TERESA K.D. CURRIER, ESQ.<br>The Brandywine Building<br>1000 West Street<br>Suite 1410<br>Wilmington, DE  18901 |
| For Brencourt Advisors: | DAVID CHANDRA, ESQ. |

**TELEPHONE APPEARANCES (Cont'd):**

| | |
|---|---|
| For Sanford C. Bernstein & Co. | Loizides & Associates<br>By: CHRISTOPHER LOIZIDES, ESQ.<br>1225 King Street<br>Suite 800<br>Wilmington, DE  19801 |
| For Silver Point Capital: | NEAL SHAH, ESW. |
| For Owens Corning: | Sidley, Austin<br>By:  HADLEY VAN VACTOR, ESQ. |
| For Owens Corning: | Saul Ewing, LLP<br>By:  DOMENIC PACITTI, ESQ.<br>222 Delaware Avenue<br>Suite 1200<br>Wilmington, DE  19801 |
| For Ad Hoc Bondholders: | Stroock & Stroock & Lavan, LLP<br>By:  DENISE WILDES, ESQ.<br>180 Maiden Lane<br>New York, NY  10038 |

**I N D E X**

**EXHIBITS:**                                                    **EVID**.

    Declaration of Michael Thaman                    28
    Declaration of Stephen Krull                     30
    Declaration of Robert Kost                       31
    Declaration of James McMonagle                   32

1           THE COURT:  Please be seated.  This is the matter of

2  Owens Corning, Bankruptcy Number 00-3837.  This is the time set

3  for the hearing on the plan confirmation.

4           The participants by phone are Stuart Kovensky, Joseph

5  Krigsfeld, Christine Daley, Sharon Zieg, Donald Workman, Peg

6  Brickley, Andy Chang, Tracy Essig, Gordon Harriss, Naomi

7  Decter, Lydia Chan, Jennifer Lowney, John Christy, James Gibb,

8  Kate Stickles, Noel Burnham, Wei Wang, Stephen Vogel, Christine

9  Jagde, John Greene, Rebecca Butcher, Janet Ohnemus, Selma

10 Windorfer, Linda Hoch, Anne Myers, David Baldwin, John Shaffer,

11 Isaac Pachulski, William Sudell, Myron Manternach, Jennifer

12 Hoagland, Marc Casarino, Joseph Gibbons, Lisa Epps, Marti

13 Murray, Blake Huynh, Francis Monaco, Eitan Melamed, Sara Gooch,

14 Anna Engh, Katharine, Mayer, Robert Gilbert, Douglas Gooding,

15 Alice Eaton, Teresa Currier, David Klauder, Daniel Chandra,

16 Christopher Loizides, Neal Shah, Hadley Van Vactor, Domenic

17 Pacitti, Denise Wildes, Christena Lambriankos and I believe

18 Steven Felsenthal.  Is there anyone present whose name I did

19 not call by phone, please?  Is the court call operator there,

20 please?

21           UNIDENTIFIED FEMALE SPEAKER:  I am.

22           THE COURT:  Hi.  I'm sorry, we're getting some kind

23 of feedback in the courtroom.  It's not terrible, but there is

24 some.  If it's possible to check to see where it's coming from?

25           UNIDENTIFIED FEMALE SPEAKER:  I am, thank you.

1          THE COURT:  Okay.  Take entries in court, good

2  morning.

3          MR. PERNICK:  Good morning, Your Honor, Norman

4  Pernick on behalf the Debtors Owens Corning.

5          MR. CONLAN:  Your Honor, James Conlan, Sidley Austin

6  on behalf of the Debtors.

7          UNIDENTIFIED FEMALE SPEAKER:  Everybody make sure

8  they use a microphone, please.

9          THE COURT:  Pardon me.  I think you're going to have

10  to mute this until people speak because we're getting feedback

11  on the phone.

12          MR. CONLAN:  Let me repeat, James Conlan from Sidley

13  on behalf of the Debtors.

14          MR. STEEN:  Good morning, Your Honor, Jeffrey Steen,

15  Sidley Austin on behalf of the Debtors.

16          MR. MONK:  Good morning, Your Honor, Charles Monk,

17  Saul Ewing on behalf of the Debtors.

18          MR. PATTON:  Good morning, Your Honor, Jim Patton

19  from Young Conaway on behalf of the Futures Rep.

20          MR. LOCKWOOD:  Good morning, Your Honor, Peter

21  Lockwood from Caplin & Drysdale on behalf of the ACC.

22          MR. INSELBUCH:  Good morning, Elihu Inselbuch from

23  Caplin & Drysdale, for the Asbestos Creditors Committee.

24          MR. KRESS:  Good morning, Your Honor --

25          THE COURT:  Do not talk.

1          MR. KRESS:  Andrew Kress with Kaye Scholer, counsel

2  for the Futures Representative.

3          MR. RAHL:  Good morning, Your Honor, Andrew Rahl,

4  Anderson Kill & Olick for the Bondholders and Trade Creditors.

5          MR. McCLAMMY:  Good morning, James McClammy from

6  Davis, Polk & Wardwell on behalf of the Official Committee of

7  Unsecured Creditors.

8          THE COURT:  I'm sorry, can you -- I don't think we

9  picked your name up, if you could start again, please.

10          MR. McCLAMMY:  Sure.  James McClammy from David, Polk

11  and Wardwell on behalf of the Official Committee of Unsecured

12  Creditors.

13          THE COURT:  Thank you.

14          MR. PASQUALE:  Good morning, Your Honor, Ken Pasquale

15  from Stroock for the Ad Hoc Bondholder Committee.

16          MR. GRAY:  Your Honor, good morning, Tony Gray,

17  Brown, Rudnick, Berlack, Israels for an Ad Hoc Committee of

18  Preferred and Equity Security Holders.

19          MR. MARCUS:  Good morning, Your Honor, Christopher

20  Marcus from Weil, Gotshal and Manges, I'm also here with Martin

21  Bienenstock from Weil, Gotshal and Manges.  We are both here on

22  behalf of Credit Suisse.

23          MR. CHRISTIAN:  Good morning, Your Honor, David

24  Christian of Seyfarth Shaw LLP on behalf of Continental

25  Casualty Company.

1          MR. GADSDEN:  Good morning, Your Honor, James

2   Gadsden, Carter, Ledyard & Milburn LLP, on behalf of the Bank

3   of New York as Indentured Trustee.

4          MR. MILTON:  Good morning, Your Honor, Jeffrey Milton

5   of Milbank, Tweed, Hadley & McCloy on behalf of Goldman &

6   Sachs.

7          MR. SHAFFER:  Good morning, Your Honor, John Shaffer

8   of Stutman, Treister & Glatt, on behalf of Kensington &

9   Springfield.

10         MR. THOMPSON:  Good morning, Your Honor, Mark

11  Thompson from Simpson Thacher on behalf of J.P. Morgan

12  Securities and J.P. Morgan Chase Bank.

13         MR. REGAN:  Good morning, Your Honor, William Regan

14  from Simpson Thacher on behalf of Travelers.

15         MS. HOGAN:  Good morning, Mary Beth Hogan, Debevoise

16  and Plimpton for the Debtors.

17         MR. KATINSKY:  Good morning, Your Honor, David

18  Katinsky with the United States Department of Justice on behalf

19  of the Internal Revenue Service.

20         THE COURT:  Anyone else?  Okay.  Mr. Pernick?

21         MR. PERNICK:  Good morning, Your Honor.  One

22  housekeeping matter if I might.  I understand that there are a

23  number of people who have asked to appear telephonically as the

24  Court has gone through the list and I think Mr. Shaffer is here

25  for one of the objectors, but there may be another objector

1 who's on the phone and I understand the Court may have a view

2 about whether this calls list -- and I just want to see how the

3 Court would like to proceed on that.

4 　　　　THE COURT:  Are these pro se people?

5 　　　　MR. PERNICK:  There may be some pro se on the phone,

6 also, and also I believe one of the objectors is on the phone,

7 or their counsel, Mr. Bodnar.

8 　　　　THE COURT:  Is someone on the phone representing an

9 objecting party who is not present in the courtroom?

10 　　　　MR. MYERS:  Your Honor, this is Ann Myers of Marks

11 O'Neill, I represent Zurich International Bermuda.  I am

12 listening on this line but my partner David Helwig is in the

13 courtroom and present as well.

14 　　　　THE COURT:  Okay, thank you.

15 　　　　MR. PERNICK: And, I don't know if there are others

16 like Zurich, where the objections are resolved and we may need

17 them to just confirm on the record.

18 　　　　THE COURT:  That's fine.  If all they're doing is

19 confirming, I just -- in the plan confirmation process with the

20 give and take, it's a little difficult to have active

21 participation by phone, but to the extent that you're just

22 confirming that an objection is withdrawn or entering an

23 appearance, that's fine.  And to the extent that there are pro

24 se people involved, I indicated that they had permission to

25 appear by phone.

1        MR. PERNICK:  Thank you, Your Honor.  Your Honor, we

2   are here after almost six years of working our way through, as

3   the Court is well aware, many difficult and challenging issues

4   and we're here on the confirmation of the sixth amended plan as

5   modified and that embodies a global settlement achieved with

6   all of the major constituents in this case.  It's consistent

7   with the settlement term sheet which was filed on May 10th.

8   The voting results, and we have a slide to put up for the

9   Court, further demonstrates that the plan does, indeed, achieve

10  what the company has long been saying was its goal in this

11  case, which is a fully consensual plan and as the Court saw

12  from the voting declarations that were filed and the summary

13  that's just up on the board for visual purposes, there's

14  overwhelming support from all classes that were entitled to

15  vote and there's acceptance by each and every voting class at

16  OCD and the subsidiary Debtors.

17        We've resolved 17 of the 19 objections including

18  those relating to the U.S. Trustee and the IRS as well as

19  others and we've presented charts to the Court which we will

20  use as a visual aid when we get to that section of the hearing.

21        Now, typically, Your Honor, we would go through the

22  background of OC's business and asbestos liability.  I'm not

23  sure that the Court believes that's necessary, or wants it.

24        THE COURT:  I don't think that's necessary.  Thank

25  you.

1       MR. PERNICK:  I wanted to at least make the offer.

2       THE COURT:  I will accept the disclosure statement

3  information and the more limited information that's in the plan

4  as the nature of that background.  No one has objected to it

5  and I think that's sufficient.

6       MR. PERNICK:  Thank you, Your Honor.  There are a

7  couple of highlights that are important to the confirmation of

8  the plan and just for the Court's understanding, Mr. Conlan and

9  I actually have divided the hearing up and we're both going to

10 stand up here today, just to make it easier because we're going

11 to switch off parts of the hearing.

12      THE COURT:  All right.  Or you can both be seated,

13 whatever you're more comfortable doing.  As long as you speak

14 into a microphone so we can pick you up on this system, that's

15 fine.

16      MR. PERNICK:  Thank you.

17      MR. CONLAN:  Good morning, Your Honor, James Conlan

18 from Sidley, on behalf of the Debtors as I mentioned earlier.

19      Your Honor, I'm just going to go through some of the

20 key facts that you'll be thinking about today in the

21 confirmation of this plan.  As you know, these cases involve

22 significant litigation and I'm not going to go through all of

23 it, but there's no question that the asbestos estimation

24 litigation was a key feature and there's no question that the

25 substantive consolidation litigation was another key feature,

1  and those two rulings set the stage for the negotiation and the

2  filing of the fifth amended plan.  We're here on the sixth.

3  But first I want to talk about the fifth amended plan.

4          The fifth amended plan was a plan that was supported

5  by the Asbestos Creditors Committee and the Futures

6  Representative, as well as the banks, and I want to be clear

7  with the Court and the Court knows this, we had to have the

8  support of Asbestos, we had to have support of the banks, we

9  wanted the support of the bondholders and other creditors.  We

10  believe that filing a plan that we hoped would garner their

11  support, but that could be confirmed over their objection was

12  the way to get to the sixth amended plan and it worked.

13          The sixth amended plan embodies the global settlement

14  that you're well aware of.  The Debtors continued to negotiate

15  after the fifth amended plan was filed again with the goal of

16  achieving a fully consensual plan.  We succeeded and announced

17  it to the Court on May 10th, with the help of a lot of other

18  people, the Asbestos Creditors Committee, the Bondholders, the

19  banks, others.  The sixth amended plan, I won't go through the

20  details of it, but it embodies, at this juncture, it embodies

21  the deal with the banks that Your Honor has heard a lot about

22  in context of the unimpairment and full payment determination.

23  It embodies the deal with the Bondholders and it embodies the

24  deal with Asbestos.

25          We've also been before you recently for additional

1  Court approvals that relate to this plan and just to remind the

2  Court, we have an equity commitment agreement with J.P. Morgan,

3  the Court authorized the execution and implementation on June

4  29th, of the JPM commitment, through October 31st.  We're going

5  to come back to that date.  Under that equity commitment

6  agreement J.P. Morgan was obligated to purchase up to 72.9

7  million shares of reorganized Owens Corning at $30 per share

8  and they received a hundred million dollar fee for that, what

9  we call backstop commitment.  You're going to hear more about

10  that.   J.P. Morgan entered into a syndication agreement with

11  D.E. Shaw, a big bondholder, Plainfield and others, which we

12  frequently refer to as the backstop providers because they were

13  part of vitally important equity commitment agreement.

14          Second feature.  The Debtors conducted a rights

15  offering.  We sought to raise $2.187 billion dollars in that

16  rights offering and we did it in connection with the

17  solicitation of votes on this plan, the sixth amended plan.

18  Essentially, shares of reorganized Owens Corning at $30 a share

19  were offered to the Bondholders, Class A5 and unsecured

20  creditors in Classes A6A and A6B.  Of the 72.9 million shares

21  offered, only 2.9 million were taken up as part of that rights

22  offering and as a result JPM is obligated to purchase the

23  remaining 70 million shares at $30 per share.  And that's very

24  important to the success of this process.

25          Finally, and we've been before the Court on this as

1  well.  We have an exit financing commitment with CitiGroup and

2  Bank of America.  It was approved by you on July 20th.  It

3  consists of a $1.4 billion dollar term loan and a $1 billion

4  dollar revolver.  It also provides, our financing provides for

5  potential issuance of up to 400 million in senior notes, which

6  will be used to reduce the term facility, I want to be clear.

7  We have 1.8 billion in total debt that would be authorized

8  under the exit financing.  So, in other words, it's not as

9  simple as taking the term and adding the revolver and adding

10  the 400, it's subject to a 1.8 cap.

11      Finally, the disclosure statement and plan

12  solicitation as you know, you approved the procedures order,

13  the solicitation procedures order on June 19th, the order

14  approving the rights offering, procedures and related materials

15  was entered on July 10th.  The disclosure statement was

16  approved on July 10th.  Briefly, the overview of the plan.

17      It is fully consistent with the Third Circuit's

18  substantive consolidation ruling, creditors of particular

19  debtors have claims against that debtor, this plan recognizes

20  that in every respect.  The treatment of creditors and, again,

21  I'll be brief.  Unclassified, priority secured claims against

22  all Debtors paid in full.  Convenience claims and general

23  unsecured claims against all Debtors other than OCD, the

24  company at the top, paid in full, with post petition interest.

25  At OCD, the top of the organizational chart today,

distributions are precisely as was agreed in that term sheet

that you heard about before.  The banks, Class A4 received the

deal that we negotiated with them, and that is described, and

you've heard much about it, I won't go on, in connection with

the full payment and unimpairment determination.  The

bondholders, Class A5, receive stock.  The unsecured creditor

classes, A6A and A6B, receive cash payments, rather than stock,

but the same value distribution using a $30 per share value.

Asbestos PI claims receive, this is against OCD, receive 1.25

billion in cash, certain asbestos specific assets, primarily

insurance and insurance related assets, plus if no fair act,

they will collect on a contingent note in the amount of $1.39

billion dollars.  And, they will receive 28.2 million shares of

reorganized Owens Corning.

        Finally, Your Honor, subordinated claims in Class A11

as well as existing stockholders received warrants.  A couple

more features.  To state the obvious and as has been the

intention from the very beginning of this case, the plan

contains a 524(g) trust and that 524(g) trust will take onto

itself both the OCD claims and the Fiberboard claims.  The

settlement, and this is the last thing I'll say about it,

includes a resolution of the estimation appeal that had been

pending, it is dismissed as part of this.

        As Mr. Pernick mentioned, we had 19 objections in

total, 17 have been resolved, the remaining two are what we

1   call Kensington as well as Ackerman.  Mr. Pernick.

2          MR. PERNICK:  Your Honor, we filed four sets of

3   modifications to the plan and/or the schedules and exhibits and

4   the main one as the Court knows, was filed on August 17th, that

5   was the plan supplement and many of the schedules and exhibits

6   were actually filed on that date.  That was, for the record,

7   two weeks before the voting deadline, it was orchestrated by

8   the Debtors and the Court so that there was enough time for

9   people to review that and have it affect their vote if they

10  needed it to.  The rest are under the category we think of

11  technical changes or clarifications that do not materially or

12  adversely affect the treatment of any claim or interest.  We

13  did file a conformed copy of the plan and all schedules and

14  exhibits on September 15th, on Friday.  That cumulatively

15  incorporates and highlights all of the modifications since July

16  10th.  So, out of an abundance of caution, we wanted there to

17  be one document for the Court and for all parties in interest

18  to review, to see what all of the changes are.

19          And, again, I'm happy to go through those but I think

20  the Court has reviewed those and unless the Court has questions

21  about any particular modifications, I don't want to take up the

22  Court's time going through each one of them.

23          THE COURT:  I don't have any questions of the

24  modifications, you were kind enough to send me duplicate sets

25  of all of these pleadings to the office and at home, so pretty

1  much my life for the last couple days has been reading, so I

2  understand the information that's here.

3  　　　　MR. PERNICK:  Thank you, Your Honor.  Your Honor,

4  with respect to the affirmative case form confirmation, again,

5  I'd be happy to discuss each of the 1129 elements.  I'm not

6  sure what the Court's pleasure is.

7  　　　　THE COURT:  Mr. Pernick, I think it's really up to

8  you to make your record.  I don't understand that any of the

9  objections deal with the 1129 standards exactly.  I think what

10  may make most sense is to see whether we can address the

11  objections and then find out whether there is anything left

12  that needs to be addressed, but if you have a different

13  presentation, that's fine.  However you want to proceed is okay

14  with me.

15  　　　　MR. PERNICK:  I think we're okay, Your Honor.  I

16  don't believe either of the objections that are still

17  outstanding deal with the 1129, if they do, we can come back to

18  them and for the record, as the Court is aware and I think

19  everybody else, we did file a detailed brief in support of

20  confirmation which lays all the arguments out and cites to all

21  the support that we have in the different declarations and

22  other pieces of evidence.

23  　　　　THE COURT:  Yes.

24  　　　　MR. PERNICK:  There is one part of 1129 that I would

25  like to deal with, just to highlight it for the Court.  We

1  actually have a cram down situation with one class in the case,

2  it's Class A12B, and we believe that the cram down requirements

3  are satisfied here.  The plan in that respect does not

4  discriminate unfairly in our view and is fair and equitable as

5  to that A12B.

6          A12B, just for the Court's information is deemed to

7  have rejected the plan because there are no holders that are

8  entitled to any distributions under the plan in that class.

9          Just for a little bit of background, there are two

10  classes of interest at Owens Corning.  Class A12A which is

11  existing common stock and Class A12B, which are OCD interests

12  other than existing common stock.  That consists of options and

13  other rights to acquire stock that are not of equal rank to the

14  A12A creditors and that's why they are in a different class.

15          The plan satisfies the absolute priority rule with

16  respect to A12B, there are no classes junior to A12B, the plan

17  does not discriminate unfairly with respect to A12B in our

18  view, because there are different legal entitlements and

19  priorities in Class A12B versus the classes ahead of them and

20  they are junior to the classes ahead, particularly A12A, no

21  senior class will receive more than payment in full and no A12B

22  holder has objected to the plan.  So, I wanted to just for the

23  record point that out to the Court that we are asking for a

24  cram down with respect to one particular class.

25          THE COURT:  All right.  I'm not aware that anybody

1 has filed an objection to that treatment, has there been an

2 objection?

3          MR. CONLAN:  No.

4          MR. PERNICK:  No.

5          MR. CONLAN:  Your Honor, James Conlan again.  The

6 plan satisfies all the elements of Section 524(g).  I won't

7 walk through them, I'll take the same approach as Mr. Pernick

8 did on the confirmation standards.  All of the explanations for

9 how 524(g) is satisfied is contained in the affidavits that

10 have been filed, as well as the confirmation brief itself, if

11 that approach pleases the Court.

12          THE COURT:  That's fine.  As I said, whatever record

13 you wish to make, go right ahead and make, otherwise, if people

14 are -- again, I'm not aware specifically of an objection with

15 respect to 524(g) that hasn't been resolved, I believe.

16          MR. CONLAN:  Your Honor, you're correct.  All

17 objections have been resolved.

18          THE COURT:  Let me ask whether anyone, and I guess I

19 will ask the operator, please to unmute the line for purposes

20 of people answering two questions.  The first is, is there any

21 objection to the Court accepting by way of a proffer the

22 information that is contained in the Debtors brief with respect

23 to the standards governing 1129 and how this plan and

24 disclosure statement meet those standards?  All right, there is

25 no objection.

1          MS. HOCH:  Hello?

2          THE COURT:  Yes?  Hello?

3          MS. HOCH:  This is Linda Hoch.

4          THE COURT:  Yes.

5          MS. HOCH:  And we may not have a disagreement on that

6    particular standard but we do have disagreement on different

7    parts of the plan, as it comes up sometime during the course.

8          THE COURT:  The plan will not be gone over line by

9    line.  If you have an objection to it that has been filed and

10   unresolved then we will at a certain pint, address those

11   objections, but what I want to do right now is find out about

12   the evidentiary support for the plan.  So, I'll get back to

13   objections after I find out whether someone is asking for more

14   of a proffer other than what the Debtor is proposing, which is

15   to look at the brief with respect to the 1129 confirmation

16   standards.

17         MS. HOCH:  Yes, thank you.

18         THE COURT:  Okay.  Anyone have an objection to using

19   the information in the Debtors brief as its proffer and the

20   affidavits, with respect to 1129 confirmation standards?  All

21   right, there is no objection, so I will accept that proffer.

22   Same question with respect to 524(g) standards, does anyone

23   object to the Debtors affidavits and briefs being used as the

24   Debtors proffer in support of how the plan meets the standards

25   for 524(g) plan injunction purposes?

1          MR. INSELBUCH:  Your Honor, you mentioned the Debtors

2     affidavits, I assume you also include within that the affidavit

3     of Future Reps, in support of confirmation?

4          THE COURT:  Yes, I'm sorry.  Actually, I do mean all

5     of the affidavits in support of confirmation, thank you.  Any

6     objection?  All right, there is no objection, so I will accept

7     that proffer as well, and if the operator would kindly mute the

8     line again.  When we get to objections, then I'll ask you to

9     unmute it once more.  Okay.  If somebody is using a Blackberry,

10    please don't.  It makes that feedback noise.  Okay.

11         MR. PERNICK:  Your Honor, I think it might be helpful

12    to actually walk the Court quickly through the declarations and

13    proffers that have been offered, just to make the record.

14         The first one is the declaration of Michael Thaman,

15    in support.  He's the Chairman of the Board and Chief Financial

16    Officer of Owens Corning.  He's actually in the courtroom

17    today.  We did previously file that declaration as the Court

18    noted.  It's at Docket Number 19188, and it's Tab O in the

19    notebook, in case anybody would like to reference it, including

20    the Court.

21         If he were called to testify he would explain that

22    historically OC -- would you prefer that I not go through them?

23         THE COURT:  No.

24         MR. PERNICK:  Oh, that OC has been a very successful

25    company and that he anticipates that after OC's emergence, that

1  the company will continue its strong financial performance.

2  I'm just summarizing what is in these, we're not going to,

3  obviously, come close to reading them into the record.

4       He would also testify that the company's continued

5  financial success will be based in part on a new holding

6  company structure which has been outlined in the plan which

7  will be organized with subsidiaries formed around product

8  lines.  He would further testify that the financial projections

9  that were presented in connection with the plan and they were

10  for the fiscal years 2006 through 2008, were made applying

11  fresh start accounting principles and certain other adjustments

12  and that the financial projections show that the company will

13  remain healthy and continue to grow, post emergence.

14       In addition, he would testify that the company has

15  entered into an agreement to form an existing new venture, in

16  which it plans to merger its International Composite's business

17  with Sangoban's Reinforcements business.  And last he would

18  testify that he believes that the company will pay its debts

19  and other obligations as they come due and that the

20  confirmation of the plan is not likely to be followed by a

21  liquidation or need for further financial reorganization.  I'd

22  like to actually move Mr. Thaman's declaration into evidence,

23  with the Court's permission.

24       THE COURT:  Any objection to my accepting Mr.

25  Thaman's declaration?  There is no objection, it will be

1  accepted.

2         MR. PERNICK:  And I didn't know whether any parties

3  wish to cross-examine Mr. Thaman.

4         THE COURT:  Anyone wish to have a cross-examination

5  of Mr. Thaman, who is in the courtroom?  No one is asking for

6  cross-examination.

7         MR. PERNICK:  Thank you, Your Honor.  Next is the

8  declaration of Stephen Krull, he is the Senior Vice President

9  and General Counsel and Secretary of Owens Corning.  We

10 previously filed that declaration with the Court, Docket Number

11 19186, and it's Tab M in the notebook.

12        If he were called to testify, Mr. Krull would testify

13 about the history of the Debtors businesses, the history of the

14 Debtors asbestos liability, and the contributing factors to the

15 Debtors decision to file bankruptcy.  He would testify about

16 the major obstacles facing the Debtors in their efforts to

17 reorganize, the partial resolution of those obstacles through

18 the estimation order, the substantive consolidation order, the

19 Third Circuit's reversal of the substantive consolidation

20 order, and the fifth amended plan and, ultimately, the

21 negotiations leading up to and the resolution embodied in the

22 settlement term sheet and the plan support agreement that

23 resulted in overwhelming creditor acceptance as we've detailed

24 today.

25        Mr. Krull would testify about the formulation of the

1 plan, the equity commitment agreement, the rights offering, the

2 exit financing commitment, the contemplated securities offering

3 and overall plan feasibility and, finally, he would testify

4 about the fairness of the plan, the good faith negotiations

5 surrounding the formulation of the plan, the diligence and

6 business judgment exercised during the formulation of the plan

7 and the appropriateness of certain key provisions, including

8 524(g) trust and the channeling injunction, the assumption of

9 executory contracts and unexpired leases, the assumption of

10 indemnification obligations and the release and exculpation

11 provisions.  I would, again, like to move Mr. Krull's

12 declaration into evidence.

13        THE COURT:  Does anyone have an objection to the

14 introduction into evidence of Mr. Krull's declaration?  You

15 need to use a microphone.

16        MR. SHAFFER:  Thank you.  I am very loud, though.

17 Your Honor, John Shaffer, for Kensington and Springfield.  We

18 don't have objection at this particular point, but it may

19 become necessary in connection with the discussion of the

20 releases and exculpations to put Mr. Krull on the stand.  I'd

21 like to see if we can resolve that issue legally first, before

22 we waste the time.

23        THE COURT:  All right, then I will accept the

24 declaration as substantive evidence, but preserve your ability

25 to ask questions on cross-examination to a later point in this

1 proceeding.

2          MR. SHAFFER:  Thank you, Your Honor.

3          THE COURT:  Does anyone else have an objection?  Does

4 anyone else wish to have cross-examination of Mr. Krull?  All

5 right, then I'll reserve that for Mr. Shaffer.  Let me make a

6 note, please, Mr. Pernick.  Okay, thank you.

7          MR. PERNICK:  Next, Your Honor, is the declaration of

8 Robert Kost in support of confirmation.  He is the Managing

9 Director in the restructuring group at Lazard Frere, the

10 financial and restructuring advisers to the Debtors.  We

11 previously filed that declaration with the Court at Docket

12 Number 19187.  If he were called to testify, Mr. Kost would

13 talk about the Debtors engagement of Lazard and his personal

14 experience working as a financial adviser to the Debtors,

15 working with the Debtors regarding the preparations of company

16 projections, the valuation of the reorganized Debtors

17 consolidated enterprise value and the valuation methodology and

18 the feasibility of the plan, including the fact that Owens

19 Corning has received a prospective investment grade rating from

20 both Moody's and Standard and Poors and in his knowledge Texaco

21 is the only other large Chapter 11 to exit Chapter 11 with an

22 investment grade rating actually at emergence.

23          Mr. Kost would also testify about the liquidation

24 analysis, independent exceed to the disclosure statement, the

25 application of that liquidation analysis to the best interests

1  of creditors tests, the Debtors total distributable value, the

2  distribution analysis in Appendix I to the disclosure

3  statement, the rights offering and employee incentive program

4  and management incentive programs.  I would move Mr. Kost's

5  declaration and the related exhibits into evidence.  And, I

6  don't know whether any party would like to cross-examine Mr.

7  Kost.

8           THE COURT:  Does anyone have an objection to the

9  admission of the declaration of Mr. Kost?  All right, there's

10 no objection.  Does anyone have cross-examination for Mr. Kost?

11 There is no cross-examination, the declaration is admitted.

12          MR. PERNICK:  Thank you, Your Honor, the last is the

13 declaration of Mr. McMonagle and Mr. Kress, I believe. wants to

14 speak a moment about that.

15          MR. KRESS:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MR. KRESS:  We would like to move into evidence the

18 declaration of James J. McMonagle, the Futures Representative

19 who was appointed by this Court to represent the interests of

20 the persons who may assert demands.  The substance of the

21 declaration is that the plan complies with the provisions of

22 Section 524(g) and results in substantially equivalent

23 treatment between present claimants and persons who may assert

24 demands.  The declaration was filed with this Court, it is

25 Docket Number 19173, and I would move the declaration into

1  evidence.

2       THE COURT:  Does anyone object to the introduction of

3  Mr. McMonagle's declaration?   There is no objection.  Does

4  anyone have cross-examination for Mr. McMonagle?  No one is

5  asking for cross-examination, the declaration is admitted.

6       MR. KRESS:  Thank you, Your Honor.

7       THE COURT:  Just a second please.

8       MR. PERNICK:  Yes, Your Honor.

9       THE COURT:  Okay, thank you.

10      MR. PERNICK:  Your Honor, moving onto the objections,

11  I don't know if the Court would find it helpful if I went

12  through the resolved objections, to just quickly state how they

13  were resolved and --

14      THE COURT:  I guess the question is whether anybody

15  has an objection to the information that's contained in your

16  chart which I think is very helpful and points to the places

17  where the plan has been amended or some other resolution has

18  taken place and so, if you want to go through them that's fine,

19  but I believe that the chart is very helpful.

20      MR. PERNICK:  That's fine with me, Your Honor.

21      THE COURT:  Does anyone wish to hear as to the 17

22  resolved objections any further information than the use of the

23  Debtor's chart that explains how and where those objections

24  have been resolved?  What would be helpful, Mr. Pernick, is

25  perhaps for you to recite, just through the list, to make sure

1 that we can confirm on the record that either the objections

2 have been resolved by the objecting party or that they are

3 satisfied with the treatment, either or, or both?

4          MR. PERNICK:  Sure, Your Honor.

5          THE COURT:  All right.

6          MR. PERNICK:  And, I'll just go down the chart, I

7 think that would be the easiest way.

8          THE COURT:  Okay.

9          MR. PERNICK:  Agenda item A on the chart is the Texas

10 Comptroller of Public Accounts.

11          THE COURT:  I'm not sure who is represented, why

12 don't you state all 17 and then I'll open the line and see

13 whether anybody wishes to address those.

14          MR. PERNICK:  Very well, Your Honor.

15          THE COURT:  Okay.

16          MR. PERNICK:  The second is Zurich International

17 Bermuda, Limited.  Third is State of Ohio on behalf of the Ohio

18 Environmental Protection Agency.  Fourth is the United States

19 of America on behalf of Internal Revenue Service.  Next is

20 Trade Debt Net, Inc.  Next is Pinal, P-i-n-a-l County, I

21 apologize if I mispronounced it.  Next is County of Comal City

22 of Waco, and Las Vegas Independent School District.  Next is

23 the United States Trustee.  Next is Ennis City of Ennis and

24 Channel View.  Next is Schultz Asset Management.  The Ad Hoc

25 Committee of Preferred and Equity Security Holders.  Dallas

1  County, Harris County, City of Houston, Houston Independent

2  School and McClennan Counsel.  Scott & Scott Limited.  Dice,

3  Inc.  United States Department of Labor, Pacific Employers

4  Insurance Company and Continental Casualty Company.

5        THE COURT:  Okay, please, I think the line has been

6  made live again, so let me inquire, first of anybody on the

7  phone representing any of the 17 parties just read into the

8  record by Mr. Pernick.  Does anyone wish to speak at all in the

9  nature of the resolution of any of the objections filed by

10  those 17 parties?

11        MR. KLAUDER:  Your Honor, this is David Klauder for

12  the United States Trustee's Office. I just have a comment when

13  you're ready.

14        THE COURT:  I'm ready.

15        MR. KLAUDER:  I just wanted to note we have resolved

16  our objection and we are satisfied with the amendment that has

17  been proposed to one of the portions with regard to the

18  releases.  I did want to make a note because there was a lot of

19  conversations and discussions I had with the Debtors regarding

20  one section of the releases and I think this can be cleared up

21  and they had agreed to make a statement on the record with

22  regard to this.  It's Section 5.16(b) of the plan which is, we

23  refer to as the third party releases.  It's noted in there and

24  we thought it was clear and the Debtors made it clear, that the

25  third party releases were consensual, fully consensual meaning

1  that if you did not -- if a creditor did not specifically check

2  the box, so to speak, on the ballot and consent to the release,

3  they were not bound by it.

4         There may have been some ambiguities with some other

5  provisions in the plan.  In conversations I had with counsel,

6  it was noted that that was the intention, that those were to be

7  fully consensual.  I wanted to make that point on the record

8  and hope that the Debtors can confirm that.

9         THE COURT:  All right.  Mr. Conlan?

10        MR. CONLAN:  Yes, we can confirm that, in fact, I'll

11  go a little bit further.  Unless a party voted and checked the

12  box, it wouldn't apply.  And, let me back up and describe 5.16

13  for a minute, (b) and that's the provision we're talking about,

14  the so called personal release or third party release section.

15        As Your Honor remembers, as part of the balloting

16  procedures that were set up, there is a box on the ballot, a

17  party has to actually vote on the plan and check the box in

18  order to keep its cause of action.  If a party doesn't vote,

19  for example, at all like Kensington, then they don't give a

20  third party release.  If a party votes, but checks the box,

21  they don't give a release.  So it is entirely consensual.

22        THE COURT:  Mr. Klauder, is that sufficient?

23        MR. KLAUDER:  Your Honor, that is satisfactory for my

24  purposes and our objection is fully resolved.

25        THE COURT:  All right, thank you.

1           MR. CONLAN:  And, again, Your Honor, that's with

2 respect to personal causes of action, so called third party

3 releases, it doesn't apply to estate causes of action.

4           THE COURT:  Yes, thank you.  Anyone else on the phone

5 have any comments with respect to the objections and the

6 resolution of the objections?

7           MS. HOAGLAND:  Your Honor?

8           THE COURT:  Yes.

9           MS. HOAGLAND:  My name is Jennifer Hoagland, I

10 represent Pacific Employers Insurance Company and other members

11 of the eight group of companies.  I just wanted to state and I

12 apologize because we're not in court and can't see the chart,

13 but our objection is resolved in the proposed order confirming

14 the plan.

15           THE COURT:  I'm sorry, you faded out, your objection

16 is resolved -- what?

17           MS. HOAGLAND:  Oh, in the proposed order confirming

18 the plan that was submitted at Docket Number 19195.

19           THE COURT:  All right, thank you.  Whoever is using a

20 Blackberry, please stop.  Anyone else on the phone?  Oh, Mr.

21 Conlan let me -- or Mr. Pernick, I'm not sure, let me have you

22 confirm that the Pacific Insurance objection will be addressed

23 in the proposed confirmation order.

24           MR. PERNICK:  Yes, Your Honor, it's in the draft that

25 we'll provide.  I think we gave counsel the language, but if

1  she doesn't have it, we'll be happy to get it to her real quick

2  after the hearing.

3          THE COURT:  Ms. Hoagland, as I understand it, you do

4  have that draft and you're satisfied with the language,

5  correct?

6          MS. HOAGLAND:   Correct.

7          THE COURT:  All right, thank you.

8          MR. PERNICK:  And just to make Ms. Hoagland

9  satisfied, there are no changes to that language in the form of

10  the order that we're going to present to the Court.

11          THE COURT:  All right.

12          MS. HOAGLAND:  Thank you.

13          THE COURT:  Anyone else on the phone who has comments

14  with respect to your objection or the resolution?

15          MR. FELSENTHAL:  Judge, this is Steve Felsenthal, if

16  I could impose on the Court a minute?

17          THE COURT:  Yes, sir.

18          MR. FELSENTHAL:  We represent Barron & Budd, Foster &

19  Spear, Waters & Krause and Weiss and Lutzenberg.  On the U.S.

20  Trustee's objection, a portion of it went to the channeling

21  injunction.  It's my understand that it's been resolved but the

22  copy of the chart does not show the resolution.  Could I impose

23  on the Court to ask counsel to -- resolved?

24          THE COURT:  Yes, sir.

25          MR. CONLAN:  It has been resolved.

1          THE COURT:  He's saying that the copy of the chart

2  that he has doesn't show the resolution so he's asking what the

3  resolution is, if you could state it on the record.

4          MR. CONLAN:  Yes.  We walked the U.S. Trustee through

5  the reasons why the settled causes of actions, the so call NSP

6  settlements were properly channelable to the trust and after

7  our explanation the U.S. Trustee and Mr. Klauder who can speak

8  for himself, accepted that explanation.

9          THE COURT:  So, there is no change to either the

10  treatment of the NSP settlements under the plan or the language

11  in the proposed confirmation order?

12          MR. CONLAN:  That is correct.

13          THE COURT:  Mr. Klauder, can you confirm that the

14  U.S. Trustee's Office is essentially not pursuing that

15  objection today?

16          MR. KLAUDER:  Your Honor, David Klauder for the

17  United States Trustee.  That's correct, it was fully resolved

18  through clarification and explanation.

19          THE COURT:  Mr. Felsenthal, is that sufficient?

20          MR. FELSENTHAL:  Yes, thank you very much.

21          THE COURT:  Anyone else on the phone?

22          MS. MYERS:  Your Honor, this is Anne Myers for Zurich

23  International Bermuda.

24          THE COURT:  I'm sorry, there's a --

25          MS. MYERS:  I just want to clarify that the --

1          THE COURT:  Pardon me, Ms. Myers, there's --

2          MS. MYERS:  -- confirmation order -- looking at today

3  was filed under Docket Number 19 --

4          THE COURT:  Ms. Myers, Ms. Myers, you're on the

5  speaker phone --

6          MS. MYERS:  Yes.

7          THE COURT:  -- I'm sorry, we can't understand you,

8  you're going to have to pick up a handset and speak, please.

9          MS. MYERS:  Your Honor, this is Anne Myers with

10  Zurich International Bermuda.  I wanted to verify that the

11  confirmation order that the Court will be looking at today is

12  the one that was filed under Docket Number 19195.

13          THE COURT:  Just a second please.  I think there is

14  probably going to be a suggested change.

15          MR. CONLAN:  There actually are some further changes,

16  but none of them deal with that objection.  That language is

17  the same as was filed under that docket number.

18          THE COURT:  Okay.  It's irrelevant because I'm going

19  to need to take this into chambers after this is over and read

20  it anyway, so the confirmation order is not going to get

21  entered today.  You will have an opportunity to see the

22  revisions and to discuss any difficulties that you see with it,

23  with counsel for the Debtors, but they're indicating, Ms.

24  Myers, that there is no change with respect to the treatment of

25  your clients claim and the settlement of your objection.

1            MS. MYERS:  Thank you, Your Honor.

2            THE COURT:  Anyone else on the phone with comments?

3            MR. GILBERT:  Judge, this is Bob Gilbert representing

4  WCI Communities.

5            THE COURT:  Yes, sir.

6            MR. GILBERT:  I'm going to have a comment with

7  respect to the proposed order but it doesn't go to a claim

8  objection, so perhaps we can hold that till a little bit later,

9  unless Your Honor wants to entertain it now.

10            THE COURT:  Well, you're speaking now, so go ahead.

11            MR. GILBERT:  Thank you, Judge.  As Your Honor will

12  recall, you approved a stipulation between WCI and Exterior

13  Systems on September 6th.  Pursuant to the stipulation, certain

14  post petition claims of WCI against Exterior concerning a

15  housing development in Palm Beach County are to be preserved

16  and survive confirmation, notwithstanding any of the discharge

17  release stay or other provisions contained in the plan or the

18  order of confirmation.

19            We don't believe there's any issue between us and

20  Exterior as to the intent of the parties here, but the -- and

21  as a matter of fact, Section 5 -- I'm sorry, 7A(3) of the

22  proposed order on Page 50, that's the latest version I have,

23  Judge, speaks to WCI's claims and their preservation post

24  confirmation.  In particular, the last couple lines of that

25  provision indicate that the claims are not affected by any

1  other provision of the confirmation order, including Section

2  5-2.

3  Now, Section 5-2 is this omnibus bar provision which

4  purports to bar certain claims against the Debtors and other

5  parties notwithstanding any other provision in the order.

6  There may be at least some suggestion that those two provisions

7  may be in conflict.  We simply wish to bring those to the

8  Court's attention and confirm, in fact, that none of WCI's

9  claims or rights are being affected by any other provision of

10  the confirmation order, including Section 5-2 and, in

11  particular, Section 7A(3) of the confirmation order as it

12  relates to WCI's claims, will control over anything contrary

13  in Section 5-2.

14  THE COURT:  I think it would be easy just to add a

15  sentence to paragraph 7A(3) that indicates that it controls

16  over any other provisions of the confirmation order or plan

17  that might be inconsistent.  Is that all right with the plan

18  proponents?

19  MR. PERNICK:  I think we have it there already, Your

20  Honor, but what we'll do after the hearing is, we'll go over

21  that language, but we're all on the same page, we've been

22  trying to resolve this and give Mr. Gilbert comfort and I'm

23  taking from his conversation that we're not quite there yet,

24  but the intention is exactly as he stated.

25  THE COURT:  Okay.  Do you have a more recent version

1  of the order than he's looking at?

2         MR. PERNICK:  I have to check.

3         THE COURT:  This was on Page 50.  Can you -- they're

4  conferring just a second.

5         MR. PERNICK:  I think Mr. Minuti from my office sent

6  this to Mr. Gilbert over the weekend, but let me just put it on

7  the record, it is Page 50.  Let me start on Page, part of Page

8  49 where it says, shall survive confirmation of the plan, and

9  shall not be discharged, released, enjoined, stayed or

10 otherwise affected by 1) any terms or provisions of the plan,

11 including but not limited to Section 14.2, relating to the

12 administrative claims bar date; 2) confirmation or the

13 effective date of the plan; 3) the provisions of 11 U.S.C.

14 Section 1141, or 4) any other provision of this -- and we

15 struck the word order and added in confirmation order,

16 including but not limited to Section 5-2 above.

17        THE COURT:  Well, it seems to be in there, Mr.

18 Gilbert.

19        MR. GILBERT:  Judge, with Debtors' -- I'm sorry with

20 counsel's acknowledgment that that's the intended meaning,

21 we're satisfied.

22        THE COURT:  All right, thank you.  Anyone else on the

23 phone, who has a comment or concern?  Okay.  I'll ask the

24 operator to mute the line and then I'll ask the same question

25 in court.  Is there anyone in court who has an issue to address

1  with respect to the resolution of your objection to

2  confirmation?

3           MR. GADSDEN:  Your Honor, James Gadsden, Carter,

4  Ledyard & Milburn, LLP, for the Bank of New York.  I understand

5  there's been language that's going to be -- that has been added

6  to the form of order that will be tendered to you this

7  afternoon or this morning that resolves my informal objection.

8           THE COURT:  Mr. Pernick?

9           MR. PERNICK:  Yes, I'm happy to read that language

10  into the record, Your Honor, if you'd like it now.

11          THE COURT:  All right.

12          MR. PERNICK:  This goes at the end of Section IV,

13  Roman Number IV-K, on Page 32, that starts with notwithstanding

14  anything to the contrary set forth in the plan or in this

15  confirmation order, the Debtors, subject to the agreement of

16  the Ad Hoc Committee of Preferred and Equity Security Holders,

17  and now we will insert -- and the Bank of New York, as special

18  trustee on behalf of the holders of the 6 1/2 percent

19  convertible monthly income preferred securities -- and then

20  continuing on, may take such other and additional steps.

21          THE COURT:  Mr. Gadsden, is that satisfactory?

22          MR. GADSDEN:  Yes, Your Honor, with the --

23          THE COURT:  I'm sorry, you need to use the

24  microphone,  sir.

25          MR. GADSDEN:  Sorry.  Yes, Your Honor.

1        THE COURT:  Okay, thank you.  Anyone else in the

2   courtroom who wishes to address the resolved objections to

3   confirmation?  Okay, that's it, Mr. Pernick.

4        MR. PERNICK:  Thank you, Your Honor.  One other

5   category before we get to the two unresolved objections and

6   Your Honor probably raised an eyebrow when you saw this filing

7   but we were just out of an abundance of caution.  There were a

8   number of miscellaneous correspondence and written

9   communications received by the Debtor.  I knew that Your Honor

10  would smile when you saw it.  We put those on Exhibit B, which

11  is we call a summary of informal submissions.  They generally

12  deal with individual claim treatment, copies of notices

13  regarding the plan which were signed by the apparent recipient

14  and sent back to us, acknowledges of receipts of documents

15  and/or other correspondence and general inquiries.  We don't

16  believe any of these are submissions that are objections to

17  confirmation, but we still wrote to each party who sent us one

18  of those advising them of the date and time of the confirmation

19  hearing, with instructions as to how to appear telephonically

20  at the hearing if they wished to and we would just request for

21  the record that the Court overrule all of those objections to

22  the extent they are objections to confirmation.  I don't know

23  before the Court considers that request, whether any of those

24  parties are on the phone or not or in court, and I don't know

25  whether you want me to actually read those names into the

1  record.

2       THE COURT:  Well, it's a pretty long list.  I have

3  the -- where did I put it, the list of participants by phone,

4  I'm not sure if any of these are the pro se litigants.  Let me

5  see.  The list of people who signed up to appear and Ms. Hoch

6  is on the phone, Linda Hoch.  There is also Selma Windorfer.

7  Those appear to be the only two pro se --

8       MS. OHNEMUS:  And Janet Ohnemus.

9       THE COURT:  I'm sorry?

10      MS. OHNEMUS:  And Janet Ohnemus.  I am a daughter of

11 Edward Windorfer, and I'm representing my mother, Selma

12 Windorfer --

13      THE COURT:  Oh, yes, Ms. Ohnemus, I'm sorry, I missed

14 your name here.  So, I have Janet Ohnemum, Selma Windorfer, and

15 Linda Hoch.  Is there anyone else on the phone who is

16 unrepresented by counsel?  Okay.  Do you want to turn to these

17 three objections first, Mr. Pernick?

18      MR. PERNICK:  Sure, Your Honor.  Just for the record,

19 the only one that I think I saw as somebody who sent us a

20 correspondence, if I got it right, were the beneficiaries of

21 Edward Windhoffer -- or Windorfer, I apologize.  I don't

22 believe the other two filed anything, but we don't have any

23 objection to the Court hearing from them at this time.

24      THE COURT:  All right.  Why don't we start with you,

25 Ms. Ohnemus and explain what your objection is, please.

1        MS. OHNEMUS:  Well, first I'd like to respond about

2    the paperwork.  I actually, and my mother did not receive any

3    of this paperwork about the court proceedings until September

4    the 13th, of 2006 and, so we were expected to call in for the

5    court call and we had these huge stacks of paperwork that I

6    tried to go through.  My mother is in a nursing home, I'm her

7    power of attorney, and so, it was -- we were not able to

8    respond in a timely manner since the deadline was already

9    passed.

10        And --

11        THE COURT:  I'm sorry, can the court call operator

12    please turn up this system, I'm having a great deal of

13    difficulty hearing Ms. Ohnemus.  Ms. Ohnemus are you on a

14    speaker phone?

15        MS. OHNEMUS:  No, I am not.

16        THE COURT:  Okay.  I'll see if the court call

17    operator can adjust the system for us, please.

18        MS. OHNEMUS:  Thank you.

19        THE COURT:  Your mother is in a nursing home and

20    you're the power of attorney, you didn't have time to file a

21    response.  Why don't you tell me what your response is?

22        MS. OHNEMUS:  Well, my father was as sheet metal

23    worker and worked on furnaces and wrapped duct work with the

24    asbestos.  He worked with it with hie bare hands and due to

25    that, before his death he was 100 percent bedridden and he

1  couldn't say more than two words without having to stop to

2  breathe.  We are poor people and we tried very hard to try to

3  continue, we had to borrow loans, I found paperwork my father

4  had to borrow over $30,000 just to we had food to eat.  We

5  didn't go on public aid.  We didn't file bankruptcy, so we

6  wouldn't have to pay our bills like OC has and my sister and my

7  mother have for years done lots of work on trying to come to

8  some settlement to say that my father's life has some value and

9  our grandchildren didn't have a chance to spend time with their

10 grandfather, three of them were born after his death and he

11 suffered so horribly.  I even had to try to do CPR on my father

12 to try to bring him back and even to this day it's just -- it's

13 really difficult.  I'm sorry.

14          THE COURT:  That's all right.  Why don't you just

15 take a minute.

16          MS. OHNEMUS:  And my sister, Linda Hoch, has worked

17 extensively and corresponded with Owens Corning.  We filed a

18 bankruptcy long before they went into -- we filed, not a

19 bankruptcy, we filed a case before they went into bankruptcy,

20 and we -- they just never told my father of all the problems

21 with asbestos.  They perpetuated the conspiracy of silence and

22 didn't tell him of the dangers and he removed it with his bare

23 hands and as a result, he probably saved many other peoples

24 lives but he lost his own and we don't know ourselves, how we

25 will be affected.  My sister and I both have breathing

1  problems, I have a huge lump growing in my throat now.  I don't

2  know what it is.  My father was probably one of the first

3  people to die from mesothelioma and asbestos and we, you know,

4  what they offer, what is that a years salary, few years salary

5  for him being take from us so soon?  I just am asking your

6  guidance in helping us to find the best solution and appreciate

7  you listening to me.  That's more than what we've ever had

8  before.

9           THE COURT:  Ms. Ohnemus, what is happening with

10 respect to this plan confirmation, if this case is confirmed

11 today, you will have the opportunity to file claims against the

12 Trust that will be formed through this plan confirmation order

13 and that Trust will be responsible for adjusting all of the

14 claims that are filed against it.  You'll have certain

15 documentation that you'll have to come up.  Medical records,

16 and so forth but --

17           MS. OHNEMUS:  Okay.

18           THE COURT:  It will all be explained to you when the

19 Trust is actually formed and the procedures are instituted by

20 that Trust.  That will not happen for several months, it just

21 takes some time to get the Trustee in place and the Trust

22 advisors in place and the Trust up and running.  But you will

23 get a notice that will indicate what you have to do in order to

24 file a claim against that Trust.  And, at that point in time,

25 whatever you can prove in the way of damages, the Trust has a

1  schedule that it will pay out.  I am not permitted to give you

2  legal advice, I would suggest -- one second, Mr. Lockwood, can

3  Ms. Ohnemus contact you for additional information as to what

4  the Trust component will be about?

5          MR. LCOKWOOD:  Certainly, Your Honor.

6          THE COURT:  All right.  Ms. Ohnemus, the name and

7  phone number of the person to contact for additional

8  information is Peter Lockwood, he is one of the attorneys for

9  the Asbestos Claimants Committee, and his phone number is --

10          MR. LOCKWOOD:  Area code 202-862-5065.

11          THE COURT:  Did you get that?

12          MS. OHNEMUS:  I did.  And, I don't know if my sister

13  would have anything to add to this.

14          THE COURT:  All right, Ms. Hoch?

15          MS. HOCH:  Yes.  Everything that my sister Janet

16  Ohnemus has said is true.  And, what you responded to her with

17  was filing claims against the Trust.  Your Honor, we have filed

18  and filed and filed papers, Chicago, California, Ohio --

19          THE COURT:  Ms. Hoch, I'm sorry, I can't hear you.

20  Are you on a speaker phone?

21          MS. HOCH:  No, ma'am.

22          THE COURT:  Okay, I apologized.  Operator, please,

23  can you turn the system up so that we can hear these folks?

24          UNIDENTIFIED FEMALE SPEAKER:  Yes, Your Honor.

25          MS. HOCH:  And, also I would like to address -- I

1 hear myself in the background.  The stallings of Owens Corning

2 in regard to our father and also reference to some legal cases

3 as best as we can understand them.

4          As I said, good morning, Judge Fitzgerald and Saul

5 Ewing, Sidley, Austin, Norman Pernick and all the other

6 attorneys for the Debtors and special counsel.  Your Honor,

7 thank you and Owens Corning for this opportunity to speak and

8 share this hearing as we feel that we have a long awaited legal

9 right.

10          We have sent summary -- responses to our previous

11 email for this is a revised response to those e-mails.  We

12 received by Fed. Ex. some papers from Owens Corning at three

13 o'clock p.m., in the afternoon of September the 13th and we had

14 to call telephonically, by ten o'clock a.m. the next day, in

15 order to be put on the scheduled agenda for this hearing.  That

16 certainly is not much time to review papers, and what if

17 someone wasn't at home to happen to get those papers and notice

18 of calling for a hearing.  They would lose their right of

19 objection.

20          I am acting in my behalf, Linda Hoch, and as

21 plaintiff and representative of the Estate of Edward Windorfer,

22 I am stating the basis and the nature of objection with

23 proposed language to be inserted to resolve some of these

24 objections.   Even though there is widespread support for the

25 plan, we do have some concerns and we do want the plan to go

1 forward and succeed.

2      We have tried to make reference to Chapter 11 of the

3 U.S.C. federal statute and federal and state rules.  We feel

4 our rights are impaired under the plan and the plan is not in

5 our best interest.  We feel this to be unfair in the integrity

6 of individual civil rights and legal rights.  May we together,

7 reason together, to resolve this Edward Windorfer case now and

8 forever and without additional filing of claims against the

9 Trust.  We want to address some of our concerns in legal

10 reference to objection.

11      Objections to claims must be resolved before a plan

12 can be fully consummated, in Section 1106(a)(7) and 1107(a) of

13 the bankruptcy code.  In legal reference, under Section 1127(a)

14 of the bankruptcy code, the plan proponent may modify the plan

15 at any time before confirmation.  If it is determined that the

16 proposed modification does have an adverse effect on the claim

17 of non-consenting creditors, then another balloting must take

18 place.  Section 1127 of the bankruptcy code.  Since so many are

19 in favor of the plan, we feel that the modification should be

20 made in our particular case as we will further explain.

21      We filed a proof of claim and served it on the

22 reorganized Debtors with a written objection, which was

23 postmarked August the 28th, 2006, setting forth the basis for

24 our objection and the legal basis of our reference thereof.  We

25 object to that part of the plan that we believe might affect

1 our current legal and civil rights as we have previously filed

2 a lawsuit.  The judgment entry of Judge Franklin on November

3 the 30th, 2000 was a stay, pending the outcome of bankruptcy of

4 the Owens Corning Corporation, pursuant to the notice of

5 bankruptcy filing, filed with the Court on October the 30th,

6 2000.  This is also in your papers that was filed with the

7 Court.   The stay was to help Owens Corning and Fiberboard

8 financially, in reorganizing their companies.  The Debtors'

9 believed that any significant interruption in supply of their

10 product would have caused, and it would have, any likely

11 permanent damage to their customer network.  The stay caused a

12 significant loss of value and resulted in a greater permanent

13 damage to us as having not received anything since that time

14 for our father's death.  We just kept going deeper and deeper

15 in the hole.

16        The plan will have an adverse effect, we feel, on the

17 claim of Edward Windorfer as it is so written.  There is a

18 claim filed in the Court of Common Pleas, in Lucas County,

19 Ohio, for Edward Windorfer, who died on April the 28th, 1981.

20 We feel that this case should be looked at and honored and

21 reviewed by this Court and Owens Corning, before the plan is

22 accepted, we request that of the Court, and of Owens Corning

23 and their attorneys.

24        This is a filed legal lawsuit that the legislation of

25 the plan would block.   My obligation here is that the

1  settlement of the restructuring proposal and the plan should

2  not be approved as it is in our case, as written, because of

3  the Estate of Edward Windorfer, would not be receiving a good

4  or fair equitable deal.  The plan as we understand it would

5  make our legally filed claim an impaired claim, by which some

6  legal, equitable or contractual right is altered.  We believe

7  that a plan by Owens Corning should not adversely affect or

8  impair the right of the plaintiff and a representative in the

9  Edward Windorfer case, or affect the rights to treatment

10  provided what we believe to be an Article 7 of the plan.

11          In special cases, like the Edward Windorfer case,

12  which is a genuine and legal case, containing everything to

13  prove a case, should remain unaffected and shall survive

14  confirmation of the plan and not be discharged when the

15  plaintiffs in this case, have satisfied the burden of proof in

16  their Ohio filed case, by a preponderance of the evidence.

17  They should not be discriminated against by a plan.  Nothing in

18  a confirmation order of a plan shall be construed to

19  extinguish, limit or bar any direct personal claim.

20          We advocate leaving open the litigation option, which

21  preserves the right to sue.  It would be wrong to ban suits

22  from asbestos exposure while the material is still being

23  imported into the United States.  We have provided a very

24  detailed proof of claim in the Ohio court with all the elements

25  needed for full payment of the claim for the representatives of

1 the Estate of Edward Windorfer.

2          In legal reference, the court must accept the factual

3 allegations of the complaint as true.  And this is Grays versus

4 Lowery, in the citation, MAMI versus Fallier, the citation.

5 The court looks to whether sufficient facts are pleaded to

6 provide the defendants with adequate notice to frame an answer.

7 Colburn versus Upper Darby.

8          In legal reference, a properly filed proof of claim

9 supersedes any scheduling of that claim.  This is according to

10 Federal Bankruptcy Proceeding 3003(c)(4).  Under Section 101(5)

11 of the bankruptcy code the word claim means a right of payment

12 or a right to a right to an equitable remedy for breach of

13 performance, if such a breach gives rights to a right of

14 payment.  Such prior act and omission of the Debtors, Owens

15 Corning and Fiberboard arose before October the 5th 2000,

16 before the stay and this would give rise to our claims against

17 them.  Such acts are for the personal injuries, sickness,

18 disease and wrongful death of Edward Windorfer.  Asbestos was

19 used in building and it was very dangerous to his health

20 because of breathing tiny fibers in his lungs.  He worked as an

21 insulator, also known as an asbestos worker.   He worked on

22 boilers, pipe fittings, steam fittings, it's all in the case.

23 You can read it.

24          Dad came home covered with white dust.  I used to say

25 to him, dad, you look like you cleaned out the chicken house

1  and you don't get the eggs.  I get the eggs.  The complaint in

2  Ohio has his health records and the pictures of buildings and

3  his work records, and also pictures of him as a very sick man

4  that had lost well over a hundred pounds.  He once was a big

5  sturdy strong man that weighed 195, when he died he was

6  somewhere between 65 to 85 pounds at is death.

7        It should be written in the plan also that

8  mesothelioma cases should be treated with urgency and are given

9  high priority.  The early doctors had difficulty even knowing

10 what they were looking at back in his day, of 1981, some

11 thought it could be emphysema but he never smoked.  Then other

12 doctors as the time went on, were looking as the x-rays and the

13 could determine that this was plural mesothelioma, a lung tumor

14 that becomes so dense that it breaks the scapulas.  The

15 following year it crushed his lungs and he died.  Before he

16 died, you could stand beside his bed for the last several

17 months and hear the death rattle in his chest.  He tried

18 everything that the doctors suggested for him to do because he

19 wanted to live, he wanted to live more than anything else in

20 this entire world and we wanted him to live.  He meant more to

21 us than anything this world ever had.

22        Well, the misconduct of prior individuals, and we

23 understand not the current officers of Owens Corning or

24 Fiberboard, but the misconduct of the prior individuals show

25 clear and convincing evidence involving substantial harm to

1  Edward Windorfer, who was exposed in working with their product

2  and causing harm and loss to his family, and causing harm to

3  him, was the cause of his disease.

4      Let me now speak on Owens Corning and Fiberboard

5  delays.  There have been years, years of excessive delay in the

6  Edward Windorfer case.  There has not been a timely resolution

7  for this case.  Breach of duty of good faith and fair dealing

8  by Owens Corning and Fiberboard.  Because of such long delays,

9  different treatment should be permissible to first resolve

10  these older cases where some, like us, have waited 25 to 30

11  years for Owens Corning and Fiberboard to get their act

12  together and do the right thing.

13      It is such improper conduct by the Debtors to have us

14  wait for so many years.  Think of you being in our shoes and

15  have gone through our situation and then you would understand.

16  We feel it is an unreasonable delay that is prejudicial.  We

17  have already waited so many years for relief.  As we

18  corresponded with Owens Corning and Fiberboard shortly after

19  our father's death, and because of our trials, hardship, we

20  even, before the statute of limitations, showed the discovery

21  rule when our niece was beheaded and we had to take our case to

22  the Supreme Court of the United States.  When our land was

23  adverse possessed for a period of 19 years because of our

24  difficulties of our dad's death, and trying to claim and own

25  what little we had left.  We sold about everything.  My mother

1  had made the fiberglass drapes, the blue material that is shown

2  in the picture, we took down almost everything out of the

3  house, the drapes from the windows and sold them at a sale so

4  that mother could keep the little house that she lived in and

5  -- anyway.  It's a terrible thing to lose whatever you have.

6        We corresponded with them, okay.  If there was

7  something in the complaint that Owens Corning and Fiberboard

8  didn't like, then they should have called us, but they didn't.

9  Their conduct in this case shows years and years of delay and

10 with all the documents filed in Mr. Windorfer's case, the case

11 should be classified, with the claim holders as entitled to

12 priority, due to the aging date of this case.

13       Certainly claims that are older should have priority

14 and be settled first before more recent claims.  Owens Corning

15 failed to perform in their conduct even before the year 2000

16 stay and our numerous letters and we wrote lots of letters.

17 You can look at them.  They have had piles of them sent

18 directly to them, sometimes 15 pages at a time, single spaced,

19 expressing what we went through, and our request for an

20 equitable relief.

21       In legal reference, the bankruptcy code defines a

22 claim as a right to payment or a right to an equitable remedy

23 for a failure of performance, if the breach gives rise to a

24 right of payment and they failed to perform even in responding

25 to our letters.  The plan is deficient because it contains no

1 class or treatment and for cases like ours, for such long

2 ignored claims like ours, that are entitled to a recovery and

3 reference to Section 510(b), it mandates that claims rank PARI

4 PASSU pari passu, sorry, with the holders of common stock.

5 Those common stock interests are classified by the plan as

6 Class 9.1, an unimpaired class.  When all is shown and known in

7 certain cases, then certain cases should come under a special

8 impaired class or a clause.

9      For the year ending December 31st 2005, Owens

10 Corning, a very successful business and we are glad for them,

11 has 6.3 billion in sales.  Now, we make reference to 768.73(b),

12 restrictions on punitive damages, a Florida statute that Owens

13 Corning was involved in, where the fact finder determined that

14 the wrongful conduct proven under this section was motivated

15 solely by unreasonable financial gain.  In such cases,

16 plaintiff may recover an award up to four times the

17 compensatory damages awarded or 2 million.  It is our

18 understanding that the legislature has placed no cap on

19 punitive damage awards where the defendants specifically

20 intended to harm the plaintiff and the defendants conduct did,

21 in fact, harm the plaintiff.  The legislature appears to cease

22 -- or create, I'm sorry an exception, an exception for those

23 who fall within Subsection (b) of the amended statute.

24      When we refer to the Debtors disregard for the safety

25 of the plaintiff, Edward Windorfer, in the Owens Corning and

1  Fiberboard products that he handled and in the buildings, and

2  at the job sites he worked at, that were connected to Owens

3  Corning and Fiberboard, gathering all of this evidence together

4  in the complaint that is filed in Ohio, we gathered the

5  evidence and we took the case to court.

6          In legal reference, 768.73, where the fact finder

7  determines that the time of injury the defendant had a specific

8  intent to harm the plaintiff and determined that the defendants

9  conduct did, in fact, harm the complainant, there shall be no

10  caps on punitive damages.  The sum of 2 million to each

11  claimant entitled thereto, or the lesser in the Ohio complaint,

12  as we did not -- mother, that is, and we did with agreement

13  with mother, Selma Windorfer, as to the amounts.  We did not

14  change it when she requested the money that she did.  We had

15  not seen it on punitive damages and we do not necessarily -- we

16  know that things were wrong, but we do not blame them, we feel

17  they will answer to a higher power and, therefore, it's not us

18  to judge our fellow man in this case.

19          We forgive them as this was a terrible thing, but we

20  do ask that relief be granted because our father suffered most

21  horribly, more than most anyone you could have ever -- more

22  than anyone mostly.  To some this is how asbestos affected and

23  harmed our family and caused us severe financial difficulties.

24  Imagine you going through this, or your family going through

25  this.

1        First, asbestos destroys the lungs, the health of

2 those that you dearly love.  Second, it robs the wage earner to

3 provide for him family, usually in bed, can't move, can't get

4 out.  Third, it kills the wage earner in time.  Fourth, it

5 causes you to lose about everything, through the sale and the

6 loss of your possessions.  And, fifth, it robs, it continues to

7 rob the asbestos victims children.  No matter how hard they try

8 to work and do what is right, asbestos caused our family hell

9 on earth.

10        We believe, I do not have much more, we believe that

11 we should not lose our legal and civil rights of a legally

12 filed case in the United States court system.  This is what our

13 system is about.  Respecting the individual's legal rights as

14 well as the rights of companies and corporations.  We are in

15 favor of the plan that will help Owens Corning, we have always

16 wanted the best for anyone whether that be an individual or a

17 corporation.  If the affects of the word "without prejudice",

18 is to prevent the decree of dismissal from operating as the bar

19 to our current claim or as the bar to a subsequent suit, please

20 do not make void what is a legal claim in this particular case

21 for Edward Windorfer, thereby depriving the earlier opinion of

22 all authority as the precedent.

23        We do not want the plan to bar the right to bring or

24 maintain an action on the same claim, or cause of sickness or

25 illness in case we, the daughters of Edward Windorfer, Janet

1 and Linda, come down with the disease in a few years, from the

2 exposure to our father's clothes and certain Owens Corning and

3 Fiberboard products.

4        At this point we do have trouble catching our breath.

5 At the end of his workday, we would greet our father with hugs

6 and kisses.  He said the best part of his day was when his

7 little girls would put their arms around his neck and say,

8 daddy, we love you.  One shouldn't be penalized in the course

9 of a trial as to the introduction of particular evidence.   We

10 hope that prior claim of interest and the -- any direct or

11 personal claims or future claims as we may have under

12 actionable, non-bankruptcy law.

13        And in regard to the trust, I think it's a good

14 thing.  But should you deny us our legal and civil rights,

15 would you place the total requested claim or an amount in the

16 trust for the beneficiaries of Edward Windorfer and allow this

17 claim to be given security credit or treatment, entitled at

18 least to a priority and paid from the trust.

19        Yes, we believe that any person or entity seeking an

20 allowance of final compensation with regard to a tort claim

21 should provide a proof of claim with the bankruptcy court that

22 would entitled them to relief.  We have tried to do this, but

23 in the short notice, we could not make all -- again all of

24 those stacks of papers relating to the claim in Ohio, as we

25 didn't have the time to do that.  We were lucky to be able to

1  call in for a telephonic conference, to do e-mails, to write

2  out what we have just written to you, and we have three boxes,

3  three feet long that we have made papers, that document where

4  our father worked, every place he went and pictures,

5  everything.  I think our case was overlooked because there was

6  too much facts in the cases, would have brought too much to

7  light in the State of Missouri, Illinois and Iowa, because the

8  business and buildings that contained asbestos.  He took it out

9  of state buildings, federal buildings, schools, hospitals.  As

10  a matter of fact, he took it out of the hospital where he went

11  to be a patient when he became sick with mesothelioma.

12          He also took it out of churches.  He worked with

13  insulation, boilers, roofing, he was a well skilled man, he had

14  went to the eighth grade and graduated and then he went to

15  Quincy College, in Quincy, Illinois, during night school, and

16  he worked at the sheet metal trade during the day.  Also, it

17  should be known that the business agent has a letter in there

18  regarding Edward Windorfer's work at the Quincy, Illinois

19  Veterans Home, that when he installed the asbestos they found a

20  cardboard where Edward Windorfer wrote his name on the

21  cardboard and dated it and that project was found to be

22  heavily, heavily contaminated with asbestos.  And then there's

23  other examples of the places that he worked.

24          THE COURT:  Ms. Hoch, Ms. Hoch, I'm going to cut you

25  off.  This is not the time or the place to recite your father's

1  work history.

2          MS. HOCH:  I'm sorry.  Could I -- can you give me two

3  more minutes, I'm almost done.  Okay, in legal reference to

4  3003 to the party documenting the claim in order to be treated

5  as the creditor, we pray this claim would be subject to a

6  separate claims process to be established by the court.   A

7  separate claims process to allow for fair treatment of special

8  circumstances like this.  And in light of the facts and

9  circumstances, which are presented to the trier of facts in the

10 complaint, the case should be an exception to the rule, on

11 exception to the plan and it would be paid fully and pursuant

12 to an order of the Court.

13         We hoped for years that we could reason with them and

14 we'll get past this and, please, help us at this point in time

15 to have some life left other than the memories of the past and

16 we d not know what factual truth or what the other side did not

17 want revealed in this document or what was tried to be ignored,

18 but our father's death did happen and his exposure did happen

19 and he worked with Owens Corning and Fiberboard materials

20 exclusively and extensively.

21         Also, the plan and confirmation order should

22 adequately provide for the timely payments of cure amounts in

23 cash.  Currently read, that the current payments required by

24 Section 365(1) of the bankruptcy code, shall be made following

25 the entry of a final order resolving such dispute.  Would you

1  think of the wording as maybe changing it to read, the cure

2  payments required by Section 365(1), or any other cure

3  payments, should be made before, not at the final entry, but

4  before, and put in writing, of the final order resolving such a

5  dispute.  It is --

6             THE COURT:  Ms. Hoch, with respect to 365 --

7             MS. HOCH:  -- resolve the objection by a cure amount

8  claim, in cash, on the effective date, or on such other terms

9  as agreed to by the parties, like the payment of a cure amount

10  claim required by Section 365(b)(1) of the bankruptcy code,

11  made in resolving the dispute and assuming the assumption and

12  approving the assumption.

13             THE COURT:  Ms. Hoch, with respect to Section --

14             MS. HOCH:  Your Honor, we pray the plan may not

15  contend to preclude rights in claims of the Edward Windorfer

16  case, 20000-2919.  Will you be so kind to make good on this and

17  may Owens Corning make good on this, as Edward Windorfer was a

18  suffering servant for Owens Corning and Fiberboard and his

19  sacrifice on earth, may it be recompensed and we want to

20  forgive and forget that this happened, and put this behind us

21  and may today be a day of deliverance from Owens Corning and

22  also for us in this case and we ask for an order from the Court

23  granting relief upon the current facts.  And may you give the

24  Edward Windorfer case your highest consideration.  We ask this

25  of the Judge and of Owens Corning.  Thank you.

1          THE COURT:  Okay.  Ms. Hoch, with respect to Section

2   365, that section does not apply to your claim and that of your

3   father, so with -- regarding cure amounts, that has to do with

4   leases and executory contracts, not with tort claims.  So I'm

5   going to let the Debtor respond to your objections, but with

6   respect to your claim under 365, I have to overrule that it's

7   simply not applicable.

8          MS. HOCH:  Yes, and I understand and I stand

9   corrected and I'm sorry.  We do not have lawyers, in writing

10  the complaint we did not use a lawyer, we only used the

11  products that we knew our father had used.

12         THE COURT:  Yes, I understand, I'm going to permit

13  the Debtor to respond at this point, Ms. Hoch, because -- I

14  think I understand your claim, but this is not the time where

15  the Court is going to adjudicate claims under this plan, your

16  claims will have to be filed against the trust.  The bankruptcy

17  code prohibits me from making exceptions within classes, in

18  fact, the code requires that claimants with equal claims be

19  treated the same way in a class and so, in that sense I cannot

20  make an exception for your father's claim or your claims.  Mr.

21  Conlan.

22         MR. CONLAN:  Yes, Your Honor, briefly.  James Conlan

23  on behalf of the Debtor.  We are sorry for the Windorfer family

24  loss, and the loss of everyone who was hurt by asbestos,

25  produced, manufactured by our company.

1          That said, I can tell you that this has been a hard

2  fought case, the Asbestos Creditors Committee and the Futures

3  Representative have fought ably on behalf of asbestos

4  claimants.  They negotiated a very good deal for themselves and

5  their clients.  Approximately $5 billion dollars worth of value

6  will go into the 524(g) trust that will respond to the claim

7  against the 524(g) trust and with respect to particular

8  questions about how mesothelioma claims are dealt with in the

9  cure and the pecking order, I would defer to Peter Lockwood or

10 Elihu Inselbach but I do know that the trust distribution

11 procedures, which we've all been through, are of the type and

12 structure that have been approved in these cases for years.

13          THE COURT:  Mr. Inselbuch.

14          MR. INSELBUCH:  Yes, Your Honor.  Our Committee has

15 represented throughout this bankruptcy, claims like the

16 Windorfer claim and I might say we have become, we as lawyers,

17 have become familiar with the suffering that these people have

18 had.

19          What I fear is forgotten sometimes, in the courtrooms

20 of this country and particularly in the bankruptcy courts, when

21 we talk about tort claims as kind of a dry item is that for

22 every tort claim there are people like the Windorfer's who

23 suffered terribly.  Their father died from mesothelioma which

24 is one of the most terrible diseases known to man and we

25 probably as a committee have represented in this bankruptcy

1 approximately 15 or 20,000 victims of mesothelioma and the

2 Futures Representative looks to a future where there will be an

3 additional 10 to 15,000 terrible deaths from mesothelioma

4 resulting at least, in part, from exposure to the products of

5 these Debtors.

6      We also have the terrible lung cancer deaths, which

7 are of equivalent number and the problem that we faced here is,

8 and the reason why these Debtors were in bankruptcy, is there

9 is not enough money to the extent that money can every

10 recompense for these injuries.  There's simply not enough money

11 to pay those claims.

12      As Judge Fulham estimated, the asbestos liabilities

13 of these Debtors were $7 billion dollars.  The Debtor had many,

14 many other liabilities.  There simply was not enough assets to

15 provide 100 percent payment to these claimants as there wasn't

16 to pay other creditors as well.

17      524(g) of the bankruptcy code enacted in response to

18 the bankruptcy of Johns Manville some years ago, provides the

19 methodology for the treatment of these claims.  If we were

20 required by the bankruptcy code to liquidate each of these

21 claims in front of this court, before we could exit the

22 bankruptcy, we would never be able to get any money to anybody.

23 The structure of this plan provides for the creation of a trust

24 as Mr. Conlan has said, absent the enactment of the so called

25 Fair Act, which to me is an oxymoron.  Absent the enactment of

1  the Fair Act, there will be approximately $5 billion dollars in

2  assets that will be put into this trust.  This trust will have

3  the responsibility for resolving the legitimate claims of all

4  asbestos victims and as the Futures Representative has seen to

5  it, to treat them all equally over time.

6          I'm hopeful that we can have this plan confirmed and

7  we can move on to the point where this trust can be set up and

8  the claims like the Windorfer's can be fairly and promptly

9  reviewed.  Thank you.

10         THE COURT:  Okay.  Ms. Hoch and Ms. Ohnemus and if

11  your mother. Mrs. Windorfer is on the phone, you as well.  I

12  have to overrule your objection to confirmation in that you are

13  asking for special treatment for your claims, because as I've

14  explained that is something that the bankruptcy code prohibits

15  this Court from enforcing and, indeed, if the Debtor tried to

16  treat your claims differently from other similarly situated

17  claims in a class, that plan would not be confirmable for that

18  very reason.

19         This trust, although it is not going to pay claims a

20  hundred cents on the dollar if the estimate of $7 billion

21  dollar in claims is the correct assessment, the trust will be

22  funded with approximately $5 billion dollars over time, not 7.

23  Nonetheless, it seems to this Court to be the best resolution

24  for tort victims.  It will, without the need if you choose to

25  accept the trust distribution procedures in full and to settle

1 these cases, not require that you go to trial.  You won't have

2 to wait any longer than getting through the claims processing

3 of the trust and the experience with other cases, claims

4 processing through the trust has been that the distributions

5 are much more rapid than litigating each and every one of these

6 asbestos claims in the tort system.

7          So, even from a prospective of not having further

8 delay, I believe this trust distribution procedure is a fair

9 and equitable way to deal with all tort victims, including

10 yours and your father's claims.

11          I apologize, Mr. Pernick and Mr. Conlan, I don't

12 remember the number of asbestos claims that were voted in the

13 various classes.  Can somebody give me a ball park number?

14          MR. PERNICK:  Can I have one minute, Your Honor?

15          UNIDENTIFIED FEMALE SPEAKER:  Your Honor --

16          THE COURT:  Just one minute please.

17          MR. PERNICK:  Your Honor, it was approximately

18 600,000 asbestos individual claims were voted.

19          THE COURT:  Okay.

20          MR. CONLAN:  And may I add, Your Honor, that over

21 99.5 percent of those voting, voted to accept the plan.

22          THE COURT:  And I don't recall seeing this, I'm not

23 sure there was a breakdown.  Is there a breakdown by subclass

24 within that class as to how many, either mesothelioma or lung

25 cancer claims were submitted?

1          MR. PERNICK:  Your Honor, the balloting agent may

2     have the data, but it's not a number that they calculated, so I

3     don't have it for you, I apologize.

4          THE COURT:  Okay.  I didn't recall seeing it.  So, I

5     guess I can just tell you that historically, and that may not

6     be the case in this specific case, but historically, the

7     mesothelioma claims are approximately 3 percent of the other

8     claims that are voted in the cases and lung cancers, if I

9     recall, are approximately 10 percent, 5 percent?  5 percent of

10    those cases.  So, of the 600,000 claims that were voted,

11    roughly 8 percent of that 600,000 would be people who have

12    suffered to the same extent that your father suffered and your

13    family suffered in this case.  As a result, if each of those

14    cases were to go to trial somewhere, by the time that process

15    worked its way through, the Debtor probably would be bankrupt

16    in an economic sense and not have sufficient funds to pay

17    anyone anything or at least very little.  This distribution

18    through the trust procedure, although there are limitations on

19    how much can be paid, I think is the fairest and best

20    resolution for all victims concerned in the tort system.  So, I

21    will overrule your objection.  I have already given, or Mr.

22    Lockwood has already given Ms. Ohnemus' phone number so that if

23    you have additional concerns as to how to  process your claim

24    through the trust, you can be in touch with him.  Since you

25    have three boxes of documents already prepared to support your

1  claim, I would think that it could be expeditiously handled

2  when you get the notification of how the trust procedures will

3  work and I'm not sure, are any of the members of the TAC or the

4  trustee present today?  There is no one here.  Mr. Lockwood,

5  I'm going to charge you with getting in touch with those people

6  and ask them please as soon as this claim is filed, to see

7  whether or not they can deal with it expeditiously.

8          MR. LOCKWOOD:  Your Honor the TDP provides in the

9  FIFO processing que for priority for oldest claims.  If this

10 claim has, in fact, been pending for 25 years, it will be,

11 assuming that it gets filed within the first six months of the

12 trust operation, it will be entitled to a priority on that

13 basis.

14          THE COURT:  All right.

15          MS. HOCH:  Glad to hear that.

16          THE COURT:  All right.  So, if you will get in touch

17 with Mr. Lockwood, he will attempt to give you some

18 supplemental information that will assist with processing your

19 claim, but please understand, he cannot act as your counsel.

20 If you need a lawyer, you're going to have to get one on your

21 own.  But he will explain to you what the process is all about.

22          MS. HOCH:  I'm sorry, what was his name again?

23          THE COURT:  I'm Judge Fitzgerald.

24          MS. HOCH:  No, the man who --

25          THE COURT:  Mr. Lockwood, Peter Lockwood.

1          MR. LOCKWOOD:  Peter Lockwood.

2          MS. HOCH:  How do you spell that?

3          MR. LOCKWOOD:  L-o-c-k-w-o-o-d.

4          MS. HOCH:  Thank you.  I was hearing impaired,

5 thanks.

6          THE COURT:  All right.  You've got the phone number?

7          MS. HOCH:  Thank you, Your Honor, and thanks to Owens

8 Corning for listening to our plea and may God Bless all of you,

9 and everything work for the best, for everyone, Your Honor.

10          THE COURT:  I think everybody here shares that

11 sentiment.  Thank you.

12          MS. OHNEMUS:  Your Honor --

13          THE COURT:  Yes.

14          MS. OHNEMUS:  I'm Janet Ohnemus and I thank you also

15 for allowing me to speak and as we are going through these

16 proceedings, I just received another packet from -- through

17 Federal Express from Saul Ewing, so I don't know about their

18 timely manner of delivery of paperwork, I hope that that does

19 improve.

20          THE COURT:  Well, I will inquire, what's with the

21 delivery issues, Mr. Pernick?

22          MR. PERNICK:  Your Honor, we've actually been trying

23 very hard, as we do with everybody that makes an inquiry, to

24 respond very quickly and get documents out.  That package, I

25 believe that Ms. Ohnemus is referring to is actually the agenda

1  from Friday night.  And so we have sent previous agendas.  I

2  know that Pauline Rekaliak (phonetic) from my office and others

3  have talked to one or both of them on occasion.  We have done

4  everything we can to get document out quickly.  I think

5  sometimes that gets perceived, for example, we're trying to

6  give the agenda from Friday night, get it to them we did it as

7  quickly as we could, but it was only to get changes to them.

8          THE COURT:  Ms. Ohnemus, I can assure you that I got

9  my copy of the agenda at home approximately seven o'clock on

10  Saturday night as well.  So, I can appreciate the fact that

11  you're only getting delivered today the changes from Friday.

12  But that is apparently what this new packet will be.  It does

13  not require any further response on your behalf.

14          MS. OHNEMUS:  Okay, thank you.

15          THE COURT:  All right, thank you.  If the operator

16  could mute the phone again, please, until we get to the next

17  level of objections.  Are there any other individual objections

18  to be addressed?

19          MR. PERNICK:  Well, Your Honor, I believe that there

20  were one or two other individuals that you were dealing with

21  before we dealt with that objection, that were on that chart of

22  people who sent correspondence, or actually, these two did not

23  send anything, but I think they wanted to speak.

24          THE COURT:  Okay.  Well, the three who are listed,

25  Ohnemus, Windorfer and Hoch, were all related to the Windorfer

1 claim.

2         MR. PERNICK:  Oh, I apologize then.  I just wanted to

3 make sure there wasn't anybody else.

4         THE COURT:  Okay.  Let me inquire.  Is there anybody

5 on the phone who is not represented by counsel, and who is not

6 involved in the Windorfer matter, operator, if you could please

7 unmute the phone for a minute.  Any response?  All right, there

8 are no responses.  Is there anyone in court who has an

9 individual claim, someone who is not represented by counsel?

10 There are no further participants by phone or in court who are

11 not represented by counsel alleging personal injury claims.

12 And, I have overruled the three objectors claims for the

13 reasons that I've stated on the record.  Okay.  Mr. Conlan.

14         MR. CONLAN:  Your Honor, James Conlan, again, on

15 behalf of the Debtor.  As we've suggested a couple of times, we

16 have two unresolved objections, although it's possible that I

17 can resolve one of them with the type of clarification that we

18 attempted with Mr. Klauder on the phone.  I'm going to be very

19 clear on this.

20         516(b) of the plan deals with third party releases,

21 not releases of causes of action that belong to the estate, for

22 example, derivative causes of action or causes of action that

23 are otherwise for the benefit of all creditors, but so called

24 third party or personal causes of action.

25         The way we have structured the plan, those third

party releases, again sometimes called personal releases, are

entirely consensual.  For example, if a party like Kensington

doesn't vote, then they do not give that third party release.

If they vote and they check the box, they do not give that

third party release.  The only people who give that third party

release are people who vote and do not check the box.  A couple

of background facts with respect to Kensington.

Kensington is an affiliate of Elliott.  You know that

name, they were a bank debt holder that has been very active in

this case for years.  You also know that in connection with our

bank deal, the agent and the Steering Committee, sought to have

Kensington dismiss the New York State action which Kensington

brought against current and former directors and officers.

Third point.  The New York State court just dismissed that

cause of action, on August 22nd of  2006 citing among other

things that it is a derivative cause of action.

Now, Kensington has sought clarity that its cause of

action, again, assuming it's personal, that it's not giving a

third party release, again, without regard to whether their

cause of action is a third party claim in contrast to property

of the estate without prejudice to that.   The answer is very

straightforward.  If the cause of action is a third party

claim, one that is personal to them, not derivative, not

property of the estate, then it is not released because I don't

believe Kensington voted on the plan.

1          Kensington's objection, actually, doesn't even talk

2   about what I just described, instead, it requests among other

3   things, a clarification that certain what I'll describe as

4   supplementary injunction provisions, don't apply, don't have

5   the effect of extinguishing and joining their alleged third

6   party claim.  Let me be clear.

7          If there's a third party claim that is not released,

8   the injunctions will not prohibit the prosecution of it.  And

9   that may, on the record, satisfy Kensington, I don't know.

10          THE COURT:  Mr. Shaffer?

11          MR. SHAFFER:  Thank you, Your Honor, I'll be very

12  brief, because I think I can be very brief.  Yes, our objection

13  was not to the consensual release because, indeed, we did not

14  consent to the third party release, our objection was actually

15  more in the term of a request for clarification, that had to do

16  with two other sections of the plan which, at least on their

17  face, appeared to grant third party releases.  One was a

18  provision in the discharge provision, 14.9(b), which says that

19  all persons shall be precluded from asserting against the

20  related persons, which includes officers and directors, and

21  then it has a whole list of types of claims.

22          And then there was also some language in what

23  otherwise would have been the asbestos injunction 5.17(a) that

24  also seemed to do that, far beyond the asbestos contact.

25          If I'm getting assurances from Debtors' counsel that

**J&J COURT TRANSCRIBERS, INC.**

1 these sections do not apply to the Kensington lawsuit to the

2 extent that the Kensington lawsuit is a third party lawsuit,

3 then we are done.  I am -- we can all go home.

4         MR. CONLAN:  We're done.

5         MR. SHAFFER:  Thank you.

6         THE COURT:  All right.  Why don't we take a very

7 brief recess, let's say 10 minutes and then we'll come back and

8 deal with the last objection.

9         MR. CONLAN:  Okay.

10         THE COURT:  All right.

11         MR. CONLAN:  Thank you, Your Honor.

12                 (Short recess)

13         THE COURT:  Please be seated.  Mr. Conlan.

14         MR. CONLAN:  Yes, Your Honor, very briefly.  The last

15 -- I mentioned two objections, this is the second of them.

16 Objector to whom we refer as Ackerman, objects to the plan on

17 the basis that a holder of the $130 million dollar DEM bearer

18 bonds, which we sometimes call the Deutsche bearer bonds, is

19 entitled to the same lien rights under the negative pledge of

20 Section 8.2 of the relevant debenture, that is the debenture or

21 indenture relating to those bearer bonds as afforded to the

22 bank holders claims and what it appears is this.

23         Section 8.2 of the relevant indenture provides

24 negative pledge language.  It says the borrower, that would be

25 Owens Corning Delaware, because OCD is obligated on these

1  bonds, just like OCD is obligation on all the other bonds that

2  you've heard about, the borrower, OCD, will not itself, not

3  will any of its consolidated subsidiaries, secure any

4  indebtedness for money borrowed or any guarantee or indemnity

5  in respect thereof, by any mortgage, pledge or any other lien

6  or encumbrance.

7         What that basically means is, Owens Corning Delaware

8  could not grant a lien on the assets of its subsidiaries.

9  Owens Corning did not grant a lien on the assets of its

10 subsidiaries, it gave guarantees as you're well aware, to the

11 banks, that is the subsidiaries gave guarantees to the banks,

12 those are unsecured guarantees.

13         The plan as you know --

14         THE COURT:  Don't they constitute a claim or an

15 encumbrance?  I mean, the language is broader than lien, it

16 says claim or encumbrance.  And, isn't the guarantee a claim or

17 an encumbrance?

18         MR. CONLAN:  We don't think so, Your Honor.

19         THE COURT:  Oh, well, okay.  Somebody better give me

20 some state law that tells me what applies then, and how that

21 applies because it seems to me that if you give a guarantee,

22 you've encumbered something, at least your financial

23 wherewithal.  Isn't it a contingent right to pursue a claim?

24         MR. CONLAN:  A guarantee is certainly a contractual

25 right, Your Honor --

1        THE COURT:  Right.

2        MR. CONLAN: -- to collect for the subsidiary

3 guarantor, but we do not believe it is an encumbrance, mortgage

4 pledge or other lien which we regard as a property interest in

5 the assets of the subsidiary.

6        THE COURT:  Oh, I see what you're saying.  The

7 difference between a contractual claim and a property right,

8 okay.

9        MR. CONLAN:  Precisely, Your Honor.  What I can also

10 tell you is, as you are well aware in this case since it's gone

11 on for years with respect to this issue, the plan preserves the

12 structural subordination of the bondholders claims, including

13 these bonds against OCD, and that is required by the

14 substantive consolidation ruling that we're all very, very much

15 aware of, but it does not subordinate these bondholder claims,

16 that is, these DEM bondholder claims to the claims of the bank

17 debt holders.

18        Finally, Your Honor, if there is a single grouping of

19 issues that has been beaten to death in these cases, it is the

20 entitlement of the banks to recover contractually on those

21 guarantees.

22        For all those reasons, we just don't think there's

23 any merit at all to this objection, but I believe counsel for

24 Mr. Ackerman is in the courtroom.

25        THE COURT:  I'll hear from Mr. Ackerman's attorney.

1          MR. MARCUS:  Your Honor, Christopher Marcus, Weil,

2  Gotshal and Manges for Credit Suisse, as the agent.  We do have

3  a response as well to this objection.  I'm happy to allow Mr.

4  Ackerman to speak first if Your Honor would  rather take it in

5  that order.

6          THE COURT:  I think I should hear from Mr. Ackerman

7  and then I'll hear your responses.

8          MR. MARCUS:  Thank you.

9          THE COURT:  Thank you.  Good morning.

10          MR. BODNER:  Good morning.  My name is Irving Bodner,

11  I'm an attorney in New York.  I would like to respond with two

12  points.  Number one, we believe that the language, the

13  definition of the lien, as set forth in the declaration of

14  undertaking, is broad enough to encompass the so called

15  contractual claim as mentioned by the Court.  Particularly, the

16  language which says as follows.  The term lien shall include

17  covenants, restrictions, encumbrances, I'm skipping words here,

18  but each one of these broad terms are specifically defined in

19  the declaration of undertaking set forth by Owens Corning

20  Fiberglass in the undertaking with respect to the issuance of

21  these debentures in 1985, 12 years before the issuance of the

22  bank holders claims.

23          Now, let's make it clear here, we are not asserting

24  that there is any restriction in this debenture that precludes

25  the issuance of the guarantees in this bank holder claim.  We

1  are simply asserting is that under this declaration of

2  undertaking, we become <u>pari passu</u> with these guarantees under

3  the terms of this declaration of undertaking.

4        THE COURT:  With the guarantees?

5        MR. BODNER:  With the priority that is asserted by

6  the bank holders.  That's number one.  That the language of

7  this undertaking is broad enough to encompass the covenants and

8  guarantees and when I stress the word covenants here I refer

9  specifically to the whole host of covenants set forth in the

10  bank credit agreement issued on -- dated June 26, 1997,

11  particularly Article 8, because what those covenants did was to

12  prohibit, the banks prohibited Owens Corning from issuing any

13  mortgage, any lien whatsoever, again, very broadly defined, on

14  the underlying assets of Owens Corning and all its subsidiaries

15  existing at that point in time, except for very limited

16  exceptions.

17        By so limiting Owens Corning, they, in fact, with

18  this negative pledge, they encumbered all of Owens Corning and

19  then on top of that, having the subsidiaries issue their

20  guarantee directly to the banks, wrapped up the entire assets

21  of the company.

22        THE COURT:  But, it's a contractual right, it's not a

23  property interest right and I think Mr. Conlan is correct, I

24  was being misled, and going down the wrong path because a

25  contractual right is not a property interest.  It is a claim,

1  but it's a contingent claim only in the event that certain

2  events occur, which at this point, haven't happened and it

3  still would not preclude property rights.  The banks, I think,

4  have not attempted to prevent the Debtors from entering into

5  contracts, but they have attempted to prevent the Debtor, with

6  the few exceptions as you've pointed out that really aren't

7  relevant to this discussion from encumbering its property so

8  that the property that stands behind the mortgages and the

9  other liens, will retain the value that's necessary to pay the

10 bank debt claim.

11          There's a big difference between an encumbrance of a

12 property interest and a contingent claim that's created by

13 contract.

14          MR. BODNER:  In responding to the Judge, may I just

15 pont out to the end, to the conclusory definition of lien set

16 forth in the declaration of undertaking in the Deutsche Mark

17 Debenture, that the term lien here is not limited to real

18 property as the Judge would suggest, but it says specifically,

19 for example, it says in the case of any security, referring to

20 --

21          THE COURT:  Share.

22          MR. BODNER: -- shares, warrants or options to acquire

23 such security.  So, this, we believe, indicates that the

24 limitation on encumbrance is not limited solely to real assets,

25 but even non-real assets, such as securities, are limited by

1  the term lien.

2          THE COURT:  That may be, that there's an additional

3  covenant that indicates that you can't impose an encumbrance on

4  the stock, but that's still not relevant to the contract

5  rights.

6          MR. BODNER:  Then --

7          THE COURT:  Because the guarantee doesn't affect the

8  stock either.  And, it's not a property -- it's not an

9  encumbrance on the stock.  It's essentially a financial

10 covenant.  It can be more, it gives rise to a claim, but it's

11 essentially a financial covenant that says that in the event

12 that the borrower, Owens Corning Delaware can't pay the debt

13 back, one of the subs will do it.  I don't think it's a

14 violation of the debenture.

15         MR. BODNER:  Let me then move to my second point, and

16 that is that this action by Owens Corning in 1997 issuing these

17 guarantees by the subsidiaries, violated what's called the so

18 called doctrine of equitable lien.  In other words, you can so

19 encumber a company's property and assets as to make the

20 negative pledge almost meaningless by tying up everything and

21 in this case the covenants by prohibiting Owens Corning from

22 issuing any kind of a lien, mortgage or other, on its property

23 as well as the guarantee of all of its significant

24 subsidiaries, in effect created a total tie up of Owens

25 Corning's assets so as to vitiate the intent and purpose of

1 this negative pledge covenant issued previously in 1985 to the

2 Deutsche Mark Debenture.

3      And, as support for that, we cite the language in

4 Metropolitan Life Insurance versus R.J. Nabisco, where the

5 Second Circuit recognized the effect that encumbrances that are

6 created may have so as to create, in effect, an equitable lien

7 on the assets of a company and this has also been recognized,

8 the American Bar Association's commentaries on indentures,

9 where a whole host of cases, particularly in the 1930's, during

10 the depression, when companies became bankrupt and the courts

11 recognized that prior creditors who had a negative pledge

12 covenant, should be entitled to an equitable lien.

13      If the Court feels that the language of this

14 undertaking in 1985 is insufficient to make it clear, then at

15 least the standards of equity and fairness that prevail in

16 bankruptcy should at least give us an equitable lien against

17 the priority of the bank holders.  And I point out in

18 particular the Deutsche Mark Debentures in this case and that

19 what prompts my coming to this court, frankly, is that they are

20 suffering worse than any class of debenture in this case

21 because of the fact that you have Deutsche Mark Debentures and

22 under the terms of these debentures, the valuation of the

23 debenture is set at the date of filing, it's merely an accident

24 of history here.  And, therefore, since the dollar exchange

25 rate to the Deutsche Mark at the time of the bankruptcy filing

1  in 01 was at a relatively high level, the recovery to the

2  Deutsche Mark Debenture, even though they are on equal par with

3  the other debentures, is, I believe, as much as 30, 40 percent

4  below the other debenture holders.  So, it's stated in the plan

5  of reorganization that the recovery should be 58 percent, but

6  the fact is, these bonds are now trading and quoted as being

7  offered at 20 Deutsche Mark to the face amount in the current

8  market.  That shows you the deep discount that these debentures

9  are suffering as a result of the effect of this situation.

10        THE COURT:  Well, on that point, I mean, that's the

11 risk that everybody takes by either buying a bond or a share of

12 stock or whatever.

13        MR. BODNER:  That's correct.

14        THE COURT:  So, the value issue, I think is not a

15 basis for this Court to set aside the exact terms of the

16 debenture to try to impose what would be equitable for the

17 Deutsche Mark Debenture holders, but not necessarily equitable

18 for other classes of creditors if the Deutsche Mark Debentures

19 were paid more than the value that's stated pursuant to the

20 debenture, whereas other creditors would then be at further

21 risk.  So, I think on that score, this Court's equitable powers

22 do not lie to set aside the terms of the debenture itself and

23 I'll have to ask for a response with respect to the concept of

24 the equitable lien by virtue of tying up the Debtors assets to

25 the point where some form of equitable lien should be imposed.

1          MR. BODNER:  Thank you.

2          MR. CONLAN:  Your Honor, James Conlan, I'll respond

3 briefly to the equitable lien and then turn the podium over to

4 counsel form Weil, Gotshal.

5          Your Honor, the facts of an equitable lien just don't

6 exist here and the reason why, among others, is that value

7 comes up from the subsidiaries of Owens Corning Delaware to

8 Owens Corning Delaware under what we call the waterfall

9 analysis.  So, it isn't the case that we tied ourself all the

10 way up, the reality is that the bondholders, including Mr.

11 Bodner's client, are receiving substantial value, as you know,

12 depending on how you count it, 55 to 58 cents on the dollar at

13 a $30 per share value.  The movement in the Deutsche Mark

14 relative to the dollar, we can't respond to that, their claims

15 are what they are, but the facts for an equitable lien just

16 aren't here factually.

17          MR. MARCUS:  Again, Your Honor, Christopher Marcus,

18 Weil, Gotshal and Manges, for Credit Suisse as agent.  Very

19 briefly, Your Honor.  I would also point out that on the

20 equitable lien issue, that what Mr. Bodner is asking for in

21 this objection actually is not an equitable lien and I would

22 point out another basis upon which to overrule the objection.

23 And the remedy that they're seeking here is actually not at all

24 an appropriate remedy.

25          As it stated in Mr. Bodner's reply and as he just

1  stated on the record, he does not argue that the issuance of

2  the guarantees violated a provision of the DM Debentures and,

3  in fact, he says his only argument is that once granted, the DM

4  Debentures require _pari passu_ treatment with the banks.  Then

5  he goes on to say, this result can be achieved by ordering the

6  banks to relinquish 3 percent of their recover.  There's simply

7  no basis to force the banks to give over some of their recovery

8  to the DM Debenture holders, even if his underlying argument

9  was correct, that he had some kind of equitable lien on the

10  Debtors property.  There's just simply no basis for the bank

11  holders to hand over some of their recovery and --

12          THE COURT:  Well, who else would he be _pari passu_

13  with?

14          MR. MARCUS:  Well, he is _pari passu_ with the bank

15  holders at the Owens Corning level, presumably, he does not

16  have claims against the subsidiary level and so he doesn't have

17  a right to be treated _pari passu_ with any creditors at the

18  subsidiary level.

19          THE COURT:  Okay.

20          MR. MARCUS:  Thank you, Your Honor.

21          THE COURT:  Mr. Bodner, do you have anything further?

22          MR. BODNER:  Yes.  I believe the language of the

23  undertaking and Section 8.2 of the indenture of the Deutsche

24  Mark Debenture is broad enough to encompass an undertaking or

25  an obligation by Owens Corning and it's consolidated

1   subsidiaries existing in 1985 with respect to their obligations

2   here and recognizing pari passu treatment for any subsequent

3   creditor who receives what's called -- anything that might be

4   construed as an equitable lien.

5        THE COURT:  Well, I don't understand the issue with

6   respect to the subsidiaries.  The bonds are not -- the

7   debentures that were issued are not obligations of the

8   subsidiaries in any respect, are they?  I haven't seen any

9   language that indicates that the subsidiaries guaranteed

10  performance of the debentures.

11       MR. BODNER:  But I believe that subsidiaries and a

12  parent, when a parent issues bonds, and specifically sets forth

13  in the bond that it or its -- and its consolidated

14  subsidiaries, and specifically refers to a limitation of assets

15  involving more than 15 percent of those consolidated

16  subsidiaries and specifically provides for that in Section 8.2,

17  that no more than 15 percent of its subsidiaries.  So, in other

18  words, the subsidiaries were clearly contemplated by Owens

19  Corning when it issued its undertaking in 1985, then those

20  subsidiaries are also, let's be realistic here, when any parent

21  issues bonds, and it refers to and obligates is consolidated

22  subsidiaries taken as a whole, we don't have separate, I've

23  never seen, I don't think anyone here in this rom has seen

24  where a bond issuance involving a parent company is

25  simultaneously signed individually by 22 consolidated

1  subsidiaries.

2          THE COURT:  But that's not -- I think that's not what

3  thus paragraph says.  It says, I'm going to eliminate some of

4  the wording, but Owens Corning --

5          MR. BODNER:  Are you looking at the undertaking or at

6  Section 8.2?-

7          THE COURT:   Yes, I am, declaration of the

8  undertaking.  Or is it Section 8.2 you want to refer to?

9          MR. BODNER:  Well, both.

10         THE COURT:  All right.  Declaration of undertaking.

11 Owens Corning, herewith undertakes as Trustee for the

12 bondholders, until such time as principle interest in

13 additional amounts, if any, of the bond terms have been --

14         MR. BODNER:  I'm sorry, I can't find what you're

15 reading.

16         THE COURT:  I'm reading the very first full paragraph

17         MR. BODNER:  Go ahead.

18         THE COURT:  -- of the declaration of the undertaking,

19 Exhibit 2 to your response to -- let me get the title of your

20 document.

21         MR. BODNER:  All right.  If we go down five lines to

22 the word neither, it says there, neither the company nor any

23 consolidated subsidiary.

24         THE COURT:  Right.  Will at any time secure any

25 indebtedness for money borrowed or any guarantee or indemnity

1 in respect thereof, by any mortgage pledge secured interest or

2 other lien or encumbrance upon any of the present or future

3 revenues, property or assets of the company or the consolidated

4 subsidiaries, the value of which in the aggregate, shall exceed

5 15 percent of the total assets of the company, its consolidated

6 subsidiaries and so forth.  It's not saying that those

7 subsidiaries -- that 15 percent of the subsidiaries can't do

8 something, it's saying that the Debtor can't cause its

9 subsidiaries to guarantee more than the consolidated 15 percent

10 value of the Debtor and the subsidiaries on a consolidated,

11 annual balance sheet basis.

12         MR. BODNER:  Correct, but going back to the beginning

13 of that clause, starting with the word neither --

14         THE COURT:  Right.

15         MR. BODNER:  -- it says, neither the company nor any

16 consolidated subsidiary.

17         THE COURT:  That's right.

18         MR. BODNER:  So, the obligation here is clearly

19 stated on behalf of Owens Corning and its subsidiaries.

20         THE COURT:  Right, but what the obligation is is not

21 to -- let me find it again here.

22         MR. BODNER:  Not to encumber more than 15 percent of

23 the total assets of the company and its subsidiaries, that's

24 all.  It's just saying, if the company is worth $5 million

25 dollars, you can't encumber more than 15 percent of those $5

1  million dollars.

2           THE COURT:  Well, in broad brush strokes, that's

3  correct.  But the specific pledge is that it will not issue a

4  mortgage, pledge, security interest or other lien or

5  encumbrance on the present or future revenues, property or

6  assets.  It doesn't -- but, a guarantee is not that, it's a

7  contractual obligation.

8           MR. BODNER:  It's not only the guarantee here that

9  we're discussing, Your Honor, it's also the covenants that are

10 issued in that same document, that same document --

11          THE COURT:  In the declaration of undertaking?

12          MR. BODNER:  No, I'm talking about the bank letter,

13 the bank credit agreement.  The bank credit agreement consists

14 of, in Section 8, particularly of that agreement --

15          THE COURT:  Yes, the affirmative and negative

16 covenants.

17          MR. BODNER:  And, those covenants so tie up the

18 company's revenues, property or assets.  Now, may I just touch

19 on the language revenue here.  They are arguing that this lien

20 so to speak is limited to property, or real assets only, what

21 about the word revenues?  Revenue is not a real asset, it's a

22 future asset.

23          THE COURT:  Better be a present asset in some

24 instances, too.

25          MR. BODNER:  But when a company speaks of revenue,

1  it's always in the future, it's never in the past.  Property

2  and assets reflect things that exist at that moment in time.

3  Revenues refer to future.  So, the lien restriction here, the

4  encumbrance restriction here, clearly contemplates more than

5  real assets, that's my point.

6       I mean, what they've done essentially is, vitiate the

7  whole negative pledge covenant by being very creative and --

8  it's not unusual to issue guarantees by subsidiaries, I'm not

9  saying it's unusual, my point here is that the language here is

10 broad enough to protect my clients debentures.  And, they're

11 saying, let's ignore it.  It should not be so easily ignored,

12 particularly here when the language, I think, should be

13 construed by the Court adversely against those who drafted it

14 and the drafters here were the people who made this

15 undertaking, Owens Corning, and I would argue, the company and

16 its consolidated subsidiaries jointly made this undertaking,

17 not just a parent who they want to make as not relevant to this

18 subsidiary.

19       I believe when this language was drafted, it was

20 clearly contemplated that the assets of the subsidiaries were

21 quite substantial and represented the major source of the

22 company's assets.  Every multinational company operates through

23 a multitude of subsidiaries, for a host of reasons, tax

24 reasons, et cetera, liability reasons and what not.  I would

25 host to venture to say that the multinational companies at the

1 parent level have very little real assets.  The real assets

2 lie, almost always in subsidiaries.  Equity should look at the

3 underlying equities here, what's being done?  What's being done

4 here is vitiating a negative pledge covenant because it's

5 inconvenient.  Thank you.

6          THE COURT:  Okay.

7          MR. CONLAN:  Your Honor, James Conlan, I won't repeat

8 what I've already said and what you've already said, but I do

9 want to respond to one point and that is, Owens Corning

10 Delaware is not a naked holding company, it has enormous assets

11 itself and those enormous assets, as well as the value that

12 flow up from the subsidiaries after the payment of the banks in

13 full, are what is funding all of the distribution to Asbestos

14 here and the substantial distribution to bondholders and to Mr.

15 Bodner's client.  The objection should be overruled.

16          THE COURT:  Well, when I look at the document and the

17 declaration of undertaking, the specific pledge is that the

18 companies and the subsidiaries to the extent that those are

19 relevant, will not secure any indebtedness for money borrowed

20 or any guarantee or indemnity in respect thereof by, this is a

21 quote "any mortgage, pledge, security interest or other lien or

22 encumbrance upon any of the present or future revenues,

23 property or assets of the company" and I'm stopping the quote

24 there.  It seems to me that mortgage and certainly lien to a

25 certain extent, would apply to real property as would

1  encumbrance.  The pledge security interest, possibly other lien

2  or encumbrance could also apply to certain personal property,

3  but nonetheless, all of them are property interests.

4         I was incorrect when I said earlier on this record

5  that I thought that the language said claim or encumbrance, it

6  does not specify claim, it only specifies lien encumbrance

7  mortgage pledge or security interest, none of which seem to be

8  affected by a guarantee.  In saying that, though, what I am not

9  certain about under applicable law is whether a guarantee

10 constitutes a pledge of a source.  In some state laws,

11 possibly, a guarantee does constitute a pledge, I don't know.

12 I take it this is applicable New York law?  I don't have that

13 part of the document, so I'm not sure.  I know that Owens was

14 an Ohio company according to this document, but I don't know

15 what law applies because I don't have that portion of the

16 document.  Whatever the law is, I guess the issue is, does the

17 provision of a guarantee by a subsidiary constitute either a

18 pledge or an encumbrance under the law of that state.

19        And, the second question would be, if it does, does

20 it rise to the level of more than the 15 percent caveat.  And I

21 don't think anybody has briefed that issue, so maybe I'm asking

22 something that's either not relevant or that no one intended to

23 brief.  I don't know.

24        MR. CONLAN:  Your Honor, just if you'd give me a

25 moment.

1          THE COURT:  All right.  See, I think the problem that

2   Mr. Bodner is raising is the definition of lien in this

3   document itself.  I'm sorry.

4                         (Pause)

5          THE COURT:  Gentlemen, could I interrupt your

6   discussion?  One portion of Mr. Bodner's argument I think I can

7   do away with and to the extent that this may take care of this

8   situation, I think I need to put this on record.

9          Part of Mr. Bodner's argument refers to the

10  definition of lien, which is in the declaration of undertaking

11  at the bottom of Page 33.  And it says, lien shall mean any

12  interest in property securing an obligation owed to, or claim

13  of a person other than the owner of the property, whether such

14  interest is based on common law, statute or contract and

15  including but not limited to the security interest or lien

16  arising from a mortgage, encumbrance, pledge, conditional sale

17  or trust receipt or lease, consignment or bailment for security

18  purposes.  The term lien shall include reservations,

19  exceptions, encroachments, easements, rights of way, covenants,

20  conditions, restrictions, leases and other title exceptions and

21  encumbrances affecting property and in the case of any

22  security, warrants or options to acquire such security.  For

23  the purpose of these bonds, the company or consolidated

24  subsidiary shall be deemed to be the owner of any property

25  which it had acquired or holds, subject to a conditional sale

1  agreement, capital lease or other arrangement, pursuant to

2  which title to the property has been retained by or vested in

3  some other person for security purposes.   The term covenants

4  in that string of events and restrictions in that string of

5  definitions, Mr. Bodner says, means that the Debtor cannot

6  undertake the covenants that are then in the 1997 credit

7  agreement, but I don't think that's what this paragraph means.

8  This string is related clearly to title exceptions and

9  encumbrances affecting property and then there's a separate

10 section that deals with the security warrants or options to

11 acquire a security which is not right now relevant.

12       So, I don't think with respect to the lien issue,

13 that there is an issue.  I do not believe that the 1997

14 agreement and its covenants, provides any bases for equitable

15 or other relief.  My concern is still, however, with the

16 concept of the pledge.  So, I apologize for interrupting your

17 discussions.  If you want to continue them, that's fine, but to

18 the extent that you were going to get into the lien issue, I

19 don't think the lien is a problem.

20       MR. CONLAN:  We were just talking about the lien

21 issue and the very paragraph Your Honor found as well.  Your

22 Honor, neither we, nor Mr. Bodner briefed the question of

23 whether a guarantee is a pledge.  Delaware law applies.  We

24 don't believe, based upon my colleagues analysis, that any

25 state takes the position that a guarantee is a pledge.  The

1 guarantee is contractual, the pledge relates to property

2 interest.

3        THE COURT:  Okay.  Well, I'm going to have to take a

4 look at that, so I think so I think you folks are going to have

5 to give me a brief on the subject.  You may be correct, I

6 simply don't know.  I've never had to examine the issue and

7 that's the only basis that I can see for relief, unless

8 somebody is going to give me a little more than, you don't

9 think, but rather that you know, or that you'll represent that

10 no state would treat a guarantee of a subsidiary as a pledge.

11        MR. CONLAN:  Your Honor, Delaware is the applicable

12 law here.

13        THE COURT:  Okay.  And Delaware applies why?

14        MR. SHULMAN:  A pledge is a --

15        THE COURT:  You need to use the microphone.  Why does

16 Delaware law apply?  Is that in the document?

17        UNIDENTIFIED MALE SPEAKER:  (Indiscernible).

18        THE COURT:  I can't hear you from back there, sir.

19        MR. SHULMAN:  Your Honor, the definition of a pledge,

20 which has been around --

21        COURT CLERK:  Please state your name.

22        MR. SHULMAN:  Oh, Jay Shulman of Saul Ewing on behalf

23 of the Debtor.  The definition of a pledge which is a security

24 interest that even -- Uniform Commercial Code, is a possessory

25 security interest in property.  A guarantee is no more than a

1 credit undertaking by a debtor.  We could certainly brief this

2 but it is well beyond the pale to suggest that an agreement to

3 pay a debt becomes a possessory interest in personal property.

4        THE COURT:  If that's the correct definition, I

5 wholly agree.

6        MR. BODNER:  I'd just like to cite the conclusory

7 language of the declaration of undertaking of the Deutsche Mark

8 Debenture issued in 1985, on top of Page 34, and the subsequent

9 page reads as follows, "the rights and obligations arising from

10 this undertaking shall in all respects be determined in

11 accordance with the law of the Republic of Germany".

12        Now, this is because this was a Deutsche Mark

13 Debenture.  I cannot speak now as to whether or not Delaware

14 law has subsumed this language because of the filing of Chapter

15 11 but clearly, the applicable law under this undertaking is

16 the law of Germany and so, I don't know, I can't respond that

17 Delaware is truly applicable and I would like permission to

18 brief this issue of the applicable language, the pledge

19 language as it affects a guarantee.

20        THE COURT:  All right.  With respect to the

21 definition under United States law, do you have any challenge

22 to the assertion that a pledge constitutes a possessory

23 interest?

24        MR. BODNER:  Yes.

25        THE COURT:  All right.  We're going to take a five

1  minute recess and I'll return.

2                    (Short break in proceedings)

3          COURT CLERK:  May the court come to order.

4          THE COURT:  All right, gentlemen, with respect to, at

5  least under United States law, it does appear that a pledge is

6  a possessory interest.  Not only Black's Law Dictionary but a

7  host of probably 25 opinions that I was able to look at quickly

8  on line, indicate that that is the case.

9          We also did a search to see whether we could get an

10 English translation of German law and we found a couple of

11 sections.  German law does indeed refer to pledges, but it is

12 not entirely clear in my very quick perusal, whether any of

13 those sections are relevant to what is transpiring before the

14 Court right now.

15         It does appear in the insolvency sections, under

16 German law, however, that there are entitlements to creditors

17 who hold pledges to a separate satisfaction, therefore, giving

18 rise to the concept that it, too, is a property interest, not a

19 contractual interest.  So, at this point I am inclined to think

20 that it is likely that a pledge will, indeed, affect the

21 property interest, not a contractual interest, however, I am

22 happy to give you a few days to brief the issue.  I do not

23 think it is going to make a difference based on this very quick

24 research but, again, it was 10 minutes worth of research, not

25 what all of your law firms will be able to put together in

1 however long you decide to brief the issue, I guess.  Yes, sir?

2 I think counsel for the agent has something to say.

3          MR. MARCUS:  Your Honor, I just wanted to sort of be

4 clear about what you said.  Is this something that you were

5 envisioning briefing in connection with confirmation?

6          THE COURT:  Well, it's an objection to confirmation.

7          MR. MARCUS:  Okay, because I think that this is --

8 that we can get past confirmation.  I don't think that this

9 actually is a confirmation issue and let me explain why.

10          He has a negative pledge covenant in his declaration

11 of undertaking, which nobody thinks gives him the right that

12 he's entitled to and, in fact, it is his burden to come here

13 today and show you that he's entitled to this and he has not

14 done that.  He has not come here with any German law, but even

15 if he can, even if he has a right under his indenture and the

16 credit agreement violated that in some way, his right was to

17 declare a default under his indenture, which I have no idea

18 whether he's done.  It sounds like that was not done back in

19 1997.  But if he did, he has a claim, he has a claim for breach

20 against the Debtors.  And so, he can assert that claim, if it's

21 at all timely in the claims process.  The plan doesn't change

22 that fact.  So, if he has a claim against Owens Corning, he

23 asserts that claim.  If he feels he has a claim against a

24 subsidiary as well, then he asserts the claim against the

25 subsidiary and that gets dealt with in the claim reconciliation

1 process.

2      And so, it is actually not at all a confirmation

3 issue, it is a claims reconciliation issue and I would suggest

4 that the Debtors are probably going to tell you that we looked

5 at this very quickly.   That the indenture trustee for this

6 issue did not file a claim against any debtor other than Owens

7 Corning, and I do not know if Mr. Bodner did, but that their

8 ability to now assert a claim, five or six years after the bar

9 date against a subsidiary debtor, is no longer timely and so

10 that issue should be dispatched very quickly.  But that's the

11 issue, whether he can assert a claim against the subsidiary.

12 If he does, the plan explains how he gets paid, and that's it,

13 that's the issue.

14           THE COURT:  All right.

15           MR. MARCUS:  Thank you, Your Honor.

16           THE COURT:  Thank you.  Mr. Conlan.

17           MR. CONLAN:  Your Honor, I can confirm that they did

18 not file claims against any subsidiaries, they only filed a

19 claim against Owens Corning Delaware.  Just to repeat in part

20 what Mr. Marcus just said.  Even if a guarantee is a pledge, we

21 don't think it is.  Even if it were, they would have a breach

22 claim against Owens Corning Delaware and their claim could be

23 no more than the amount of the instrument.

24      We recognize that claim, we will pay that claim.

25 Frankly, this legal argument doesn't even affect the quantum of

1  that claim.  Their claim is for the face amount of the

2  instrument, just like Mr. Rahl's clients claims are for the

3  face amount of the instrument.  They can come up with ten

4  different theories of breach.  We breached Mr. Rahl's documents

5  as well when we filed bankruptcy, when we didn't pay him, when

6  we didn't pay interest, it doesn't go anywhere, Your Honor.  We

7  don't want to brief it because we don't think, even if he were

8  right, and he's not, that it would matter.  So, we don't see it

9  as a confirmation issue.

10          THE COURT:  All right.  So, the plan in your view is,

11  essentially, allowing the claim at the face amount and paying

12  it pursuant to the terms of the plan.  So, whether or not there

13  is an objection to confirmation, the issue as to whether or not

14  it should be pari passu, in your view, is a claims resolution

15  issue and if, in fact, the Debtor is somehow incorrect in what

16  the plan says the distribution has to be, it will be resolved

17  through the claims process?

18          MR. CONLAN:  Correct.

19          THE COURT:  But there's been no claim filed.

20          MR. CONLAN:  Well, they filed a claim against Owens

21  Corning Delaware for the face amount of their instrument, the

22  amount that they --

23          THE COURT:  The indenture trustee.

24          MR. CONLAN:  -- that's correct.

25          THE COURT:  The indenture trustee filed it.

1          MR. CONLAN:  Correct.

2          THE COURT:  Okay.  And that includes Mr. Bodner's

3 clients?

4          MR. CONLAN:  Correct.

5          THE COURT:  Okay.  So, Owens is somehow responsible

6 for figuring out what the appropriate allowed claim is, but

7 you're conceding the allowance of the claim in the plan, so

8 where do I have a claims allowance issue?

9          MR. CONLAN:  Let me confer with my colleagues for one

10 minute.

11          MS. MARCUS:  Excuse me, Your Honor, just real

12 quickly.  The only claims allowance issue would be if Mr.

13 Bodner was to assert a claim against a subsidiary.

14          THE COURT:  Well, he can't do that now.

15          MR. MARCUS:  I agree with Your Honor.  I don't think

16 that he can, I think he's time barred from doing that, but that

17 would be the only issue.  This is merely a claims issue and

18 he's too late on the claim.

19          THE COURT:  So, the <u>pari passu</u> -- I'm sorry, some how

20 or other I got myself mixed up.  I thought this was easy and

21 now I've gone down the wrong path, I guess.

22          MR. CONLAN:  Yes, let me answer your question, I'm

23 sorry, Your Honor.   The plan does provide that the claim of

24 the bondholders, in general, including the indenture trustee

25 under this bond issuance, is allowed at the face amount of the

1  claim.

2          THE COURT:  Okay.

3          MR. CONLAN:  And, so, he can have 15 theories of

4  contractual liability damages, his claim will never be more

5  than that amount and he will receive, they will receive the

6  distribution to which they're entitled on that allowed claim.

7          THE COURT:  All right.  So, it's a distribution issue

8  that I'm looking at, so I'm back to a plan confirmation issue.

9          MR. CONLAN:  No, Your Honor, we don't see it as a

10 distribution issue.

11         THE COURT:  Well, I don't have a claim issue, you're

12 conceding the face amount of the claim, which is all they're

13 entitled to, against Owens.  There's been no claim filed

14 against the subs, so there's no claim that can be allowed

15 against the subs.

16         MR. CONLAN:  Correct.

17         THE COURT:  So it has to be a distribution issue if

18 there's any issue at all, because there's no claim issue, you

19 conceded the claim.

20         MR. CONLAN:  We don't think there is any issue at

21 all.

22         THE COURT:  Well, I know that, you've responded, but

23 I don't -- I think at this point I'm not -- I believe that

24 there has been an objection lodged.  I'm not sure that I see

25 any merit to the objection, I think I need to hear from Mr.

1 Bodner.

2        Mr. Bodner, my very brief look at what a pledge is

3 does not seem that it's going to give you a legitimate or a

4 sustainable objection to this plan.

5        MR. BODNER:  I want to stress a very important point.

6 The issue of what a pledge is does not -- should not be limited

7 to simply and only the guarantee.  There is more here than

8 simply the issuance of a guarantee by Owens Corning and its

9 consolidated subsidiaries in favor of the bank credit group.

10        What was done here is totally encumbering all of

11 Owens Corning's assets.

12        THE COURT:  But it isn't.

13        MR. BODNER:  Yes, it -- let me explain, if I may,

14 very briefly.  By giving those covenants, the covenants

15 specifically encumbered all of Owens Corning's real property

16 and we're trying to bifurcate the guarantee language, which is

17 arguably, argued by the bank group, as not being a property

18 interest and the negative pledge which was issued to those

19 banks, which encumbered all of Owens Corning's asserts and what

20 I mean by that is that by precluding Owens Corning and its

21 subsidiaries from issuing any mortgage, lien, whatsoever, on

22 any of its assets, other than $20 million dollars, what they

23 effectively did was tie up all those assets and then by, in

24 other words, what they did was, from the bottom up, tie them up

25 and then issue that guarantee on top, to doubly wrap it up.  In

1  other words, they've wrapped up the bottom by tying up the

2  assets, the real property, and then issued a guarantee which is

3  a superseding encumbrance on those underlying assets.

4        What I'm -- and what has to be understood here is,

5  that the guarantee is not an isolated pledge, or promise here.

6  The guarantee comes together with a package and that package,

7  that package totally tied up the property.

8        THE COURT:  But it doesn't --

9        MR. BODNER:  It does, it does, because --

10        THE COURT:  To the extent that it is prohibiting

11  Owens and the Debtors from encumbering the property by issuing

12  the mortgage, it's preserving value.  It's not tying up value.

13        MR. BODNER:  Exactly, it's preserving value to make

14  all the value in that guarantee.

15        THE COURT:  But to the extent that whatever the bank

16  debt is paid, leaves assets available for the bonds, you're

17  better off not worse off.

18        MR. BODNER:  The credit agreement was a $2 billion

19  dollar credit agreement.

20        THE COURT:  Yes.

21        MR. BODNER:  In order to protect that credit

22  agreement, what they did was, Owens from 1997 and thereon, was

23  precluded from doing anything with all of its assets.  Do you

24  realize what has been achieved here?

25        THE COURT:  That --

1          MR. BODNER:  All of its assets are untouchable.

2          THE COURT:  Mr. Bodner, that's an overstatement,

3   number one.  Even the documents that you've cited don't say

4   that.  There are limitations with respect to what the documents

5   can do, but to the extent that the tied up assets, it's

6   preserving value to pay the bank debt and to the extent the

7   bank debt is satisfied from any of those assets, it's then

8   preserving value for the subordinate levels of debt.

9          So, I'm losing the issue as to --

10         MR. BODNER: Because distinguishing between what is a

11  property interest and what is a inchoate non-property interest,

12  is a very delicate thing.  But were that guarantee come

13  together with pledges, covenants, that so tie up all of the

14  company's assets in a very, very significant and substantial

15  way, let's understand, the banks here, their purpose was to

16  protect $2 billion dollars and make that $2 billion dollars a

17  priority claim against the totality of the company.

18         THE COURT:  All right.  So that happened in 1997, was

19  a default declared?

20         MR. BODNER:  No, there was no default because they --

21  all this, all --

22         THE COURT:  Under your indenture.

23         MR. BODNER:  -- all my indenture provides is, once

24  you do that, I become pari passu, there's no default by doing

25  that.  There's no prohibition.  I'm not arguing, there is no

1  prohibition against doing it.  What they did was --

2        THE COURT:  I don't see anything in this declaration

3  of undertaking, at least in the sections that have been

4  provided --

5        MR. BODNER:  All it says is, all it says is --

6        THE COURT:  -- that give you a pari passu right to

7  what could otherwise be construed as a secured claim.  Where is

8  it in this document that you get yourself bootstrapped into a

9  secured position, or pari passu with a secured creditor when

10  you're nothing but a debenture holder?

11        MR. BODNER:  They are not a secured creditor either,

12  they're unsecured and they've been stating that.

13        THE COURT:  But they have certain assets that have

14  been committed to pay that debt, the guarantees of the

15  subsidiaries that don't apply to the debenture holders.  So, I

16  agree, they are not secured as to Owens, but they have

17  additional collateral that they can look to to secure the

18  repayment of the debt that the bondholders can't look to.

19        So, your claim to be treated pari passu, my question

20  is with what?  If it's to the Owens debt, which is the only

21  claim that I see that anybody has under these debentures is

22  against Owens, because these is no guarantee of the

23  subsidiaries for the debentures.  So, if you're pari passu with

24  the banks as to the Owens debt, this plan attempts to address

25  that issue by providing the distribution that is in accord with

1 the circuits non-substantive consolidation ruling that looks to

2 each of the independent enterprises of this estate and the non-

3 debtor enterprises of the estate, values those assets and pays

4 the creditors of those independent assets something and in this

5 instance, what they've agreed on, and then looks to Owens to

6 pay its creditors.  Your client has an unsecured claim against

7 Owens.  The allegation I believe that I'm facing is that as to

8 Owens, at the Owens level, your clients and the banks and

9 everyone else are getting their claims allowed in full, and

10 then getting the appropriate distribution percentage based upon

11 the plan's structure.

12        So, I don't understand, even if you were successful

13 in processing this objection, I don't see how you're entitled

14 to a 3 percent surcharge against the bank debt because they

15 have claims against the subsidiaries that your client doesn't

16 have claims against, which is why I say I've lost somehow or

17 other one of the guys who practiced criminal law when I was a

18 criminal prosecutor, used to tell the jury that they had to

19 keep their eye on the squirrel because the squirrel always

20 found the nuts.  Well, I've lost the squirrel.  It worked for

21 the juries, they loved it.

22        MR. BODNER:  I believe the language of the

23 undertaking, the declaration of undertaking issued in 1985

24 specifically obligates Owens and its subsidiaries.

25        THE COURT:  Okay, and that is the point at which I

1  disagree.  It does say that Owens will, and it's subsidiaries

2  --

3          MR. BODNER:  Neither Owens nor its subsidiaries, what

4  does that mean?

5          THE COURT:  -- will not pledge assets.  But it does

6  not create a guarantee by the subsidiaries.  It's simply --

7          MR. BODNER:  Not a guarantee nothing is -- it's

8  simply --

9          THE COURT:  -- it's preserving the value at Owens.

10         MR. BODNER:  -- it creates an untaking, it creates an

11 obligation, it creates a promise.

12         THE COURT:  I think you hit the nail on the head

13 earlier.

14         MR. BODNER:  What is a promise?

15         THE COURT:  You hit the nail on the head earlier.

16 Owens, as a holding company, looks to its subsidiaries for

17 value.  Now, Owens in this instance has substantial value of

18 its own, I don't think that's the point that anybody is

19 conceding, but to the extent that there is upstreaming from

20 subsidiaries to the parent, this declaration of undertaking

21 essentially is saying that Owens isn't going to do something

22 that will prohibit its value from being diminished beyond what

23 this agreement says that it will prohibit.

24         MR. BODNER:  It says specifically that they shall not

25 divest more than 15 percent of its subsidiaries property or

1  assets in favor of any subsequent creditor. It's black and

2  white.

3          THE COURT:  Well, it says that it will not create a

4  lien or encumbrance, it doesn't mention divestment.  A lien or

5  encumbrance upon --

6          MR. BODNER;  Well, a lien is almost like a

7  divestiture.

8          THE COURT:  Well, okay.  I cannot see a basis to your

9  objection for the reason that I've stated earlier.  I believe

10  that it is, number one, that the declaration of undertaking is

11  looking to property interests, not necessarily real property

12  interests, but property interests, nonetheless.  The

13  contractual right is not a property interest, it is a different

14  animal and although sometimes figuring out which is which may

15  be a delicate enterprise, in this instance, I don't think it

16  is.  The debentures are clearly obligations that the Debtor,

17  Owens Corning, has to pay.  The subsidiaries have not issued

18  guarantees.  The bank claims stand in an entirely different

19  posture which is the reason that this circuit, in essence, said

20  that no substantive consolidation would be approved.  What your

21  argument is attempting to do, I think, is backdoor around the

22  substantive consolidation ruling of the Third Circuit, which

23  obviously, this Court, cannot do.

24          MR. BODNER:  I don't believe in any way, shape or

25  form, the Third Circuit addressed any of the issues that we're

1  discussing here today.  I'd like to reserve the opportunity to

2  brief this issue of the meaning of the pledge and whether a

3  pledge can mean a guarantee as well.

4          THE COURT:  I'll give you a few days if you want to

5  take a look at that issue, but as I said, I really don't think

6  it's going to get you anywhere, but I understand you're in

7  court and you haven't had a chance to brief it since I raised

8  it today.  So, I'll give you time to do that.

9          MR. BODNER:  Thank you.

10          MR. RAHL:  Your Honor ---

11          THE COURT:  Yes.

12          MR. RAHL:  Just very briefly.

13          COURT CLERK:  Please enter your appearance.

14          MR. RAHL:  Andrew Rahl, from Anderson, Kill & Olick.

15  With regard to the domestic bond and interest, all of them did

16  contain negative pledge clauses and, obviously, were impacted

17  by the bank covenants the same way that Mr. Bodner's clients

18  were.  I just want to make two observations.

19          Obviously, if in some way Mr. Bodner's position is

20  upheld on any theory, perhaps, other than construction of

21  German law which, of course, wouldn't apply to the U.S. bonds,

22  whatever rights we might have that flow from that we certainly

23  would seek to reserve them.

24          I do want to also make the observation having,

25  obviously, been involved in the substantive consolidation

1  dispute for so long, as I just remarked to Mr. Bienenseick now,

2  I have to confess when we made the point about getting Mr.

3  Bodner's perhaps attempting to circumvent the Third Circuit's

4  ruling, I have to agree with your observation that you don't

5  have the authority to authorize that.  I can only make the

6  further observation that I respectfully, on a personal level,

7  do disagree with the Third Circuit.

8        THE COURT:  Do you have the ability to circumvent it,

9  Mr. Rahl?  Okay.  Go ahead, Mr. Marcus.

10        MR. MARCUS:  Your Honor, on last point because I'm

11  not sure that I see the need for supplemental briefing by Mr.

12  Bodner, but if you just read the first paragraph which I think

13  contemplates the issuance of guarantees, I'm sort of in the

14  middle of the paragraph where it says --

15        THE COURT:  Of the declaration of undertaking?

16        MR. MARCUS:  Of the declaration of undertaking, I

17  apologize.

18        THE COURT:  All right.

19        MR. MARCUS:  It says, neither the company nor its

20  consolidated subsidiaries will at any time secure any

21  indebtedness for money borrowed or any guarantee or indemnity

22  in respect thereof by a mortgage.  So, it contemplates the

23  grant of guarantees and he would only be entitled to whatever

24  rights he's entitled to under this document to the extent that

25  the guarantees were followed up by a mortgage or a pledge or

1 something else which, of course, they were not.

2       THE COURT:  I agree in this instance that what this

3 document is attempting to do is prohibit the Debtor from

4 securing certain assets that would somehow or other diminish

5 the rights of the 1985 bondholders under this agreement.  I

6 know that's painting with a broad brush but as a general

7 proposition.

8       My only question is whether in issuing the guarantees

9 the Debtors did create the security. I think from the brief

10 research that I've been able to do, that they did not, but

11 nonetheless, I raised the issue in court today, I think in

12 fairness, I have to give counsel a brief opportunity to take a

13 look at that issue.  And I'm going to give him that opportunity

14 but I doubt that it's going to result in any different ruling

15 than an overruling of the objection.

16       MR. MARCUS:  Thank you, Your Honor.

17       THE COURT:  Mr. Bodner, how much time do you need to

18 brief this issue?

19       MR. BODNER:  A few days.  Thursday?

20       THE COURT:  All right, that's September the 21st.

21 Anybody who wishes to file some opposition, how much time will

22 you need?

23       MR. CONLAN:  Your Honor, we'll file our response at

24 the same time.  I can't help myself, I have to say one more

25 time, even if he were right, his claim would still only be for

1 the face amount of his instrument and it would still only be at

2 OCD and we're still going to pay him just like other

3 bondholders, so I really do think we lost the squirrel here.

4 And two days is worth a lot of money to this company.

5        THE COURT:  Well, you're not going to get a

6 confirmation order out of me before September 21st anyway, Mr.

7 Conlan, let's be real.  So, you know, that is not going to tie

8 up the confirmation process in that sense.  But with respect to

9 the question of whether or not -- I'm sorry, oh, the

10 distribution issue, whether on not the banks are some how or

11 other required, which is the remedy that's being sought to give

12 up the 3 percent of their claim to pay this class of creditors,

13 I still think that is a plan confirmation issue.  It is not a

14 claims allowance process.  You have conceded the allowance of

15 the claim at the Owens Corning level and there is no claim

16 against the sub, so it is purely and simply a distribution

17 under the plan.  If the plan --

18        MR. CONLAN:  An inter-creditor issue?

19        THE COURT:  -- if the plan is incorrect in its

20 construction of the allowance of this claim, it can't be

21 confirmed because it's the plan that's providing for

22 distribution.  So, it is a plan issue.  And I think Mr. Bodner

23 can -- if Mr. Bodner is correct that somehow or others Owens

24 encumbered its assets in violation of the declaration of

25 undertaking and the remedy through the plan is that he has an

1  allowed claim but the percentage distribution is incorrect,

2  it's going to need to be fixed because it's the plan that sets

3  that distribution, it's not a claims allowance process, as I

4  see it.  So, I think that's the issue.  Okay.

5          So, everybody wants to brief -- everyone wants until

6  September 21st to take a look at this issue and brief the

7  matter and you're going to do both Delaware and German law, or

8  whatever law you deem appropriate.  Okay.  September 21.

9          MR. CONLAN:  Thank you, Your Honor.

10          THE COURT:  Mr. Bienenseick, did you have something

11  you wanted to put on record?

12          MR. BIENENSEICK:  Thank you.  What I was troubled

13  with was the suggestion that the Court ever needs to get to

14  German law for the following reason.  The portion of the

15  indenture or the declaration of undertaking that my colleague

16  read a few moments ago, contemplates that there will be bank

17  debt and guarantees of bank debt.  It actually uses the word

18  guarantees.  It then says, if those guarantees are further

19  supported by mortgages or pledges, then there would be a

20  default under that declaration of undertaking.

21          Our point is, since guarantees were already

22  contemplated as being allowed, you never get to whether there's

23  a pledge, mortgage or anything else.  He's complaining about

24  the guarantees which the declaration of undertaking blesses and

25  contemplates in the first instance.

1          THE COURT:  I'm sorry, where is that?  It says will

2    at any time secure any indebtedness for money borrowed or any

3    guarantee or indemnity.

4          MR. BIENENSEICK:  That's it, that's it.  Secure any

5    indebtedness for money borrowed or any guarantee or indemnity.

6          THE COURT:  Right.

7          MR. BIENENSEICK:  So, you can have money borrowed and

8    you can have a guarantee or indemnity of money borrowed --

9          THE COURT:  You just can't secure it.

10          MR. BIENENSEICK: -- you -- exactly.

11          THE COURT:  Right.  And I think that is exactly the

12    point.

13          MR. BIENENSEICK:  No, but no, Your Honor.  He's

14    saying it was the guarantee that triggers his rights.  This

15    says, we assume you've given a guarantee of your bank debt.

16          THE COURT:  Unless -- I see what you're saying.  That

17    can give a guarantee you just can't pledge that guarantee as

18    further security for the payment of some other claim.

19          MR. BIENENSEICK:  Whatever a pledge is under German

20    law.  But, seriously, this contemplates that you'll have bank

21    debt and you'll guarantee the bank debt and you'll indemnity

22    the bank debt.  It only triggers rights on behalf of the

23    debenture holders if you then give a mortgage, pledge, security

24    interest or other lien for that guarantee.

25          THE COURT:  That definitely seems to be the correct

1  construction.

2         MR. BIENENSEICK:  You never get to the issues that he

3  was going to brief.

4         THE COURT:  I think you're correct.

5         MR. BIENENSEICK:  Thank you.

6         THE COURT:  Mr. Bodner, I think Mr. Bienenseick is

7  correct.  That the issue is not that the Debtor can't borrow

8  money, it's that the Debtor can't issue a pledge of a guarantee

9  in connection with that borrowed money.  I have been missing a

10  line because I've been concentrating on the subsection that you

11  have referred me to without really paying much attention to the

12  entire paragraph, which is a dangerous thing to do.

13         So, I don't see the need for a brief, because even if

14  a pledge is a contractual right or a guarantee would be a

15  pledge under German law, nonetheless, that guarantee has not

16  been pledged as security for performance under the bank debt.

17  So, I think Mr. Bienenseick is correct.

18         For those reasons, I retract the briefing, I'm simply

19  going to overrule the objections for the reasons I've stated on

20  this record.  Okay, Mr. Pernick?

21         MR. PERNICK:  Your Honor, that closes the Debtors

22  case and I believe all the objections, but we may just want to

23  confirm that on the record, that there's nobody else with an

24  objection.

25         THE COURT:  On the phone, please, if you could unmute

1  the phone line for a moment.  Does anyone have any further

2  objection to confirmation, other that those that have been

3  addressed on the record today?  Anyone?  All right, there's no

4  response, you can mute the phone line again.  Thank you.  Does

5  anyone in court have any objection to confirmation other than

6  those that have been addressed on the record today?  There is

7  no response.  There are no other objections.

8        MR. PERNICK:  Thank you, Your Honor.

9        MR. CONLAN:  Thank you, Your Honor.

10       MS. HOCH:  Linda Hoch.

11       THE COURT:  Ms. Hoch?  Yes, I've addressed your

12 objections.

13       MS. HOCH:  I know.  We just thought there might have

14 been a claim, we did not put it in in time against Anna Gress

15 and Hamilton Insulation.  And for the --

16       THE COURT:  Ma'am, ma'am, there hasn't been a claims

17 bar date.  You do not need to worry about filing those claims.

18 You will be filing them against the trust for your personal

19 injuries.  You will get appropriate notice and you can process

20 your claims against the trust for the personal injuries.  You

21 are not barred from doing that by virtue of not having filed

22 anything with this court.

23       MS. HOCK:  Okay.  We filed on Saturday, but due to

24 the time limits of getting lack of their time of getting the

25 papers in time, we did on Saturday send by Fed. Ex. a proof of

1 claim but I don't think it was able to be processed before you

2 seen it, Your Honor.  But, we did try.

3          THE COURT:  No, I would not be seeing it, Ms. Hoch.

4 If this plan is confirmed, the Court will not be involved in

5 that process any further.  It will be the trust that will take

6 effect and there are provisions in the trust for how you can

7 ascertain whether you agree with the trust documents and the

8 provisions of the trust or not and as I explained earlier, Mr.

9 Lockwood will provide you with some additional information as

10 to how the structure of that trust will work.

11          MS. HOCH:  Okay.  Well, thank you, Your Honor.  And

12 we kindly appreciate listening to us, thanks.

13          THE COURT:  All right, you're welcome.

14          MS. HOCH:  Good-bye.

15          THE COURT:  Okay, Mr. Pernick.

16          MR. PERNICK:  Your Honor, since the hopeful

17 confirmation of the plan marks the near end of Owens Corning

18 bankruptcy cases, I wonder if the Court might permit Mr. Kroll

19 just to say a couple of quick words, which he'd like to address

20 the Court.

21          THE COURT:  Yes, sure.

22          MR. KROLL:  Good afternoon, Your Honor.

23          THE COURT:  Mr. Kroll, good afternoon.

24          MR. KROLL:  Steve Kroll, general counsel for Owens

25 Corning, the Debtor.   Well, it's been a long road getting

1  here, Your Honor.  I just wanted to say a few remarks before
2  the hearing was completed today.

3         When Owens Corning filed for Chapter 11, six years
4  ago, we really set three goals for our restructuring.  First
5  and foremost was that any person who was harmed as a result of
6  being exposed to our product, we wanted to make sure that them
7  or their families were fairly compensated.  That was first and
8  foremost in our restructuring.

9         Secondly, as we worked our way through this process,
10 we wanted to make sure that all of our creditors were treated
11 fairly and equitably, and last, we wanted to make sure that
12 Owens Corning, when we merged from Chapter 11, we did so
13 financially strong and prepared to grow and succeed into the
14 future.  And, Your Honor, we're very proud of this plan.  We
15 think that, in fact, we're confident that it is establishes or
16 that it satisfies all three of those goals that we had set six
17 long years ago.

18        There is one group of folks who really refused to be
19 distracted by a lot of the challenges and issues that this case
20 presented and that was the employees of Owens Corning.  I mean
21 the employees of Owens Corning were focused on one thing, and
22 that was delivering quality products to our customers and
23 providing them with value and solutions.  And, frankly, that is
24 the value that was created that we're now able to distribute
25 with this plan.  And without our employees, frankly, there

1 would not be a plan.  So, I did not want this hearing to go

2 without the contributions they made being reflected on the

3 record today.

4        We also wanted to take this opportunity to thank our

5 customers and our suppliers who saw this whole process through

6 with us and supported us for the entire case.  We wanted to

7 thank the representatives of all the major creditor groups,

8 most of whom are here today, who worked very productively and

9 cooperatively in developing this sixth amended plan that was

10 overwhelmingly supported by all of our creditors.  We want to

11 thank you, Your Honor, for the way you've continued to march

12 this case forward through a lot of difficult times and

13 challenging issues and the way you resolved disputes in a very

14 fair and thoughtful way.  And we wanted to make sure we thanked

15 our outside advisers, our co-counsel, Saul Ewing and Sidley

16 Austin and our financial advisers Lazard.  It was really their

17 collective experience and wisdom that helped guide us through

18 this case.

19        So, just to conclude, Your Honor, Owens Corning is

20 very proud of the way that we represented the Debtor through

21 this case.  We're very, very anxious to be able to compensate

22 finally after a very long time our prepetition claimants and

23 creditors and we're very anxious to have the opportunity to

24 start building value for our new shareholders.  Thank you.

25        THE COURT:  That's very nice.  You know, I appreciate

1 the fact that you are recognizing the employees and the

2 customers and the suppliers because I think sometimes the fact

3 that they do stick with the Debtor is understated and six years

4 is a long time, but frankly, given what this case went through

5 in that six years, I'm very pleased with the fact that you're

6 coming out when you are, this year.  I, frankly, didn't expect

7 it for another two.  So, that's good news.

8          MR. KROLL:  Well, thank you, Your Honor.

9          MR. PERNICK:  Your Honor, with respect to the order

10 and the findings of fact and conclusions of law, we actually

11 have a red line from the version that was filed --

12          THE COURT:  Oh, good.

13          MR. PERNICK:  -- I believe Thursday night that you've

14 seen.

15          THE COURT:  All right.

16          MR. PERNICK:  There are a couple of additional

17 paragraphs that we want to add in.  One is the one that I

18 described to you before.  The second one deals with just, I

19 believe, a clarification on the bank holders claims and

20 treatment.  And, I think I have those -- the first one was the

21 one with respect to Mr. Gadsden, which I read.  And the second

22 one is in Section 6(b)(3)(c) on Page 47, and it basically

23 preserves the banks rights to dispute the final allowed amount

24 of the claims.  We don't anticipate that on fees and expenses

25 there will be an issue, but if there is, it preserves their

1 right to deal with that which is fine with us.

2         What I would propose is, we have actually given this

3 red line draft which I think incorporates all of the changes

4 dealing with the objections to the parties in the courtroom.  I

5 don't want to speak for them, I'm not sure if they've all

6 signed off on it yet, but they've all had some opportunity to

7 see that.  I think we would like to take a little bit of time

8 after court and ask anybody who is in court today if they have

9 any issues with that language to let us know before they leave

10 the court.

11         With respect to parties on the phone, if they would

12 send Mr. Conlan and I an e-mail letting us know they'd like to

13 see a copy of the order, we will go back to the hotel get that

14 right out to them and then once we get everybody's revisions

15 that we agree with, if we have a dispute we'll bring it to the

16 Court, but I don't anticipate that.  We will then send over to

17 the Court, we'll hand deliver a red line and a clean copy of

18 both documents in final form.

19         THE COURT:  All right.  I spoke with the district

20 court judge about whether he wanted to sit jointly for purposes

21 of this hearing and he assured me that he did not, however, he

22 will be addressing the findings, especially with respect to the

23 524(g) injunction which, of course, he has to do.

24         MR. PERNICK:  Right.

25         THE COURT:  So, what I would propose, Mr. Pernick,

1 because of the exhibits that have been introduced into

2 evidence, I think it would be appropriate for the district

3 court to have a complete set and maybe, I don't know how

4 difficult this is, I'm not sure that I don't have mish-mashed

5 sets as a result of the fact that I had a set here and a set at

6 home, maybe it would be better when you deliver the

7 confirmation order, to deliver a clean set of the documents --

8          MR. PERNICK:  Of the plan and exhibits?

9          THE COURT:  -- the plan and the exhibits and the

10 declarations that have been admitted and your briefs that are

11 admitted, so that -- oh, you have it here.

12          MR. PERNICK:  It's a little thick, Your Honor.

13          THE COURT:  How nice.  Okay.

14          MR. PERNICK:  What we'll do is, we will do that and

15 we will submit a clean copy because we also thought it would be

16 important, not only for the district court and Your Honor, but

17 for parties in the future, if anybody ever had a question about

18 what was confirmed, we actually made the plan an exhibit to the

19 order for that reason, with all the schedules and exhibits.

20          THE COURT:  Yes, okay.  Well, that would be very

21 helpful then.  I can just transmit that to the district court

22 with the proposed confirmation order and findings of fact.

23          MR. PERNICK:  We actually have those two documents

24 for Your Honor to consider and then we did a one page order

25 incorporating those for Judge Fulham to consider if that's

1  acceptable to Your Honor.  If Your Honor is not happy with

2  this, we can change it.

3          THE COURT:  A one page order that does what?

4          MR. PERNICK:  That basically confirms the plan and

5  the findings of fact and conclusions of law and the order that

6  Your Honor signed.

7          THE COURT:  Oh, you mean an order for the district

8  court judge to enter.

9          MR. PERNICK:  For the district court to consider.

10          THE COURT:  That's fine.  You can transmit whatever

11 you choose to Judge Fulham.  You know, I don't know whether he

12 will be creating his own order or attempting to use the draft

13 or whether he'll be doing some supplemental hearing.

14 Obviously, I can't speak for him, I don't know.

15          MR. PERNICK:  Would you like us to transmit those

16 documents once you sign or you would like to do it?

17          THE COURT:  No, I would prefer -- yes, to have the

18 court record transmitted to Judge Fulham as the court record,

19 so I would prefer that you send to me the complete set and then

20 I will transmit to him in ordinary course of business, the

21 documents that I've looked at.

22          To the extent that the proposed findings need to make

23 reference to a specific exhibit, please do, okay, and the

24 modifications because the district court gets a little unhappy

25 sometimes when there are proposed findings without a record

1 site.

2          MR. PERNICK:  Okay.

3          THE COURT:  So, it would be helpful in the order and

4 in the proposed findings to do a record site.

5          MR. PERNICK:  Okay, we will take care of that.  Your

6 Honor, I'd also just like to echo Mr. Kroll's comments from the

7 Debtors side and thank everybody who was a participant in this

8 process and just as well Your Honor, for all the patience and

9 you did drive this case.  We appreciate it and we appreciate

10 your efforts to get us here today.

11          THE COURT:  That was very nice of you, Mr. Pernick,

12 not to say that I drove the case crazy.

13          MR. PERNICK:  No, no, no.  I wasn't even thinking

14 that, Your Honor.  Wasn't even a thought in my mind.

15          THE COURT:  Well, thank you.

16          MR. PERNICK:  We do appreciate it.

17          THE COURT:  And I have to pay my own compliments, you

18 folks have been very cordial with each other despite some very

19 hot and contested litigation that's been going on and that

20 actually makes it much easier for the Court to deal with the

21 issues as opposed to the personalities.  So, I thank you all

22 for that.

23          MR. PERNICK:  You're welcome.

24          THE COURT: Anyone further?  Yes, sir.  Mr. Gray?

25          MR. GRAY:  Your Honor, just a very minor technical

1   point.  Two of the exhibits to the plan, Exhibits L and M,

2   contain the warrant forms, the forms of the warrant agreements

3   and warrants that will be distributed to Classes A-11 and

4   A-12A.  Just to make it clear on the record, and I believe the

5   Debtors are agreeable to do this, the warrant forms actually

6   haves Owens Corning, a Delaware corporation is the issuer.

7   Given the restructuring transactions that are now contemplated

8   by the plan, and a new holding company at the top of that

9   structure that will actually issue all of the securities

10  including the warrants under the plan, appropriate changes will

11  need to be made to those exhibits to reflect those

12  restructuring transactions.  Thank you.

13          THE COURT:  Mr. Pernick?

14          MR. PERNICK:  The answer is yes, Your Honor.

15          THE COURT:  Okay.  So, you're going to wait and send

16  me the completed corrected sets?

17          MR. PERNICK:  Let me just check that.  We will get

18  those changes with agreement between now and the effective

19  date, but it will not hold up the presentation of the order to

20  Your Honor.

21          THE COURT:  Mr. Gray.

22          MR. GRAY:  That's acceptable to us, Your Honor.

23          THE COURT:  I thought there was something in one of

24  the proposed confirmation orders or findings of fact, I don't

25  recall where, that indicated that the necessary document

1 changes would be done between now and the effective date.  I

2 don't know that it specifically applies to those exhibits, but

3 I think there is that paragraph.

4          MR. GRAY:  That is correct, Your Honor.  That

5 paragraph, I believe, is in the confirmation order.  I just

6 wanted to make sure on the record that that particular change

7 would be done.

8          THE COURT:  Okay.  And that's sufficient, that the

9 proposed order contains that language?

10          MR. GRAY:  Yes, Your Honor.

11          THE COURT:  All right, thank you.

12          MR. KRESS:  Your Honor, if I may, just one

13 housekeeping --

14          THE COURT:  Yes, sir.

15          MR. KRESS:  Andrew Kress from Kaye Scholer.  We had

16 filed together with the Asbestos Claimants Committee a motion

17 to authorize the Debtors to reimburse the Trustees in the

18 efforts that they will have to take between now and the

19 effective date to set up the trust and, in particular, this

20 case more so, because of the structure of the plan which is

21 very different than any of the other trusts that have come out.

22          A CNO to that motion was filed on September 13th,

23 which is Docket Number 19213 --

24          THE COURT:  19213?

25          MR. KRESS:  Yes, that is the CNO, Your Honor, the

1 motion itself is 18673.

2          THE COURT:  Okay.

3          MR. KRESS:  And I would just ask Your Honor's

4 indulgence if we can have that order signed as quickly as we

5 can since the trust has to get up and running, has to deliver

6 documents prior to the effective date, in connection with the

7 closing.

8          THE COURT:  Okay.  I will have it pulled later today

9 when I get back to court and take a look at it.  As far as I

10 recall, I didn't see the CNO for that, I did see the motion,

11 but I'm not --

12          MR. KRESS:  No, it's a pass through, Your Honor,

13 because whatever Owens Corning reimburses the trust for gets

14 deducted from the first payments.

15          THE COURT:  I understand, except some how or other I

16 -- now that I say that, I think I did see the CNO and had

17 instructed the order to be entered, but I'll take a look, Mr.

18 Kress.  I'm sorry, I just have lost track of that detail.

19          MR. KRESS:  That's okay, thank you, Your Honor.

20          THE COURT:  All right.

21          MR. PERNICK:  Your Honor, just the last item is, if

22 there are parties on the phone that would like to see the

23 order, I'd like to ask that they let us know that, maybe within

24 the next two hours, so that we can then get them a copy of the

25 order and try to have any language that they would like

1  discussed.

2          THE COURT:  Do you want me to unblock the line again

3  and you want to take a list?

4          MR. PERNICK:  Sure, if they want to tell us, that'd

5  be great.

6          THE COURT:  The court call operator, if you could

7  please unblock the line again.

8          MR. LOIZIDES:  This is Chris Loizides for Sanford C.

9  Bernstein & Co., LLC, it's another defendant in the Debtors

10  avoidance action.  I just wanted to confirm that, clarify that

11  I assume that none of these changes will affect the fact that

12  that avoidance action and all other avoidance actions will be

13  dismissed with prejudice upon confirmation, subject only to the

14  plan becoming effective.  If that's correct, then I don't think

15  I need to see the revised plan.

16          MR. PERNICK:  That is correct, and no changes have

17  been made since --

18          THE COURT:  On confirmation.  There are going to be

19  dismissed on confirmation not on the effective date.

20          MR. LOIZIDES:  That's right.  I just said they would

21  be dismissed on, is it consummation or confirmation?

22          THE COURT:  It would be unlikely to do it on

23  confirmation until the plan goes effective.

24          MR. PERNICK:  I think it's the effective date, but I

25  can check that.

1        MR. KRESS:  Your Honor, I believe the plan does

2   provide that the course of action --

3        MR. PERNICK:  Right.

4        THE COURT:  It's on the effective date, Mr. Loizides.

5        MR. LOIZIDES:  I thought it was on confirmation but

6   subject to a condition subsequent, that the plan go effective

7   which is --

8        MR. PERNICK:  No, it's the effective date, but the

9   answer to the question is, nothing in this order has changed

10  that treatment in the plan.  That stayed consistently the same.

11       MR. LOIZIDES:  Okay, thank you.

12       THE COURT:  Let me find my list again.  I'm going to

13  read through the list of the participants by phone.  As I call

14  your name, I'll pause so that you can indicate if you want to

15  have a copy of the documents that Mr. Pernick is going to

16  distribute with respect to the confirmation order.  If you

17  don't want them, you don't need to say anything, just say yes

18  if you do want them please.

19       Stuart Kovensky, Joseph Krigsfeld, Christine Daley,

20  Sharon Zieg, Donald Workman.

21       MR. WORKMAN:  Yes and I sent an e-mail to Mr. Pernick

22  and Mr. Conlan.

23       THE COURT:  Thank you.  Peg Brickley, Andy Chang,

24  Tracy Essig, Gordon Harriss, Naomi Decter, Lydia Chan, Jennifer

25  Lowney, John Christy, James Gibb.  I see Kate Stickles in the

1  courtroom.  Noel Burnham, Wei Wang, Stephen Vogel, Christine

2  Jagde.

3          MS. JAGDE:  Yes, please.

4          THE COURT:  Okay, thank you.  John Greene, Rebecca

5  Butcher, Janet Ohnemus.

6          MS. OHNEMUS:  Yes, please.

7          THE COURT:  All right, thank you.

8          MR. PERNICK:  Could we actually inquire how we can

9  get those documents --

10          THE COURT:  Do you have an e-mail, Ms. Ohnemus?

11          MS. OHNEMUS:  Yes, I do.  It's -- you want me to give

12  it now?

13          THE COURT:  Yes, please.

14          MS. OHNEMUS:  Okay, lower case, it's

15  johnemus99@hotmail.com.

16          THE COURT:  Mr. Pernick, you want to repeat it back?

17          MR. PERNICK:  Sure.  johnemus99@hotmail.com.

18          MS. OHNEMUS:  That's correct.

19          THE COURT:  Okay.  Those documents will be sent to

20  you via e-mail, Ms. Ohnemus.

21          MS. OHNEMUS:  Thank you.

22          THE COURT:  Selma Windorfer, Linda Hoch, Anne Myers.

23          MS. MYERS:  Yes, please.

24          THE COURT:  All right.  David Baldwin, John Shaffer,

25  Isaac Pachulski, William Sudell, Myron Manternach, Jennifer

1 Hoagland.

2        MS. HOAGLAND:  Yes, please.

3        THE COURT:  All right.  Marc Casarino, Joseph

4 Gibbons.

5        MR. GIBBONS:  Yes, Your Honor.

6        THE COURT:  All right, thank you.  Lisa Epps, Marti

7 Murray, Blake Huynh, Francis Monaco, Eitan Melamed, Sara Gooch,

8 Anna Engh, Katharine Mayer, Robert Gilbert, Douglas Gooding,

9 Alice Eaton, Teresa Currier, David Klauder.

10        MR. KLAUDER:  Yes, please.

11        THE COURT:  All right.  Daniel Chandra, Christopher

12 Loizides, Neal Shah, Hadley Van Vactor, Domenic Pacitti, Denise

13 Wildes, Christena Lambriankos.

14        MS. LAMBRIANKOS:  Yes, please.

15        THE COURT:  All right.  Is there anyone's name that I

16 did not call who wants a copy of the confirmation order and

17 proposed findings?

18        MR. FELSENTHAL:  Judge, this is Steve Felsenthal.

19 I'll send Mr. Pernick an e-mail, I would like to see it.

20        THE COURT:  Oh, thank you, Mr. Felsenthal.  I

21 apologize for missing your name.

22        MR. PERNICK: Your Honor, two that I don't believe, if

23 we could have their e-mail address, I think Jennifer Hoagland,

24 I'm not sure we have that and I want to make sure we do.

25        THE COURT:  Ms. Hoagland?

1          MS. HOAGLAND:  Thanks, I just -- excuse me, I'll just

2    send an e-mail.

3          MR. PERNICK:  Okay, perfect.  And, I apologize,

4    Christina -- I can't --

5          MS. LAMBRIANAKOS:  Lambrianakos.  I'll send Mr.

6    Conlan an e-mail right now.

7          MR. PERNICK:  Okay, thank you.

8          MS. LAMBRIANAKOS:  You're welcome.

9          MR. PERNICK:  And just to confirm what we will send

10   around, is a red line version of the findings of fact and

11   conclusions of law and the confirmation order, red line to the

12   Thursday night version that was filed.  So, it'll show all the

13   cumulative changes since Thursday night.

14         THE COURT:  All right.  Are there any housekeeping

15   matters to be addressed by anyone on the phone?  Okay.  You can

16   mute the phone line again then, thank you.  Mr. Pernick?

17         MR. PERNICK:  Your Honor, from the Debtors side we

18   have nothing further, and, again we thank you very much.

19         THE COURT:  Anyone else have any housekeeping matters

20   to address?  Well, congratulations.

21         MR. PERNICK:  Thank you, Your Honor.

22         THE COURT:  We're adjourned.

23         MR. PERNICK:  Thank you very much.

24

25                              *****

## CERTIFICATION

I, ELAINE HOWELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of my ability.

/s/ Elaine Howell              Date: September 25, 2006

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.