UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Case No. 00-03837 (JKF) |
| | ) | Chapter 11 |
| OWENS CORNING, et al., | ) | |
| | ) | Courtroom No. 2 |
| | ) | 824 Market Street |
| Debtors. | ) | Wilmington, Delaware 19801 |
| | ) | |
| | ) | |
| | ) | September 25, 2006 |
| | ) | 9:56 A.M. |

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Saul Ewing, LLP
                            By:  NORMAN L. PERNICK, ESQ.
                                 KATHLEEN MAKOWSKI, ESQ.
                            222 Delaware Avenue, Suite 1200
                            P.O. Box 1266
                            Wilmington, Delaware 19899

                            Sidley Austin LLP
                            By:  RICHARD COBB, ESQ.
                            1501 K Street, N.W.
                            Washington, D.C.


ECRO:                       Brandon McCarthy

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**TRANSCRIPTS PLUS**
**435 Riverview Circle, New Hope, Pennsylvania 18938**
e-mail courttranscripts@aol.com

**215-862-1115    (FAX) 215-862-6639**

Appearances:
(continued)


| For Official Committee of Asbestos Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>1201 Market Street, 15th Floor<br>Wilmington, Delaware 19801 |

For Designated           Monzack & Monaco
Official Committee of     By:  JOHN B. BERRINGER, ESQ.
                          1201 North Orange Street Suite 400
                          P.O. Box 2031
                          Wilmington, Delaware 19899-2031


For Ad Hoc Equity         Connolly Bove Lodge & Hutz, LLP
Committee:                By:  MARC PHILLIPS, ESQ.
                          1220 Market Street, 10th Floor
                          Post Office Box 2207
                          Wilmington, Delaware 19899


For The U.S. Trustee:     Office of the U.S. Trustee
                          By:  DAVID KLOUDER, ESQ.
                          844 King Street
                          Wilmington, Delaware 19899


For Future Reps:          Young Conaway  Stargatt & Taylor, LLP
                          By:  SHARON ZIEG, ESQ.
                          The Brandywine Building
                          1000 West Street, 17th Floor
                          Wilmington, Delaware 19899-0391


For Credit Suisse,        Landis Rath & Cobb LLP
Cayman/Bank Group:        By:  RICHARD COBB, ESQ.
                          919 Market Street, Suite 600
                          Wilmington, Delaware 19801


For Diana Torrejon,       DIANA TORREJON, Pro Se
et al:

**Appearances:**
**(continued)**

| | |
|---|---|
| **For Creditors'** | **Morris Nichols Arsht & Tunnell** |
| **Committee:** | **By:  WILLIAM H. SUDELL, JR., ESQ.** |
| | **1201 North Market Street** |
| | **P.O. Box 1347** |
| | **Wilmington, Delaware 19899-1347** |

4

1      **THE COURT:  Good morning.  This is the matter of**
2  **Owens Corning, 00-3837.**

3      **The participants I have listed by phone are Ken**
4  **Pasquale, Gordon Harriss, James McClammy, Isaac Pachulski, John**
5  **Shaffer, Howard Ressler, Frank Hill, Tracy Essig, Sara Gooch,**
6  **John Christy, James Gibb, Kate Stickles, Marti Murray, Stephen**
7  **Vogel, Michael Davis, Peter Jancsky, Peter Lockwood, Gary**
8  **Pakulski, Andrew Kress, David Wheeler, and Robert Williams.**

9      **I'll take entries in court.  Good morning.**

10     **MR. PERNICK:  Good morning, Your Honor.  Norman**
11  **Pernick on behalf of the debtors.**

12     **MR. NEAL:  Good morning, Your Honor.  Guy Neal,**
13  **Sidley Austin, on behalf of the debtors.**

14     **MS. MAKOWSKI:  Good morning, Your Honor.  Kathleen**
15  **Makowski from Saul Ewing on behalf of the debtors.**

16     **THE COURT:  Excuse me one second.**

17                    **(Pause)**

18     **THE COURT:  Okay.  Thank you.**

19     **MS. ZIEG:  Good morning, Your Honor.  Sharon Zieg of**
20  **Young Conaway Stargatt and Taylor on behalf of the Futures**
21  **Representative.**

22     **MR. COBB:  Good morning, Your Honor.  Richard Cobb,**
23  **Landis Rath and Cobb on behalf of Credit Suisse, Cayman Branch,**
24  **the Bank Group.**

25     **MR. SUDELL:  Good morning, Your Honor.  William**

1  Sudell of Morris, Nichols, Arsht and Tunnel for the Creditors'

2  Committee.

3          MR. MONACO:  Good morning, Your Honor.  Frank Monaco

4  for the designated members.

5          MR. HURFORD:  Good morning, Your Honor.  Mark Hurford

6  for the ACC.

7          THE COURT:  Mr. Pernick?

8          THE COURT:  Good morning, Your Honor.  Just to go

9  through and make sure our records are the same as to what's

10 been continued and where you entered orders.  I have continued

11 Number 2 in part, which is the forty-first omnibus objection

12 with respect to insurance claims.  That's continued to October

13 23.

14         CNOs or COCs were submitted in Number 4, in part,

15 which is the forty-fifth omnibus objection, and Number 11 with

16 respect to Continental Casualty, the proof of claim 9019

17 motion.

18         Resolved with orders to be submitted is Number 2 in

19 part, which, again, is the forty-first omnibus objection on

20 insurance claims.  You have entered orders in Number 1,

21 fortieth omnibus objection.

22         6, which is the futures representatives' motion for

23 reimbursement for Section 524(g) trust, expenses in advance for

24 the trust being set up.

25         Number 7, the Oregon State Motor Pool Settlement.

1          Number 8, the E&Y expanded retention.

2          Number 9 the Olive Branch, Mississippi Real Estate

3    sale.

4          And, Number 10, the sale of the Fort Lauderdale,

5    Florida asphalt facilities.

6          Withdrawn is Number 5, the omnibus motion for relief

7    from stay with respect to judgments on appeal.

8          That leaves us with Item Number 3 with respect to the

9    forty-second omnibus objection, the objection to Mr. Kager's,

10   claim, K-A-G-E-R.

11         Number 4, the forty-fifth omnibus objection with

12   respect to the claim of Robert L. Williams.  And I think I

13   heard Your Honor mention that he's on the phone.

14         Number 12 is a status conference.  And I apologize if

15   I mispronounce the name, with the Torrejon motion to intervene.

16         Number 13, the status conference on the Committee's

17   professionals.

18         And Number 14, the status conference on the

19   Kensington adversary action.

20         THE COURT:  I have instructed my staff with respect

21   to Item 11 to enter that order.  But I didn't see it until

22   Friday, and so I'm not sure that it has been done yet, Mr.

23   Pernick.  And I understood that 5 was withdrawn, too.  So --

24   and I believe other than that, I'm up to speed with everything

25   that you've put on record.

1          MR. PERNICK:  Thank you, Your Honor.  Your Honor,

2  unless the Court has any question, I's presume that we just go

3  forward with -- in the order, and so we'll start with Number 3,

4  which is the objection to the Kager claim.

5          THE COURT:  All right.

6          MR. PERNICK:  Followed by Number 4 with respect to

7  Mr. Williams, and Katie Makowski from my office is going to

8  handle that.

9          THE COURT:  Okay.

10          MS. MAKOWSKI:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MS. MAKOWSKI:  For the record, Kathleen Makowski from

13  Saul Ewing for the debtors.

14          Your Honor, we're going forward on the forty-second

15  omnibus objection with respect to Mr. Kager's claim.  I don't

16  believe Mr. Kager is either in the courtroom or on the

17  telephone, but we'd still like to proceed and I'd like to note

18  for the record some important elements of the claim on our

19  part.

20          THE COURT:  Is anybody -- is Mr. Kager or anybody

21  representing Mr. Kager either present, on the phone or in the

22  courtroom?

23              (No audible response heard)

24          THE COURT:  Okay.  There's no response.  Go ahead,

25  Ms. Makowski.

1          MS. MAKOWSKI:  Yes, Your Honor, for the record, the

2    forty-second omnibus objection addresses claims improperly

3    filed by current and former employees for amounts allegedly due

4    under either the debtors' 401K retirement plans or pension

5    plans.  Or like Mr. Kager's claim, under the debtors' worker

6    compensation programs.

7          Mr. Kager's claim, which is Claim 4735, is listed on

8    Exhibit B to the claims objection.  And as alleged by the

9    debtors, is an improperly filed worker's compensation claim

10   with a settled liability and an open medical portion.

11         Just to give the Court some background with respect

12   to Mr. Kager's claims -- the underlying claims:

13         Mr. Kager was initially injured on the job in 1979.

14   Over the next few years, the debtors' records indicate that he

15   filed approximately ten worker's compensation claims with the

16   State Board of Worker's Compensation.  Two of those claims were

17   ultimately successful.

18         And his current status with respect to the debtors

19   and with respect to his worker's compensation is permanent

20   partial disability.

21         To date, Your Honor, the company's records indicate

22   that Owens Corning settled and paid the indemnity or liability

23   portion of his claim in the amount of $74,865.

24         With respect to his open medical, Your Honor, he

25   continues to treat for those particular claims that are still

1  viable under the State Worker's Compensation Board.  And Owens

2  Corning is paying applicable expenses as they are submitted and

3  approved.

4       Owens Corning records reflect that the company has

5  paid to date Mr. Kager $138,488.35 on account of his open

6  medical.

7       Your Honor, the debtors have continued to administer

8  an intent to continue administering all worker's compensation

9  claims, including Mr. Kager's, in the ordinary course of

10 business and consistent with a very early order of the Court

11 with respect to employment -- employee related claims and

12 applicable State law.

13      Therefore, Your Honor, there is no prejudice to

14 expunging Mr. Kager's claim as his worker's compensation claim

15 will continue to be administered in the ordinary course of

16 business.

17      THE COURT:  Yeah, in fact, it appears that the claim

18 has to be expunged, otherwise there will be some double

19 treatment for this claim if it is not.  So, I agree and will

20 accept an order.

21      MS. MAKOWSKI:  Thank you, Your Honor.  I'll submit an

22 order under certification of counsel.

23      THE COURT:  All right.  Thank you.

24                    (Pause)

25      THE COURT:  Okay.  Do you want to go on to Item 4?

1        MS. MAKOWSKI:  Sure.  The next item, Your Honor, is

2   the debtors' forty-fifth omnibus objection to claims.  In this

3   particular instance, we are objecting and here today on the

4   claim of Robert L. Williams.  I believe Mr. Williams is on the

5   telephone.

6        MR. WILLIAMS:  That is correct.

7        MS. MAKOWSKI:  Mr. Williams, what I'd like to do is

8   tell the Court why we objected to your claim and then give you

9   an opportunity to talk to the Court about why you think it

10  shouldn't be expunged.  Is that -- is that okay?

11       MR. WILLIAMS:  That's fine.

12       MS. MAKOWSKI:  Great.  Your Honor, Mr. -- we -- the

13  debtors listed Mr. Williams' claim on Exhibit E of the

14  objection, which are those claims which are not supported by

15  the debtors' books and records.

16       We'd like to give Your Honor some background as to

17  Mr. Williams' claim.  Mr. Williams filed a claim in these cases

18  on or about March 19th, 2001 on account of alleged on-the-job

19  employment and sexual discrimination allegedly occurring from

20  1997 through approximately March, 2000.

21       On April 21st, 2000, Mr. Williams filed a complaint

22  with the State of California under that State's Fair Employment

23  and Housing Statute.  I believe a copy of that complaint was

24  attached to Mr. Williams' proof of claim.

25       The following year, on April 20th, 2001, the

1  California Department of Fair Employment and Housing issued a

2  notice of case closure to Mr. Williams citing no probable cause

3  to prove a violation of the Statute.

4          Your Honor, I don't believe that was attached to the

5  objection, nor was a copy attached to Mr. Williams declaration.

6  I have an additional for the Court, if Your Honor would like a

7  copy.

8          THE COURT:  All right.  Thank you.

9          MS. MAKOWSKI:  May I approach?

10          THE COURT:  Yes.

11                          (Pause)

12          THE COURT:  Thank you.  All right, I've been handed a

13  document that's called notice of case closure dated April 20,

14  2001, and addressed to Mr. Williams.

15          Go ahead.

16          MS. MAKOWSKI:  Your Honor, the notice -- if you -- it

17  goes on to state that Mr. Williams, at the bottom of the

18  notice, has the right to file a civil action in the State

19  Court, but that that action must be filed within one year from

20  the date of what that particular notice calls the right to sue,

21  which was issued to Mr. Williams by the Department of Fair

22  Housing and Employment (sic) on April 16th, 2001.

23          No action was filed, and the debtors were not served

24  with any State Court action with respect to Mr. Williams'

25  claim.

1          Over four years later, on December 2nd, 2005, Saul

2   Ewing sent Mr. Williams a letter inviting him, nevertheless, to

3   submit a settlement demand with respect to his proof of claim.

4          Your Honor, I have a copy of that letter if Your

5   Honor would like to see it.

6          THE COURT:  No, that's fine.

7          MS. MAKOWSKI:  Oh, actually, I'm sorry, Your Honor,

8   that -- a copy of that letter was attached to Mr. Williams'

9   declaration.

10          Paragraph 4 of the letter states that -- states the

11   reason for the letter, Your Honor, which is that the debtors

12   believed that a consensual resolution of the claim will

13   dispense with any need for Owens Corning to object to the

14   claim, and will save both parties the cost and delays of

15   litigation.

16          Mr. Williams responded to the letter on December 9th,

17   2005, offering to settle his claim for $100,000.  That, I do

18   have a copy of, Your Honor, if you'd like to see it.

19          THE COURT:  No, I -- I believe you.

20          MS. MAKOWSKI:  Okay.  The debtors did not respond to

21   his letter, but instead determined in their business judgment

22   to object to his claim based on the underlying status of his

23   claim, which their records indicate was that he had not filed a

24   State Court action.

25          Your Honor, the debtors would argue that whatever

1  claim Mr. Williams has against the debtors, to the extent that

2  a claim remains, should be brought under the applicable State

3  Statute.  Based on the information that we have and the debtors

4  have in their records and described above, the debtors have no

5  liability to Mr. Williams and that no liability is reflected in

6  their books and records.

7           THE COURT:  Okay.  Mr. Williams?

8           MR. WILLIAMS:  Yes, ma'am.

9           THE COURT:  Go ahead, sir.

10          MR. WILLIAMS:  Well, basically, what I'd like to say

11 -- and I'm not really articulate, but I'll do the best I can.

12 Owens Corning, everything that I wrote in my declaration, is

13 true.  That did happen to me.  I didn't make any of this up.  I

14 wasn't able to afford legal counsel on my own, so I went to

15 L.A. County and asked them for help.

16          What they told me was they spoke to nothing but Owens

17 Corning employees, which would be very biased on one side as I

18 never received the fair trial or a hearing that I should have

19 got.

20          And when I talked to the man that handled the case,

21 he said unless it was open and shut, basically that the County

22 of Los Angeles could not afford to proceed with it.

23          So, what I did was I hired a paralegal to help me.  I

24 paid to have a letter drawn up demanding $150,000 settlement.

25 The reason I came up with the $150,000, Your Honor, was because

1  that was the amount of wages I figured I would lose with my

2  personal, you know, personal injury type feeling on what

3  happened to me, I figured that was fair.

4          As far as them sending me a settlement demand, they

5  sent the settlement demand, they never responded to that.

6          When I sent them a notarized letter demanding the

7  $150,000, which is a legal document sent in a proper amount of

8  time, it was sent before the Statute of Limitations would have

9  been up.  There was no deception on my part, Your Honor, it was

10 the best I knew how to do with what I could afford to work

11 with, being unemployed at that time.

12         I did try to get legal counsel.  Unfortunately, in

13 the State of California, they don't have anything for a civil

14 matter.  They only handle battered women, that type of stuff,

15 in the legal -- the free legal help.

16         So, I did the best I could with what I had to work

17 with.  I did send them that $150,000 demand on a legal

18 document, which was notarized.  They received it.  They never

19 responded to that.

20         They sent me their settlement demand.  I asked for

21 100,000 because I figured they would want to dicker and go

22 down, you know, back and forth.  So, you know, maybe we could

23 come up with a reasonable agreement.

24         They never did that.  They never responded to my

25 first letter.  They didn't respond to their settlement demand,

1  which I responded to them, but they did not respond back.  They

2  also called me on the 21st of August of this year, that was

3  Katie Makowski that called me, said they would like to try and

4  settle it again.  They never contacted me again.

5          I didn't make any of this up.  Everything that I said

6  in my declaration is true.  It did happen to me.  Men don't

7  make this up against other men.  This is what happened to me.

8  And because I could not afford attorneys doesn't make it go

9  away.  It still affected me.  It still -- if you look at my --

10 in my record, it shows my work history.  I progressed all the

11 way up to that point when I lost my job due to what happened to

12 me by Owens Corning employees.  You could see my wages have

13 dropped.  I've lost $110,000 in wages.  I lost my wife.  I lost

14 everything I had.   And all I wanted was a fair settlement and

15 I never received any -- any -- any compensation for what

16 happened to me.

17          THE COURT:  All right.  It seems to me that perhaps

18 what you ought to do, having made a demand letter, is actually

19 have a conversation with this gentleman and see if there's some

20 resolution that you can come up with before I give you a final

21 ruling.  I think that might be appropriate.  Because apparently

22 there has not been any back and forth.  It may not be possible

23 to settle this case, especially since no civil suit was filed

24 within the time frame that's authorized in the notice of case

25 closure letter that was sent to Mr. Williams by the Department

1  of Fair Employment and Housing.  But I think one good effort to

2  actually talk might be appropriate.

3          So, Ms. Makowski, I'm going to direct that you get in

4  touch with Mr. Williams.  See if there is a resolution.  And if

5  not, then put this back on the October agenda.

6          MS. MAKOWSKI:  I will do that, Your Honor.

7          THE COURT:  All right.  Mr. Williams, I'm going to

8  continue this matter until October so that Ms. Makowski can

9  actually have a discussion with you and see whether or not this

10 can get settled.

11         If I can't, then I'll give you a ruling on the

12 debtors' objection to your proof of claim at the October

13 omnibus hearing.

14         MR. WILLIAMS:  Okay.

15         MS. MAKOWSKI:  Thank you, Your Honor.

16         THE COURT:  All right.  And Ms. Makowski will provide

17 you with the call in information and so forth when she

18 discusses this matter with you, Mr. Williams.

19         MR. WILLIAMS:  Okay.

20         THE COURT:  Okay.  Thank you.

21         MR. WILLIAMS:  Thank you.

22         THE COURT:  So, Item 4 is continued until the October

23 omnibus.

24         MS. MAKOWSKI:  Thank you, Your Honor.

25         THE COURT:  Thank you.

```
 1              MR. PERNICK:  Your Honor, that takes us to Item
 2   Number 12, which is the status conference on the Torrejon
 3   motion to intervene.
 4              THE COURT:  All right.
 5              MR. WHEELER:  Under David Wheeler on behalf of the
 6   respondents.  And I'm on conference call at this time, Your
 7   Honor, because Mr. Rice is with me.  He got disconnected from
 8   the court call.
 9              THE COURT:  Okay.  Is he back?
10              MR. WHEELER:  He's -- he's right here with me.
11              MR. RICE:  Yes, Your Honor.  Good morning.
12              THE COURT:  Good morning.
13              THE COURT:  Good morning.  All right.  I believe Ms.
14   Torrejon is present in the courtroom.  So, I'm going to --
15   since this is her motion to intervene, ask her to come to the
16   podium and briefly explain to me what her position is.
17              MS. TORREJON:  Good morning, Your Honor.
18              THE COURT:  Good morning.
19              MS. TORREJON:  I apologize for our delay.  I'm here
20   today to --
21              THE COURT:  Ms. Torrejon, for the benefit of the
22   Court Reporter, you need to state your name and spell it,
23   please.
24              MS. TORREJON:  Okay.  My name is Diana Torrejon, the
25   last name is T-O-R-R-E-J-O-N.
```

1          THE COURT:  All right.  Thank you.  Go ahead.

2          MS. TORREJON:  I'm here this morning, Your Honor, to

3  intervene on behalf of my father, myself and my four minor

4  children.

5          And -- and -- gosh, I'm a little bit nervous.  You'll

6  have to excuse me.

7          THE COURT:  It's actually -- you're talking about

8  your father's estate.

9          MS. TORREJON:  Yes.

10         THE COURT:  All right.

11         MS. TORREJON:  Well, both, Your Honor.

12         THE COURT:  Your father is not alive.

13         MS. TORREJON:  Yes, but on behalf of myself and my

14  other four children, as well.

15         THE COURT:  Yes, all right.

16         MS. TORREJON:  Because we were parties to the

17  original settlement agreement in 1992.

18         THE COURT:  I don't know what original settlement

19  agreement you were parties to.

20         MS. TORREJON:  In 1992 -- in February of 1992, when

21  they took the videotaped deposition of my father, Ron Motley,

22  in the law firm of Ness Motley Loadholt Richardson and Poole,

23  we entered into a settlement agreement.  My father's estate --

24  he was still alive at the time.  Was for a settlement

25  agreements only.  We were not going to go into any trial.  And

1  the defendants that were present, Exxon, Haliburton were some

2  of the ones that were named in the suit, along with a hundred

3  different product manufacturers.  Entered into a settlement

4  agreement that was finalized in Tyler, Texas a few days later.

5       They built a class action lawsuit around my father.

6  And where we did not opt out of any proceedings, we went ahead

7  and decided to wait the ten years when the insurance companies

8  and various others could pull out of the settlement agreement.

9       In the interim, the law firm of Motley Rice entered

10  into a second contract agreement with other family members in

11  January of 1996, commingling the two cases.

12       It's also my understanding in -- well, I asked on or

13  about August the 16th or 18th, Owens Corning or Saul Ewing, as

14  well as the Omni Corporation, to send me information concerning

15  any ballots or what was being done in these Bankruptcy Courts.

16  Because the problem is, Your Honor, they're spread through out

17  various districts throughout the United States, in New Jersey,

18  in Pittsburgh, in Pennsylvania, Louisiana, Arkansas, et cetera,

19  like that.  And it's been very difficult on my part because I

20  am pro se, I have no legal background, I'm not an attorney, my

21  field is medicine.

22       But I do know what the truth is.  I do know what

23  happened.  And I have substantive evidence to prove my claim of

24  conspiracy and fraud on the part of Ron Motley and Joseph Rice.

25       Secondly, they're operating under a fraudulent,

1  general power of attorney, that is not my name.  It's my name,

2  it's not my signature in all of these various different

3  Bankruptcy Courts throughout the United States.

4         THE COURT:  But they -- they said very clearly in

5  their papers that you retracted whatever power of attorney they

6  did have, and they have not represented you in any proceeding.

7  That's very clear in their papers, that you -- apparently you

8  did sign something, at least they think you did.  But then you

9  retracted your authority that had been conveyed to them.  So,

10 even if you didn't sign the original papers, and they thought

11 you had, you did retract that authority, and they know that,

12 and now they're not representing you, and haven't represented

13 you.

14        MS. TORREJON:  That was as of October, 2005.  At that

15 point, they were saying they didn't represent me.  That they

16 had never represented me.  That they entered into a contractor

17 representation, like I said, with other family members in

18 January of 1996.

19        THE COURT:  After your father died.

20        MS. TORREJON:  My father died in April the 22nd,

21 1994.

22        THE COURT:  All right.  And they got powers of

23 attorney from your mother, your father's wife --

24        MS. TORREJON:  Um-hum.

25        THE COURT:  -- after your father died, as the

1  executrix of his estate essentially.

2          MS. TORREJON:  They didn't enter into a contract

3  agreement until January of 1996, which I witnessed my mother

4  signing.

5          Prior to that date, all the way up and before my

6  father died, they settled settlements with him.  They settled

7  numerous settlements prior to his death.  And all the way up

8  until 1996, Your Honor, under what contractor representation?

9  They didn't enter into a contract agreement until January of

10  1996 with my mother.

11          THE COURT:  Well, okay.

12          MS. TORREJON:  And, yes, I did retract a power of

13  attorney.  I'm not saying -- I don't know what you're referring

14  to, first, Your Honor, what they retracted or anything, because

15  I have nothing that was served to me, what you're testifying or

16  what you're saying.

17          THE COURT:  They filed a pleading with this Court to

18  indicate in response to your motion to intervene, and that's

19  what I'm referring to.

20          MS. TORREJON:  Okay.  I never received it.  So, you

21  know, I'll look.  But I'm not denying that Motley Rice or the

22  law firm of Motley Rice or the law firm of Motley Rice has

23  numerous general power of attorneys, not only for myself, but

24  for my mother.

25          And I would also request that exhibits from the Owens

1  Corning would be released so you can see the dates and the

2  times and, et cetera, like that, of what, in fact, took place

3  in the time lines.

4          What I'm saying is they have numerous -- they

5  commingled the case, Your Honor, and they have numerous general

6  powers of attorneys that they use at will at various different

7  bars.

8          THE COURT:  I don't know what you mean by commingled

9  the case.  If they represented your father, and then represent

10  your mother as the executrix of your father's estate, they may

11  have claims against different entities for asbestos exposure to

12  different products, but that's -- I'm not sure what you mean by

13  commingling.

14          MS. TORREJON:  On -- on the original contract or

15  representation where we entered into settlement agreements and

16  finalized in Tyler, Texas in 1992, my father and I signed the

17  original contract agreement.  And the videotaped depositions in

18  February of 1992 that they took of my father, who identified

19  numerous product manufacturers.  At that first deposition

20  hearing, my father and I both signed contracts of

21  representation that left me sole principal or legal

22  representative after his demise.

23          THE COURT:  Well --

24          MS. TORREJON:  In 1996 --

25          THE COURT:  That's a State Court issue.  If there

1    isn't a State Court order that appoints someone under those

2    specific issues, then this Court doesn't do that.  And as far

3    as I can tell from this document, there is no State Court order

4    that appoints you as your father's representative.

5           MS. TORREJON:  No, I'm talking about the original

6    contract of representation.

7           THE COURT:  But it doesn't matter.  Your father was

8    alive at that time.  And he was apparently representing himself

9    because he entered into settlement agreements.

10          MS. TORREJON:  No, at that point, Ness Motley

11   Loadholt Richardson and Poole were his attorneys.  We entered

12   into contracts of representation and agreed to settlement terms

13   that he would not go to trial and that we would wait the ten-

14   year period of time.

15          According -- and I submitted some of the documents

16   that show that we never opted out of any of these contracts.

17          So, when they entered into a second contract of

18   representation for higher contingency fees, I think that's a

19   violation, from what I understand, of RICO Statutes.

20          THE COURT:  Well, I don't know about RICO, but if

21   you've got a State law claim against Ness Motley, you can file

22   it.

23          But this bankruptcy doesn't address claims against

24   attorneys.  It addresses claims against Owens Corning.

25          MS. TORREJON:  Okay.  We never filed in Arizona.  We

1  filed because there were questions of jurisdiction, which are

2  questions of jurisdiction that remain today, Your Honor.

3             THE COURT:  Over what?

4             MS. TORREJON:  Over who has jurisdiction.

5             THE COURT:  No, as to Owens Corning, I have

6  jurisdiction.  No one else.  There is no claim.  There is no

7  dispute.  I have that jurisdiction.

8             MS. TORREJON:  Okay.  Well, I question whether or not

9  the Supreme Court has jurisdiction to hear the merits of my

10 father's case.  I don't believe the Federal District Court nor

11 the Federal Bankruptcy Court have jurisdiction to hear claims

12 or to hear the merits of my father's case.

13            THE COURT:  The only -- the only place that there is

14 a vehicle right now for hearing the merits of any claim your

15 father has against Owens Corning is through this Bankruptcy

16 case.

17            The plan confirmation hearing in this case was last

18 week.  I am in the process of doing the findings of fact and

19 the conclusions of law that will support the confirmation order

20 now.  I hope to get that done this week, if not it will be the

21 beginning of next week.

22            Once that happens, there will be a trust that will

23 adjudicate personal injury actions.  You or your mother --

24 actually I believe it will be your mother, not you, but

25 regardless of who it is, whoever represents your father's

1    estate will have an opportunity to file a claim against that

2    trust.  And that's how it will be adjudicated.

3            MS. TORREJON:  And what I'm saying, Your Honor, is

4    that Owens Corning alone, these cases had been settled back in

5    1994.

6            THE COURT:  Well, if that's the case, then you'll

7    take the settlement documents --

8            MS. TORREJON:  To my mother.  To my mother.

9            THE COURT:  Okay.  Then you'll --

10           MS. TORREJON:  But she didn't enter into a contractor

11   representation until 1996, Your Honor.

12           THE COURT:  But I'm -- it's -- it doesn't make any

13   difference.  The claim is the claim.  Whether your mother had a

14   contract to process it, or whether no one had a contract to

15   process it on behalf of your father's estate.  The claim is the

16   claim.

17           If it was settled, then there will be one track by

18   which it will be adjudicated.  If it wasn't settled, it will

19   still get adjudicated through the trust.

20           So, whoever represents your father's estate is the

21   entity on behalf of your father that will be filing a claim.

22           MS. TORREJON:  And that's my reason to try to

23   intervene today, Your Honor, because not being named parties to

24   this suit, we have no standing in a Federal District Court, or

25   anywhere else, to appeal.

1          **THE COURT:  And -- but you have no powers of**

2   **appointment in the State Court that permit me to let you to**

3   **intervene because there is no power that I understand that**

4   **exists, letters of appointment by any State Court that says**

5   **you're the executrix of your father's estate.**

6          **MS. TORREJON:  And that's not what I'm -- what I'm**

7   **saying today, Your Honor.  I'm not claiming to be the executor**

8   **of his estate.**

9          **THE COURT:  Well, then you have no ability to**

10  **intervene on his behalf.**

11         **MS. TORREJON:  I am saying I am party to the original**

12  **contractor of agreement with Ness Motley Loadholt Richardson**

13  **and Poole.**

14         **THE COURT:  If you have an action against the**

15  **attorneys, that is a State Court action.  That has nothing to**

16  **do with this bankruptcy case.  This bankruptcy is looking at**

17  **claims against Owens Corning.  Your father may have a claim**

18  **against Owens Corning because he was -- he -- he may allege**

19  **that he was injured.  Because he is diseased, his estate may**

20  **have a cause of action, it may not.  It depends on a lot of**

21  **things.**

22         **But whoever is the appropriate representative of that**

23  **estate has the standing to pursue that claim against the trust.**

24  **I don't believe that person is you.  You do not have a State**

25  **Court order or procedure -- paper of any type that indicates**

1  that you represent your father's estate.  And so you are not

2  the proper party to --

3          MS. TORREJON:  Okay.

4          THE COURT:  -- to intervene here.

5          MS. TORREJON:  Because of the jurisdictional issues,

6  the case was -- the petition -- the original petition on my

7  father's behalf was filed in the Virgin Islands, not in any

8  State Court, not in any --

9          THE COURT:  Jurisdictional issues about what?  I'm --

10 I've lost --

11         MS. TORREJON:  Okay.  My father was not a United

12 States citizen.

13         THE COURT:  Okay.

14         MS. TORREJON:  He didn't obtain citizenship until

15 1951.  The numerous cases against Haliburton, Exxon and the

16 various different product manufacturers were prior to 1949

17 where various other insurance companies and, et cetera,

18 represented the settlement agreement.

19         The case that Joseph Rice and Ron Motley introduced

20 were cases after 1949, up until 1954, or something, when he no

21 longer sailed.  And -- and he got a citizenship in 1951.

22         What I'm asking about jurisdictional issues was the

23 cases prior to 1951 -- 1949, those cases, because there were

24 questions of jurisdiction, he was a merchant mariner, he was a

25 commander with the --

1          THE COURT:  Regardless, this is 2006.

2          MS. TORREJON:  Yes, and --

3          THE COURT:  that's 60 years ago.  What are -- what

4  claims --

5          MS. TORREJON:  Because of the jurisdictional issues.

6          THE COURT:  That has nothing to do with Statutes of

7  Limitations.  I'm not aware of any Statute of Limitations

8  that's going to get you 60 years later into a different court.

9  But if I'm in error, that doesn't make any difference.  The

10  reality is that this Court has jurisdiction over Owens Corning

11  claims.  And to the extent that there are any, for personal

12  injuries, you're going to have to file -- no, not you.  The

13  appropriate representative of your father's estate will have to

14  file those claims against this trust when the time is ripe.

15          MS. TORREJON:  Your Honor, I would ask you at this

16  point to stay any further motions until certiorari can be made

17  to the Supreme Court to --

18          THE COURT:  I'm not staying anything.

19          MS. TORREJON:  -- to question jurisdiction, to

20  determine jurisdiction.

21          THE COURT:  I have jurisdiction.  In fact, I'm

22  compelled to determine my own jurisdiction.

23          I am finding that it is this Bankruptcy Court that

24  has jurisdiction over the Owens Corning bankruptcy estate as an

25  arm of the District Court sitting in Delaware.  That I am in

1  the process of issuing a finding that will indicate that the

2  plan will be confirmed in short order.  I do not have that

3  order entered yet.  It will be docketed when it is entered.

4  But I had the hearing.  I indicated at that hearing I would be

5  entering findings of fact and conclusions of law to support

6  confirmation, and I will be doing so in the very near future.

7  Hopefully within a week, if not sooner than that.  And that is

8  my jurisdiction.  I have subject matter jurisdiction over all

9  claims that may be brought against this estate, and I am not

10  staying any proceedings in this case.  You are not the proper

11  party, as I understand it right now, to represent your father's

12  estate.

13          If you, in fact, get some power of appointment from

14  Arizona or wherever your father died, I believe the papers told

15  me that it was Arizona, then you will, at that point in time,

16  when you file a claim against the trust, prove that you are the

17  appropriate representative, and people will deal with you.

18          But until and unless you have that paper, you are not

19  the representative of your father's estate.

20          MS. TORREJON:  Okay.  And then on behalf of myself

21  and my four children.

22          THE COURT:  If you have claims that you can link to

23  asbestos injury, you may represent yourself.

24          MS. TORREJON:  Okay.

25          THE COURT:  You may not represent your minor

1    children.   You will have to get counsel for them, I believe.

2              MS. TORREJON:   They're adults today.

3              THE COURT:   Well, then they --

4              MS. TORREJON:   Two -- the two older ones are.

5              THE COURT:   Then they have to represent themselves or

6    get their own counsel.

7              MS. TORREJON:   And what I'm saying in the same

8    settlement agreement that we settled into in February of 1992,

9    because of the medical etiology of my father, and because of

10   medical knowledge known to both the insurance companies, as

11   well as Johns Manville and various different product

12   manufacturers, because of secondhand exposure to asbestos, we

13   settled into settlement agreement, as well, along with my

14   father because we were told at that time that we ran a high

15   risk of all of us dying from mesothelioma at a later date.

16             THE COURT:   Okay.   Well, if you -- if you were -- if

17   you have a settlement agreement, you have it.   Whatever claim

18   you and your children have against Owens Corning will be

19   handled in the fashion in which it's dealt with under the plan

20   when the confirmation order is addressed.   And you clearly are

21   able to represent yourself.

22             Your adult children are clearly able to represent

23   themselves without counsel.   But -- but no non-lawyer is going

24   to be able to act as legal counsel for another individual or

25   corporation.

1          So, -- and as to your father's estate, as I've

2     indicated, you're not the proper representative.  If you, at

3     some point, are made the proper representative, then you will

4     have that standing to pursue that claim, as well.

5          MS. TORREJON:  Okay.  So, we would move to intervene

6     as named plaintiffs for myself.

7          THE COURT:  You don't need to intervene.  All you

8     need to do is file your claim against the trust when the

9     confirmation order is entered that sets up the trust.

10         MS. TORREJON:  Your Honor, it's my understanding that

11    if we are not named plaintiffs, which we entered in settlement

12    agreements, we're not named plaintiffs in any court, that we

13    have no standing to appeal in any Federal District Court.

14         THE COURT:  You need to consult legal counsel.  I am

15    not permitted to give you legal advice.

16         All I can tell you is this:  If you have a claim

17    based on personal injury, you may file it against the trust at

18    the appropriate time and it will be addressed in the normal

19    course of business.  I'm not saying it's going to be allowed or

20    paid, I'm simply saying it will be looked at by the trustee's

21    of that trust in the appropriate time.

22         MS. TORREJON:  Okay.  Your Honor, I would also submit

23    to the Court that on August -- on or about August the 16th or

24    18th, I requested from Owens Corning and Saul Ewing that we

25    received ballots and the package of what was happening in the

1   Bankruptcy Courts.  I didn't receive them until on or about

2   September the 20th, one month later.   So, we were never able

3   to vote or be heard in any of those proceedings, as well.

4          THE COURT:  Well, frankly, at this point, ma'am, it's

5   irrelevant because the support for this plan was so

6   overwhelming that even if you voted the six claims that you

7   allege you can vote, that is your father's estate, yourself and

8   your four children, it would not make a difference one way or

9   the other to plan confirmation.   Because the votes were

10  overwhelming.   There were, what, 600,000 ballots submitted, in

11  essence, and over 90 percent of them were in favor of the plan.

12  So, six more ballots, even if they rejected the plan, would not

13  make a difference to the vote.

14         That does not mean that you can't file your claim

15  against the trust.  You still have that opportunity to do it.

16  But your -- your votes, even if they were against confirmation,

17  would not make a difference in that class now.

18         MS. TORREJON:  I understand that Joseph Rice and

19  Marcel and Bickford (phonetic), because there were a number of

20  attorneys that are involved in this conspiracy, filed, as of 30

21  days, 60 days ago, that they no longer represent me.

22         THE COURT:  Well, I don't know when this document was

23  filed.  There is a -- there was a response to your motion to

24  intervene filed by -- on behalf of Mr. Rice, indicating that a

25  certain attorney who once represented you no longer works for

1   his -- for the firm that he works for.  And to the extent that

2   you may have given a power of attorney to that firm, you have

3   withdrawn it, and that they had correspondence back to you

4   showing that they were not representing you based on the fact

5   that you had withdrawn your power of attorney.

6           Mr. Pernick?

7           MR. PERNICK:  Your Honor, just so you have it, it

8   actually was filed on September 21, and it's Docket Number

9   19315.

10          MS. TORREJON:  And -- and it -- based on information

11  and belief that I have, on July the 19th, 2006 is when Ron

12  Motley and Joseph Rice filed that they no longer represented

13  me.

14          THE COURT:  Well, I don't know, but it doesn't matter

15  because you're saying that you don't want them to represent

16  you.  They're saying they don't represent you.  So, they don't

17  represent you.

18          MS. TORREJON:  Yet they have a general power of

19  attorney with a fraudulent signature, not only in this Court,

20  but in numerous courts throughout the United States.

21          THE COURT:  I can't address any other court but this

22  one.  You filed an action here, and I have jurisdiction over

23  this matter.  They have filed a document with this Court

24  indicating that they do not represent you.  They have attached

25  to it copies of letters that they sent to you indicating that

1  they don't represent you.

2          In fact, one of the letters canceled a meeting that

3  you had tried to set up with them because of the fact that they

4  did not represent you, and that there was some confusion in my

5  mind, not necessarily in the documents, as to when the events

6  took place.

7          Nonetheless, it is clear you don't want them to

8  represent you, they don't represent you, they have agreed they

9  don't represent you, and that's the end of the matter.  There's

10 nothing more for me to adjudicate.

11         Is there anything else?

12         MS. TORREJON:  No.  Other than, you know, I would

13 request, once again, that you stay any further motions that

14 neither you nor the Federal District Courts have jurisdiction

15 to hear any merits further concerning my father.

16         THE COURT:  All right.  That's denied.  Mr. Rice, I'm

17 not sure, are you speaking or is someone speaking for you?

18         MR. RICE:  Your Honor, we are available to the Court.

19 We have nothing further to add to our pleadings, but

20 clarification.  I believe the 1992 action that Ms. Torrejon was

21 speaking about was the Fiberboard Class Action that was

22 ultimately rejected by the U.S. Supreme Court, and it related

23 to the Fiberboard claims.

24         THE COURT:  All right.  Well --

25         MR. RICE:  If you have questions, Your Honor, we have

1   nothing further to add to our pleadings.

2           THE COURT:  Okay.  The United States Supreme Court

3   set aside certain settlement agreements, and apparently this is

4   one of them.  So, if that is the case, there is no settlement.

5           But that does not mean that you don't still have a

6   claim that you can pursue against the trust, Ms. Torrejon.  So,

7   you -- you really should consult counsel.

8           MS. TORREJON:  Your Honor, I've attempted to get

9   counsel and have talked to over 20 different attorneys.  They

10  either have some indirect or direct relationship with Ron

11  Motley.  I have not been able to obtain counsel because of

12  that.

13          I've also been told that it's political suicide for

14  numerous attorneys to go up against Ron Motley or Joseph Rice.

15          THE COURT:  Well --

16          MS. TORREJON:  In Tucson, or anywhere else, I've had

17  very -- much difficulty in trying to obtain an attorney.

18          THE COURT:  Okay.  Well, this -- I -- as I indicated

19  earlier, this is not the forum in which to adjudicate some

20  claim that you think you have against Mr. Rice or Ness Motley.

21  This is the place to look at claims for asbestos injury that

22  may have been caused by Owens Corning, and that is to the

23  extent that you or your adult children or your father's estate

24  have those claims, this is the place to adjudicate them.  Any

25  other claims, I make no profession of jurisdiction over.  I do

1  not have it, and I will not assert it.

2       MS. TORREJON:  Okay.  The second thing that we would

3  like to request again is to be named plaintiffs -- or for me to

4  be a named plaintiff or a named party of interest.

5       THE COURT:  Well --

6       MS. TORREJON:  So I have standing to intervene in any

7  other orders, in any Federal District Courts.

8       THE COURT:  Again, I'm sorry, but I don't understand

9  what you're asking.  If you have a claim, you may file it.

10  There is no suit pending where you can be named as a plaintiff

11  in any action in this Court.  That's not how the bankruptcy

12  processes work.

13       If you have a claim, you will process it against the

14  trust that will be formed when the Court enters an order that

15  confirms the plan.  That's where your vehicle will go.  It will

16  be up to you to initiate that action.

17       MS. TORREJON:  But any appeals that are connected

18  with the Federal Bankruptcy Court or the Federal District

19  Courts, in order to appeal in the Federal District Court any of

20  your decisions, Your Honor, I need to be a party of interest or

21  a named party.

22       THE COURT:  You are a party in interest to the extent

23  that you're asking to intervene, and I am denying that motion

24  because it is unnecessary with respect to you.  You don't need

25  to intervene in the context of the bankruptcy case.  You have

1  party in interest standing -- creditor standing to the extent

2  that you allege that you have a claim against Owens Corning.

3         So, to that extent, you're an alleged creditor.  You

4  have standing.  You may appeal my order as you choose.

5         With respect to your father's estate, you are not the

6  appropriate representative.  You do not have standing because

7  you don't have any appointment papers that indicate that you

8  are the proper representative for your father's estate.

9         And as to adult children in your family, you cannot

10 represent them because you are not a lawyer.  They must

11 represent themselves.

12        Those are my rulings.  That gives you the standing

13 that you need to take any action that you choose with respect

14 to an appeal.

15        Anything else?

16        MS. TORREJON:  No, Your Honor.

17        THE COURT:  Okay.  Mr. Rice, anything?

18        MR. RICE:  No, Your Honor.  May I -- I'm here at --

19 under -- pursuant to your order.  May I be excused?

20        THE COURT:  Yes, sir.  Thank you.

21        MR. RICE:  Thank you, Your Honor.

22        THE COURT:  All right.  Thank you.  An order will be

23 entered.

24        Mr. Pernick, will you be able to draft an order for

25 me to that effect, please, so that I can enter it on the

1  docket?

2          MR. PERNICK:  Yes, Your Honor.

3          THE COURT:  All right.  Thank you.

4          MR. RICE:  Thank you, Your Honor.

5          MR. PERNICK:  Your Honor, Item Number 13 is the

6  monthly status conference with respect to the Committee's

7  professionals.  I know that the official representatives filed

8  a report, and that the banks filed one on August 15th.

9          THE COURT:  I did not see the bank's.  I did see the

10 Official Committee's, but I will take a look at the bank's.  I

11 don't need a status report.  And, frankly, I think at this

12 point in time, if all matters are going to be mooted as -- all

13 actions that are pending are going to be either dismissed or

14 mooted as a result of confirmation, I don't need any further

15 reports either.

16         MR. PERNICK:  That was my next question, Your Honor.

17 Thank you.

18         THE COURT:  Is that Item 12?  I'm sorry.

19         MR. PERNICK:  13.

20         THE COURT:  13.  Thank you.  One second, please.

21         MR. PERNICK:  Um-hum.

22                     (Pause)

23         THE COURT:  Okay.  Thank you.

24         MR. PERNICK:  Your Honor, Item Number 14 is a status

25 conference on the Kensington action, the adversary action.  And

1  if you'd like, let me give you a little bit of background on --

2  excuse me -- on what that action's about and where we stand.

3          In September of 2003, Kensington and Springfield, two

4  affiliates of Elliott Associates, filed a complaint in the

5  Supreme Court of the State of New York against certain Owens

6  Corning officers and directors.  They basically alleged in that

7  complaint that the officers and directors had breached their

8  fiduciary duty and committed fraud regarding their management

9  of the NSP.  That the defendants drew down allegedly money on

10  the credit line, about $600 million, for the purpose of putting

11  the money into the hands of the NSP plaintiff lawyers to

12  somehow curry favor because the defendants knew that we were

13  going to file bankruptcy back at that period.

14          We filed a motion to dismiss on the grounds that the

15  claims belonged to O.C., and they were basically derivative.

16  And that they could not sue the defendants because of the

17  exculpation clause in our certification of incorporation.

18          On October 6th of 2003, Owens Corning filed an

19  adversary action against the plaintiffs seeking to enjoin them

20  from continuing to prosecute the complaint.

21          And on January 6th of 2005, we entered into a consent

22  order which the Court signed enjoining the plaintiffs from

23  prosecuting the complaint, subject to certain exceptions.  One

24  of those was that the parties could file the -- different

25  defendants could be added if the plaintiffs wanted to, or

1  additional ones, and that the parties could file a motion to

2  dismiss and have that heard by the Court, but not action passed

3  that.

4        On August 22nd of 2006, the Supreme Court for the

5  State of New York actually dismissed the complaint and held

6  that basically that the claims were derivative.

7        We filed a notice -- a certification of counsel with

8  a copy of that opinion, I believe, last week.  I can get Your

9  Honor the docket number if you need it.  That consent order

10  that was entered back in January of 2005 said that the

11  injunction -- well, first of all, it required us to file a copy

12  of any opinion by the New York Court with the Court and have a

13  status conference on the next regularly scheduled omnibus

14  hearing --

15        THE COURT:  Right.

16        MR. PERNICK:  -- which is why we're here today.

17        THE COURT:  And I've read the opinion that you

18  submitted, thank you.

19        MR. PERNICK:  Thank you, Your Honor.

20        The injunction actually in the stipulated order by

21  the parties remains in full force and effect until the earlier

22  of the entry of a order confirming the plan or further order of

23  the Court.

24        We have not had an opportunity to discuss this with

25  the Kensington plaintiffs.  And given Your Honor's comments

1  about the confirmation order and its timing, I think what we'd

2  like to propose to the Court, and I think that counsel's on the

3  phone, I know Mr. Baldwin's in the court, is that we consult

4  with them.

5          I think we proposed that the injunction be

6  consensually extended until the effective date of the plan.

7  I'm not sure if they are in agreement with that or not, but

8  we'd like to consult with them, unless the Court has a

9  preference on how you'd like this handled.

10          THE COURT:  Is someone on the phone representing

11  Kensington?

12          MR. SHAFFER:  Yes, John Shaffer's here, Your Honor.

13          THE COURT:  Okay, Mr. Shaffer, go ahead.

14          MR. SHAFFER:  I think what Mr. Pernick has proposed

15  is fine.  We should have a conversation off-line and put this

16  off until the next hearing.

17          THE COURT:  Okay.  And keep the injunction in effect

18  until the next omnibus?

19          MR. SHAFFER:  Well, let me ask, Mr. Pernick, when is

20  the next omnibus?

21          THE COURT:  I think it's October 23rd.

22          MR. SHAFFER:  Uh, yes, that should be fine.  One of

23  the issues we had -- not to get into much detail in this call

24  is that our time to notice an appeal of the New York Supreme

25  Court's decision will run based upon when defense counsel

1  serves us with a notice of that -- the entry of that decision.

2  I don't believe that's occurred yet.  We think that's going to

3  be stayed, too, by the current injunction.  So long as Owens

4  Corning agrees that the stay applies, not only to actions we

5  would take, but also to action that their defense could would

6  take in terms of serving us with notice of entry of that

7  decision, which would otherwise start our appeal time, I think

8  that's fine.

9          THE COURT:  Mr. Pernick?

10          MR. PERNICK:  Your Honor, I just have not consulted

11  with the client.  I mean that sounds reasonable, but I need to

12  talk to them about it.  I'll be happy to do so right after the

13  hearing and then give Mr. Shaffer a call.

14          THE COURT:  All right.  So, why don't you folks just

15  give me an order that memorializes whatever agreement you have.

16  It seems to me that it would be -- best serve everyone to

17  continue the injunction until the next hearing.  But I agree

18  that the debtor should not take advantage of the fact that

19  Kensington is enjoined by serving the notice of appeal.  That

20  injunction should certainly encompass both sides at that time.

21          MR. PERNICK:  Understood, Your Honor.

22          THE COURT:  Okay.  I'll just expect to get an order

23  on a certificate of counsel from Mr. Pernick after he speaks

24  with you, Mr. Shaffer, to see what you can resolve -- how you

25  can resolve this.  And I'll continue the matter until the

1  October omnibus.

2        MR. SHAFFER:  Thank you, Your Honor.

3        THE COURT:  All right.  Thanks.

4        MR. PERNICK:  Your Honor, unless the Court has

5  anything further, we do not.

6        THE COURT:  Anyone have any housekeeping matters?

7              (No audible response heard)

8        THE COURT:  Okay.  We're adjourned.  Thank you.

9        MR. PERNICK:  Thank you, Your Honor.

10       MR. SHAFFER:  Thank you.

11           (Proceedings Adjourn at 10:44 A.M.)

12

13                C E R T I F I C A T I O N

14

15       I, Karen Hartmann, certify that the foregoing is a

16  correct transcript to the best of my ability, from the

17  electronic sound recording of the proceedings in the above-

18  entitled matter.

19

20   /s/  Karen Hartmann                Date:  September 29, 2006

21  TRANSCRIPTS PLUS

22

23

24

25