```
1   UNITED STATES BANKRUPTCY COURT
2   DISTRICT OF DELAWARE
3
4   In re:                          :
                                    :
5   ACANDS, INC.,                   :    Case No. 02-12687 (KG)
                                    :
6           Debtor.                 :
    _____:
7                                   :
    In re:                          :
8                                   :
    ARMSTRONG WORLD INDUSTRIES,     :
9   INC., et al.,                   :    Case No. 00-04471 (KG)
                                    :
10          Debtors.                :
    _____:
11                                  :
    In re:                          :
12                                  :
    COMBUSTION ENGINEERING, INC., :      Case No. 03-10495 (KG)
13                                  :
            Debtor.                 :
14  _____:
                                    :
15  In re:                          :
                                    :
16  THE FLINTKOTE COMPANY,          :    Case No. 04-11300 (KG)
    et al.,                         :
17          Debtors.                :
    _____:
18                                  :
    In re:                          :
19                                  :
    KAISER ALUMINUM CORPORATION,    :
20  et al.,                         :    Case No. 02-10429 (KG)
                                    :
21          Debtors.                :
    _____:
22  In re:                          :
                                    :
23  OWENS CORNING, et al.,          :    Case No. 00-03837 (KG)
                                    :
24          Debtors.                :
    _____:
25
```

Page 2

1    In re:                          :
                                     :
2    UNITED STATES MINERAL            :
     PRODUCTS COMPANY,                :      Case No. 01-02471 (KG)
3                                     :
              Debtor.                 :
4    _____:
                                     :
5    In re:                          :
                                     :
6    USG CORPORATION, et al.,         :      Case No. 01-02094 (KG)
                                     :
7              Debtors.              :
     _____:
8                                     :
     In re:                          :
9                                     :
     W.R. GRACE & CO., et al.,        :      Case No. 01-01139 (KG)
10                                    :
              Debtors.                :
11   _____:
12
13
                            United States Bankruptcy Court
14
                            824 North Market Street
15
                            Wilmington, Delaware
16
17                          October 14, 2016
18                          10:31 AM
19
20
21
     B E F O R E :
22
     HON KEVIN GROSS
23
     U.S. BANKRUPTCY JUDGE
24
25   ECR OPERATOR:   GINGER MACE

1   HEARING re Motion of Honeywell International Inc. for Access

2   to Rule 2019 Exhibits [Filed: 6/30/2016]

3

4   HEARING re Emergency Motion of the North American

5   Refractories Company Asbestos Personal Injury Settlement

6   Trust Advisory Committee to (1) Consolidate and Continue

7   Hearings and (2) Appoint Rule 2019 Expert and Referee

8   [Filed: 8/4/2016]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South and Sherri L. Breach

1    A P P E A R A N C E S :

2    POLSINELLI PC

3         Attorney for Honeywell International Inc.

4         222 Delaware Avenue, Suite 1101

5         Wilmington, DE 19801

6

7    BY:   JUSTIN K. EDELSON, ESQ.

8

9    MCDERMOTT WILL & EMERY LLP

10         Attorneys for Honeywell International Inc.

11         340 Madison Avenue

12         New York, NY 10173-1922

13

14   BY:   DARREN AZMAN, ESQ.

15         MEGAN M. PREUSKER, ESQ.

16

17   WHITE AND WILLIAMS LLP

18         Attorney for Ford

19         824 N. Market Street

20         Suite 902

21         Wilmington, DE 19899

22

23   BY:   CHRISTIAN J. SINGEWALD,ESQ.

24

25

```
 1   MCGUIRE WOODS

 2        Attorney for Ford

 3        Gateway Plaza

 4        800 East Canal Street

 5        Richmond, VA 23219-3916

 6

 7   BY:  K. ELIZABETH SIEG, ESQ.

 8

 9   A.M. SACCULLO LEGAL

10        Attorney for Narco TAC

11        27 Crimson King Drive

12        Bear, DE 19701

13

14   BY:  THOMAS KOVACH, ESQ.

15

16   CAPLIN & DRYSDALE

17        Attorneys for Narco TAC

18        One Thomas Circle, NW

19        Suite 1100

20        Washington, DC 20005-5802

21

22   BY:  KEVIN MACLAY, ESQ.

23        TODD PHILLIPS, ESQ.

24

25
```

1   SAUL EWING LLP

2        Attorneys for Reorganized Owens Corning

3        Centre Square West

4        1500 Market Street

5        38th Floor

6        Philadelphia, PA 19102-2186

7

8   BY:  ALAN H. ISENBERG, ESQ.

9        MARK MINUTI, ESQ.

10

11  YOUNG CONAWAY STARGATT & TAYLOR, LLP

12        Attorneys for Narco TAC

13        Rodney Square

14        1000 North King Street

15        Wilmington, DE 19801

16

17  BY:  SHARON M. ZIEG, ESQ.

18        EDWIN J.  HARRON, ESQ.

19

20

21

22

23

24

25

1   MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP

2        Attorney for Waters Kraus & Paul

3        1105 North Market Street

4        15th Floor

5        Wilmington, DE 19801

6

7   BY:  NATALIE D. RAMSEY, ESQ.

8

9   PACHULSKI STANG ZIEHL & JONES

10        Attorney for W.R. Grace

11        919 North Market Street

12        17th Floor

13        Wilmington, DE 19801

14

15   BY:  JAMES E. O'NEILL, ESQ.

16

17   RICHARDS LAYTON & FINGER

18        Attorney for Armstrong World Industries and Kaiser

19        Aluminum Corporation

20        One Rodney Square

21        920 North King Street

22        Wilmington, DE 19801

23

24   BY:  JASON M. MADRON, ESQ.

25

1   UNITED DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3         844 King Street

4         Suite 2207

5         Wilmington, DE 19801

6

7   BY:  JANE LEAMY, ESQ.

8

9   ALSO PRESENT TELEPHONICALLY:

10  KARL SCHIENEMAN

11  AMANDA SUZUKI

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2               THE CLERK:  Please rise.

3               THE COURT:  Good morning, everyone.  You may be

4     seated.  It's a pleasure to see you all for this important

5     argument.  And Mr. Edelson, good morning.

6               MR. EDELSON:  Good morning, Your Honor.  Justin

7     Edelson from Polsinelli for Honeywell.

8               THE COURT:  Yes.

9               MR. EDELSON:  We're here this morning on a

10    consolidated hearing on the nine asbestos cases --

11              THE COURT:  Right.

12              MR. EDELSON:  -- that have been assigned to Your

13    Honor.  There are two agenda items today.  It's Honeywell's

14    motion for access to the 2019 exhibits and the Narco TAC

15    motion to appoint an expert and referee.

16              I will cede the podium to Mr. Azman, from

17    McDermott Will & Emery, who will handle the argument from

18    Honeywell.

19              THE COURT:  All right.  Thank you.

20              MR. EDELSON:  Thank you, Your Honor.

21              THE COURT:  Should we have introductions?  Does

22    anyone want to make introductions first?  Let's do that

23    here, all right?

24              MR. AZMAN:  Your Honor, Darren Azman, McDermott

25    Will & Emery --

1        THE COURT:  Yes.

2        MR. AZMAN:  -- counsel to Honeywell.

3        THE COURT:  Good morning.

4        MR. AZMAN:  Also with me is my colleague, Megan

5   Preusker from Honeywell --

6        THE COURT:  Good morning.

7        MR. AZMAN:  -- or from McDermott.

8        MR. SINGEWALD:  Good morning, Your Honor, Chris

9   Singewald on behalf of Ford Motor Company.  With me is my

10  co-counsel, Elizabeth Sieg.  Elizabeth is with McGuire Woods

11  firm in Richmond, Virginia.

12       THE COURT:  Good to have you here.

13       MR. SINGEWALD:  Thank you.

14       THE COURT:  Thank you.

15       MR. KOVACH:  Good morning, Your Honor, Tom Kovach,

16  A.M. Saccullo Legal.  I'd like to introduce Kevin Maclay and

17  Todd Phillips from Caplin & Drysdale.

18       THE COURT:  Good morning.

19       MR. MACLAY:  Good morning, Your Honor.

20       THE COURT:  Mr. Minuti, good morning.

21       MR. MINUTI:  Good morning, Your Honor.  Mark

22  Minuti from Saul Ewing.  I'm here today for Owens Corning,

23  Your Honor.  I rise just to introduce my partner, Adam

24  Isenberg.

25       MR. ISENBERG:  Good morning, Your Honor.

1           THE COURT:  Mr. Isenberg, welcome.

2           Mr. Harron, good morning.

3           MR. HARRON:  Good morning to you, Judge Gross.

4   It's nice to see you.

5           THE COURT:  Good to see you.

6           MR. HARRON:  Thanks again for the accommodation of

7   moving today's hearing to today.

8           THE COURT:  Absolutely.

9           MR. HARRON:  I appreciate it so I could be here in

10  person.

11          THE COURT:  Good.

12          MR. HARRON:  For the record, Ed Harron from Young

13  Conaway for the Narco Future Claimants' Rep and the Flintco

14  Future Claimants' Rep.  And with me today is my colleague,

15  Sharon Zieg.

16          THE COURT:  Good morning.  Good morning, Ms. Zieg.

17          MR. HARRON:  Thank you, Your Honor.

18          MS. RAMSEY:  Good morning, Your Honor, Natalie

19  Ramsey, Montgomery McCracken Walker & Rhoads for Waters

20  Kraus & Paul.

21          THE COURT:  All right.  Thank you, Ms. Ramsey.

22          MR. O'NEILL:  Good morning, Your Honor.

23          THE COURT:  Mr. O'Neill, good morning.

24          MR. O'NEILL:  James O'Neill, Pachulski Stang Ziehl

25  & Jones appearing in the W.R. Grace case on behalf of the

1    reorganized debtors.

2            Your Honor, we filed a -- kind of a limited

3    response or objection --

4            THE COURT:  Yes.

5            MR. O'NEILL:  -- and we'll address that if it --

6    if we get to it.

7            THE COURT:  All right.

8            MR. O'NEILL:  Thank you.

9            THE COURT:  All right.  Thank you, Mr. O'Neill.

10            MR. MADRON:  Good morning, Your Honor.

11            THE COURT:  Good morning.

12            MR. MADRON:  For the record Jason Madron --

13            THE COURT:  Yes.

14            MR. MADRON:  -- of Richards Layton & Finger

15    appearing on behalf of Armstrong World Industries and Kaiser

16    Aluminum Corporation, also two of the reorganized debtors

17    with closed cases.

18            THE COURT:  All right.  Thank you.

19            MR. MADRON:  Thank you.

20            THE COURT:  Thank you, Mr. Madron.

21            Ready for you now.

22            MR. AZMAN:  Good morning again, Your Honor.

23    Darren Azman for the record, McDermott Will & Emery, counsel

24    to Honeywell.

25            Your Honor, when we last spoke about a month ago

```
 1    Your Honor expressed a preference for moving forward first

 2    with the access motions --

 3              THE COURT:  Yes.

 4              MR. AZMAN:  -- and then we turn to the referee

 5    motion.  Is that still the way in which Your Honor would

 6    like to proceed?

 7              THE COURT:  That is the way I'd like you --

 8              MR. AZMAN:  Okay.

 9              THE COURT:  -- I'd like to have the argument.

10    And, you know, I'm kind of new to these cases.  It would be

11    helpful to me if you gave me just a little bit of

12    background.

13              MR. AZMAN:  Sure.

14              THE COURT:  How we got to today.

15              MR. AZMAN:  That is the first part of what I

16    planned on presenting --

17              THE COURT:  All right.  Good.

18              MR. AZMAN:  -- to Your Honor.

19              THE COURT:  Good.

20              MR. AZMAN:  How we got here today.  So let's start

21    with the 2019 orders that were entered in these nine cases

22    as well as a number of other asbestos cases over the years.

23              The orders were entered around 2004 and 2005 for

24    the most part --

25              THE COURT:  Yes.
```

1          MR. AZMAN:  -- and certainly in these cases that's

2     when they were entered.  And what they asked parties to do

3     is it said all law firms who are representing personal

4     injury asbestos claimants in these nine cases need to file

5     statements pursuant to what was then Bankruptcy Rule 2019.

6     It's obviously changed over time.

7          THE COURT:  Right.

8          MR. AZMAN:  But what it was at the time.

9          And the statements were filed on the electronic

10    docket, the one or two pager, and the exhibit was filed off

11    of the electronic docket.  The exhibits contained

12    information such as the first and last name of the personal

13    injury asbestos claimant, social security number, disease,

14    in some cases the settlement amounts, and it varied between

15    the cases and also varied depending on which law firm filed

16    a statement, but that's generally what was included on the

17    2019 exhibits that were filed off of the docket.

18          THE COURT:  Okay.

19          MR. AZMAN:  Now notably there was never any

20    finding made that these should be filed under seal.  All

21    that was done at the time is that they put aside the issue

22    of whether it was appropriate to do it at the time or not

23    saving it for a later day, and that's pretty clear if you

24    look at a transcript from Judge Fitzgerald's comments as

25    well as later opinions that have looked at whether or not a

1    finding has ever actually been made.

2             Fast forward to 2013, Garlock Sealing

3    Technologies, a case that was filed in the Western District

4    of the North Carolina.  In 2013 Judge Hodges, the presiding

5    judge in that case, held an estimation hearing --

6             THE COURT:  Yes.

7             MR. AZMAN:  -- to determine the current and future

8    liability for mesothelioma claims.

9             On the one hand Garlock argued that the total

10   amount should be around 125 million and the asbestos bar and

11   other parties argued that it's more like a billion or 1.3

12   billion, something in that range.

13            Judge Hodges permitted significant discovery in

14   that case in advance of the estimation hearing, and

15   ultimately it resulted in what we believe was a ground-

16   breaking decision that sent ripples through the asbestos

17   community.

18            Just quoting one thing from that case Judge Hodges

19   found a startling pattern of misrepresentation by asbestos

20   claimants.

21            Your Honor, this wasn't shocking to Honeywell, it

22   wasn't shocking to Ford, it really wasn't shocking probably

23   to any asbestos defendants who are involved in the tort

24   system.  This is something that's been recognized for a long

25   time.  Congressional reports have recognized the fraud that

1    exists, reputable newspapers, other media outlets such as a

2    Wall Street Journal, have conducted their own investigations

3    and reported on it.  The unfortunate reality is that fraud

4    exists in the asbestos trust and asbestos tort systems.

5              Now as part of the significant discovery that was

6    permitted by Judge Hodges Garlock sought the 2019 exhibits

7    that were filed in these very nine cases.  Garlock, as they

8    saw it, that was just one piece of the puzzle for being able

9    to demonstrate to Judge Hodges why the number should be

10   closer to 125 million.

11             As Your Honor is well aware now Judge Fitzgerald

12   originally denied Garlock's motion seeking access to the

13   2019 exhibits, and I'm sure Your Honor is also now familiar

14   with Judge Stark's opinion --

15             THE COURT:  Yes.

16             MR. AZMAN:  -- that reversed just about every

17   finding in Judge Fitzgerald's decision.

18             Your Honor, the 2019 statements were an integral

19   part of Garlock's arguments and the ultimate finding by the

20   court, and that is that fraud exists.

21             Now let's fast forward about a year later to late

22   2014.  Honeywell and other parties, including Ford, sought

23   access to the 2019 exhibits that were filed in Garlock.  Not

24   the ones that were filed in this case or any of these nine

25   cases, the ones that were actually filed in Garlock.  We

1    were successful in doing that, and the order in that case

2    contained limitations that were designed to protect the

3    interest of asbestos claimants.  And now those are the same

4    exact protections that we've included in the proposed order

5    that we submitted to Your Honor in connection with our

6    access motions in these cases.

7            Your Honor, notably each and every law firm that

8    serves as a member of the Narco TAC received notice of what

9    we did in Garlock.  They received notice, they entered an

10   appearance, whether it was actual or constructive notice,

11   they knew what was going on.  And although we didn't look

12   into every single lawyer that's in this room today to see

13   whether or not they had entered notice of appearance in that

14   case or whether they law firm did, I think it's fair to

15   assume that most or all of them had again actual or

16   constructive notice of what was going on.

17           So I'd ask Your Honor to consider the following

18   question.  Why didn't a single lawyer in this courtroom at

19   that time object to what we were doing in Garlock, yet now

20   they're here today objecting to essentially what amounts to

21   the same exact relief?  Say for maybe different information,

22   but the same exact type of information.  Is it because they

23   didn't receive notice?  No, they received notice as I just

24   said.  Is it because the facts are any different in the

25   case?  No, in fact Judge Stark has already ruled on the

1    exact same facts, that these 2019 exhibits should be

2    available to the public.  Has the law changed?  Not to my

3    knowledge.

4             You know what did change, Your Honor, is that

5    Honeywell sued the Narco trust in the Western District of

6    Pennsylvania as Your Honor is now well aware.

7             THE COURT:  Yes.

8             MR. AZMAN:  And we alleged that they violated a

9    number of provisions of the Narco trust agreement and the

10   TDP.  And consistent with the recurring theme the Narco

11   trust constituents continued to find ways to impose costs on

12   Honeywell to deter or litigation efforts.  That is the only

13   logical inference that you can draw if you look at the facts

14   and how things have played out over the past few years.

15            Your Honor, Honeywell has a number of significant

16   and legitimate reasons for seeking access to these

17   documents, both in connection with the Narco trust and in

18   connection with what we refer to as the Bendix litigation,

19   which is completely separate and apart from the Narco trust

20   matters.

21            We -- the arguments that were raised by the Narco

22   TAC in their objection, these are all recycled arguments, as

23   I'm sure Your Honor has now seen if you look at any of the

24   briefing that was done in those cases, and they've all been

25   flatly rejected by Judge Stark.

1          Now I know that we submitted a 30-page reply --

2          THE COURT:  Yes.

3          MR. AZMAN:  -- and I apologize that it was so

4  long, but we felt it was important to go through each and

5  every argument that the Narco TAC and other parties made to

6  show you exactly where, how, and why those arguments were

7  rejected.  I'm not going to go through a recitation of those

8  arguments now, but there were a few things that I did want

9  to highlight for Your Honor.

10          Your Honor, the first is diverting.  Whether under

11  the common law as articulated by the third circuit in

12  Publiker (ph) or under Section 107 of the Bankruptcy Code

13  there is a presumptive or statutory right of access to these

14  2019 exhibits.  That is the default.

15          The TAC has the burden, and it's a significant

16  one, of demonstrating that an exception applies, and these

17  exceptions are to be applied sparingly.  Specificity and

18  articulated reasoning are essential.  Broad allegations of

19  harm such as the one that the TAC has made don't cut it.

20  Conclusory statements without any evidence whatsoever don't

21  cut it.

22          Second, Your Honor, let's take a look at the 107

23  exceptions.  The TAC argues that several of those exceptions

24  are applicable.  I want to put aside the legal deficiencies

25  for a moment.  I'm happy to address them later, because I

1   think that they were already well briefed in all the

2   pleadings.

3          I think the TAC's argument as a practical matter

4   or as a logical matter it's understood cut by the very fact

5   that the information we are now seeking is part of a

6   complaint that you would file in state or federal court,

7   that information is never filed under seal.  And the

8   character of that information doesn't change just because

9   it's now included in a 2019 exhibit.

10         So is counsel suggesting that asbestos plaintiffs

11  routinely subject themselves to identify theft or other

12  unlawful injury as would be required under the 107

13  exceptions in the tort system and then no one, including the

14  very same counsel that represents those parties in those

15  cases, has done anything about it?  That makes absolutely no

16  sense.

17         Finally, Your Honor, some courts have held that

18  Section 107 under the Bankruptcy Code actually trumps or

19  supersedes the common law that congress indicated its intent

20  to do so because it passed such a provision.  Under this

21  view only the specifically enumerated exceptions under

22  Section 107 are relevant.  Either an expectation applies or

23  it does not.  There's no weighing of the interests.

24         Your Honor, under either standard there has been

25  absolutely no evidence presented to the Court that would

1    justify keeping this information from the public.  Honeywell

2    and other members of the public, such as Ford, have

3    legitimate reasons for seeking access to these documents.

4    And consistent with Judge Stark's well-reasoned opinion and

5    the orders entered by other courts, including Garlock by

6    Judge Hodges, Porter Hayden in Maryland, this Court should

7    not allow the Narco TAC and other constituents to protect

8    their own selfish interests in keeping asbestos fraud in the

9    shadows.

10             Your Honor, that's all I have.  I'm happy to

11   answer any questions you have or --

12             THE COURT:  I have some.  I do have some here.

13             MR. AZMAN:  Sure.

14             THE COURT:  And does access depend on stating a

15   valid purpose?  In other words, I know that your argument is

16   there is a presumptive right to access, but do you have to

17   come in and say here's why we want access to these

18   documents?  You don't have to do that?

19             MR. AZMAN:  No, our view, Your Honor, let's take

20   it in two different steps.  You have the common law and then

21   you have Section 107.

22             THE COURT:  Right.

23             MR. AZMAN:  I'll start with that Section 107, then

24   I'll go to the common law.

25             Under Section 107 there are only specific

1    exceptions that apply and are either met or not.  And the

2    Narco TAC, the parties seeking to keep those documents from

3    the public's eyes has the burden of proving that.

4           So as the movant seeking access Honeywell does not

5    have the burden of demonstrating what it intends to use --

6    what purpose it intends to use the 2019 exhibits for or

7    anything else, and that routinely occurs in cases where, you

8    know, the Wall Street Journal or the New York Times is

9    seeking access, they don't disclose necessarily what they're

10   doing.  I mean the presumption is they're reporting on it,

11   but they might have other purposes for using that.  But no,

12   our position is absolutely not, we do not have any burden to

13   show the Court why we need to use these statements.

14          But I think it's helpful to have some context.

15          THE COURT:  Well it is because in -- in his

16   opinion Judge Stark was dealing with an estimation

17   proceeding.  That was the purpose --

18          MR. AZMAN:  Yes.

19          THE COURT:  -- for which those documents were

20   sought and I think that Judge Stark dealt with that purpose.

21   Did he not?

22          MR. AZMAN:  He addressed it, but he didn't -- that

23   wasn't the basis for his finding the way I read Judge

24   Stark's decision.  He happened to address it because all of

25   the parties were objecting that the reason was improper,

1    just as is happening here, and that's the same reason why we

2    included significant argument in response to what our

3    purposes ore, and we might have 50 other purposes for using

4    these statements.  It's not just a three or four or five,

5    you know, legislative efforts like you mention, those are

6    not the only purposes.  But it would be unreasonable to have

7    Honeywell come back to this court, especially if history is

8    any indication of the future with our dealings with the TAC

9    and other parties that are related to Narco, every single

10   time we have -- had a different use for them.

11          But I'd also note that Honeywell is a Fortune 500

12   company, this isn't some random company or person coming to

13   court asking for access to these exhibits.

14          THE COURT:  But in his opinion Judge Stark limited

15   the use of the 2019 exhibits.

16          MR. AZMAN:  He did, Your Honor, and if you look at

17   the transcript very carefully it's clear that nobody

18   objected to that.  That's the key right there, nobody

19   objected to that use at all, including Garlock itself.

20   Garlock was under significant time constraints to get those

21   2019 exhibits so that it could present its argument to the

22   court --

23          THE COURT:  Right.

24          MR. AZMAN:  -- in advance of the estimation

25   hearing, and it didn't really care.  It had no future use of

Page 24

1    the 2019 exhibits.  Contrasted with Honeywell we're an

2    ongoing company and we have significant uses for those 2019

3    exhibits.

4                THE COURT:  Okay.  The exhibits that you're

5    seeking --

6                MR. AZMAN:  Yes.

7                THE COURT:  -- access to, are they documents that

8    will in some way illustrate fraud?

9                MR. AZMAN:  We believe so, Your Honor, and I will

10   caveat --

11               THE COURT:  Tell me a little bit about them.

12               MR. AZMAN:  I will caveat --

13               THE COURT:  What do you think they have?

14               MR. AZMAN:  I will caveat that my saying again we

15   do not think that we need to demonstrate -- if you had to

16   demonstrate whether the purpose for which you seek to use a

17   public document that you're seeking access to, if you had to

18   do that every single time you'd be having a trial on the

19   merits of the cause of action essentially.  So I don't think

20   that we are required to demonstrate the likelihood of

21   success in that cause of action or even that we might have a

22   cause of action even if we only want to use these for

23   internal purposes of recordkeeping.

24               Our position is that we're entitled to access.

25   But I'm happy to elaborate on what the use might be.

1                    THE COURT:  Please.

2                    MR. AZMAN:  And I think the best example is the

3        one that we laid out in our reply.  The statement that was

4        submitted by the Waters and Kraus law firm, that's just one

5        example, there are many that are like it where the law firm

6        is attesting under penalties of perjury that the clients

7        that are attached to that exhibit have claims against that

8        debtor in bankruptcy and may have claims against a trust.

9                    Now is that definitive proof that we now have a

10       claim for something?  No, of course not, that's why we

11       haven't filed a lawsuit against anybody at this stage, we're

12       just seeking access to the documents, but that's one piece

13       of the puzzle just as Garlock saw it.

14                    And if you look at the exhibit that was attached

15       to our reply, there were several, one of them was a trial

16       exhibit --

17                    THE COURT:  Right.

18                    MR. AZMAN:  -- that Garlock submitted, which if

19       you read through even just a couple of those examples, which

20       are the 15 individuals over whom Garlock was permitted to

21       obtain discovery, it's pretty scathing in terms of the fraud

22       that was perpetrated in terms of who they asserted claims

23       against, but in tort against Garlock they never even

24       disclosed it.

25                    So that's exactly what we think we'll be able to

1    use it for, and certainly Garlock was successful.  Parties

2    were arguing that their liability was a billion dollars and

3    Judge Hodges found 125 million was really the closer number.

4              THE COURT:  Okay.  How about privacy concerns, the

5    privacy of those people who submitted the 2019 --

6              MR. AZMAN:  Absolutely.

7              THE COURT:  -- information?

8              MR. AZMAN:  Privacy is very important here.  We

9    acknowledge that.  But the constraints that we have placed

10   on the disclosure of these 2019 exhibits are the same exact

11   restraints that were placed on it by Judge Hodges and the

12   same exact restraints that were placed on it when we sought

13   access to the Garlock 2019 exhibits.  There's nothing more.

14   We are going to redact the five -- the first five digits of

15   social security numbers, the retention agreements which the

16   Narco TAC complains about.  We've never asked for them, Your

17   Honor, nobody has asked for them in the past so we're not

18   asking for them now.  We thought we'd make it easy.

19             Frankly, Your Honor, we're a little bit surprised

20   as to why this is so contention given there's so much law

21   that's already been decided in these cases specifically.

22             But no, we think we've adequately addressed any

23   privacy concerns, especially given, as I said before, that

24   this is the same type of information that a claimant -- an

25   asbestos claimant would need to put in a state or federal

1    court complaint.  It's information that was already

2    disclosed to some extent in a number of fashions.

3              For example, almost all of the estimation hearing

4    materials were unsealed by the Garlock court.  I'm not just

5    talking about the 2019 exhibits.  One of the examples we

6    gave, which is one of many, are the ballots that were

7    submitted in these cases.

8              THE COURT:  Right.

9              MR. AZMAN:  I think Armstrong is the only

10   exception, but just to be clear.  But in eight of these nine

11   cases the ballots were disclosed, and I know that the Narco

12   TAC makes the argument about well disclosure of information

13   in one form is a little bit different than allowing somebody

14   to create a telephone directory.  Well guess what, that's

15   already been done.  Look at the way that they list

16   everything on the ballots.  It's already there.

17             So it's hard for us on this side of the podium to

18   fathom why there's such a contentious debate over these, but

19   here we are and that's how -- that's our position in terms

20   of whether we need to explain what our use is for the 2019

21   exhibits.

22             THE COURT:  All right.  How do we remove

23   information that Honeywell is not seeking?  The social

24   security numbers, the retention agreements.  Who's going to

25   do that?

1              MR. AZMAN:  Well, Your Honor, Karl Schieneman I

2    believe is his name, was the special master who was

3    appointed when Garlock original sought access to the 2019

4    exhibits in these cases.  Karl and his team did what I

5    understand to be quite a good job.  It was a laborious job,

6    but they did it in redacting all of the social security

7    numbers and they certified that everything was done

8    according to the court's order, including redaction of the

9    retention agreements and anything else that we'd included.

10             Now, Mr. Schieneman did reach out to me yesterday

11   or the day before asking if he thought it made sense to

12   attend this hearing telephonically in case the Court had any

13   questions on that.  I don't know if Mr. Schieneman is on the

14   phone, but if Your Honor had any questions for him and he is

15   on the phone I'm sure he'd be happy to answer them in terms

16   of how the work was done and the fact that it exists in the

17   clerk's office of the Western --

18             MR. SCHIENEMAN:  Yes, Your Honor, this is Karl

19   Schieneman, I am on the phone and happy to answer any

20   questions you might have.

21             THE COURT:  Have you -- do you have a set of these

22   exhibits already redacted and with retention agreements

23   removed and the like?

24             MR. SCHIENEMAN:  We don't -- we didn't -- we were

25   under a strict confidentiality order when handling this

1    material, and we were ordered to destroy and return the

2    material that we had worked on.  You know, we submitted one

3    set to the Garlock claimants and then we sent one set back

4    to the court in the Western District of Pennsylvania

5    Bankruptcy Court to retain.

6            And, you know, the interesting thing that wasn't

7    discussed in this entire process we did is how we would tell

8    people what we did because we had a confidentiality order,

9    and I've talked to the Western District of Pennsylvania and

10   the court and they've agreed that I should be able to

11   explain what -- you know, what we did, how we accomplished

12   it, and how we protected the confidential nature of the

13   information.  That court was very happy with the process we

14   did and the efficiency and the economic end result and the

15   fact that the information was protected.

16           So I can explain what we did if you'd like, but

17   I --

18           THE COURT:  Yes.  Yeah, please do.

19           MR. SCHIENEMAN:  Okay.  So we had -- we were

20   supplied with hand copies of all the 2019 agreements and as

21   well as the retention agreements.  I think there was a total

22   of 1.3 million pages if memory serves me.  We used a tool --

23   a visual clustering tool that enabled us to group similar

24   types of documents together, and when we found a social

25   security imprint we were able to understand, even though the

1    scanned or partially scanned, because these are all records

2    that entire pile was (indiscernible) social security number

3    as that same file.

4           People have asked if we were able to do 1.3

5    million pages of redactions for what would have manually

6    taken an army of 89 people to do in the two months we had.

7    We did it with 11 review attorneys around the country.  They

8    placed the redactions, we had a QC process, we entered into

9    a claw back agreement with Garlock that if anything slipped

10   through it would be returned to us.  And in about six weeks

11   -- five, six weeks we completed the task.

12          I would not -- the reason I'm on this call was I

13   anticipated there might be questions, I figured it might

14   help short circuit the process if I made myself available.

15   I would not suggest because the work has already been done

16   that the work be redone.  But what we didn't get a chance to

17   do under the incredible time pressures we had was make sure

18   that the redaction was actually on every single document

19   (indiscernible).  We did some judge panel sampling

20   basically.

21          And I would suggest if were we to undertake this

22   effort again that we would just potentially review what had

23   already been produced and made sure, because no one has done

24   that, that scan is in place, and doing the clean up that was

25   necessary.  And that would be even less of an economic

```
 1    burden.

 2            I think the economics of that review, not my time

 3    as special master, but the time of the review is somewhere

 4    in the $60,000 range, instead of costing over a million

 5    dollars doing it the traditional way.  So it was very cost

 6    effective.

 7            THE COURT:  And -- but you would have to start

 8    from scratch here; is that correct?

 9            MR. SCHIENEMAN:  No.  What the court in the

10    western district has told me is they were comfortable --

11    they don't -- they didn't have the manpower to do this

12    before and it's not what they do, so they would be

13    comfortable turning over what we turned over, you know,

14    because we've kept it confidential in Garlock, what we did

15    then so that we could potentially check it and make sure

16    that the same confidentiality provisions that were in place

17    in Garlock or in place in this case, because they are

18    obviously very concerned about the fact that this

19    information was filed under seal, and I don't want to speak

20    for the court, but I have a strong sense they would like

21    that process to be followed again and they'd be comfortable

22    if it was followed again, you know, using the same process.

23            And so it was a work product we had already done

24    and potentially check it to make sure it -- the seals were

25    in place.  We -- you know, we would have the technology
```

1    available that we used before to do any clean up.

2              THE COURT:  All right.  And that would be -- now

3    in the Western District of Pennsylvania you were dealing

4    with how many cases?

5              MR. SCHIENEMAN:  Twelve -- 12 of these cases.

6              THE COURT:  And here it would be nine of these

7    cases?

8              MR. SCHIENEMAN:  How many cases are in it I'm not

9    familiar with --

10             THE COURT:  It's nine, yes.  It's nine.

11             MR. SCHIENEMAN:  Yes.

12             THE COURT:  Okay.  All right.  If you'll just

13   remain on the phone in case people have questions that would

14   be helpful, Mr. Schieneman.

15             MR. SCHIENEMAN:  Thank you, Your Honor.

16             THE COURT:  Thank you.

17             You want fairly broad use of these documents.

18             MR. AZMAN:  We do.  The same use that we got in

19   Garlock when we sought access.  The same use we got in --

20             THE COURT:  Well in Garlock you got the right to

21   use the documents --

22             MR. AZMAN:  For any --

23             THE COURT:  Oh, I'm sorry, out of --

24             MR. AZMAN:  When Honeywell and Ford and others got

25   the right to use --

1           THE COURT:  In North Carolina.

2           MR. AZMAN:  And again, everyone in this room had

3    -- I'll speak at least about the Narco TAC because of the

4    movants.  They had notice.  Why are they here now objecting

5    to the same relief?  It doesn't make any sense.  It's the

6    exact same order.  If there are any nuances we're happy to

7    conform them.  I'll represent that, but I believe that

8    they're exactly the same.

9           THE COURT:  Okay.  The order that you propose

10   provides any entity including Honeywell.

11          MR. AZMAN:  Yes, anyone in the public, that's

12   exactly what we got before.  It's not just Honeywell we're

13   talking about.  As the supreme court and other courts have

14   recognized the idea that papers in bankruptcy cases and in

15   other courts should be public it's a fundamental right.  It

16   fosters especially in mass tort cases.  It fosters the

17   truth, and that's what we're trying to get here.

18          Now we're not saying they have to set up a website

19   and make it available for all to see on Google, and

20   Honeywell certainly has no intention of doing that, but it's

21   publicly filed documents that should be available.

22          THE COURT:  Well I understand Honeywell is seeking

23   the documents and I understand Ford is seeking the

24   documents.  Why shouldn't the order be restricted to

25   Honeywell and Ford?

1            MR. AZMAN:  Your Honor, that's something we'd be

2    willing to consider.

3            THE COURT:  All right.

4            MR. AZMAN:  But let me be clear, when we say

5    Honeywell and Ford we work with many people.  We have third

6    parties that we need to provide them to, and that's not

7    something we're going to -- and Ford may not have -- Ford

8    may not be amenable to that.  But I don't think that there's

9    any reason why it should be restricted only to Honeywell and

10    Ford.

11            THE COURT:  Well doesn't Judge Stark in his

12    opinion make it clear that its parties who request access to

13    these documents?

14            MR. AZMAN:  I'm not sure that he absolutely says

15    that that's the way it works.  I think that if a document is

16    to be made public it's to be made public, it doesn't just

17    get -- you're still sealing the document.   But if you're

18    restricting access only to certain people such as Honeywell

19    and Ford there has to be a basis for that finding under 107,

20    one of the exceptions.  Like I said before, there's no

21    weighing of the interest and limiting the order.  If you can

22    find an exception that applies then maybe there's, you know,

23    some consensual arrangement that the parties would agree to.

24    But there's no exception that applies here.  It's either --

25    needs to be made available to public or not, and like I

1    said, there's no argument that any of the exceptions apply.

2              THE COURT:  All right.

3              MR. AZMAN:  So I don't think that you can just

4    limit it to just Honeywell and Ford if you're going to find

5    that none of the exceptions apply.

6              THE COURT:  And you want to use these documents in

7    lobbying efforts and the like.

8              MR. AZMAN:  That's one example, yes.

9              THE COURT:  All right.  Who should bear the cost

10   of Mr. Schieneman, for example?

11             MR. AZMAN:  Well that's something that we've

12   discussed.  Obviously Your Honor is aware that two of the

13   reorganized debtors have filed limited objections and that's

14   exactly what they've asked about.

15             THE COURT:  Right.

16             MR. AZMAN:  And it's our position, if you look at

17   107, it says that public documents shall be -- does anyone

18   have -- do you have a copy of that --

19             THE COURT:  It does say without cost.

20             MR. AZMAN:  Without cost, Your Honor.

21             THE COURT:  Yeah.

22             MR. AZMAN:  If these documents are public they're

23   public and they need to be made available without cost.

24   So --

25             THE COURT:  Well but there is cost involved here.

1    It's not because of the way the exhibits are --

2              MR. AZMAN:  Yes, but --

3              THE COURT:  -- arranged.

4              MR. AZMAN:  -- the reorganized debtors that are

5    here complaining today about the cost were involved in the

6    case ten years ago.  We were not.  That was their doing and

7    the court's doing and the parties' doing and that they

8    created this cost is not our problem.  We're seeking access

9    to these as publicly available documents.  If we're entitled

10   to access them then we're entitled to access them and we

11   shouldn't have to bear the cost.

12             THE COURT:  All right.  All right.  Those are my

13   questions for know.

14             MR. AZMAN:  Thank you, Your Honor.

15             THE COURT:  Thank you.

16             MS. SIEG:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MS. SIEG:  Beth Sieg at McGuire Woods for Ford

19   Motor Company.

20             THE COURT:  Yes.

21             MS. SIEG:  We are also seeking public access to

22   the 2019 exhibits that have been filed in these nine cases,

23   and I want to emphasize at the outset again that Rule 2019

24   is a disclosure rule.  The purpose of the rule is to provide

25   transparency about which creditors are participating in a

1    bankruptcy case.  Creditor identity is not a confidential

2    matter.  Every day, Your Honor, creditors are participating

3    in your courtroom saying what their names are and what their

4    claims are.  And Rule 2019 is a rule that's designed to

5    foster that kind of disclosure so that the public and

6    parties in interest can see who's participating in a

7    bankruptcy case.

8            Now, Your Honor, I would point to a case that we

9    cited in some of our papers, the Company Doe decision out of

10   the fourth circuit very recently, and that court held that

11   the public has an interest in knowing the identity of

12   litigants in cases.  That is part of the right of public

13   access is to know who's participating in federal courts and

14   state courts for that matter.

15           THE COURT:  But weren't these exhibits -- wasn't

16   access to some extent restricted to parties who requested

17   the access?

18           MS. SIEG:  Your Honor, I don't agree with that

19   interpretation of how it was set up.  You know, what the

20   district court decision said is this was a mechanism, a

21   protocol for handling the filing, here's how we're going to

22   receive these.  We will decide public access issues later.

23           THE COURT:  Okay.

24           MS. SIEG:  So I don't think that it was set up as

25   a determination that access should be restricted in some

1   way, held off the public docket, never disclosed to the

2   public, or if disclosed only disclosed to selective parties

3   with a prior restraint contrary to First Amendment on their

4   ability to dues and disseminate the information that they

5   received as part of that access.

6           So no, I don't think that that is an issue that

7   has been determined by the structure of these orders, and

8   there's certainly no binding precedent or rule that would

9   prohibit Your Honor from granting public access now that it

10  is fully before Your Honor to decide.

11          THE COURT:  And that's what the order provides,

12  any party, including Honeywell and Ford.

13          MS. SIEG:  Yes.

14          THE COURT:  So you would want that language to

15  remain as it is and not be restricted to Honeywell and Ford.

16          MS. SIEG:  That's correct, and for good reason,

17  Your Honor.  If the order were restricted to Honeywell and

18  Ford that would constitute a prior restraint on speech.  We

19  have cited to Your Honor all of the case law on that issue

20  and Ford's joinder that was filed on September 20.

21          Your Honor, if these are documents that the public

22  is entitled to access it would violate the First Amendment

23  to instruct Ford and Honeywell that only they get access.

24  That's effectively prohibiting our ability to use these

25  documents under our free speech rights under the First

1    Amendment.

2              Your Honor, I would point out again, as Mr. Azman

3    has said, the exceptions to 107 are construed narrowly --

4              THE COURT:  Yes.

5              MS. SIEG:  -- they require evidence to demonstrate

6    that they are applicable, and that has not been done here.

7    There is no risk of identity theft in the form of the order

8    that we have proposed, because it includes the usual

9    redactions that are required under Bankruptcy Rule 9037.

10             And I will note Mr. Azman went over this about the

11   inconsistency with the Narco TAC's position here and all of

12   the prior orders that have been entered in other courts on

13   these 2019 access issues, and I will represent to Your Honor

14   that I personally negotiated the Garlock 2019 access order

15   with Mr. Kevin Maclay, and that order was designed

16   specifically to allow broad public access to Rule 2019

17   statements and that's exactly what we're seeking here.

18             THE COURT:  And the order is virtually the same in

19   this case as was entered in Garlock?

20             MS. SIEG:  Yes, it is.  And I'll echo Mr. Azman

21   that if it isn't we're certainly willing to make whatever

22   changes are necessary to match it up to that order.  We

23   tried to make sure that we did that, you know, adjusting for

24   case captions and things.

25             Your Honor, I would like to emphasize in answering

1     one of the questions that you asked of Mr. Azman is our

2     purpose relevant?  No, it isn't, and we've cited case law to

3     that effect.  It's the (indiscernible) Capital case and the

4     Father M. case in all of the papers.  Congress has codified

5     what policies override the public access interest.  Those

6     appear in 107.  If one of those doesn't exist then congress

7     has said the public has a right of access at no cost.

8             THE COURT:  But didn't Judge Stark address purpose

9     in his opinion?

10            MS. SIEG:  The purpose that Garlock sought these

11    2019 statements for was --

12            THE COURT:  Yes.

13            MS. SIEG:  -- to find out who asserted claims in

14    these cases.

15            THE COURT:  Right.

16            MS. SIEG:  That was what Garlock wanted to do.

17            THE COURT:  And to be used in the estimation

18    proceeding and then to be destroyed -- the documents to be

19    destroyed.

20            MS. SIEG:  And, Your Honor, the key difference

21    between Garlock and Ford and Honeywell, Garlock was in a

22    Chapter 11 --

23            THE COURT:  Yes.

24            MS. SIEG:  -- knowing that it is seeking a

25    channeling injunction for all of its asbestos liability.

1   What other purpose would it ever possibly have?  So the fact

2   that Garlock would consent to prior restraints on its own

3   use isn't determinative of whether Ford and Honeywell should

4   be subject against their will to such prior restraints.

5   They're just in very different positions.  And really the

6   purpose for which we're seeking it is not relevant under

7   107, but it is a legitimate purpose.

8           As the Garlock estimation opinion revealed knowing

9   the identity of creditors who are asserting claims in

10  bankruptcy cases is important.  These Rule 2019 exhibits

11  will not in and of themselves demonstrate that fraud

12  occurred, but what it will demonstrate is who asserted

13  claims in these cases.  That's what they assert, that is

14  what Rule 2019 requires disclosure of.  And, Your Honor, we

15  think that there's really just not been a sufficient showing

16  to overcome the public right of access.

17          And again, I'll point Your Honor to the Company

18  Doe decision that every passing day that these documents

19  aren't made available to the public is a separate injury to

20  the public access rights.  So we urge Your Honor to act

21  swiftly and grant public access to these documents.

22          THE COURT:  How about privacy concerns and the

23  medical records?  This goes beyond the names and social

24  security numbers or the four digits of the social security

25  numbers, this goes to, for example, family history.

Page 42

1          MS. SIEG:  Your Honor, that I do not -- not having

2     seen the exhibits myself I can't gauge the accuracy of

3     whether they do include medical information.  I know that we

4     are not seeking any kind of medical documents.  I don't

5     believe that the Rule 2019 orders required submission of

6     such information.

7          To the extent it's in there we don't want it and

8     we agreed to that limitation in the Garlock estimation trial

9     record.

10         And as to the other privacy concerns, again,

11    there's a bankruptcy rule that describes how we protect

12    those interests, it's Rule 9037, and our proposed order

13    embodies those same protections.

14         And again, I'll point Your Honor to some of the

15    case law that we cited in both the Honeywell joinder and I

16    believe the Honeywell reply which shows, you know, if you

17    are an objector who's proposing secrecy you have to come

18    forward with specific evidence to show that there is a risk

19    of identity theft, and that takes a vulnerable account and a

20    -- and identity thief, and you have to do that with

21    evidence.  There's no evidence that there is an undue risk

22    of identity theft just by allowing the public to know the

23    names of creditors in these bankruptcy cases.

24         So to the extent that this information does

25    include things like medical histories, we certainly don't

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

1    want those and I don't believe that they should have been

2    submitted in the first place.

3                Now, I will make one caveat.  I believe that the

4    2019 orders do require that the creditor specify which

5    asbestos related disease they have.

6                THE COURT:  Yes.

7                MS. SIEG:  That's not confidential, that's the

8    same kind of thing that you would put in a public complaint

9    filed in the tort system.  So we would not agree to -- that

10   the disease type should be redacted, but any kind of medical

11   history we're not interested in that.

12               THE COURT:  All right.  All right.  Thank you.

13               MS. SIEG:  Thank you, Your Honor.

14               THE COURT:  Thank you.

15               MR. MACLAY:  Good morning, Your Honor.

16               THE COURT:  Good morning, sir.  How are you?

17               MR. MACLAY:  I'm doing Well.  I'm Kevin Maclay,

18   we're representing --

19               THE COURT:  Yes.

20               MR. MACLAY:  -- the Narco TAC this morning.

21               THE COURT:  Yes.

22               MR. MACLAY:  Your Honor, as was noted earlier

23   today the Narco TAC did not file a surreply deciding to save

24   its fire, so to speak, for today's hearing.  But because of

25   that I will be going beyond some of the comments made here

1     today to address some of the comments made in the reply

2     brief, which the Narco TAC believe to be inaccurate.

3              But a couple of quick background facts.  As Your

4     Honor knows I'm here representing the Narco TAC.

5              THE COURT:  Right.

6              MR. MACLAY:  The Narco TAC is charged with

7     representing the interest of the asbestos victims in a

8     fiduciary capacity that have Narco trust claims and so

9     that's obviously the capacity which I'm here today.

10              You have heard, Your Honor, that many of the

11     arguments here kind of relate to wanting to take what the

12     movants like about Judge Stark's decision and disregarding

13     what they don't like about it, and I think it's very

14     important to take a step back and realize what his decision

15     did not permit Garlock to do.

16              It did not permit Garlock to use this information

17     in any way against the individuals whose information was

18     being provided.  It could only be used in the aggregate in

19     Garlock's estimation trial.  Garlock could not have used

20     this in lawsuits against individuals.  It could not have

21     used it in lobbying efforts naming the individuals.  It

22     could not use it in lobbying efforts whatsoever.  Those uses

23     were precluded by Judge Stark.

24              THE COURT:  But the -- but Honeywell and Ford

25     argue that Garlock was under some kind of time constraint

and perhaps didn't urge Judge Stark beyond where he went.

MR. MACLAY: Well if you look at Judge Stark's decision, Your Honor, he himself noted that they had multiple purposes. In his decision he noted first of all they had the purpose, as we've discussed here today, in using them in the estimation proceeding. He also noted that they wanted to use them in a potential RICO action. And he also noted they wanted to use them in lobbying efforts. Those were both perfectly capable of being pursued during Garlock's bankruptcy. And of course there's no one that can say here that Garlock would definitely have emerged from bankruptcy. It could have had to dismiss the bankruptcy. And so the option of tort actions always existed for Garlock, Your Honor.

But yet Judge Stark said, no, you can't use it for any of that stuff. And Garlock never agreed to any of those particular restrictions. Garlock made a general comment oral argument that they would be open to tailoring to some restrictions, and then Judge Stark imposed the restrictions that he thought were necessary and appropriate under the law and under the facts.

And so for anyone to tell Your Honor that Garlock agreed to not use it in a tort action, that Garlock agreed to not use it in lobbying efforts it's just not supported by the record and it certainly -- Judge Stark's decision was

1    not contingent upon any sort of agreement.  You can just

2    read the decision.  That's the decision, it speaks for

3    itself.  No contingency on Garlock's agreement.

4           With respect to -- so that's kind of a fundamental

5    point here, Your Honor.  Given that Judge Stark's view of

6    the privacy interests here was that those privacy interests

7    to be protected adequately had to preclude the use by

8    Garlock of individual attacks on these individual elderly

9    and sick victims of asbestos, many of whom are no longer

10   represented.

11          Your Honor, to be consistent with that ruling, if

12   it were to enter any sort of order providing any sort of

13   use, should preclude that kind of use, and that's something

14   that neither of the movants here today is frankly

15   acknowledging to Your Honor, what Stark's restrictions

16   actually were and what they would mean if applied here.

17   Your Honor, I think most likely what they would mean is that

18   they shouldn't get them at all, because their express

19   purposes are things that Judge Stark did not permit.

20          And with respect to whether or not they need a

21   purpose, Your Honor, we've addressed this in our briefing,

22   I'll touch on it a little bit later, but I would just like

23   to mention something that apparently the other side has

24   forgotten from the transcript of Judge Stark's decision in

25   addition to as Your Honor pointed out the fact that he in

1    fact analyzed Garlock's purpose in his decision.

2              On page 29 of the transcript of that oral

3    argument, Your Honor, Judge Stark asked the following

4    question.  "But in this case you have an order that was

5    approved by the third circuit and not appealed by you and

6    not an issue in this appeal."

7              THE COURT:  Right.

8              MR. MACLAY:  It says you need to file a motion in

9    order to get access.  "So given that don't I have to access

10   your motion and the purposes for which you are seeking

11   access?"  That question I think underlies the court's

12   conclusion, Your Honor, that Garlock couldn't use it for its

13   other expressed purposes, and their argument that Garlock

14   was under time pressure is frankly neither here nor there.

15             With respect to this --

16             THE COURT:  And those were prior decisions even of

17   the third circuit which --

18             MR. MACLAY:  That's correct, Your Honor.

19             THE COURT:  -- which affirmed Judge Fitzgerald's

20   rulings.

21             MR. MACLAY:  It confirmed the process.

22             THE COURT:  Yeah.

23             MR. MACLAY:  Absolutely.  And that process remains

24   in effect and it was also subsequently addressed by the

25   Kaiser district court and then subsequently addressed by

1    Judge Stark himself.

2            So at this point, Your Honor, I don't think it

3    really should even be open to them to argue with any degree

4    of credibility that Your Honor should just open them up to

5    public view from any sort of restriction.  We have a

6    process, it's been approved multiple times, it should be

7    followed, it requires a motion, and undercuts the theory of

8    their access in the first place, which is why they

9    ultimately shouldn't be given access at all.

10           You heard frankly a lot of irrelevant arguments

11   about another case and how fraud was allegedly shown in that

12   case.  I'm not going to get into that too much, Your Honor,

13   it's really neither here nor there either, but I will just

14   note just to clarify a couple points they said.

15           The GAO had looked -- has looked into the

16   allegations of fraud in the trust system and the GAO

17   concluded there was no fraud, the non-partisan GAO.  The

18   house minority report very recently who also concluded

19   unanimously there was no fraud then.

20           And that's all I'm going to say about it just to

21   note this background that these Fortune 500 companies would

22   like Your Honor to buy into is certainly at a minimum open

23   to reasonable dispute and should not be the basis for any

24   decision by Your Honor.

25           You heard that in another case there were -- there

1  was a consent order entered that provided broader access

2  than what the Narco TAC is arguing should be restricted to

3  here today.  And as we put it in our brief, Your Honor,

4  first of all as a fundamental legal matter those consent

5  orders are irrelevant.  The law is clear that consent orders

6  have no presidential event.  So that's the primary argument

7  right there, Your Honor, it doesn't matter.

8          When they try to get Your Honor to rely on a

9  consent order in another case with different parties doing

10  different things they're asking Your Honor to draw a legally

11  insupportable conclusion.

12          And secondly, Your Honor, obviously in the Garlock

13  case there are a lot of other things going on.  I cannot

14  represent to Your Honor the Narco TAC had any knowledge of

15  what was going on in the Garlock case much less about these

16  2019s.  And for them to suggest to the contrary is just

17  again unsupported.

18          To the extent Your Honor feels that there are any

19  factual issues that need to be developed with respect to the

20  2019 proceedings obviously we'd have to have further

21  proceedings to look into those facts.

22          I know we had an unexpected witness here today

23  with Mr. Schieneman, and if there anything -- if there are

24  any other issues like this that Your Honor feels need

25  clarification we would need to explore them.  And there are

1   a couple of other issues that I think we would need further

2   proceedings about, that I'll get to a little bit later on.

3           So you have heard today, Your Honor, you have

4   heard Honeywell acknowledge who wants to use these 2019s in

5   tort litigation what they term the Bendix litigation.  Well

6   that's exactly what Judge Stark didn't permit, Your Honor.

7           THE COURT:  I don't know much about the Bendix

8   litigation other --

9           MR. MACLAY:  I know it's tort actions against

10  individuals, Your Honor.

11          THE COURT:  Okay.

12          MR. MACLAY:  And that's the key.  Because Judge

13  Stark restricted this information for use in a bankruptcy

14  estimation to be used in the aggregate.  No individuals

15  could be sued, no individuals could have their information

16  published.  Their names couldn't even be published.

17          So when you hear the movants tell you that this

18  information isn't really confidential, names and social

19  security numbers or portions of them don't need to be

20  protected by you, that's certainly in direct contravention

21  of Judge Stark's own ruling.  And so just keep that in mind,

22  when they make that argument what they're really saying

23  surreptitiously is don't do what Judge Stark did even though

24  on the face that they raise they say follow what Judge Stark

25  did.

Page 51

1           If you follow what Judge Stark did you will not

2    allow this information to be used against these individual

3    elderly sick asbestos victims.  And as has been acknowledged

4    by the movants these documents include social security

5    numbers and medical records.

6           THE COURT:  What would you have me do here?

7           MR. MACLAY:  Well let me divide that -- that's an

8    excellent question, Your Honor, let me divide it into two

9    parts if I could.

10          I think what I would really want Your Honor to do,

11   based on what we've heard about their purposes, I'd like

12   Your Honor to say I have to evaluate your purposes, I have

13   some information from Judge Stark's decision about what

14   would and wouldn't be an appropriate use of these documents,

15   your proposed use is inconsistent with those restrictions,

16   and you should not get them.  That I think, Your Honor, is

17   the best answer to the question.

18          If Your Honor felt like you had to provide some

19   access for some reason that isn't clear to me at the moment,

20   then Your Honor, I think you would need to analogize your

21   reasoning as closely as possible to what Judge Stark did.

22          What Judge Stark did, among other things, was only

23   provide the information subject to a protective order issued

24   by a subsequent court in a very specific proceeding.

25          THE COURT:  Correct.

1          MR. MACLAY:  So, for example, although it

2    certainly wouldn't be what I think Your Honor should do, if

3    Your Honor were to issue an order saying I'm going to

4    release subject to all sorts of restrictions that we can

5    talk about in more deal in a minute because they're very

6    important, to -- for use in the trust processing dispute

7    that's pending in the Western District of Pennsylvania

8    subject to a protective order to be issued by that court and

9    only for use in that proceeding that would be something more

10   analogous to what Judge Stark did, although I think it would

11   go beyond what he did too, because it would relate to

12   individuals and not just aggregate information, but

13   precluding the use that he also precluded in terms of what

14   they say they want to do just for lobbying and precluding

15   what they said they want to do with respect to tort actions.

16          And keep something else in mind, they've

17   acknowledged here that they have 40 or 50 other purposes.

18   Well, Your Honor, if you have to evaluate --

19          THE COURT:  Well they want me to open it up to any

20   member of the public.

21          MR. MACLAY:  Oh, they do, Your Honor, and that is

22   of course blatantly inconsistent with every prior ruling in

23   this case -- in these cases.

24          But more fundamentally, Your Honor, think about

25   this, if Your Honor is required to evaluate their purposes,

1    and we are telling you that you are, not just under the

2    common law or 107, but under the prior orders which are not

3    subject to collateral effect here, how can you do that when

4    they have hidden purposes that they haven't chosen to

5    elaborate for Your Honor?  How can you open up to the public

6    when who knows how many identities -- they said there has to

7    be an identity thief.  Well you know what, Your Honor, I

8    know one thing about identity thieves they exist, and if you

9    open up to every one in the world well guess who's getting

10   access to it, Your Honor, identify thieves.  It's pretty

11   obvious.

12           And so if you have to evaluate purpose, as we

13   believe that you do, you can't give it to people with hidden

14   purposes and you can't give it to people that are unknown.

15   It just isn't consistent with the legal framework that's

16   been set up and approved multiple times in these same cases.

17           One factual point, Your Honor.  You asked how

18   these exhibits show fraud and what you were basically told

19   in response is well they showed fraud in Garlock.  So let me

20   just make a couple of points that Your Honor may or may not

21   be familiar with.

22           The decision issued by Judge Hodges never

23   mentioned 2019s, and there were some 2019s that were

24   provided to Judge Hodges which he apparently didn't rely on

25   from discovery efforts.  But the 2019s produced on loss from

1    these cases were never used by Judge Hodges because they

2    were never put into evidence, they never was used at all in

3    the estimation.  And so the argument that they show fraud,

4    look what happened in Garlock therefore we should get the

5    same information, those documents weren't even admitted,

6    they weren't used, they weren't relied upon.  And so that's

7    just a false argument.

8              What we do know -- oh, one other thing.  They say

9    everything in here is already in the ballots that were

10   produced and made public in Garlock.  Well, Your Honor, if

11   everything that was in here was actually already produced in

12   the ballots in Garlock this entire exercise would be a

13   frivolous one.  It would be a waste of court resources, it

14   would be an improper intrusion for no basis whatsoever into

15   the privacy.  If you believe what they say you should close

16   down this exercise on that basis alone.  They've got

17   everything they say they need, Your Honor, take them at

18   their word, shut this down, don't allow them to misuse this

19   process and impose burdens upon the courts and the debtors

20   of reviewing what Mr. Schieneman has said previously are

21   over one million pages -- I think he said 1.3 million

22   earlier today --

23             THE COURT:  Yes.

24             MR. MACLAY:  -- over 3300 CDs, over 200,000

25   documents.  It's a massive exercise.  Mr. Schieneman doesn't

1    have the documents anymore.

2           You were told that other courts might, and I'll

3    get to that again in a minute, but Your Honor, if other

4    courts have the documents that they need why are they here?

5    If they think the Western District in North Carolina has

6    these documents why aren't they there?  If they think the

7    Western District of Pennsylvania has the reduced set that

8    should then be further worked on why aren't they there?  Why

9    are they just here?  They can't get the fulsome relief they

10   seek from Your Honor any way without massive expenditures,

11   which are not justified by their very thin basis for

12   requesting these documents in the first place.

13          And, Your Honor, just as a matter of procedure

14   you've heard an argument here from Ms. Sieg about First

15   Amendment and how allegedly restricting these documents in

16   any way would constitute a prior restraint, besides the fact

17   it's obviously inconsistent with what Judge Stark did.  It's

18   also an argument that only came up in one place in this

19   briefing, and that is in the brief you allowed Honeywell to

20   file with respect to conflict issues potentially held by

21   Judge Fitzgerald, and Ford used that as an excuse to throw

22   in a completely new argument that we obviously haven't had a

23   sufficient chance to respond to.

24          So if you place any credence whatsoever into the

25   constitutional arguments, and I'll explain in a minute Your

1    Honor why I think they're frivolous any way, that would

2    again require a further process.  You can't sandbag your

3    opponent, Your Honor, by throwing in a constitutional

4    argument in a brief that isn't even supposed to be about

5    that without court permission.  That's just not appropriate

6    and I'm sure Your Honor wouldn't permit it.

7              Now with respect to -- oh, one quick question for

8    Your Honor procedurally.  Would you like me to blend into my

9    argument the arguments about Judge Fitzgerald or would you

10   like me to save that for a subject --

11             THE COURT:  Let's save those arguments.

12             MR. MACLAY:  Okay.  Thank you.

13             THE COURT:  Yes.

14             MR. MACLAY:  Now with respect to Honeywell's

15   purpose I've already explained to you why in Judge Stark's

16   view the prior orders required purpose be examined.  It's

17   also a matter of law, Your Honor, that many courts have

18   analyzed purpose even under Section 107.  The Second Circuit

19   in Orion (indiscernible) Corp. said in limited circumstances

20   courts must deny access to judicial documents generally

21   where an open inspection may be used as a vehicle for

22   improper purposes.  Similar statements were from the Rivera

23   case, also in our brief and the Fifty Stores case.  But of

24   course this very case has similar holdings.

25             The district court in Kaiser, Your Honor, said,

1    "Although Section 107(a) evidences a strong desire by

2    congress to preserve the public's right to access judicial

3    records, that right is not absolute.  Courts have

4    supervisory power over the records and files and may deny

5    access to those records and files to prevent them from being

6    used for an improper purpose."

7              In the same exact -- one sentence later after the

8    107 standard, Your Honor.

9              And then of course in this -- in all of these

10   cases Judge Stark ruled that one of Garlock's purpose was

11   appropriate and didn't analyze those other purposes except

12   implicitly by not permitting them to be pursued.

13             So any argument that purpose isn't something Your

14   Honor can consider is wrong, in fact frankly, Your Honor,

15   Your Honor must consider the purposes.  And their purposes

16   here are inappropriate.

17             THE COURT:  But what specific -- do you agree they

18   have to show specific harm under 107 -- Section 107?

19             MR. MACLAY:  Under 107 -- well you have -- yes and

20   no, Your Honor.  The short answer is kind of.

21             With respect to the common law test you have to

22   show particular harm and then your court engages in

23   essentially a balancing test.

24             THE COURT:  Right.

25             MR. MACLAY:  That's really also the case under

Page 58

```
1    107, we do have to show undue risk of legal harms to

2    individuals.  One second.  But we have done that here.  We

3    have -- and not only have we done that here, Your Honor,

4    that's implicit -- that's explicit in Judge Stark's

5    decision.  His decision is premised in at least three

6    different points within it on making sure the privacy

7    interest of individuals were respected, in these same cases

8    for these same documents.

9               So I would suggest, Your Honor, that as a matter

10   of law of the case it's already established that these

11   documents do implicate privacy interests that must be

12   respected in the analysis.

13              THE COURT:  Now Ford has said we don't want the

14   medical records, we want to know what form of asbestos

15   disease we're talking about, we want the names, we want the

16   four digits I guess of the social security number, and we

17   want to know what disease they claim to be suffering.

18              MR. MACLAY:  And, Your Honor --

19              THE COURT:  Is that a problem for you?

20              MR. MACLAY:  It absolutely is because 2019

21   statements are not evidence of claims.  And this goes back

22   into the garbage in garbage out argument, Your Honor, which

23   is given that 2019 statements, as Judge Fitzgerald

24   recognized, the court who entered those orders, who required

25   their submission, who was the most familiar with the
```

1    contents of the respective documents that were submitted,

2    they don't -- and even Judge Stark references this in his

3    decision, although he chooses not to get into it too much

4    and leave that to the other court -- but the bottom line,

5    Your Honor, is why except in an aggregate format that can't

6    be used against those individuals would you ever permit

7    these Fortune 500 companies to go after innocent asbestos

8    victims on a theory that they had alleged exposure in cases

9    in which they had filed 2019s?

10           Your Honor a bankruptcy court, Your Honor, you're

11   quite familiar with the limitations on the way 2019 used to

12   read, it doesn't even read this way anymore.  And so the

13   argument that 2019 is an important rule and we have to

14   fulfill its purposes, well guess what, it's been revised so

15   none of these statements are required anymore, they're not

16   filed anymore.  So clearly the public interest in it is

17   pretty light because, you know, the decision was made that

18   those requirements don't -- shouldn't exist.

19           But to allow the names, social security numbers,

20   and disease type to not just be produced to them but then to

21   be used by them to go after these individuals and impose

22   costs and burdens upon them, to allow Honeywell to try to

23   essentially suppress trust claims against the trust that is

24   financially responsible for in sort of an interim effect

25   those are illegitimate purposes, Your Honor, which shouldn't

1    be permitted, and it is problematic for that reason, and

2    that's why Judge Stark didn't permit it.  That's why Judge

3    Stark only allowed the information to be used in the

4    aggregate.

5                THE COURT:  Aggregate.  That's right.

6                MR. MACLAY:  Absolutely.  And that's a critical

7    word, in the aggregate.  His view of the privacy interests

8    was they would be violated by allowing them to use it in

9    individual situations, which is what these Fortune 500

10   companies are proposing to do.  And of course it is clear

11   from Judge Stark's decision, Your Honor, that's what he was

12   doing.

13               As I mentioned there are three different places in

14   his opinion where he relies upon the privacy interests.  For

15   example, he noted that privacy interests of the individuals

16   identified in the 2019 exhibits weigh against disclosure of

17   the exhibits to Garlock.  The bankruptcy court was properly

18   concerned would they choose a privacy and possible identify

19   theft.

20               He noted that he provided Garlock access to the

21   2019 exhibits "subject to certain limitations that are

22   intended to substantially reduce any threat to privacy

23   interests."

24               He also noted that the limitations he's imposing

25   should largely, if not entirely, prevent identity theft and

1    other harms the bankruptcy court envisions might follow from

2    granting Garlock the access it seeks.

3            It is not a hypothesis, Your Honor, it is a proven

4    fact that the restrictions he imposed were intentional to

5    protect the privacy interests that he acknowledged were

6    important and that are part of both the common law right of

7    access restrictions and part of the Section 107 analysis.

8    And so I don't really think that should be open to

9    reasonable debate, Your Honor.  And he certainly didn't run

10   those restrictions past Garlock itself before imposing them.

11           Now with respect to 107, obviously 107 has common

12   law analogs that have common law right of access, and so I

13   don't know how much time Your Honor wants to spend on kind

14   of discussing whether 107, you know, applies or not, so let

15   me just address it briefly and Your Honor can ask me any

16   questions that Your Honor would like.

17           THE COURT:  Well, I think it does apply.

18           MR. MACLAY:  Well, Your Honor, 107(a) applies to

19   papers filed in a case and on the dockets of a bankruptcy

20   court.

21           THE COURT:  It doesn't say that on --

22           MR. MACLAY:  It does say that, Your Honor.  That's

23   the language of 107.  Hold on one second.

24           THE COURT:  Hold on a second.  I have it right

25   here.

1        (Pause)

2             THE COURT:  Paper filed in the case under this

3    title.

4             MR. MACLAY:  And the dockets of a bankruptcy court.

5    And so, Your Honor, in the Keiser District Court decision

6    the Court said this:  The 2019 orders made this information

7    "submitted pursuant to 2019 orders unavailable on the public

8    docket except upon motion by a party and order of the

9    bankruptcy court."

10            So there's an open issue, Your Honor, as to whether

11   107 applies to these documents at all because the exhibits

12   were not filed on the docket.  I think that is a clearly

13   established fact.  They were submitted to the Court, and if

14   you look at the very first page, the very first sentence of

15   Judge Starke (ph) decision, the very first sentence of his

16   decision he says, they were submitted to the Court -- to the

17   clerk.

18            And so --

19            THE COURT:  Well, I --

20            MR. MACLAY:  -- again --

21            THE COURT:  -- I read that a little different.

22            MR. MACLAY:  Uh-huh.

23            THE COURT:  A paper filed in the case under this

24   title and the dockets of a bankruptcy case --

25            MR. MACLAY:  Yes.

1        THE COURT:  -- just two items --

2        MR. MACLAY:  Joined by an injunction, an and.  Now

3   I will tell Your Honor that Judge Starke asked me four years

4   ago in this -- in one of these courtrooms, I'm not sure if

5   it was this very courtroom, if I was aware of any precedent

6   analyzing whether that grammatical construction was correct

7   or incorrect.  And I reported to him at that time I was

8   unaware of any decision reaching this one way or the other.

9        I still am with one exception.  Judge Starke's own

10  decision clearly rests upon the common law.  For example,

11  Section 5 of his decision is titled, "Garlock (ph) will be

12  granted access to the 2019 exhibits pursuant to the common

13  law right of public access to judicial records."  He never

14  said in his opinion that 107 controlled or even applied,

15  although he cited to it as a see also in one footnote, and

16  maybe there are a couple of other references.

17       But the point being, Your Honor, there's at least a

18  significant legal question which frankly is murky about

19  whether 107 applies at all.  That's presumably why Garlock

20  and now Honeywell heavily relied upon the common law in

21  their paper.  If they really were so confident, Your Honor,

22  that 107 applies they wouldn't have even mentioned the

23  common law in their paper.  They would have just argued 107.

24  But they argued both and, frankly, they led off with the

25  common law.

1           So it is not clear that 107 applies at all as a

2     legal matter.  I think it's murky.  And certainly Judge

3     Starke's decision which they purport to follow relied on the

4     common law.  And so that's the precedent we have in these

5     very cases as law of the case.

6           No one has argued, Your Honor, that even under 107

7     that Your Honor is required to disregard privacy interests

8     or the risk of identity theft.  In fact, as the statute

9     107(c) itself says, to the extent you find that there's a

10    "undue risk of identity theft or other unlawful injury" --

11    left broad -- to the individual or the individual's property

12    you can impose protections.  That's what Judge Starke did.

13    And as we have argued to Your Honor, the fact that the

14    phrase "undue risk" is used and it's analogous to what was

15    done in the common law prior to 107 indicates that you

16    should engage in a balancing act or balancing test.

17          And if it is true as we have argued to you that

18    these 2019 exhibits are not evidence of exposure, are not

19    claims, but are merely filings by a lawyer to list basically

20    all of his clients that may have claims because if you don't

21    list someone in 2019 historically, Your Honor, you ran the

22    risk of having that claim be unable to vote --

23          THE COURT:  Right.

24          MR. MACLAY:  -- or have that claim even potentially

25    be expunged.  It was -- there were sanctions that were --

1    that pertained to 2019 compliance.  So as Judge Fitzgerald

2    recognized and as Judge Starke didn't rebut, didn't address

3    even because he went in a different direction in his

4    analysis, there's no basis to think that 2019 filing is

5    anything other than a lawyer's statement of who he

6    represents that might have a claim against the debtor.

7            And given that, to allow them to be used as

8    evidence of a claim is on its face illegitimate.  And,

9    therefore, when balancing whether the privacy interest of

10   the individuals whose medical records, whose disease

11   diagnosis, whose names and social security numbers are in

12   the documents -- and by the way, Mr. Shineman (ph) had noted

13   in a report he issued that more than 400,000 redacted

14   (indiscernible) social security numbers.  So there are a lot

15   of them in here.  Whether they should have been or not is

16   besides the point.  They're there and they're of course

17   required to be redacted.  That wouldn't even be an option

18   open to the Court, I don't think, to not redact those.

19            THE COURT:  Right.

20            MR. MACLAY:  Clearly we argued the risk of identity

21   theft is undue.  And one thing Mr. Shineman said that I

22   definitely agree with, Your Honor, which is that the process

23   in his hands was rushed and so documents were sort of

24   sampled to see if they could contain this information.

25            I can tell Your Honor that in my capacity as an

1    attorney in the Garlock case I have seen some of the 2019s

2    and I can confirm Judge -- Mr. Shineman's concern that

3    documents did get through that process that contained

4    information that was not supposed to be in them including

5    both social security numbers in full as well as

6    unfortunately medical records that possibly honestly back at

7    the time this was discussed four years ago no one really

8    knew they were in there because who knows what's in 1.3

9    million pages of information.  It's a massive quantity.

10            But they are in there, Your Honor, and they

11   absolutely have to be protected, both because they're

12   personally identifying and because they're extremely

13   personal.  The privacy interest inherent in those as the

14   Third Circuit has recognized in our -- as we point out in

15   our brief several times is extremely high.  Any balancing

16   act -- test would certainly have to preclude that sort of

17   information for being produced frankly for almost any

18   reason.

19            So the information is clearly protectable under

20   both 107(c) and its common law analogue.  It also included,

21   by the way, claim amounts.  That was another piece of

22   information in the 2019s.

23            And for the reason I've already told you given that

24   Honeywell and Ford can't legitimately use them it makes --

25   you have to evaluate their purpose and wonder is there a

1    legitimate purpose for a document that doesn't actually show

2    exposure, that doesn't actually show that they have a claim.

3    If -- the purpose that these entities have admitted to is to

4    make the contrary argument.

5         Now in a bankruptcy context in the Western District

6    of Pennsylvania where the court -- where it's also overseen

7    by a bankruptcy court who is familiar with the bankruptcy

8    court processes, as was the case in Garlock, there is sort

9    of a check on that you could argue, Your Honor, because the

10   Western District of Pennsylvania Bankruptcy court can decide

11   to what extent they should be used.

12        But if you just release it into the public, if you

13   just allow them to use any state law tort case and any

14   lobbying effort there is no such restriction and you run a

15   much greater risk of misuse, Your Honor, which I think Your

16   Honor should be appropriately concerned with given Judge

17   Starke's ruling and the obvious types of this information

18   that we're talking about.

19        THE COURT:  Well, their order provides anyone --

20        MR. MACLAY:  I'm aware of that, Your Honor.

21        THE COURT:  -- including, including Honeywell and

22   Ford.

23        MR. MACLAY:  I'm aware, Your Honor, and that's

24   grotesquely inappropriate.

25        And they kind of -- the movants, Your Honor, have

1    tried to brush off the concept that the fact that some of

2    this information might be available somewhere else is not a

3    reason to prevent their protection here.

4         And I would just note for Your Honor, as is in our

5    briefs, the Supreme Court disagrees.  The Supreme Court has

6    made quite clear statements that there's a vast difference

7    between the public records that might be found after a

8    diligent search of courthouse files, county archives and

9    local police stations throughout the country, and a

10   computerized summary located in a single clearinghouse of

11   information.

12        And on that basis it held that third party requests

13   for that information invaded privacy.  That's the Supreme

14   Court of the United States.

15        It did it again in another context, when it held

16   "an individual's interest in controlling the dissemination

17   of information regarding personal matters does not dissolve

18   simply because that information may be available to the

19   public in some form.

20        So, Your Honor, as a legal matter the fact that

21   some of this information might be available in some other

22   context is frankly not relevant.  And I found it very ironic

23   that the movant cited Judge Starke's comments about how some

24   of this would be what you would have to put in the complaint

25   anyway because first of all some of these people never filed

1    complaints, right.   These are just clients of attorneys.

2          But secondly Judge Starke then imposed very

3    stringent privacy protections.  So clearly what Judge Starke

4    thought is what he did.  And what he thought was these

5    interests were worthy of protection.  So you can't take an

6    out of context sentence from his decision and use it to

7    override the restrictions that he imposed.  That would be

8    inappropriate and unwarranted.

9          With respect to the constitutional issues, I've

10   already noted, Your Honor, that if Your Honor was inclined

11   to really evaluate those we would need a separate set of

12   briefings.  But let me just briefly say -- and there are a

13   variety of authorities that say you can't even do it in a

14   reply brief, much less in a -- I'm not even sure what to

15   call it.  A supplemental brief on a different issue that was

16   unapproved.

17         But Local Rule 707(2)(b)(2) says that.  The

18   Catholic Dieses case at 437 B.R. 488 at 492, note 19 says

19   that -- the cases (indiscernible) say that.  You can't do it

20   and that's -- and if Your Honor was looking at that argument

21   we would need a new set of briefing to address it.

22         But just conceptually if they're talking about

23   prior restraints the case that they cite, I believe, the

24   Sorrell case, a Supreme Court case --

25         THE COURT:  Yes.

1           MR. MACLAY:  -- says prior restraints exist when

2    information a party possesses is subject to restraints on

3    the way the information is disseminated.  They don't possess

4    this information yet.  And there are numerous cases making

5    that distinction.  Seattle Times, for example, a Supreme

6    Court case, 457 U.S. et 36 says that conditions on receipt

7    of document discovery are not prior restraints because there

8    were conditions on your getting the document.

9           The Sorrell Supreme Court case itself, 131 Supreme

10   Court at 2665 to 266 distinguished a law that put conditions

11   on access to government held information from prior

12   restraints.  So the prior restraint argument is a complete

13   red herring, Your Honor, because they don't have it yet and

14   you're perfectly well positioned to place restrictions.

15          And if anything their argument establishes how

16   important it is that you do so because they're going to

17   argue if you give it to them without restrictions that they

18   get to use it in any way even someone later on says, this is

19   a horrible abuse.  It will be too late then, Your Honor,

20   because of their prior restraint argument potentially.

21   That's why it is so important that these restrictions, if

22   you're going to allow any production whatsoever, that they

23   be placed now and immediately.

24          THE COURT:  That they be placed now and --

25          MR. MACLAY:  Meaning that before you allow any

1    production of any of this information to anyone you make

2    sure that it's subject to restrictions of the type that

3    Judge Starke imposed.

4            THE COURT:  Okay.

5            MR. MACLAY:  And just as a side point, counsel for

6    Ford noted that she had had discussions with me about the

7    2019s in the Garlock case.  I'll note that in that case,

8    which is by the way 10-31607 at Docket Number 3378, Ford

9    acting through its same counsel here made the following

10   statement:

11           "Legitimate concerns about the disclosure of other

12           information shown to fall within the exception" --

13           107, but that wasn't in the quote -- "can and

14   should   be addressed by redacting information where

15           necessary or placing limits on subsequent

16           disclosure."

17           This same party and this same lawyer made that

18   statement in the Garlock case and then cited Judge Starke's

19   decision as precedent for that and that's at page 11 of

20   their brief, which is Docket 3378, Your Honor.

21           So if we're going to get into what happened in the

22   Garlock case, that's the only relevant thing.  Essentially,

23   an acknowledgment by the same lawyer for the same client

24   that their legal position now is invalid.

25           Now one thing that is sort of implicit in what we

1    heard today from Mr. Shineman, Your Honor, is when Your

2    Honor does the balancing that's required expressly under the

3    common law or implicitly by the undue word in the 107 test,

4    it's the burden not just on the parties I would argue, Your

5    Honor, but on the Court.  You've heard now that the very

6    time consuming and expensive and intensive process that Mr.

7    Shineman engaged in, the output of that is not in Your

8    Honor's possession anymore.  It is in another court

9    apparently, the Western District of Pennsylvania.  I don't

10   know if that's frankly true or not, Your Honor, but at least

11   that's been asserted.

12            I know for -- to my information, Your Honor, it is

13   not in the possession of the clerk in the Western District

14   of North Carolina, which was argument made, because it was

15   never submitted into evidence, how could it be.  But even if

16   it were you wouldn't be the right court to go to about it.

17   But I don't think that it is.  It's  not to my knowledge in

18   the possession of that clerk, Your Honor.

19            And so let's just talk, Your Honor, a little bit

20   about what Judge Fitzgerald did on remand because after

21   Judge Stark issued his decision there were some details that

22   had to be worked out.

23            THE COURT:  Yes.

24            MR. MACLAY:  That's why Mr. Shineman was engaged.

25   Judge Fitzgerald worked through those details.  She --

1           THE COURT:  She produced --

2           MR. MACLAY:  She entered --

3           THE COURT:  -- a protocol.

4           MR. MACLAY:  Exactly.  A protocol order, Your

5    Honor, a ten-page single-spaced document which laid out with

6    an admiral degree of specificity how the process was going

7    to be carried out.

8           And it noted that there was going to be a special

9    master planned.  It noted that they were over 3,300 CDs,

10   many of which contained excluded documents and personal

11   identifiers.  It noted that the clerk's office had confirmed

12   that there were many social security numbers in their

13   fullness in these documents.

14          THE COURT:  Yes.

15          MR. MACLAY:  It noted that all costs, fees and

16   expenses associated with the exhibit production shall be

17   itemized by the vendors and paid for in fully by Garlock.

18          THE COURT:  Right.

19          MR. MACLAY:  As well as the cost incurred by the

20   courts.  It had all sorts of special details with respect to

21   the inspection of the files, how there would be files called

22   vendor to special master, produced to Garlock or excluded

23   from Garlock.  That's paragraph 33 of the protocol order.

24          Paragraph 43 of the protocol order noted that

25   affidavits were required of certain individuals receiving

1   information confirming that they understood the restrictions

2   imposed by the various orders.  It ended up being 300, the

3   ones by Judge Starke.  The subsequent protective order

4   issued in the Western District of North Carolina and the

5   protocol order entered by Judge Fitzgerald on remand.  And

6   that included a return and destruction requirement as Your

7   Honor noted earlier in today's comments.

8            So it's a lot of work to go through for something

9   that they can't use in any legitimate fashion and we would

10  argue, Your Honor, that they've acknowledged their intent to

11  use it in an illegitimate fashion.  And Your Honor both

12  should and must consider that in discussing whether they get

13  it whatsoever.

14           And so with that, Your Honor, the Narco TAC rests.

15           THE COURT:  All right.  Thank you.  Thank you.

16           Mr. Harron.

17           MR. HARRON:  Hello again, Your Honor.  Ed Harron

18  for Larry Fitzpatrick who is the future claimant's rep in

19  Narco.

20           THE COURT:  Yes.

21           MR. HARRON:  And, also, Jim McMonigal (ph) filed a

22  joinder as a future claims rep in (indiscernible).  And both

23  Mr. McMonigal and Mr. Fitzpatrick, they served during the

24  bankruptcy cases, but they continue to have an oversight

25  role with those trusts respectively.

1            Your Honor, I don't want to repeat what Mr. Maclay

2      has said.  I think he articulated his legal position very

3      well.  My clients would adopt his position and the rationale

4      that he's offered for it.

5            But, Your Honor, I think you're at a disadvantage.

6      The people on this side of the courtroom, we've been

7      fighting this fight for 15 years --

8            THE COURT:  Yes.

9            MR. HARRON:  -- and we dropped it in your lap for a

10     couple of weeks.  And we've got staffs and people and you're

11     a little outgunned on this side.  So I thought some -- not

12     intellectually, just so I -- in terms of --

13            THE COURT:  I understand --

14       (Laughter)

15            THE COURT:  -- Mr. Harron and I appreciate --

16            MR. HARRON:  -- the number of hands.

17            THE COURT:  -- and I appreciate your insight.

18            MR. HARRON:  The number of hands on this.  And so -

19     - and, Your Honor, I know this is going to come up later,

20     but that's one of the reasons we suggested that Judge

21     Fitzgerald might be helpful.

22            MR. MACLAY:  Yes.

23            MR. HARRON:  She lived it across all of these

24     cases.

25            But, you know, Mr. Azman made a suggestion at the

1    beginning of his remarks that attack and we are in this in

2    some effort to run up costs and are victimizing Honeywell's

3    role as a, you know, a good faith participant in the Narco

4    Trust.

5            Well, there's another side to that story as you may

6    think.  As you may know Honeywell has agreed to pay the

7    Narco Trust on an evergreen basis up to $150 million per

8    year --

9            THE COURT:  Right.

10           MR. HARRON:  -- to fund claims as they're approved.

11   So why did Honeywell agree to this level of funding.  Well,

12   it's because Honeywell was Narco.  It's set forth in the

13   record.  It's not disputed.  Narco was an unincorporated

14   division of Honeywell while Narco was selling the products

15   that contained asbestos.

16           THE COURT:  Okay.

17           MR. HARRON:  And then Narco was spun off and became

18   its own corporation.  For years there were disputes between

19   Narco as the new company and Honeywell over which bag of

20   asbestos was sold by Honeywell's Narco, which bag of

21   asbestos was sold by the new Narco.  They couldn't ever

22   figure it out and claimants, because the bags were named in

23   the same manner couldn't decide who to sue.  So they sue

24   everybody.

25           So Honeywell is responsible for Narco's asbestos

1    that was in the market for decades and killed a lot of the

2    husbands of the widows who are claimants, so-called

3    claimants or at least on the exhibits to the 2019.

4          And Your Honor may note these exposures occurred in

5    the 50s, 60s, 70s.  By the 80s the use of asbestos was

6    diminishing and these exposures occurred on industrial

7    sites.  So you're dealing with failing memories and in many

8    cases of a widow where it was her husband who was exposed at

9    the industrial site.

10         And the way the Narco product was used, it was a

11   refractory cement.  It went into industrial furnaces to make

12   the bricks and whatever else is in an industrial furnace

13   more resistant to heat.

14         THE COURT:  Okay.

15         MR. HARRON:  It was a bag of mix.  It was poured,

16   stirred.  Dust went everywhere.  So everyone at the furnace,

17   around the furnace was exposed.  Workers went home.  The

18   wife would wash the clothes.  The people in the household

19   would be exposed.

20         And why is this significant here?  One, Honeywell

21   is not agreeing to fund Narco out of the goodness of its

22   heart.  It was liable for poisoning people for years.  And,

23   Your Honor, I'll limit myself to reference the poison to the

24   extent that they'll limit their references to fraud.

25         Your Honor, let's talk about fraud for a second.

1    As I mentioned these are elderly claimants that were exposed

2    decades ago to products that may or not -- may or may not

3    have been packaged during the time of the exposure.  They

4    may have been used.  And sometimes a product would have the

5    same name and one year that product would contain asbestos,

6    the one year -- the next year it wouldn't contain asbestos.

7              So the naming game is difficult on both sides of

8    the fence.  What defendants often refer to as fraud, and

9    that's what they were screaming about in Garlock and --

10             THE COURT:  Yes.

11             MR. HARRON:  -- that's what you see in the press.

12             THE COURT:  Yes.

13             MR. HARRON:  We refer to as difficulty in

14   determining which defendant was responsible for the product.

15   The individuals at issue here, there's no doubt that they're

16   sick.  There's no doubt that their sickness was caused by

17   asbestos.  Mesothelioma, which is where the bulk of the

18   money goes, the only known cause of mesothelioma is exposure

19   to asbestos.

20             THE COURT:  Right.

21             MR. HARRON:  So these people know they're sick.

22   They're either dead or dying.  But they don't know which of

23   the many defendants is responsible for poisoning them in the

24   first place.  So plaintiffs firms and other lawyers through

25   due diligence over time identify who may or may not have

1   poisoned them.

2        So to the extent that a claimant may or may not be

3   able to name a certain defendant in one proceeding and then

4   through diligence, discovery may be able to name a defendant

5   in the next proceeding, not necessarily an indicia of fraud.

6        And what you may have is you may have in a

7   deposition someone may say, were you exposed to Narco

8   castalyte (sic) whatever and then they say, never heard of

9   that.  In the next deposition they say, did you ever see

10  this bag, and the Narco bag had an Indian head on it.  And

11  they'll say, oh, I do remember that now.  It was a long time

12  ago, but I remember that bag.  So that's what happens often

13  in asbestos litigation, largely because of the names --

14  pardon me -- the nature of the asbestos exposure, the

15  passage of time, and the conduct of defendants who go to

16  great lengths to hide which of their products were at which

17  sites.

18       So, Your Honor, when we talk about the individuals

19  at issue here I just thought it was important that you

20  recognize that this fight's been going on for a long time

21  and there are two sides to the coin.  The people who were

22  least involved in the fight are the people who are named on

23  the exhibits to the 2019 filings.  All they did was go to a

24  lawyer and say, I'm dying of asbestos or my spouse is dead

25  from asbestos.  Their lawyer was required, because the

1    defendants filed bankruptcy, to submit a 2019 statement.

2            THE COURT:  Right.

3            MR. HARRON:  And most of those people have no idea

4    that this proceeding is occurring today.

5            Your Honor, another thing that's relevant about the

6    nature of the exposure to the product and the history is

7    even when Honeywell and Ford get this information they're

8    not going to be able to do anything with it because as Judge

9    Fitzgerald recognized once she sets forth her protocol the

10   fact that someone is named on a 2019 means very little in

11   respect of whether or not they're alleging exposure to these

12   defendants.

13           Quite frankly, Your Honor, I think this is an

14   effort to harass the claimants.  And, Your Honor, why would

15   I say that?  Well, I know that in Narco Honeywell is doing

16   everything it can to not pay the trust.  Since it's been up

17   and running and processing claims for the last three or four

18   years I would say that Narco's gone out of pocket to pay

19   newly filed claims zero.

20           And, Your Honor, Mr. Azman mentioned that they took

21   us to court in the Western District of Pennsylvania.

22           THE COURT:  Right.

23           MR. HARRON:  They lost.  I just think that's

24   another important fact.  They raised allegations against the

25   trust.  They sought an injunction.  Judge Agresti (ph) there

1    denied it.

2          So with that context in mind, Your Honor, you're

3    familiar with Judge Starke's ruling.  You've read 107 and

4    107(c).  I think under the common law, under the precedent,

5    under the Bankruptcy Code it's a balancing test.

6          And we assert as Mr. Maclay articulated very well

7    that they have shown no legitimate basis to obtain this

8    information.  I submit largely it's an opportunity to harass

9    innocent victims of asbestos.  We think there are many good

10   reasons that this information should be protected.

11         I believe recently and I don't have my notepad.  So

12   in -- I think it was in the Decs (ph) case where Your Honor

13   recognized that employee information was sensitive and

14   shouldn't --

15         THE COURT:  Yes.

16         MR. HARRON:  -- be disclosed on the public docket.

17         THE COURT:  Yes.

18         MR. HARRON:  This is analogous to what we have

19   here.  And there was another case.  What's the -- in Wet

20   Seal, Your Honor, there was -- in that case there's actual

21   evidence of identity fraud where a bad actor obtained

22   information from the docket and filed false claims.  And I

23   think you can take notice of that, that those are the types

24   of dangers that the Court needs to be sensitive to when it

25   resolves this dispute.

1           But, Your Honor, unless you have specific questions

2     that's all I wanted to say.

3           THE COURT:  Well, I know it's a balancing test.

4     But don't I have to have some specific facts from the side

5     of the Narco TAC and future claimants of harm?  Do I have

6     any specific facts of harm?

7           MR. HARRON:  Well, Your Honor, I think you could

8     take judicial notice of the harms that occurred in the Wet

9     Seal case.  I think it's a matter of public record, the

10    dangers of releasing private information into the public

11    domain.  Mr. Maclay said the harm is evident if we were

12    going to take this information and spread it all over the

13    public record.

14          And, Your Honor, the other difficulty is that, you

15    know, we can't identify specific harms in the abstract

16    because we're trying to prevent those harms in the first

17    place.  The information --

18          THE COURT:  Right.

19          MR. HARRON:  -- is not out there.  I think Judge

20    Starke and Judge Fitzgerald took notice of the potential for

21    harm when they imposed the limitations that they did.

22          THE COURT:  Okay.  All right.  Thank you, Mr.

23    Harron.

24          MR. HARRON:  Thank you, Your Honor.

25          THE COURT:  Thank you.

1           Does anyone need a break?  I'm fine, but do people

2    need a break at this point?

3           UNIDENTIFIED SPEAKER:  From our side we would like

4    to continue if that's okay with Your Honor.

5           THE COURT:  That's fine with me.

6           All right.  Good morning.  Oh, it's a -- well, I

7    guess it's still morning.  Yes.

8           MS. RAMSEY:  Thank you, Judge Gross.  I'll be very

9    brief, but I wanted to augment a little bit.

10          THE COURT:  Remind me who you're representing.

11          MS. RAMSEY:  Certainly, Your Honor.  I'm

12    representing Waters Kraus & Paul.  It's an asbestos

13    plaintiffs' law firm.

14          THE COURT:  Yes.

15          MS. RAMSEY:  And we filed a joinder to the response

16    filed by the Narco TAC.  And we would join in the argument

17    that Mr. Maclay made today as well as Mr. Harron's argument.

18          I wanted, though, to augment a little bit Mr.

19    Harron's response to the Court's question about harm --

20          THE COURT:  Yes.

21          MS. RAMSEY:  -- because I think the harm here is

22    palpable.  When Ms. Sieg was making an argument earlier she

23    referred to the persons who were identified on the exhibits

24    to the 2019 statements as creditors.  That's a term of art

25    obviously in a bankruptcy case.  It is the term that's used

Page 84

1    in Rule 2019.

2          But when Judge Fitzgerald modified the order it was

3    to address the unique circumstances in an asbestos

4    bankruptcy where you don't just have asbestos current

5    creditors, but you have potential future creditors who have

6    already been harmed, but are in various stages of discovery,

7    haven't yet maybe brought their case or haven't completed

8    their full due diligence.  As Mr. Harron said, the

9    investigative process in an asbestos case can take some

10   time.  It's fact intensive.

11         And you have individuals that are diagnosed with an

12   asbestos illness and who either are -- have a memory -- have

13   memory issues or you have the family who may not have the

14   full exposure history.  And if there is a basis to believe

15   that a defendant might be responsible it is the attorney's

16   responsibility to try to preserve the ability to recover

17   until such time as the due diligence is completed.  And with

18   the filing of a bankruptcy case and the automatic stay that

19   goes into effect with that discovery comes to a halt.  So to

20   the extent that it is incomplete it remains in that stage of

21   incomplete -- incompletion.

22         Judge Fitzgerald knew that, recognized it.  It was

23   well understood in connection with the 2019 process that she

24   put into place.  And in the Pittsburgh Corning case in

25   opinion on the 2019s she herself said:

1          "And that was made clear when the law firms agreed

2     to file the 2019 statements.  In some instances they

3     represent potentially future claimants, people who know

4     they've been exposed but have no injury, demand holders, and

5     yet those people may never have a demand because their

6     injury may never manifest.  And so the statements don't

7     necessarily show there is a 'present creditor involved.'

8     That's the difficulty with a 2019 in a mass tort context."

9          Those -- that was the understanding that Judge

10    Fitzgerald had.  That was the understanding that the bar

11    had.  And yet it's clear that what the intention of

12    Honeywell and Ford is is to take a person who appears on

13    that 2019 --

14          THE COURT:  Right.

15          MS. RAMSEY:  -- and to accuse that person of fraud

16    if they are now involved in litigation where they have not

17    said that they have a claim against the particular asbestos

18    defendant where that 2019 was filed.  So you have an already

19    injured plaintiff who -- or the family of a deceased

20    plaintiff who is already in extremeness, has suffered a very

21    significant injury and now they're in a position of having

22    to defend themselves from an allegation that they've

23    committed fraud.

24          There's reputational harm.  There is a cost to

25    that.  There is a very real and very concrete other harm, to

```
1   use the terminology of 107(c) or improper purpose, to use
2   the common law phrasing, that is present here that
3   distinguishes this case considerably from Judge Starke's
4   agreement to permit 2019 exhibits to be produced to Garlock
5   for the limited purpose of its use before a Bankruptcy Court
6   who understood fully what a 2019 was and was not, was
7   presiding over an asbestos bankruptcy and understood the
8   parameters and the unique aspects of an asbestos bankruptcy
9   in an estimation trial where everyone involved in that trial
10  could argue their respective positions with respect to that.
11          This is a very, very different situation and, Your
12  Honor, we would urge the Court to deny access based upon the
13  intended obvious harm here.
14          Thank you.
15          THE COURT:  Thank you.
16          MS. RAMSEY:  Do you have any questions for me, Your
17  Honor?
18          THE COURT:  No, I don't.  No, I don't.
19          MS. RAMSEY:  Thank you.
20          THE COURT:  I certainly understand your position.
21          Anyone else?
22          Mr. O'Neal.
23          MR. O'NEAL:  Yes, Your Honor.
24          MR. MACLAY:  Your Honor, can I just make one
25  request?
```

1          THE COURT:  Yes.

2          MR. MACLAY:  Your Honor has asked a couple of

3    questions that I would like the opportunity to address at

4    the end of this if I may.  I just wanted to put that out

5    there.

6          THE COURT:  I'll give you that opportunity, Mr.

7    Maclay.  Absolutely.

8          MR. MACLAY:  Thank you, Your Honor.

9          THE COURT:  Yes.

10          Mr. O'Neal.

11          MR. O'NEAL:  Yes.  Thank you again, Your Honor.

12    James O'Neal on behalf of the reorganized debtors and W.R.

13    Grace.

14          THE COURT:  Yes.

15          MR. O'NEAL:  Just a point on the cost, we filed a

16    limited response opposing any costs being imposed on the

17    reorganized debtors and in Honeywell's response they agreed

18    that they would be submitting a revised order which does not

19    seek to impose any costs on the debtors and the reorganized

20    debtors would not be bearing any costs in connection with

21    production of the 2019 exhibits to Honeywell or any other

22    party.

23          So I just wanted to clarify that we do have a

24    statement from Honeywell with respect to costs.  At least as

25    far as the reorganized debtors go, they don't seek to impose

1    any costs on the reorganized debtors.

2           THE COURT:  That's right.

3           MR. O'NEAL:  Okay.  Thank you very --

4           THE COURT:  Thank --

5           MR. O'NEAL:  -- much, Your Honor.

6           THE COURT:  Thank you.

7           Mr. Madron.

8           MR. MADRON:  Thank you, Your Honor.  Again for the

9    record Jason Madron on behalf of Armstrong World Industries

10   and Kaiser Aluminum.

11          Your Honor, on the phone for Kaiser Aluminum is my

12   co-counsel, Amanda Suzuki, of Jones Day.  I'll let her speak

13   on behalf of the Kaiser debtors.  But just to briefly touch

14   on the Armstrong debtors, Your Honor, we did file as I'm

15   sure Your Honor saw a very brief response, almost a

16   reservation of rights.

17          THE COURT:  Yes.

18          MR. MADRON:  Most specifically, the Armstrong

19   debtors objected to the extent that the cases would be re --

20   or the Armstrong case would be reopened.  Obviously, that

21   could subject Armstrong to the U.S. Trustee fee and

22   reporting obligations and the like.  And Armstrong feels

23   that that would be inappropriate.  We obviously ciote to the

24   Garlock decision where Judge Starke found that the cases

25   need not be reopened  --

1              THE COURT:  That's right.

2              MR. MADRON:  -- to adjudicate an issue very similar

3      if not on all fours to this.

4              So for a number of reasons, one, I don't believe

5      anybody has requested that Your Honor reopen the case.

6      Indeed, in Footnote 2 of Honeywell's motion they

7      specifically state that it's not necessary for Your Honor to

8      reopen the case.  So we would obviously respectfully request

9      based on the Garlock precedent as well as the fact that

10     there is no motion pending before the Court to reopen

11     Armstrong's case that the case remain closed.

12             I would, however, join that Armstrong should not be

13     subject to any fees or cost or expense.  We take no position

14     whether or not any relief should be granted to any of the

15     movants here today, Your Honor.

16             But to the extent that Your Honor does grant relief

17     to the movants Armstrong should not bear the cost or expense

18     of that.  I believe Owens Corning pointed out in their

19     response that in the Garlock case the order or the protocol

20     that was ultimately entered by Judge Fitzgerald on remand

21     specifically found that Garlock would exclusively, at

22     paragraph 26 of that protocol, be responsible for any

23     expense.  We believe the same result should be true here to

24     the extent that Your Honor is entitled -- is inclined to

25     grant access.

```
 1              THE COURT:  All rgiht.

 2              MR. MADRON:  Thank you, Your Honor.

 3              THE COURT:  Thank you, Mr. Madron.

 4              MR. ISENBERG:  Good afternoon --

 5              MS. SUZUKI:  Your Honor, this is Amanda Suzuki from

 6     Jones Day for Kaiser.

 7              THE COURT:  Yes.  Good afternoon.

 8              MS. SUZUKI:  Good afternoon.  I would like to

 9     primarily just echo what Mr. Madron said with respect to

10     Kaiser.  Similarly, I -- we filed a reservation of rights

11     and indicated first that Kaiser should not be responsible

12     for any costs related to reopening the bankruptcy cases.

13     And as Mr. Madron said we don't think any motion is on file

14     or that it is even necessarily necessary to reopen the

15     cases.  But we would just like to kind of reiterate that

16     point.

17              And second to, you know, just briefly echo what Mr.

18     Madron said, we also do not believe that the Kaiser

19     reorganized debtors should be responsible for any costs

20     related to any of the relief requested here today to the

21     extent the Court is inclined to grant it.

22              Thank you, Your Honor.

23              THE COURT:  Thank you.  Thank you.

24              Yes.

25              MR. ISENBERG:  I was going to say good morning,
```

1    Your Honor, but I will say good --

2           THE COURT:  It's --

3           MR. ISENBERG:  -- afternoon, Your Honor.

4           THE COURT:  It's afternoon already, Your Honor.

5           MR. ISENBERG:  Adam Isenberg, Saul Ewing, on behalf

6    of the reorganized Owens Corning debtors.

7           THE COURT:  Yes, sir.

8           MR. ISENBERG:  Your Honor, we filed a very brief

9    response.  We take no position as to whether Honeywell,

10   Ford, or any other party should or should not be granted

11   access to the 2019 exhibits.

12          I will just note a couple of things for the record,

13   Your Honor.  Our case was confirmed in October of 2016.

14          THE COURT:  Okay.

15          MR. ISENBERG:  The cases have been closed for at

16   least six years.  Whether there is fraud or impropriety or

17   not in the asbestos bar it is not our issue.  It is not our

18   fight.  And we take no position on that.

19          But we filed a response, Your Honor, because of the

20   proposed mechanics and the proposed form of order that

21   Honeywell had submitted with its motion.  I think we have

22   agreement there's a statement in the response filed by

23   Honeywell or the reply filed by Honeywell that Owens would

24   not be bearing the cost for this.  I hope that's still the

25   case, Your Honor.

1           If that is the case, we would want to see any

2     proposed form of order that Honeywell would submit.  But

3     subject to that, Your Honor, I think our issues are

4     resolved.

5           THE COURT:  All right.  Thank you.

6           MR. ISENBERG:  Thank you.

7           THE COURT:  Thank you, Mr. Isenberg.

8           Why don't we do this?  Let's take a ten-minute

9     break or 15 minute break because I think we've been going at

10    it a while and it's now time for replies, and this would

11    probably be an appropriate time to do that.

12          So we'll be back here at 25 after.

13          Thank you, everyone.

14          MR. MACLAY:  Thank you, Your Honor.

15        (Recess taken at 12:07 p.m.; resumed at 12:25 p.m.)

16          THE CLERK:  Please rise.

17          THE COURT:  Thank you, everyone.  You may be

18    seated.

19          MR. AZMAN:  Your Honor, I think Mr. Maclay wanted

20    to make some follow up remarks and if he feels he needs to

21    do it I would like for that to happen now and then we can

22    close with our reply.  Does that work for Your Honor?

23          THE COURT:  Mr. Maclay.

24          MR. MACLAY:  With the understanding that I may then

25    have rebuttal remarks after that depending --

1        THE COURT:  All right.

2        MR. MACLAY:  -- if (indiscernible) I'm willing to

3   do that.

4     (Laughter)

5        MR. MACLAY:  It would be more efficient to wait,

6   but it's up to Your Honor.

7        THE COURT:  Let's proceed with Honeywell.

8        MR. AZMAN:  No problem.  Again, for the record

9   Darren Azman, McDermott, Will & Emery for Honeywell.

10       Your Honor, I think Mr. Maclay is being quite

11   disingenuous.  Mr. Maclay was counsel to the asbestos

12   claimants' committee in Garlock.  And he's here representing

13   the Narco TAC.  By their pleadings and response to our

14   motion to strike they explained to Your Honor that they're

15   essentially acting on behalf of Narco TAC claimants.

16       In Mr. Maclay's role as counsel to the asbestos

17   claimants' committee in Garlock it was no different.  Mr.

18   Maclay negotiated the very order that gives us the right to

19   use the Garlock 2019 exhibits for whatever purpose we want,

20   the same order that we've submitted to Your Honor.

21       So if that doesn't raise some eyebrows I'm not sure

22   what does when Mr. Maclay is the one who negotiated that

23   very order.  I mean, he relies a lot on saying the consent

24   orders have no precedential effect.  Well, when you're the

25   one that negotiated it, it kind of does.

1            In response to --

2            THE COURT:  Well, I don't know all the differences

3     between the Garlock case and these cases.

4            MR. AZMAN:  Well, I was only referring to who was

5     acting --

6            THE COURT:  I don't know, for example, if there

7     were decisions from the Third Circuit Court of Appeals that

8     say if you want access file a motion.  And then your order

9     provides that anyone may have access.  I don't understand

10    that at all.

11           MR. AZMAN:  Well --

12           THE COURT:  You're not here on behalf of anyone.

13    You're here on behalf of Honeywell and you're here on behalf

14    of Ford.  And I don't know why you're opening this up to

15    everyone in the world to come in and say, we have access

16    now.

17           MR. AZMAN:  Well, Your Honor, I -- and I'll get to

18    this in a minute, but I think we have to bring this back

19    home to what really matters and what is important here and

20    that is Section 107.  And I'll -- again, I'm going to go

21    through all those elements in just a moment.  But if Your

22    Honor does not find that any of the 107 exceptions is

23    applicable, I don't see how you can order it to not be made

24    available to anybody who's interested.  And I'll cite a

25    couple of cases from this --

1          THE COURT:  I don't know that --

2          MR. AZMAN:  -- district --

3          THE COURT:  -- I can or can't.

4          MR. AZMAN:  Well, let me --

5          THE COURT:  But I know that your motion didn't

6    speak for everyone.  It spoke for Honeywell --

7          MR. AZMAN:  Understood.

8          THE COURT:  -- and then the order speaks for

9    everyone.

10          MR. AZMAN:  Let me cite just a few cases --

11          THE COURT:  All right.

12          MR. AZMAN:  -- from this Circuit.  This is

13    Continental Airlines, a '93 case.  The Court finds that

14    issues regarding public disclosure of papers filed in

15    connection with bankruptcy proceedings generally should be

16    resolved under Section 107 since Congress has pulmogated an

17    express statutory scheme addressing public access to papers

18    filed in bankruptcy cases.  That's just what Continental

19    says.  That just says that 107 trumps the common law.  And

20    again I'll come back to that.

21          Because -- and this is now a case citing

22    Continental from the Northern District of Ohio -- because

23    congress enacted an express statutory scheme issues

24    concerning public disclosure of documents in a bankruptcy

25    case should be resolved under 107.  It says the same thing.

1          Now here's the important quote from a bankruptcy

2     court in the District of Vermont:  "If the 107 exceptions do

3     not apply the inquiry is complete and the Court's decision

4     will favor public access."  Your Honor has to make a

5     determination at some point as to whether any of these

6     exceptions under 107 applies.  If it does not apply it needs

7     to be made public.  That's the bottom line.  It doesn't

8     matter that other parties are not here before Your Honor.

9          And I'm not sure Your Honor really wants to do

10    that.  Does Your Honor really want 100 parties every single

11    time they need to get access to the same document that

12    you've already granted access to come into the court --

13          THE COURT:  That's what the Third Circuit told me

14    to do.

15          MR. AZMAN:  Well, I'm not sure --

16          THE COURT:  Didn't it?

17          MR. AZMAN:  In which case, Your Honor?

18          THE COURT:  Well, I don't have the cite in front of

19    me.  But isn't that what the Third Circuit said when it

20    affirmed Judge Fitzgerald?

21          MR. AZMAN:  Your Honor, the Third Circuit opinion

22    was not -- it affirmed the process for --

23          THE COURT:  Yes.

24          MR. AZMAN:  -- for filing results of the electronic

25    docket.  There was no finding about whether it was

1    appropriate for them to be sealed or whether any of the 107

2    exceptions applied.  There's never been a finding about 107

3    had complied except in Judge Starke's opinion.  That's the

4    only opinion that's ever been issued about whether an

5    exception applies.

6              So I don't agree with that characterization of what

7    the Third Circuit was really addressing in that case.

8              THE COURT:  All right.

9              MR. AZMAN:  Now, Your Honor, let's go back to what

10   Judge --

11             THE COURT:  Why do you care if everyone has access?

12             MR. AZMAN:  Well --

13             THE COURT:  Why does Honeywell care?

14             MR. AZMAN:  -- this is a mass tort issue, Your

15   Honor, and as numerous courts have stated it fosters truth.

16   Okay.  That's our goal is to foster truth and --

17             THE COURT:  Your goal is not to foster truth.  Your

18   goal is to represent your client.

19             MR. AZMAN:  You're absolutely right.  But the

20   ability of other parties to see this information and then

21   perhaps reach out to our client and coordinate them, that is

22   representing my client.  To the extent that 50 other people

23   may have information and see something different that we

24   haven't seen, that is exactly why we think it is important

25   for anybody to be able to get access to these documents.

1              For example, Ford.  We've collaborated with them on

2    a number of occasions, not just in this case, but in other

3    cases involved in asbestos and other matters.

4              THE COURT:  Yes.

5              MR. AZMAN:  That is important to us, Your Honor.

6    It's just as important for us to have access as it is for

7    others to be able to see it and think about it maybe in a

8    different light.

9              THE COURT:  All right.

10             MR. AZMAN:  Now in terms of describing all of the

11   reasons that Honeywell might want to use these 2019 exhibits

12   we don't have to do that.  There is an attorney/client

13   privilege I don't need to tax counsel what we intend to do

14   with this.  And that's not what the motion is about.  That's

15   not what's on trial here.  We're not talking about the

16   merits of what the 2019 statements say or don't say.  And

17   that's exactly what Judge Starke said in his opinion.  It

18   makes no difference.  That's not to be decided today and it

19   has nothing to do with the right of access under either

20   common law or Section 107.

21             Now let's turn to the ballots.  Mr. Maclay said,

22   well, if the ballots have all the information you want then

23   why are we here today.  Well, he's absolutely right except

24   on one thing.  They don't have all the information we want.

25   The ballots have creditors who filed claims and elected to

1    vote on them.  Okay.

2         But it's the same type of information.  All of

3    those ballots were unsealed in the Garlock case.  So if Mr.

4    Maclay is arguing that there is a difference between

5    individual, number one Jane Doe who was already -- whose

6    information is already public as a result of unsealing the

7    ballots and John Doe whose information is not, it's the same

8    exact information, it's just a different person.  The

9    character of the information doesn't change just because you

10   throw it in a 2019 exhibit.  There's no difference.

11        Now I want to turn to Mr. Maclay's statement that

12   our reliance on the common law is some sort of indication as

13   to our view as to the applicability of Section 107.  That's

14   just not true.  Let's first start with whether these are

15   papers filed in a case.  I think Your Honor sees past that

16   nonsensical argument.

17        As Judge Starke did in a footnote he clearly

18   recognized that he was addressing 107 throughout various

19   portions of his brief.  And if you look at case law on 107

20   people have tried to argue that discovery materials are not

21   papers filed in a case because they aren't actually filed.

22   Every court has rejected that kind of argument.  These are

23   case -- these are papers filed in a case.  But I won't spend

24   too much time on it because, again, I think it's pretty

25   clear.

1           The second point under 107 is that it trumps common

2      law.  I just went through all of those cases.  You need to

3      look at 107 and find that one of these exceptions applies.

4      There is no weighing of the interest.  Either an exception

5      applies or it does not, and if it does not, then it needs to

6      be made available to the public.

7           And, Your Honor, again, I'm going to turn in just a

8      moment and go through each of the 107 exceptions, but as a

9      general matter as I stated in my opening the argument that

10     any exception under 107 applies to the information in these

11     2019 exhibits, it doesn't make any sense.  For example,

12     identity theft.  How is it possible that I -- that asbestos

13     claimants who have been including this very same type of

14     information in state and federal court complaints for years

15     in asbestos cases haven't had the issue of identity theft.

16     Why is it all of a sudden an issue now because it might be

17     revealed under a 2019 exhibit.  It is the exact same

18     information.

19          And the same can be said for any of the other

20     exceptions under 107, other unlawful injury to an individual

21     or their property.  That hasn't happened.

22          Now let's go through 107 because I think that's

23     really important.  Like I said I want to bring things back

24     home to what Your Honor has to decide on the law and the

25     facts.

1          107(c). let's start with that.  Undue risk of

2     identity theft.  Here's the test.  Disclosure of personal

3     information by itself is not necessarily causally related to

4     identity theft.  As Ms. Sieg said, you need to show an

5     identity thief and a vulnerable account.  "A speculative

6     possibility theft" -- and I'm quoting here -- "is not enough

7     to trump the importance -- the important governmental

8     interest behind Section 107."

9          "Now the tax argument on 107(c)" -- and I'm quoting

10    here from their brief -- "public release of personally

11    identifying information and medical information and records

12    certainly carries with it the threat of identity theft or

13    other unlawful injury."

14          Your Honor, that's the extent of facts if you could

15    call that that would support a 107(c) finding here.  There's

16    no mention of who might try to steal the identities or what

17    they might do with it or how they would go about doing that.

18    And there's certainly no demonstration of any undue risk of

19    that happening.  And this just doesn't cut it under 107(c).

20          There is nothing in this court that's been

21    submitted to this Court that you could rely upon to find

22    that 107(c) applies.  And it's interesting to note that

23    counsel really hasn't much talked about any of the 107

24    exceptions other than in just broad strokes.  They haven't

25    gone through and told Your Honor what specifically.  You

1    know what they've told Your Honor, judicial notice of harm.

2    I don't know what that means.  I've never heard of that

3    before.

4         I think the harm is palpable.  Again, that's not

5    evidence.  Your Honor has no evidence in front of him.

6    There are no declarations.  There's just nothing other than

7    there's a name in it.  Somebody might steal their identity.

8    That's all you have.

9         Now let's turn to undue risk of other unlawful

10   injury.  Again, Your Honor, the test is specificity and

11   articulated reasoning are essential.  I don't think that

12   judicial -- Your Honor should take judicial notice of harm

13   supports the articulated reasoning that is required to show

14   that there's going to be undue risk of other unlawful

15   injury.

16        They mentioned -- the TAC mentions in their brief

17   tortuous invasion of privacy and tortuous harassment as if

18   they just picked those terms out of a book and said, let's

19   throw that in there.  Not a single case cite, not a single

20   fact that talks about tortuous invasion of privacy.  So I --

21   I just don't see how there's anything that Your Honor could

22   rely upon to find that there's undue risk of other unlawful

23   injury.

24        Let's now turn to 107(b).  107(b), as Your Honor

25   probably is involved with very often in Chapter 11 cases,

1    and you're well aware, the information -- it must contain

2    information that implicates the movant's business

3    operations.  Disclosure of the information must reasonably

4    be expected to cause the entity commercial injury.

5              And I'm just quoting a few cases here.  The Court

6    must find that the information is so critical to the

7    operations of the entity seeking a protective order that its

8    disclosure will unfairly benefit that entity's competitors.

9              Your Honor, we cited a number of cases that

10   demonstrate when this example is applicable.  Georgetown

11   Steel, disclosure of the company's employee's names and

12   salaries, the Court found that it would threaten the

13   debtors;' ongoing business operations and put it at a

14   competitive disadvantage.

15             The Borders case, disclosure of information in the

16   purchase agreement related to vendors, employees, and

17   financial data that also would give competitors an unfair

18   advantage.

19             And, finally, Frontier, disclosure of a list

20   containing the debtors' contractual counterparties would

21   give competitors an unfair advantage.  That's the context

22   when you see that argument made and sometimes it works and

23   sometimes it doesn't.  But this is not that context.

24             Your Honor, first, it's the individual law firms

25   that have standing to make this argument, not the asbestos

1   claimants which is who the TAC is claiming to represent

2   here.  The asbestos claimants don't care about the TAC or

3   the law firms who are here representing themselves today.

4   The individual asbestos claimants had no business operations

5   to be concerned with.  Unless Mr. Maclay is going to

6   represent to this Court that he's here before Your Honor

7   representing every law firm who filed these statements, I

8   just don't see how 107(b) would even be argued.  It doesn't

9   make any sense.

10          Second, Your Honor, the 2019 statements routinely

11  were disclosed.  And we haven't been able to obtain the 2019

12  statements that were filed in a third of the bankruptcy

13  cases that have been filed across the United States.  The

14  fact that these 2019 exhibits contain asbestos claimant

15  information as opposed to other types of clients have no

16  bearing on whether this information is commercially

17  sensitive.

18          Certainly the TAC can't now argue that law firms

19  that routinely filed these 2019 statements that were not

20  filed off the electronic document -- docket all of a sudden

21  have relevance and importance greater in these cases because

22  they happen to not be filed on the docket.  It is the exact

23  same information with different names and different social

24  security numbers and different diseases, nothing more.

25          The only real argument that the TAC has, putting

1   aside the issue that they're representing law firms when

2   they make that argument, is that the retention agreements

3   are commercially sensitive.  And I don't know why they

4   devoted a page to this in their brief because we haven't

5   asked for the retention agreements and we've made that clear

6   from the beginning.  But that's really the only argument

7   that they might have.

8        (Pause)

9            MR. AZMAN:  Your Honor, that's all I have.  I just

10  want to reiterate that Your Honor needs to make a decision

11  under 107 here.  107 trumps the common law.  Courts in this

12  circuit have held that.  And they have made absolutely no

13  showing, there's no evidence.  So we would ask that Your

14  Honor grant the motions and grant our access.  Thank you.

15           THE COURT:  All right.  Thank you, Mr. Azman.

16           Ms. Sieg.

17           MS. SIEG:  Your Honor, I had a few follow up points

18  to make and I would like to focus first on your concern

19  about whether the Third Circuit's affirmance of Judged

20  Fitzgerald's original orders have set up a, kind of a

21  binding process.

22           And, Your Honor, what happened in that Third

23  Circuit decision is it affirmed the process for getting

24  these things on file, getting them into the Court.  And it

25  said, public access issues will be handled later.  If

1    anybody comes in and asks for them that's a separate issue

2    that's got to be determined later.

3            Now in Judge Starke's decision that happened to

4    some extent.  Garlock came in to these cases and said, hey,

5    I want access to all these 2019 statements.  So Judge Stark

6    was asked to decide, does 107 apply to them.  If so, has the

7    presumption of access been rebutted.  And he said, no.

8            The second piece of what is now presented to Your

9    Honor for the first time on a contested basis is whether

10   there should be access and, once granted, whether there

11   should be restrictions.  The Third Circuit has never said

12   that that is the analysis Your Honor is bound to perform.

13   And I would like to cite to Your Honor two cases from the

14   Third Circuit that actually say, no, Your Honor is not bound

15   by these prior orders.

16           The first is the Miller case and that's at 16 F.3d

17   at 551 and 552.  And, Your Honor, there the Third Circuit

18   said, "The public's interest in access judicial documents

19   isn't resolved for all other parties and for all time by

20   injury of one initial order."

21           So this is not the type of situation.  Public

22   access issues are not the type of situation where there is a

23   law of the case kind of argument.  Your Honor, that -- there

24   is a wealth of case law in the Third Circuit that goes

25   against that proposition.

1            And Your Honor emphasized that Mr. Azman and myself

2   are here today on behalf of specific clients.  That is true.

3   I represent Ford Motor Company.

4            THE COURT:  Right.

5            MS. SIEG:  And the right that Ford is asserting is

6   the right to public access under various theories, primarily

7   Section 107.  And, again, I'll point Your Honor to a Third

8   Circuit decision. It's the Bank of America decision at 800

9   F.2d at 345.  And the Third Circuit said, the public's

10  interest in accessing judicial documents isn't lessened

11  because they're asserted by a private party and not, for

12  example, a news organization.

13           That -- the identity of the person requesting

14  public access isn't determinative of the kind of access that

15  should be granted.  And it's for that reason that the

16  purpose to which the documents are going to be put is not

17  relevant.   And, Your Honor, I would just again go back to

18  the language of Section 107 which clearly applies.  And it

19  doesn't involve a determination about what the papers are.

20  It says, papers filed in a bankruptcy case.  You do not get

21  into a discussion of, well, one judge thinks that this paper

22  doesn't mean anything.

23           Judge Fitzgerald, for example, doesn't think that

24  Rule 2019 statements constitute an assertion of a claim.  I

25  disagree with that.  Your Honor, we live in the bankruptcy

1   world where defined terms have meaning.  Rule 2019 applies

2   to creditors.  There is an FCR appointed in cases that are

3   designed to address the interest of future claimants.  So

4   future claimants are not required to file 2019 statements.

5            THE COURT:  Right.

6            MS. SIEG:  Creditors are.  And, Your Honor, in the

7   Garlock estimation trial that Court certainly thought that

8   2019 statements have evidentiary value as some evidence that

9   a particular creditors may have been exposed to the products

10  of companies against whom they've filed a Rule 2019

11  statement.

12           SO there are differing views all over the country

13  about the evidentiary value of these.  And, of course, that

14  depends on the type of proceeding in which they're intended

15  to be used.  But that inquiry is not something that Your

16  Honor has to or can undertake under this Section 107

17  analysis.

18           And, Your Honor, the suggestion that you don't have

19  authority to grant the relief that we're seeking because the

20  Western District of North Carolina has a copy of a CD that

21  was made when Garlock requested these documents I think is a

22  silly proposition.  But if that were the case, the binding

23  precedent in that jurisdiction would require release of

24  these Rule 2019 statements.  Not these 2019 statements but

25  others were at issue in the Garlock estimation proceeding

1    and that Court held that 2019 statements are subject to the

2    public's right of access and they're not subject to any

3    restrictions.

4              Your Honor, the Rule 29 statements are important.

5    Our opponents today recognize that they impact who can vote

6    on a plan.  They are very significant disclosure issues

7    under Rule 2019 and they identify the names of creditors.

8    And, Your Honor, that's all we're here today to find out is

9    who filed 2019 statements in these cases.

10             Your Honor, I'm sorry if I'm skipping around a

11   little bit.  I would point out that Mr. Maclay suggests some

12   restrictions on use is required because otherwise there

13   could be identity theft or there could be harassment of

14   these innocent victims.  Your Honor, this type of

15   information has existed in the public domain for a couple of

16   years now from the Garlock case on a very, very broad basis.

17   You know, the telephone directory analogy, that exists.  The

18   Court published a link to it on its own website, the Western

19   District of North Carolina.  So there has been a telephone

20   directory of the alleged innocent victims for years.

21             And there is not a single example before Your Honor

22   of an asbestos creditor or any type of creditor who has been

23   subject to an undue risk of identity theft, not a single

24   example in the whole nation have they been able to come up

25   with today.  And this exact type of information has existed

1    in the public domain for a while.

2           And, Your Honor, this ties in, it dovetails with

3    another reason why you shouldn't impose use restrictions on

4    these documents.  For example, in the sample ballot that

5    Honeywell attached to one of its pleadings in this case you

6    can see that in eight of the nine cases at issue today the

7    ballots indicate whether certain of those voting creditors

8    had previously filed 2019 statements in this Court.

9           And, Your Honor, those documents are subject to

10   unrestricted use and publication by any member of the public

11   including Ford, including Honeywell.  So if Your Honor were

12   to say, Ford and Honeywell, you cannot use evidence of a

13   Rule 29 statement that one of these people filed in one of

14   these cases, that would contradict the fact that that

15   information is already in the public domain to some extent.

16   So that would lead to contradictory results and it would

17   lead to increased litigation.

18          I mean, these are cases for the most part that have

19   been closed for years.  And to set up a process where every

20   time someone wants to see these things they have to come

21   back into this Court is a process that would not be

22   sustainable.  And it's not required under the Third Circuit

23   precedent for the reasons that I explained when I first

24   stood up a moment ago.

25          Your Honor, I would point out as well that debtors,

1    even asbestos debtors are required to file schedules and

2    statements of financial affairs.  Those things require them

3    to list the names and identities of creditors. Those things

4    have been filed not under seal for years and years and years

5    and there has never been a suggestion that schedules of

6    asbestos debtors should be put under seal because these are

7    special creditors who are subject to some heightened risk of

8    identity theft.

9         There are massive Chapter 11 cases where there are

10   thousands and thousands of individual creditors employees,

11   different kind of vendor creditors and none of them, not a

12   single example has been cited where the fact that their

13   identity as a creditor has been disclosed has subjected them

14   to an undue risk of identity theft.  And that's not a

15   situation that would be workable in any way, shape or form

16   in Chapter 11 cases for debtors and others to try to figure

17   out which creditors are deserving of some special secrecy in

18   a case.  It's just not a workable system.

19        And in terms of the cost for providing public

20   access to these particular documents, I would say, you know,

21   that's a function of what in my view was a faulty process to

22   begin with.  But I do have a suggestion that I think would

23   resolve the Court's concern about the cost of granting

24   access.  And in the Garlock case when we got access to the

25   giant estimation trial record it was over 2 million pages of

1    documents.  There was a concern that, you know, we were

2    supposed to redact the first five digits of social security

3    numbers and medical information, but there was a concern

4    given the volume that something might slip through the

5    cracks.

6            THE COURT:  Right.

7            MS. SIEG:  And so the order provided if you receive

8    something that should have been redacted, you destroy is,

9    you return it you don't use it.  I suggest a similar

10   provision could be appropriate here.  We know that a process

11   has already been done to do the appropriate redactions.  The

12   concern was, oh, well, we didn't do our QC process.  Okay.

13   Well, then if something has slipped through the cracks then

14   that can be destroyed, returned, not used.  But that is not

15   a reason to violate the First Amendment and impose very

16   broad use restrictions on the entities that are seeking

17   public access.

18           And, Your Honor, I would just -- this is just a

19   small point, too.  Mr. Maclay suggested that further

20   proceedings might be necessary to consider these very

21   important constitutional issues.  I would just say that the

22   constitutional issue was implicated by the request for

23   public access.  If they have an argument that is supposed by

24   any case law that suggests  use restrictions are appropriate

25   they could have presented those in their opposition papers

1    and they didn't.  They actually didn't cite any case law

2    other than the Judge Starke decision which I've just

3    explained isn't binding in this regard.  They cited no case

4    law that would support Your Honor's imposition of those kind

5    of use restrictions and it would violate a wealth of

6    existing third circuit case law.

7            Unless you have any further questions that

8    concludes my remarks.

9            THE COURT:  All right.  Thank you, Ms. Sieg.

10           Mr. Maclay.

11           MR. MACLAY:  Thank you, Your Honor.

12           Your Honor, first I'll address a question you

13   raised and then I will respond to both a couple of

14   misstatements about my own behavior with respect to this

15   matter as well as some new arguments which weren't addressed

16   initially in the opening statements which I would like to

17   briefly respond to.

18           Your Honor, you had asked the question about, to

19   what extent do you need to find specific facts when

20   evaluating the risk of identity theft and other

21   confidentiality harms.

22           THE COURT:  Right.

23           MR. MACLAY:  And I would make a couple of points

24   about that question, Your Honor.

25           First, the record in front of Your Honor is the

1    same record that was in front of Judge Starke.  And Judge

2    Starke certainly found that record to be sufficient to

3    impose substantial restrictions designed to protect the

4    confidentiality issues.

5              With respect to the kinds of harms that could come

6    about, I will note that 107, which they say governs, talks

7    about an undue risk of harm.

8              Well, implicit in the concept of a risk of harm,

9    Your Honor, is we're talking about things to happen in the

10   future.  And when we're talking about things that will

11   happen in the future it's hard to do more than think through

12   what would logically be likely to happen.

13             It's not unreasonable, Your Honor, to think that if

14   people's personally identifying information is released into

15   the public record associated with their disease types,

16   associated with portions of their social security number if

17   not the whole thing, that that would lead to identity theft

18   as the statute specifically mentions, potential Medicare

19   fraud claims brought by other people, potential trust

20   admissions done fraudulently by other people, potential IRS

21   refund claims done by other people.  The statute protects

22   personally identifying information because it's so obvious

23   and so clear that these risks exist, Your Honor.

24             In fact, in the Dex Media case that was why the

25   addresses were not provided.  Well, the addresses are a

1    portion of what's in these 2019s, Your Honor, these peoples

2    addresses and their names and a portion of their social

3    security numbers and their disease, lots of information

4    which when you put it together can be used for the obvious

5    nefarious purposes of identity thieves or others.

6          And we heard from the movants that we haven't

7    identified any particular identity thief which I found to be

8    a fascinating proposition.  I suppose I could go onto some

9    criminal dockets and get you the names of some identity

10   thieves, Your Honor.  But as I mentioned in my initial

11   remarks we do know one thing about identity thieves, they

12   exist and they want to open up these documents to the world.

13   So by definition they want to open up these documents to

14   identity thieves.  What more proof do you need, Your Honor.

15   It's quite clear.

16          With respect also to the particular facts point,

17   remember something else about these cases.  You've heard

18   people tell you they don't need to be reopened.  And as a

19   proposition that's general I don't have a problem with that.

20   But the creditor matrices have not been maintained.  A lot

21   of the plaintiff's law firms have been dissolved or no

22   longer exist or no longer represent those same claimants.

23          It is certainly fair as a constitutional matter, if

24   you want to talk about the constitution, that there's been

25   no notice to many of these affected individuals.  Given

1   that, I think Your Honor should be quite careful before

2   holding an insufficient factual record has been established

3   to protect those elderly, sick, individuals or their widows

4   from potential abuse by whomever, either these Fortune 500

5   companies or the world to which they wish to open up the

6   information.

7            I was accused that I was being disingenuous, Your

8   Honor, because on behalf of the Garlock committee I

9   negotiated a consent order whereas here I don't agree to

10  similar protections according to them.

11           Your Honor, first of all as a legal matter it is a

12  universally understood proposition that consent orders have

13  no precedential value even as to the same parties.  And so

14  the idea that the Narco TAC would be adversely affected

15  because I'm the lawyer representing them is odious, contrary

16  to law and supported by no precedent whatsoever.  And the

17  concept that I am being tersely disingenuous for

18  representing my client's interest here is offensive, Your

19  Honor, and I take offense to it.

20           The point is the Garlock case was a quite different

21  case with a whole lot of different factors.  And if I were

22  free to disclose my client's confidences I could explain

23  some of the differences, but I can't.  But I can say they

24  exist and that's why the law is quite clear that it's

25  irrelevant here.  They have no -- what happened there has no

1    precedential effect, period.  That's just a legal principal

2    which is unrebutted.

3           With respect to their desire to open it up to the

4    world they say because they collaborate with other people.

5    Your Honor, Judge Stark said you can't use this information

6    except in the aggregate that doesn't identify any individual

7    people.  Their express purpose to collaborate with various

8    unidentified other people potentially including Ford to

9    pursue these individuals is -- flies in the face of Judge

10   Starke's order.

11          And it's very interesting that when you saw their

12   original papers they were quite careful not to say that they

13   were actually asking your order to essentially reverse Judge

14   Starke's decision or at least ignore the restrictions that

15   were baked into his ruling.  But it's become quite clear,

16   Your Honor, if there was any doubt about that that that's

17   exactly what they're saying.  They're not saying, do what

18   Judge Starke did.  They're saying don't do what Judge Starke

19   did because if you did do what Judge Starke did they

20   wouldn't get these documents or if they did it would be

21   constrained to a very narrow purpose not to be used against

22   individuals.

23          It's interesting.  They argue that some 2019s for

24   the first time in reply have already been out there so why -

25   - why have there not already been harms from that.  Well,

1    Your Honor, the answer is simply.  There are three 3300 CVs

2    with hundreds of thousands of people.  It's quite possible

3    there have been people whose identities have been stolen.

4    How would we know?  The volume is so vast it's impossible to

5    know for sure.

6          But we know there's a risk of it and that's what

7    the statute and the common law look to, the risk.  The risk

8    is clear as you said in Dex Media.  Home addresses are

9    something which can be misused.  That's why you didn't

10   permit it to be done there and you said, I think in the

11   present day with the abuse of private information that those

12   addresses need to be redacted.

13         The same thing is true here, Your Honor.  You don't

14   -- it's not overly speculative to say that identity theft

15   exists.  In fact, it's noted in the statute as a basis for

16   your Court's decision.  And so the idea that we need to

17   identity particular identity thieves is just unsupportable.

18         This concept that we don't represent law firms and,

19   therefore, we can't speak for their interest with respect to

20   107(b) is an interesting argument.  It's never been in any

21   of their briefs.  If it had been perhaps we would have more

22   law firms here represented by separate counsel.

23         But what I do know, Your Honor, is that when Judge

24   Starke made his ruling he did so on the basis and in part of

25   the committee's representations that those law firms'

1    interests were affected. T he law firms' interests are

2    clearly comingled with those of their constituents.

3            And to the extent they're trying to make a standing

4    argument it's too late to do so now, Your Honor.  And if

5    they wanted to make a standing argument it should have been

6    in their briefs and we would have responded to it

7    appropriately.  But the fact is the interest of the asbestos

8    constituency is interlinked with the interests of their law

9    firms and I believe that on behalf of the Narco TAC I have

10   standing to speak to both, and if they didn't think that

11   they should have made it part of their standing objection

12   which they didn't do.

13           Now with respect to the Miller case that Ms. Sieg

14   was -- reacted to --

15           THE COURT:  Yes.

16           MR. MACLAY:  -- in her reply remarks, (a), Your

17   Honor, I believe she misstated that case which I fortunately

18   happen to have with me.  And, two, before I get to the quote

19   from the case which I think is most pertinent, Judge Starke

20   held expressly in his opinion that the Rule 2019 orders

21   initially entered by Judge Fitzgerald were not subject to

22   collateral attack.  He ruled that out in his order.

23           THE COURT:  Correct.

24           MR. MACLAY:  So o what she's saying now is

25   basically ignore his ruling on that point, open them up to

1    collateral attack.  I don't think that's consistent with the

2    law and it's certainly not consistent with the law of this

3    case.

4            Now from the Miller case, Your Honor, there's this

5    quote and this is 551 to 552 of that case:

6            "Even if the initial sealing was justified, when

7    there is a subsequent motion to remove such a seal the

8    District Court should closely examine whether circumstances

9    have changed sufficiently to allow the presumption allowing

10   access to court records to prevail."

11           So it is certainly true, Your Honor, that they can

12   bring this motion.  They have brought this motion.  Here

13   they are in front of Your Honor.  That's all the Miller case

14   says.  It doesn't say that nothing that happened before is

15   relevant.  Of course they're here.  They have the right to

16   ask for the documents.  That's what they've done.  But that

17   doesn't mean they automatically get the documents.  It

18   doesn't mean that all the prior precedent in this

19   jurisdiction is irrelevant.  It's all quite relevant as

20   Judge Starke recognized.

21           And there are a number of times that you have heard

22   from the movants about what happened in Garlock.  What

23   happened in Garlock, again, was a consent order.  That's all

24   there was.  There was no ruling by Judge Hodges independent

25   of the consent order.  It was just a consent order.  It has

1    no precedential value, so just keep that in mind every time

2    they talk about what happened in Garlock.  It's legally

3    irrelevant.

4           And the concept that Judge Starke thought the 2019s

5    were relevant, I don't understand where that comes from

6    because we've already told you, Your Honor, that the 2019s

7    were not addressed in his decision.  So I guess they purport

8    to read Judge Hodges' mind because that's the only way they

9    could make that statement.  It's not in his decision.

10          The 2019 statements themselves are not part of any

11   phone directory.  As I mentioned they were never provided to

12   the Court.  So, clearly, whatever link Ms. Sieg was talking

13   about it does not contain these documents and this

14   information.  And the Supreme Court has said and it's

15   unrebutted by the other side that the fact that some

16   information in certain documents may be available in other

17   forums does not remove their privacy protections here.  Your

18   Honor has to consider the privacy protections in these

19   documents before Your Honor that are the subject of this

20   motion.

21          THE COURT:  Does 107 trump the common law, Mr.

22   Maclay?

23          MR. MACLAY:  Not in this case, Your Honor.  In

24   fact, I would say generally not.  But that isn't something

25   that's been clearly briefed by the other side because they

1    lead off with the common law.  Now they want you -- to tell

2    you it's irrelevant.  It's interesting it's more than half

3    of their briefs.

4         So the short answer, Your Honor, is no.  But even

5    if it did it wouldn't matter because the similar analysis

6    applies as I laid out in my initial remarks.  And there are

7    numerous cases, Your Honor, that -- as I mentioned in my

8    initial remarks.

9         For example, look at purpose under 107 and do a

10   sort of balancing test under 107.  The Kaiser District Court

11   in this very -- one of these very cases did that.  So it --

12   I think it's clear that with respect to the current dispute

13   in front of Your Honor 107 does not sort of belie the common

14   law protections, especially given their reliance on the

15   common law.  Although I ultimately do believe the analysis

16   would b the same under 107 as I've laid out.

17        Ms. Sieg made an interesting argument for the first

18   time today about bankruptcy schedules and about how they

19   contain some of this information.

20        Well, first of all, that's already addressed by

21   what I've just said about the Supreme Court.  It doesn't

22   matter if it's already available in some form.  But I will

23   note, for example, in a piece of paper that I just happen to

24   be hopefully handed by one of my co-counsel here today, that

25   there are cases that have the debtors redact things from the

1    schedules because of personally identifying information.

2    For example, in the SCF Entertainment case, 16-10238

3    Bankruptcy -- the Bankruptcy District Court of Delaware

4    authorized the debtors to file schedules and statements with

5    redactions of the names of creditors and the addresses of

6    the employees.

7            And so, frankly, that point undercuts their

8    position here, Your Honor.  It's not required to be in the

9    schedules always.  It depends.  Sometimes it's precluded

10   from being on those schedules.

11           So to make sort of a summation here, Your Honor,

12   Judge Starke only gave access to the 2019 exhibits under

13   very stringent conditions limited to very narrow purposes.

14   And they've acknowledged that a purpose is to be different

15   than those purposes in a way which is odious and contrary to

16   the law and Judge Starke's reasoning.

17           So if Your Honor were to follow Judge Starke's

18   reasoning you would either not all the production at all or

19   you would only allow it to be used with respect to the

20   particular proceeding in front of the Western District of

21   Pennsylvania with respect to cross processing  subject to a

22   protective order to be issued by that court and --

23           THE COURT:  What --

24           MR. MACLAY:  -- and all the other limitations that

25   Judge Starke imposed.

1           Thank you, Your Honor.

2           THE COURT:  Thank you.  Thank you, Mr. Maclay.

3           Yes.

4           MS. SIEG:  Yes.  Just briefly.  I just realized

5    there may have been a confusion between the two types of

6    previous Garlock orders that we've been talking about.

7           THE COURT:  All right.

8           MS. SIEG:  One was the consent order that granted

9    public access to the Garlic Rule 29 statements.  The other

10   order, which was not by consent, which was on a fully

11   contested basis was where the Bankruptcy Court supported by

12   a prior ruling by that District Court held that all of the

13   estimation trial evidence was subject to the public right of

14   access and shouldn't be subject to any use restrictions

15   included in that estimation trial evidence or 2019

16   statements filed in other cases.

17          And that Court held that the 2019 statements did

18   have some evidentiary value and that was part of the reason

19   why public access was granted because these things were

20   introduced at trial.  They were filed in the court.  They

21   were subject to 107.

22          So there were -- I wanted to clarify that there are

23   two prior Garlock orders, one of which was done by consent -

24   -

25          THE COURT:  When was that in relationship to the

Page 125

1    second?

2              MS. SIEG:  To the -- I'm sorry.

3              THE COURT:  To the district court ruling?

4              MS. SIEG:  Well, the district court in the summer

5    of 2014 held that the bankruptcy court in North Carolina had

6    erred when it initially allowed all of the trial evidence to

7    come in under seal.  It said that that was totally

8    inappropriate and the public has a right of access to these

9    documents.  It remanded the case to the bankruptcy court to

10   allow it to issue a ruling granting public access subject to

11   restrictions of the type that are set forth and requirement

12   in Bankruptcy Rule 9037.

13             And then after that litigation which was on remand

14   in the bankruptcy court, that resulted in the order on a

15   fully contested basis where the Court held that all of the

16   estimation trial evidence including certain 2019 statements

17   are subject to the right of public accessed.

18             Your Honor, one additional clarifying point.  Mr.

19   Maclay just suggested that use be restricted to this other

20   proceeding in Pennsylvania.  Ford's not a party of that.

21   That would be a totally useless proposition from Ford's

22   perspective.  And it -- again, for all the reasons I've said

23   it's not supported in the case law.

24             I would like to make one --

25             THE COURT:  What is Ford's purpose?

1          MS. SIEG:  Ford's purpose is to see who the

2     creditors were in these cases.  It's as simple as that.

3     These are papers that were filed in these cases and we're

4     interested to see who the creditors were who filed 2019

5     statements.  Ford may have a myriad of other purposes that

6     it will, you know, think about and do over the coming years.

7          I mean, I don't think I'll represent Ford for the

8     remainder of my life as much as I would hope that I do.  But

9     they -- I mean, the -- I am not capable of describing all of

10    the various different purposes that one day these things

11    might be useful for.  And people disagree about their value,

12    but that doesn't have any significance in terms of what the

13    public is entitled to access to under 107.

14          And I would just point out again, I think I've made

15    this clear.  The Garlock court in its estimation decision

16    did, in fact rely on 2019 statements as alternative exposure

17    evidence.  And I -- we don't need to dwell on that, but the

18    Court did use these things.  It didn't cite them in its

19    estimation opinion only because it was still operating under

20    the erroneous orders that required all this stuff to be

21    sealed.  That's why they're not cited in the opinion because

22    it took millions of dollars and years of litigation to get

23    those things unsealed as they should have been from the

24    beginning.

25          And lastly the case that was just cited about the

1    one court that did allow some sealing of certain creditor

2    information and schedules, that case involved -- I think

3    that involved an involuntary petition.  I'm not sure on

4    that.  But regardless of what it -- whether it was voluntary

5    or involuntary there was a specific finding that a director

6    competitor of the debtor could exploit the identity of the

7    creditors in order to get a competitive advantage.

8            And so 107(b) was supported by specific evidence in

9    that case and that is totally lacking from what we have

10   here.  There is no, as Mr. Azman pointed out, there is no

11   competitive advantage from people finding out who the

12   creditors were in these nine cases.

13           Thank you, Your Honor.

14           THE COURT:  Thank you, Ms. Sieg.

15           MR. AZMAN:  Your Honor, Darren Azman again. Just a

16   few points in rebuttal.

17           The restrictions in Garlock by Judge Starke were

18   consensual.  We cited it in our reply brief, but I'll quote

19   just some of the language from the transcript.  This is

20   Judge Hodges speaking:  "There" -- and there's a couple of

21   typos from what he's -- what the transcript says:

22           "There is a couple of references, at least one in

23   your reply brief" -- and this is him talking to Garlock's

24   counsel -- "and I think one of the appellees also about

25   whether the Court could or should impose any confidentiality

Page 128

1    limitations if you were to prevail in this appeal.  I wasn't

2    sure whether I should infer from the argument in your reply

3    that Garlock would be open as a condition of obtaining some

4    access to some of these exhibits, to have some type of

5    restriction imposed on its use.  Is that something Garlock

6    is offering or not?"

7             In response, Garlock's counsel:

8             "Yes.  We did offer that below, Your Honor.  We

9    think that once the Court finds that there is some serious

10   injury that could be rendered that doesn't end the question.

11   The Court at that point can tell of the disclosures to avoid

12   that injury."

13           Now here we don't think that there is an injury,

14   but we did offer that we would keep the information

15   confidential.  It was consensual.  That's the only reason

16   why there's anything in that opinion about the need to

17   restrict access.

18           Now in terms of not granting anyone by Ford and

19   Honeywell access to the 2019 exhibits I will read from Judge

20   Starke's opinion:

21           "The sharing of information among litigants may

22   help promote fairness and efficiency.  Also favoring access

23   is that the issues involved here going to liabilities

24   arising from a mass tort are important to the public."

25           Your Honor, sunshine is the best disinfectant.

1    That is our view and I know that that's Ford's view and

2    other asbestos defendants.

3         Now let's talk about what harm has happened.  Your

4    Honor, this info has already been out there for many years.

5    Nothing has happened.  And how would we know if this harm is

6    what Mr. Maclay suggests.  Did you ask -- did he ask any of

7    his purported constituents who he represents/  Is there a

8    declaration?  Is there even a declaration that says from a

9    clamant, Your Honor, I don't know that there's actually harm

10   or that there will be, but I'm fearful there's going to be

11   some type of harm.  There's not even the most basic type of

12   evidence.  And last time I checked unsubstantiated

13   statements by counsel is not evidence.

14        And that's all you have, Your Honor.

15   Unsubstantiated statements that don't even articulate the

16   degree that is necessary of harm in order to find that one

17   of the 107 exceptions applies.

18        Mr. Maclay cited some broad arguments about

19   Medicare fraud would apply.  You know, that argument could

20   be made with respect to any type of information that's in

21   the public domain.  Whether it's schedules as Ms. Sieg

22   pointed out of creditors names or whether it's the 2019

23   exhibit information or the very complaints that asbestos

24   claimants file in State and Federal courts.  So I just don't

25   see how that argument cuts it or makes any sense.

1          I want to briefly address the notice argument.  Mr.

2     Maclay briefly in passing and he did this in his brief as

3     well mentioned, well, maybe nobody got notice and there's

4     not sufficient notice.

5          Your Honor is familiar with Epiq Bankruptcy

6     Solutions I presume.  Epiq does a significant amount of

7     noticing for Chapter 11 cases and that's who we retained to

8     go out and figure out addresses of every law firm that found

9     -- that filed a 2019 exhibit.  We didn't just look on the

10    docket.  You know, as many people have recognized these

11    cases are old and we realize that. Bit we did -- we went

12    above and beyond.  We spent a significant amount of money to

13    look at websites of these law firms to see who is still

14    there, who's not there, who was in the case.  And every

15    single law firm that we could figure out got notice of this

16    motion.

17         So notice is just not an issue and they have not

18    presented any evidence as to somebody who may not have

19    received notice.

20         Now Mr. Maclay talks about their being differences

21    between Garlock and this case.  He negotiated the order in

22    Garlock.  The 2019 exhibits that were filed in Garlock which

23    we're happy to present to the court because that order

24    allows us to do that, they're no different than the 2019

25    exhibits that were filed in these cases or any of the other

1    cases where we have been able to obtain the 2019 exhibits.

2          So I know he's eluding to some facts that he thinks

3    may be different and because of the attorney/client

4    privilege he can't disclose it, but I don't know what he

5    could possibly be talking about.  The information is exactly

6    the same.  The fact is he negotiated an order for the same

7    type of information in Garlock that we now have before Your

8    Honor and it is -- and I will repeat it.  It is disingenuous

9    and I understand he takes offense to that, but I don't see

10   how that is not disingenuous that he negotiated an order

11   that is exactly the same as we're asking Your Honor to enter

12   today.

13         Lastly, Your Honor, you've heard a number of

14   attorneys on the other side talk about our pursuit of

15   individual asbestos claimants.  What you haven't heard, Your

16   Honor, is anything about maybe a pursuit against law firms.

17   And you know what?  That's actually already been done.

18   There are a number of RICO actions that have been filed by

19   Garlock against law firms including Walters & Kraus because

20   counsel is here today.

21         So let's not make this about law -- litigation

22   against individual defendants.  There are a number of uses

23   and it's not just that.

24         That's all I have, Your Honor.

25         THE COURT:  All right.

1              MR. MACLAY:  Your Honor, I hadn't expected that

2     today we would be talking so much about a different case as

3     opposed to what Judge Starke did in these cases, but I will

4     tell you a couple of facts about the Garlock case to shed

5     some light on what you've been told today.

6              The 2019s that the other side has talked about were

7     for 15 designated claimants as opposed to hundreds of

8     thousands.  And they were cherry-picked by the debtor, of

9     course, because it was part of its attempt to make certain

10    arguments.  As I mentioned Judge Hodges didn't rely on them

11    at all.  And when they were added into the estimation record

12    which was itself made public they were redacted of all sorts

13    of information including diagnosis, date et cetera.  So even

14    if they were relevant in any way the arguments that have

15    been made on their basis -- on the basis of them are false.

16             But moreover Judge Starke in these very cases

17    already said that these are worthy of privacy protection.

18    We don't need to look at what other courts have done, Your

19    Honor.  Look at these cases and Judge Starke's decision.

20             The concept that we on behalf of the Narco TAC

21    should have gone to the homes presumably of these widows or

22    dying elderly victims of asbestos is odious, Your Honor, for

23    the reason I mentioned before.  (A) we represent the

24    interests of all of them collectively, but moreover, Your

25    Honor, you -- would it really have benefited Your Honor to

1   have a declaration from some elderly widow that she is

2   afraid of identity theft.  I guarantee you I could produce a

3   thousand of those, Your Honor, because it's obvious.  Of

4   course there's a risk of identity theft and of course people

5   would be concerned about it if it were brought to their

6   attention.

7           But this notice issue that the other side just so

8   cavalierly dismissed is a real one.  They said -- and by the

9   way the concept that lawyer statements are not evidence, but

10  then his lawyer statement that we did everything we could do

11  for notice, there's no evidence of any of that.  And if this

12  were really an issue we should get some evidence on that.  I

13  would love to see it.

14          But the reality is a lot of those law firms don't

15  exist.  A lot of those law firms would no longer represent

16  those people.  These cases that have been closed in some

17  cases for ten years, the creditor matrices have not been

18  maintained. There is no ability of this Court or any court

19  to say these individuals have gotten any kind of sufficient

20  notice.  And that is why Your Honor should keep that in mind

21  when undertaking the analysis and be very skeptical of those

22  sorts of attacks.

23          And if Your Honor did believe a further evidentiary

24  proceeding were necessary we've already suggested Judge

25  Fitzgerald in that role in our papers which is a point I

1    guess we'll get to next.

2              That's all I have, Your Honor.

3              THE COURT:  All right.

4              MR. AZMAN:  Your Honor, two very brief -- I'll be

5    less than a minute.

6              THE COURT:  Less than a minute.  Okay.

7              MR. AZMAN:  Less than a minute.

8              It was not 15 claimants whose information was

9    disclosed.  We got access to hundreds of 2019 exhibits.  Mr.

10   Maclay is talking about the evidentiary record excluding the

11   2019 exhibits.  So 2019 exhibits, we got all of them, lots

12   of information, the same stuff we're seeking here.

13             Second, on the notice issue the evidence is in the

14   record, Your Honor.  Epiq filed affidavits of declaration

15   like they do in every single case and Mr. Maclay has not

16   filed anything that attacks whether or not notice was

17   sufficient other than the statements he just made.  So

18   unless -- it's not the -- the burden is not on me after a

19   declaration has been filed to further substantiate that.  So

20   that's already been done.

21             THE COURT:  All right.  All right.

22             Well, let's turn to Judge Fitzgerald and a motion

23   for a referee special master and Judge Fitzgerald's role.

24             MR. MACLAY:  Thank you, Your Honor.

25             THE COURT:  Yes.

1          MR. MACLAY:  And I'm pleased to report to Your

2    Honor that at least from our perspective this portion of the

3    argument will be relatively brief because I think the issue

4    is simple.  Judge Fitzgerald would make sense here as a Rule

5    2019 expert and referee because she was the judge for almost

6    all of the asbestos bankruptcies in the Third Circuit

7    including all of the cases in front of Your Honor.

8          THE COURT:  Right.

9          MR. MACLAY:  She drafted the orders that Your Honor

10   has been called upon to implement.  Their motion

11   (indiscernible) pursuant to the orders she entered.  She

12   also -- they focused attention on the fact she issued an

13   initial decision which was reversed by Judge Starke.  But

14   after that she implemented his decision.  She entered a

15   protocol order on remand in, again, all nine of these cases

16   providing and putting, you know, flesh on the bones of the

17   limited access that Garlock was being provided for

18   particular uses.

19          THE COURT:  But why do I need her?

20          MR. MACLAY:  Well, Your Honor, whether or not you

21   need her is ultimately your decision.  And I don't want to

22   propose to tell Your Honor that you need her or anyone else.

23   Why she would be helpful, though, I think is the legal test

24   for whether Your Honor would want to appoint an expert or

25   other court-appointed referee position.

1          And I think the way she might be helpful to Your

2     Honor is that if you decide to order any kind of disclosure

3     of this, and if Your Honor decides not to you might not need

4     her.  If you think they haven't established a proper purpose

5     or their purposes are too broad or they're violating Judge

6     Starke's restrictions, all of which I think are true, then I

7     think you may not need her.

8          But because of her knowledge of the documents,

9     because of her knowledge of the order, because of her

10    knowledge of the background, because of her knowledge of the

11    claimant, because of her knowledge of the course of all of

12    these asbestos bankruptcies I think she could provide

13    assistance to Your Honor in thinking through the risks, and

14    thinking through the legitimacy of the uses, and thinking

15    through the practicality of how to implement Judge Starke's

16    decision.  And she has already done that in the implementing

17    order.  But ultimately it's up to Your Honor whether you

18    think she'll be useful to you.

19         But what you heard at the status conference from

20    Honeywell was that she had a conflict and they were quite

21    convinced that she had a conflict.  And we told Your Honor,

22    Your Honor, we've done some research.  We can't find any

23    cases.  And then you authorized them to file a supplemental

24    brief on the conflict issue.  The transcript was quite

25    clear, on the conflict issue.

1              And what you got from them, Your Honor, didn't even

2    mention the word conflict I don't believe.  It certainly

3    didn't make a conflict argument.  There is no conflict.  The

4    only real basis that they have proposed to not have her be

5    used by Your Honor is the fact that she is conflicted -- she

6    gave Your Honor a letter which also made clear she had an

7    expert look into this.  There's no conflict.

8              So given that there's no conflict, given that she's

9    available to serve as she made clear in her letter, too, and

10   given that she has a lot of relevant knowledge both

11   factually and just experientially through the cases as well

12   as potentially legally, Your Honor may not need her, but I

13   think she'll be useful to Your Honor.  And what I would

14   suggest Your Honor do as I mentioned at the last status

15   conference is just pick up the phone and call her.

16   Honeywell seems to have some objection to that, but there's

17   no legal basis for that objection.  Honeywell would have no

18   objection -- no ability to object to your consulting with

19   your own court retained expert.

20             So it seems to me as night follows day, Your Honor,

21   you should be free to reach out to such a person and discuss

22   with them whether their appointment would be useful to you.

23   And that's what I would suggest you do if you have any

24   particular uncertainties as to whether she would be useful.

25             So because of her long-standing experience with

1    these cases and these exact issues and these exact documents

2    as well as Mr. Shineman who, in fact, implemented this

3    process before it just seems logical.  How could she not be

4    helpful?  And given that the primary purpose in their

5    initial paper at least that Honeywell put forward was to be

6    used essentially in front of her, Your Honor, in the Narco

7    mediation, that's just another reason why she would seem to

8    be a good fit for the process.

9            And that's, Your Honor, what I have to say about

10   that.

11           THE COURT:  All right.  Thank you, Mr. Maclay.

12           Mr. Azman.

13           MR. AZMAN:  Well, I think the one thing we can

14   agree on is we're both going to be fairly short on this,

15   fortunately.  Why do I need her?  That's a great question,

16   Your Honor.  We've been wondering the same thing for the

17   past couple of months, why do you need her.  There's no role

18   for a 2019 expert and referee.  This isn't an intellectual

19   property matter.  This isn't some novel area that Your Honor

20   is not capable of adjudicating.

21           Your Honor is more than familiar with reading case

22   law and understanding the history of 2019, and I think the

23   parties, including Mr. Maclay, have done an adequate job of

24   informing Your Honor of the history in these cases.  There's

25   case law directly on point in these cases.  Again, this is

1    not novel.

2         Your Honor, there's no compelling arguments on the

3    access motions and it's not surprising because there really

4    are none.  The issues have already been decided.  But

5    naturally as any good lawyer would do they attack though,

6    what other avenues do I have to do something about this, and

7    they threw up a hail Mary and they filed a referee motion.

8    I'm not saying it's not something I would have thought of or

9    tried to do.  I don't blame them.  But the fact is, is that

10   there is no role for a referee in this case.  It just

11   doesn't make any sense.

12        Now let me talk about the substance of why Judge

13   Fitzgerald should not and cannot be appointed.  Ex parte

14   communications, we've had them with Judge Fitzgerald

15   specifically related to the access motions, the substance.

16   And I'm not just talking about the ability or whether she

17   has a conflict or not.  There were ex parte communications

18   on that level as well.

19        But I want to clarify there were communications

20   with Fitzgerald and these were not on our own doing and this

21   was before the referee motion was filed.  So it had nothing

22   to do with, you know, preparing to make this type of

23   argument.  The fact is those conversations took place.

24        THE COURT:  Now on access to the 2019 exhibits?

25        MR. AZMAN:  Yes, Your Honor.  Substantive --

1          THE COURT:  Okay.

2          MR. AZMAN:  -- and I can't go into details --

3          THE COURT:  No.  No.

4          MR. AZMAN:  -- because of confidentiality, but we -

5     -

6          THE COURT:  Understood.

7          MR. AZMAN:  -- we did think it was important to

8     raise that.

9          Now here's a question.  Has the TAC had those ex

10    parte communications?  Well, you know, we raised that

11    question and we pointed out that upon information and belief

12    they have.  We don't know for sure, but that's our belief.

13    You didn't hear Mr. Maclay rebut that.  He didn't file a

14    surreply even though Your Honor said that he could ask for

15    that.  And he hasn't stood up and said anything about

16    whether they've had ex parte communications.

17          But it's interesting, Your Honor, why are they so

18    bent on getting Judge Fitzgerald appointed as a referee to

19    decide these motions.  It doesn't make a whole lot of sense

20    and that leads to only one conclusion.  They've had some

21    conversations with her that make it pretty clear maybe she's

22    a little bit favorable to what the TAC is asking for here.

23    And I don't really see any other way one could view what's

24    going on here other than that.

25          But I'm open to hearing other arguments that Mr.

1    Maclay may have for why they so desperately want her to

2    adjudicate these motions.

3             Now let's talk about Judge Fitzgerald's own

4    response to Your Honor's letter --

5             THE COURT:  Yes.

6             MR. AZMAN:  -- and we appreciate you sending that

7    response.

8             THE COURT:  And I've had no conversations with her.

9    That's the -- the letters are the sole communications.

10            MR. AZMAN:  I appreciate Your Honor letting me

11   know. And I know Mr. Maclay cavalierly said why don't you

12   just pick up the phone.  I don't know that Your Honor can do

13   that, but you're welcome to if you think that's appropriate

14   before you've decided the referee motion.

15            I'm going to read two quotes.  They're the most

16   relevant quotes in my view on the referee motion.  "I have

17   concerns relating to the Narco mediation."  That's one.  "If

18   any party to the Narco mediation is not comfortable with my

19   serving as a referee for the Court I believe it would be

20   very difficult for me to help the parties achieve a

21   resolution."

22            I don't really have much more other than those two

23   quotes.  I think they speak for themselves.  Judge

24   Fitzgerald sees a problem, whether it's a formal conflict or

25   not, you know, that's a totally separate issue.  She sees

1    this being a problem for the parties to reach a resolution

2    both on this matter and in the Narco mediation that is

3    ongoing.

4              Finally, Your Honor, as we noted in our papers Mr.

5    Maclay did state at the scheduling conference that if Judge

6    Fitzgerald for whatever reason is unable or unwilling to

7    accept the appointment we would withdraw the request.  I'm

8    not -- I don't think that she, you know, said she's

9    unwilling to do it.  I'm not saying that he was obligated to

10   withdraw the request.  But I do think that those two quotes

11   that I just read to Your Honor were just about as close as

12   you can get to saying what needed to be said for them to

13   withdraw the motion.  And we asked them to withdraw the

14   motion and they didn't.

15             So, Your Honor, again, there really is no need for

16   Your Honor to farm this issue out to Judge Fitzgerald as a

17   so-called 2019 expert.  And with that, Your Honor, I'll

18   rest.

19             THE COURT:  All right.

20             MR. AZMAN:  Thank you.

21             THE COURT:  Thank you, Mr. Azman.

22             MR. HARRON:  Just two things, Your Honor, very

23   briefly.  Again, for the record Ed Harron --

24             THE COURT:  Yes.

25             MR. HARRON:  -- for the Narco future claims

1    representatives.  I was on the calls with Judge Fitzgerald

2    where we addressed her mediating or advising the Court on

3    this issue.  There were no discussions of the substance of

4    dispute except consistent with what was in her letter.  She

5    did articulate that she believed, notwithstanding a prior --

6    her own prior rulings and her experience as a judge enabled

7    her to evaluate the laws that exist today and make objective

8    -- and exercise objective and independent judgment.  That's

9    all she stated.  It's the same thing that's in her letter.

10            And how Judge Fitzgerald may be able to assist you

11   --

12            THE COURT:  Yes.

13            MR. HARRON:  -- I've mentioned, Your Honor, she's

14   lived these cases.  The terms of the Narco Trust

15   distribution procedures were negotiated and litigated in her

16   courtroom.  The audit provision on which Honeywell relies in

17   large measure for the -- its purpose to obtain these

18   documents, that was a central focus of that bankruptcy case.

19   She's familiar with the breadth of those audit rides and it

20   is, to be candid, it's a focus of the mediation that she's

21   involved with today.

22            So I think to the extent Your Honor is inclined to

23   engage in a balancing test, to the extent Your Honor has

24   decided that Honeywell has met its burden, that it's

25   entitled to something, Judge Fitzgerald's familiarity with

1    the audit rides, with the TEP, and with claimant information

2    in general could assist you in evaluating exactly what that

3    something should be and designing an order that allows them

4    to achieve their legitimate interests while not

5    (indiscernible) on the privacy concerns of the claimants.

6              THE COURT:  All right.  Thank you, Mr. Harron.

7              Ms. Sieg.

8              MS. SIEG:  Thank you, Your Honor.

9              Judge -- former Judge Fitzgerald's close

10   involvement in all of these prior issues and all of the

11   numerous ex parte conversations she's apparently had about

12   2019 issues really gives Ford very great pause as to whether

13   she individually would be appropriate to the extent this

14   notion were even permissible.

15             Your Honor, we've cited in our paper, you know,

16   there is a statute that prohibits the recall of judges who

17   have returned to private practice.  They're asking that she

18   be appointed to issue a report and recommendation like a

19   magistrate judge would do.  That's totally inappropriate.

20   And former Judge Fitzgerald individually probably would not

21   be the best choice for someone who is impartial.  We've

22   heard today that she has a lot of very strong views on 2019

23   issues.

24             And, Your Honor, I think the sort of silliness of

25   this exercise could be illustrated by thinking of some other

1    judges with significant asbestos experience that could be

2    selected.  For example, Judge -- former Judge Hodges who

3    presided over the estimation trial in Garlock has a lot of

4    significant experience and some very strong views on what

5    2019s mean.  Perhaps he should be appointed.

6           Or former Judge Schmidt who presided over the very

7    largest environmental and asbestos bankruptcy case that is -

8    - that was still pending and he was presiding over that case

9    for almost a decade, has a lot of significant experience.

10          And I would like to bring to Your Honor's attention

11   a recent issue that arose within the Southern District of

12   Texas on a very similar issue.  A former judge, former

13   bankruptcy judge took a view in an active case about the

14   propriety of certain things that had happened on his watch

15   as a judge in some of his cases and the entire district

16   court, the entire Southern District of Texas jointly issued

17   an opinion admonishing that former judge from taking a

18   position in active litigation.

19          So, Your Honor, this is inappropriate on a number

20   of levels, particularly -- and no disrespect meant for

21   former Judge Fitzgerald.  It's not necessary.  I would like

22   to read a quote that I have enjoyed reading very much as we

23   were preparing this.  And it's from the D.C. Circuit and it

24   says, "Each courtroom comes equipped with a legal expert

25   called a judge."  We have that here.  This is a very simple

1    statute with simple language.  The law is settled.  The

2    redactions have already been done.  There's not even a need

3    for a special master to undertake, you know, the

4    administrative role of implementing what this Court's order

5    might be in regard to the type of information that should be

6    released.

7            So we do not think that this is an appropriate

8    exercise, and I'll emphasize again a very good decision from

9    the Fourth Circuit, Company Dough, where it emphasizes that

10   each passing day is a separate injury where the public is

11   denied its right of access.  This process would just

12   perpetuate the injuries that are already happening and it's

13   not necessary and it adds an additional cost, a condition on

14   public access that Section 107 doesn't count.

15           And we've pointed out in our paper as well that

16   there's a lot of existing case law within the Third Circuit

17   and elsewhere that provides court ordered arbitration is

18   itself subject to the public right of access.

19           So this notion is just multiplying proceedings on

20   proceedings and would be inappropriate on so many levels.

21   And we do oppose that request.

22           Thank you, Your Honor.

23           THE COURT:  Thank you, Ms. Sieg.

24           MR. MACLAY:  Just very briefly, Your Honor.

25           THE COURT:  Yes.

1          MR. MACLAY:  Your Honor, there is no argument that

2     if Judge Fitzgerald were still a judge that she would be

3     hearing all of these cases and there would be no legitimate

4     argument that she would be precluded from doing so because

5     of whatever opinions she may hold.  She made clear in her

6     letter that she understands Judge Starke's ruling.  She

7     implemented it on remand and she would comply with it. So

8     the suggestion that she's somehow biased in a way which

9     precludes her being involved is unsupported by the law, Your

10    Honor.

11         And I agree with something that Mr. Azman said.  He

12    told Your Honor that you could pick up the phone and call

13    her.  Well, I think the parties are in agreement.  Just pick

14    up the phone and call her and decide for yourself --

15         THE COURT:  I don't think Mr. Azman said that.

16         MR. AZMAN:  No.  It's quite the opposite of what I

17    said.

18         MR. MACLAY:  Oh, I thought that's what he said,

19    Your Honor.

20         THE COURT:  No.

21         MR. AZMAN:  No.  I said that would be

22    inappropriate.

23         MR. MACLAY:  Oh, okay.  Well, then let me rephrase

24    what I just said, Your Honor.  I misheard Mr. Azman.

25    Although Mr. Azman does not think that would be appropriate,

1    he has provided no legal basis --

2        (Laughter)

3            MR. MACLAY:  -- to preclude that call and as the

4    matter of logic, Your Honor, if Your Honor had any questions

5    about her willingness to serve or ability to do so without

6    being adversely affected by her knowledge you could

7    certainly call her and figure that out.  She's a former

8    judge and I don't think anyone here has intentionally at

9    least attacked her integrity.  I know we certainly haven't.

10           And you've heard from Mr. Harron that apparently

11   the only substantive conversations about the 2019s have come

12   from the other side because the people handling that on our

13   side are Todd Phillips and myself, Your Honor.  We haven't

14   talked with Judge Fitzgerald.  I believe Leslie Kelleher

15   from our firm has, possibly Mr. Weiner who is behind me in

16   the pews.

17           But we have not engaged in apparently the level of

18   conversation that Honeywell has, but we're still okay with

19   it if Your Honor thinks it's useful because we believe in

20   her integrity.  We don't think that she would be adversely

21   affected by such communications, nor do we think they were

22   inappropriate as recognized by Honeywell.

23           So long story short, Your Honor, she would be the

24   most helpful person because of her long-time experience in

25   these cases on these 2019 issues.  And if Your Honor thought

1    it would be appropriate and helpful to you we would urge you

2    to pick up the phone and call her.

3              Thank you, Your Honor.

4              THE COURT:  All right.  Thank you.

5              Well, I -- look, I have no question relating to

6    Judge Fitzgerald's integrity.  She is a person of very sound

7    integrity.  I'll give the matter some thought.  I just don't

8    think I need her for this issue and to decide these matters.

9              But I'll let you know what my ruling is, all right,

10   after I've given it some thought.  I'm going to reserve

11   decision.  I know that the parties would love a decision

12   today and we'll certainly get something out as promptly as

13   we can.  But I have some cases to go back and re-read.

14             And I will say this to you.  I am heavily -- going

15   to heavily rely on Judge Starke's opinion -- ruling, I

16   think.  You know, the Garlock decision, the Garlock case,

17   what Judge Hodges did or didn't do and that sort of thing is

18   not really what's going to drive my decision.  It's going to

19   be the cases you've cited as well as Judge Starke's case in

20   particular.  And that will guide me, I think, toward a

21   ruling.

22             So I appreciate good argument and very intense

23   argument.  And I thank you all very much.  And with that

24   we'll stand in recess.

25        (A chorus of thank you)

1          THE COURT:  Thank you, everyone.  Good travel to

2    you.

3          (Whereupon, these proceedings concluded at 1:34 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3                            RULINGS

4                                                      PAGE

5    Motion of Honeywell International Inc. for Access to

6    Rule 2019 Exhibits [Filed: 6/30/2016]            --

7

8    Emergency Motion of the North American  Refractories

9    Company Asbestos Personal Injury Settlement Trust

10   Advisory Committee to (1) Consolidate and Continue

11   Hearings and (2) Appoint Rule 2019 Expert and

12   Referee [Filed: 8/4/2016]                        --

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T I O N

2

3    We , Dawn South and Sherri L. Breach, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    **Dawn South**    Digitally signed by Dawn South
                        DN: cn=Dawn South, o, ou,
                        email=digital1@veritext.com, c=US
7    _____    Date: 2016.11.11 12:00:24 -05'00'

8    Dawn South

9    AAERT Certified Electronic Transcriber CET**D-408

10   **Sherri L Breach**    Digitally signed by Sherri L Breach
                            DN: cn=Sherri L Breach, o, ou,
                            email=digital1@veritext.com, c=US
11   _____    Date: 2016.11.11 12:01:50 -05'00'

12   Sherri L. Breach

13   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

14

15

16

17   Date:  November 11, 2016

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501